# EXHIBIT A

*MANHATTAN TELECOMMUNICATIONS CORP. D/B/A METROPOLITAN TELECOMMUNICATIONS, A/K/A METTEL v. GRANITE TELECOMMUNICATIONS, LLC*
Court of Chancery of the State of Delaware
C.A. No. 2020-0380-JRS
As of June 9, 2020

**INDEX OF PLEADINGS**

| No. | D.I. | Date | Title | Confidential |
|---|---|---|---|---|
| B1 | 1 | 05/19/20 | *Verified Complaint for Injunctive Relief* | *Confidential* |
| A1 | | 05/19/20 | Declaration/Verification of Mark Marshall to Verified Complaint | |
| B2 | | 05/19/20 | *Exhibits A-C to Verified Complaint* | *Confidential* |
| A2 | | 05/19/20 | Plaintiff's Motion for a Temporary Restraining Order | |
| A3 | | 05/19/20 | [Proposed] Order Granting Plaintiff's Motion for a Temporary Restraining Order | |
| A4 | | 05/19/20 | Plaintiff's Motion to Expedite | |
| A5 | | 05/19/20 | [Proposed] Order Granting Plaintiff's Motion to Expedite | |
| B3 | | 05/19/20 | *Opening Brief in Support of Plaintiff's Motion for a Temporary Restraining Order and Motion to Expedite* | *Confidential* |
| A6 | | 05/19/20 | Rule 5.1 Certification | |
| A7 | | 05/19/20 | Letter to Register in Chancery from Steven Caponi Providing Summons Instructions | |
| A8 | | 05/19/20 | Supplemental Information Sheet with Statement of Good Cause | |
| A9 | 2 | 05/19/20 | Issued (1) summons 5.19.20 to special process server (1 copy) | |
| A10 | 3 | 05/19/20 | Notice of Service of Plaintiff's First Set of Requests for the Production of Documents | |
| A11 | | 05/19/20 | Certificate of Service to Notice of Service of Plaintiff's First Set of Requests for the Production of Documents | |
| A12 | 4 | 05/20/20 | Motion for Admission Pro Hac Vice of Dana B. Parker on behalf of Plaintiff | |
| A13 | | 05/20/20 | [Proposed] Order Granting Motion for Admission Pro Hac Vice of Dana B. Parker on behalf of Plaintiff | |
| A14 | | 05/20/20 | Certification of Dana B. Parker Pursuant to Rule 170(c) in Support of Motion for Admission Pro Hac Vice of Dana B. Parker on behalf of Plaintiff | |
| A15 | | 05/20/20 | Certificate of Service to Motion for Admission Pro Hac Vice of Dana B. Parker on behalf of Plaintiff | |
| A16 | 5 | 05/20/20 | Motion for Admission Pro Hac Vice of Charles F. Rysavy on behalf of Plaintiff | |
| A17 | | 05/20/20 | [Proposed] Order Granting Motion for Admission Pro Hac Vice of Charles F. Rysavy on behalf of Plaintiff | |

1

| No. | D.I. | Date | Title | Confidential |
|-----|------|------|-------|--------------|
| A18 | | 05/20/20 | Certification of Charles F. Rysavy Pursuant to Rule 170(c) in Support of Motion for Admission Pro Hac Vice of Charles F. Rysavy on behalf of Plaintiff | |
| A19 | | 05/20/20 | Certificate of Service to Motion for Admission Pro Hac Vice of Charles F. Rysavy on behalf of Plaintiff | |
| A20 | 6 | 05/20/20 | Granted ([Proposed] Order Granting Motion for Admission Pro Hac Vice of Dana B. Parker on behalf of Plaintiff) | |
| A21 | 7 | 05/20/20 | Granted ([Proposed] Order Granting Motion for Admission Pro Hac Vice of Charles F. Rysavy on behalf of Plaintiff) | |
| A22 | 8 | 05/20/20 | Summons with Affidavit of Service to Granite Telecommunications, LLC on May 20, 2020 by Special Process Server | |
| A23 | 9 | 05/22/20 | Letter dated May 22, 2020, from VC Slights to counsel scheduling a telephonic argument for June 3, 2020, at 11:00 a.m. concerning (1) Plaintiff's Motion for a Temporary Restraining Order and (2) Plaintiff's Motion to Expedite | |
| A24 | 10 | 05/22/20 | Letter to Vice Chancellor Joseph R. Slights III from Steven L. Caponi enclosing courtesy copies of Plaintiff's Verified Complaint, Motion for a Temporary Restraining Order, Motion to Expedite and related documents | |
| A25 | 11 | 05/22/20 | COVID-19 Order re Public Filings of Documents Filed as Confidential Filings, entered by Vice Chancellor Slights on May 22, 2020 | |
| A26 | 12 | 05/26/20 | Entry of Appearance of R. Judson Scaggs, Jr., Barnaby Grzaslewicz and A. Gage Whirley of Morris, Nichols, Arsht & Tunnell LLP on behalf of Defendant Granite Telecommunications, LLC with Certificate of Service | |
| A27 | 13 | 05/26/20 | Motion for Admission Pro Hac Vice of Joshua N. Ruby on behalf of Defendant Granite Telecommunications, LLC with Certificate of Service | |
| A28 | | 05/26/20 | Proposed Order for Admission Pro Hac Vice of Joshua N. Ruby on behalf of Defendant Granite Telecommunications, LLC | |
| A29 | | 05/26/20 | Certification for Admission Pro Hac Vice of Joshua N. Ruby on behalf of Defendant Granite Telecommunications, LLC | |
| A30 | 14 | 05/26/20 | Defendant's Motion for Confidential Treatment (with Certificate of Service) | |
| A31 | | 05/26/20 | [Proposed] Order Granting Defendant's Motion for Confidential Treatment | |

| No. | D.I. | Date | Title | Confidential |
|---|---|---|---|---|
| A32 | 15 | 05/27/20 | Motion for Admission Pro Hac Vice of T. Christopher Donnelly on behalf of Defendant Granite Telecommunications, LLC (with Certificate of Service) | |
| A33 | | 05/27/20 | Certification of T. Christopher Donnelly in support of Motion for Admission Pro Hac Vice | |
| A34 | | 05/27/20 | [Proposed] Order Granting the Admission Pro Hac Vice of T. Christopher Donnelly on behalf of Defendant Granite Telecommunications, LLC | |
| A35 | 16 | 05/27/20 | Granted ([Proposed] Order Granting Defendant's Motion for Confidential Treatment) | |
| A36 | 17 | 05/27/20 | Granted ([Proposed] Order for Admission Pro Hac Vice of Joshua N. Ruby on behalf of Defendant Granite Telecommunications, LLC) | |
| A37 | 18 | 05/27/20 | Granted ([Proposed] Order Granting the Admission Pro Hac Vice of T. Christopher Donnelly on behalf of Defendant Granite Telecommunications, LLC) | |
| A38 | 19 | 05/27/20 | Public Version of Verified Complaint | |
| A39 | | 05/27/20 | Certificate of Service to Public Version of Verified Complaint | |
| A40 | 20 | 05/27/20 | Public Version of Opening Brief in Support of Plaintiff's Motion for a Temporary Restraining Order and Motion to Expedite | |
| A41 | | 05/27/20 | Certificate of Service to Public Version of Opening Brief in Support of Plaintiff's Motion for a Temporary Restraining Order and Motion to Expedite | |
| A42 | 21 | 05/28/20 | Motion for Admission Pro Hac Vice of Anthony P. La Rocco on behalf of Plaintiff | |
| A43 | 22 | 05/28/20 | Certificate of Service to Motion for Admission Pro Hac Vice of Anthony P. La Rocco on behalf of Plaintiff | |
| A44 | | 05/28/20 | [Proposed] Order Granting Motion for Admission Pro Hac Vice of Anthony P. La Rocco on behalf of Plaintiff | |
| A45 | | 05/28/20 | Certification of Anthony P. La Rocco Pursuant to Rule 170(c) in Support of Motion for Admission Pro Hac Vice of Anthony P. La Rocco on behalf of Plaintiff | |
| B4 | 23 | 05/28/20 | *Defendant's Brief In Opposition to Plaintiff's Motion For A Temporary Restraining Order And Motion to Expedite* | *Confidential* |
| B5 | 24 | 05/28/20 | *Declaration of James Balestraci Pursuant to Delaware Supreme Court Administrative Order No. 6, In re COVID-19 Precautionary Measures* | *Confidential* |
| B6 | 25 | 05/28/20 | *Declaration of Geoff Cookman Pursuant to Delaware Supreme Court Administrative Order No. 6, In re COVID-19 Precautionary Measures* | *Confidential* |
| B7 | 26 | 05/28/20 | *Declaration of James Easton Pursuant to Delaware Supreme Court Administrative Order No. 6, In re COVID-19 Precautionary Measures* | *Confidential* |

| No. | D.I. | Date | Title | Confidential |
|-----|------|------|-------|--------------|
| B8 | 27 | 05/28/20 | *Declaration of Karen Hogle Pursuant to Delaware Supreme Court Administrative Order No. 6, In re COVID-19 Precautionary Measures* | *Confidential* |
| B9 | 28 | 05/28/20 | *Declaration of Charles Pagliazzo Pursuant to Delaware Supreme Court Administrative Order No. 6, In re COVID-19 Precautionary Measures* | *Confidential* |
| A46 | | 05/28/20 | Exhibits 1-3 to Defendant's Brief In Opposition to Plaintiff's Motion For A Temporary Restraining Order And Motion to Expedite | |
| A47 | | 05/28/20 | Certificate of Service to Defendant's Brief In Opposition to Plaintiff's Motion For A Temporary Restraining Order And Motion to Expedite | |
| B10 | | 05/28/20 | *Exhibits A-B to Declaration of James Balestraci Pursuant to Delaware Supreme Court Administrative Order No. 6, In re COVID-19 Precautionary Measures* | *Confidential* |
| A48 | | 05/28/20 | Certificate of Service to Declaration of James Balestraci Pursuant to Delaware Supreme Court Administrative Order No. 6, In re COVID-19 Precautionary Measures | |
| A49 | | 05/28/20 | Certificate of Service to Declaration of Geoff Cookman Pursuant to Delaware Supreme Court Administrative Order No. 6, In re COVID-19 Precautionary Measures | |
| A50 | | 05/28/20 | Certificate of Service to Declaration of James Easton Pursuant to Delaware Supreme Court Administrative Order No. 6, In re COVID-19 Precautionary Measures | |
| A51 | | 05/28/20 | Certificate of Service to Declaration of Karen Hogle Pursuant to Delaware Supreme Court Administrative Order No. 6, In re COVID-19 Precautionary Measures | |
| A52 | | 05/28/20 | Certificate of Service to Declaration of Charles Pagliazzo Pursuant to Delaware Supreme Court Administrative Order No. 6, In re COVID-19 Precautionary Measures | |
| A53 | 29 | 05/29/20 | Granted ([Proposed] Order Granting Motion for Admission Pro Hac Vice of Anthony P. La Rocco on behalf of Plaintiff) | |
| A54 | 30 | 05/29/20 | Letter to The Honorable Joseph R. Slights, III from A. Gage Whirley Having Hand Delivered to Chambers Today two Chambers' Copies of (1) Defendant's Brief In Opposition to Plaintiff's Motion For A Temporary Restraining Order And Motion to Expedite, (2) Declarations of James Balestraci, Geoff Cookman, James Easton, Karen Hogle and Charles Pagliazzo and supporting documents thereto, which were filed on May 28, 2020 | |
| B11 | 31 | 06/01/20 | *Reply Brief in Support of Plaintiff's Motion for a Temporary Restraining Order and Motion to Expedite* | *Confidential* |

4

| No. | D.I. | Date | Title | Confidential |
|-----|------|------|-------|--------------|
| A55 |  | 06/01/20 | Declaration of Andoni Economou in Support of Reply Brief in Support of Plaintiff's Motion for a Temporary Restraining Order and Motion to Expedite in accordance with Delaware Supreme Court Administrative Order No. 6 In re COVID-19 Precautionary Measures |  |
| A56 |  | 06/01/20 | Declaration of Timothy Hanley in Support of Reply Brief in Support of Plaintiff's Motion for a Temporary Restraining Order and Motion to Expedite in accordance with Delaware Supreme Court Administrative Order No. 6 In re COVID-19 Precautionary Measures |  |
| A57 |  | 06/01/20 | Certificate of Service for Reply Brief in Support of Plaintiff's Motion for a Temporary Restraining Order and Motion to Expedite and related documents |  |
| A58 | 32 | 06/02/20 | Letter to Vice Chancellor Slights from Steven L. Caponi Enclosing Courtesy Copies of Reply Brief in Support of Plaintiff's Motion for a Temporary Restraining Order and Motion to Expedite, Declaration of Andoni Economou, and Declaration of Timothy Hanley |  |
| A59 | 33 | 06/04/20 | Judicial Action Form -.Telephonic oral argument and rulings of the Court on plaintiff's motion for a TRO and Motion to Expedite held 06.03.2020. VC Slights. Karen Siedlecki, Court Reporter. Motion for TRO-Denied. Motion to Expedite is Denied, VCS proposed a November trial date. Parties should confer on scheduling and submit either agreed-upon scheduling order or competing orders. |  |
| A60 | 34 | 06/04/20 | [PUBLIC VERSION] Defendant's Brief In Opposition to Plaintiff's Motion For A Temporary Restraining Order And Motion to Expedite (with Certificate of Service) |  |
| A61 | 35 | 06/04/20 | [PUBLIC VERSION] Declaration of James Balestraci Pursuant to Delaware Supreme Court Administrative Order No. 6, In re COVID-19 Precautionary Measures (with Certificate of Service) |  |
| A62 | 36 | 06/04/20 | [PUBLIC VERSION] Declaration of Geoff Cookman Pursuant to Delaware Supreme Court Administrative Order No. 6, In re COVID-19 Precautionary Measures (with Certificate of Service) |  |
| A63 | 37 | 06/04/20 | [PUBLIC VERSION] Declaration of James Easton Pursuant to Delaware Supreme Court Administrative Order No. 6, In re COVID-19 Precautionary Measures (with Certificate of Service) |  |
| A64 | 38 | 06/04/20 | [PUBLIC VERSION] Declaration of Karen Hogle Pursuant to Delaware Supreme Court Administrative Order No. 6, In re COVID-19 Precautionary Measures (with Certificate of Service) |  |

| No. | D.I. | Date | Title | Confidential |
|-----|------|------|-------|--------------|
| A65 | 39 | 06/04/20 | [PUBLIC VERSION] Declaration of Charles Pagliazzo Pursuant to Delaware Supreme Court Administrative Order No. 6, In re COVID-19 Precautionary Measures (with Certificate of Service) | |
| A66 | 40 | 06/08/20 | [PUBLIC VERSION] Reply Brief in Support of Plaintiff's Motion for Temporary Restraining Order and Motion to Expedite | |
| A67 | | 06/08/20 | Certificate of Service to [PUBLIC VERSION] Reply Brief in Support of Plaintiff's Motion for Temporary Restraining Order and Motion to Expedite | |

*MANHATTAN TELECOMMUNICATIONS CORP. D/B/A METROPOLITAN TELECOMMUNICATIONS, A/K/A METTEL v. GRANITE TELECOMMUNICATIONS, LLC*
Court of Chancery of the State of Delaware
C.A. No. 2020-0380-JRS


A1
Declaration/Verification of Mark Marshall to Verified Complaint

05/19/20

**EFiled:  May 19 2020 10:32AM EDT**
**Transaction ID 65644538**
**Case No. 2020-0380-**

### IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| MANHATTAN TELECOMMUNICATIONS CORP., D/B/A METROPOLITAN TELECOMMUNICATIONS, A/K/A METTEL, | |
| Plaintiff, | C.A. No. |
| v. | |
| GRANITE TELECOMMUNICATIONS, LLC, | |
| Defendant. | |

### VERIFICATION

STATE OF New York        )

                  )

COUNTY OF New York       )


      I, Mark Marshall, Executive Director of Customer Care at Manhattan Telecommunications Corp., d/b/a Metropolitan Telecommunications, a/k/a MetTel Plaintiff in the above-listed matter, having been duly sworn, do hereby depose and state that I reviewed the Verified Complaint, and the statements set forth therein are true and correct to the best of my knowledge, information, and belief.  I am duly authorized to execute this Verification.  I declare under penalty of perjury under the

laws of Delaware that the foregoing is true and correct.

Executed on the __18__ day of __May__ (month)__2020__ (year).

__Mack Marshall__ (Printed Name)

_____ (Signature)

*MANHATTAN TELECOMMUNICATIONS CORP. D/B/A METROPOLITAN TELECOMMUNICATIONS, A/K/A METTEL v. GRANITE TELECOMMUNICATIONS, LLC*
Court of Chancery of the State of Delaware
C.A. No. 2020-0380-JRS


A2
Plaintiff's Motion for a Temporary Restraining Order

05/19/20

EFiled:  May 19 2020 10:32AM EDT
Transaction ID 65644538
Case No. 2020-0380-

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

MANHATTAN TELECOMMUNICATIONS
CORP., D/B/A METROPOLITAN
TELECOMMUNICATIONS, A/K/A
METTEL,

            Plaintiff,

   v.

GRANITE TELECOMMUNICATIONS, LLC,

        Defendant.

C.A. No.

## PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER

Plaintiff Manhattan Telecommunications Corp., d/b/a Metropolitan Telecommunications, a/k/a MetTel ("MetTel" or "Plaintiff") respectfully moves this Court for an Order:

1.    Preliminarily enjoining Granite from making any statements about MetTel or its business operations to any current MetTel client; and

2.    Preliminarily and permanently enjoining Granite from making any false or misleading statements about MetTel or its business operations.

The complete grounds for this Motion are set forth in the Opening Brief in support of Plaintiff's Motion for a Temporary Restraining Order and Motion to Expedite filed concurrently with this Motion, as well as in the Plaintiff's Verified Complaint.

Dated: May 19, 2020          **K&L GATES LLP**

/s/ *Steven L. Caponi*
Steven L. Caponi (No. 3484)
Matthew B. Goeller (No. 6283)
600 King Street, Suite 901
Wilmington, DE 19801
Phone: (302) 416-7000
steven.caponi@klgates.com
matthew.goeller@klgates.com

*Counsel for Plaintiff Manhattan
Telecommunications Corp.*

Words: 98

*MANHATTAN TELECOMMUNICATIONS CORP. D/B/A METROPOLITAN TELECOMMUNICATIONS, A/K/A METTEL v. GRANITE TELECOMMUNICATIONS, LLC*
Court of Chancery of the State of Delaware
C.A. No. 2020-0380-JRS

A3
[Proposed] Order Granting Plaintiff's Motion
for a Temporary Restraining Order

05/19/20

**EFiled:  May 19 2020 10:32AM EDT**
**Transaction ID 65644538**
**Case No. 2020-0380-**

**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

| | |
|---|---|
| MANHATTAN TELECOMMUNICATIONS CORP., D/B/A METROPOLITAN TELECOMMUNICATIONS, A/K/A METTEL, | |
| Plaintiff, | C.A. No. |
| v. | |
| GRANITE TELECOMMUNICATIONS, LLC, | |
| Defendant. | |

**[PROPOSED] ORDER GRANTING**
**PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER**

This ____ day of _____, 2020, upon consideration of the Motion for a Temporary Restraining Order (the "Motion") filed by Plaintiff Manhattan Telecommunications Corp., d/b/a Metropolitan Telecommunications, a/k/a MetTel ("MetTel") against Defendant Granite Telecommunications, LLC ("Granite" or "Defendant"), and finding good cause for the relief sought therein, IT IS HEREBY ORDERED THAT:

1.      The Motion is GRANTED;

2.      Defendant  is enjoined from making any statements about MetTel or its business operations to any current MetTel client; and

3.      Defendant is enjoined from making any false or misleading statements about MetTel or its business operations.

_____

Chancellor/ Vice Chancellor

*MANHATTAN TELECOMMUNICATIONS CORP. D/B/A METROPOLITAN TELECOMMUNICATIONS, A/K/A METTEL v. GRANITE TELECOMMUNICATIONS, LLC*
Court of Chancery of the State of Delaware
C.A. No. 2020-0380-JRS


A4
Plaintiff's Motion to Expedite


05/19/20

EFiled:  May 19 2020 10:32AM EDT
Transaction ID 65644538
Case No. 2020-0380-

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

MANHATTAN TELECOMMUNICATIONS
CORP., D/B/A METROPOLITAN
TELECOMMUNICATIONS, A/K/A
METTEL,

        Plaintiff,

    v.

GRANITE TELECOMMUNICATIONS, LLC,

       Defendant.

C.A. No.

## PLAINTIFF'S MOTION TO EXPEDITE

Plaintiff Manhattan Telecommunications Corp., d/b/a Metropolitan Telecommunications, a/k/a MetTel ("MetTel" or "Plaintiff") respectfully moves this Court for an Order: (1) shortening the time to answer the Verified Complaint; (2) scheduling a hearing for resolution of the issues raised in this motion, at the earliest time available to the Court; and (3) ordering expedited discovery relating to the issues raised in this motion.

The complete grounds for this Motion are set forth in the Opening Brief in Support of Plaintiff's Motion for a Temporary Restraining Order and Motion to Expedite filed concurrently with this Motion, as well as in the Plaintiff's Verified Complaint.

Dated: May 19, 2020          **K&L GATES LLP**

*/s/ Steven L. Caponi*
Steven L. Caponi (No. 3484)
Matthew B. Goeller (No. 6283)
600 King Street, Suite 901
Wilmington, DE 19801
Phone: (302) 416-7000
steven.caponi@klgates.com
matthew.goeller@klgates.com

*Counsel for Plaintiff Manhattan
Telecommunications Corp.*

Words: 102

*MANHATTAN TELECOMMUNICATIONS CORP. D/B/A METROPOLITAN
TELECOMMUNICATIONS, A/K/A METTEL v. GRANITE TELECOMMUNICATIONS, LLC*
Court of Chancery of the State of Delaware
C.A. No. 2020-0380-JRS

A5
[Proposed] Order Granting Plaintiff's Motion to Expedite

05/19/20

**EFiled:  May 19 2020 10:32AM EDT**
**Transaction ID 65644538**
**Case No. 2020-0380-**

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

|  |  |
|---|---|
| MANHATTAN TELECOMMUNICATIONS CORP., D/B/A METROPOLITAN TELECOMMUNICATIONS, A/K/A METTEL, | |
| Plaintiff, | C.A. No. |
| v. | |
| GRANITE TELECOMMUNICATIONS, LLC, | |
| Defendant. | |

## [PROPOSED] ORDER

This ____ day of _____, 2020, upon consideration of Plaintiff's Motion to Expedite (the "Motion") and finding good cause for the relief sought therein, IT IS HEREBY ORDERED THAT:

1.      Plaintiff's Motion is GRANTED; and

2.      The parties are directed to meet and confer within ___ business days of this Order, after consultation with the Court's judicial assistant, submit a proposed Scheduling Order governing these expedited proceedings and Plaintiff's Motion for a Temporary Restraining Order.

_____
Chancellor/ Vice Chancellor

*MANHATTAN TELECOMMUNICATIONS CORP. D/B/A METROPOLITAN TELECOMMUNICATIONS, A/K/A METTEL v. GRANITE TELECOMMUNICATIONS, LLC*
Court of Chancery of the State of Delaware
C.A. No. 2020-0380-JRS

A6
Rule 5.1 Certification

05/19/20

EFiled:  May 19 2020 10:32AM EDT
Transaction ID 65644538
Case No. 2020-0380-

**K&L GATES**

May 19, 2020

**VIA FILE & SERVEXPRESS**

Steven L. Caponi, Esq.
steven.caponi@klgates.com

T 302-416-7080

Register in Chancery
Court of Chancery of the State of Delaware
500 N. King Street
Wilmington, DE 19801

**Re:  *Manhattan Telecommunications Corp., d/b/a Metropolitan
Telecommunications, a/k/a MetTel v. Granite Telecommunications, LLC***

Dear Register in Chancery,

Plaintiff in the above-captioned action hereby certifies compliance with Rule
5.1(e) in accordance with Rule 5.1(c) of the Rules of Chancery.
Contemporaneously with the confidential filing of Plaintiff's Verified Complaint,
Exhibits A-C to Plaintiff's Verified Complaint and Opening Brief in Support of
Motion for Temporary Restraining Order and Motion to Expedite (the
"Confidential Filing"), Plaintiff shall use its best efforts to give actual notice to
each person who could have a legitimate interest in designating information in the
Confidential Filing as Confidential Information.  Plaintiff shall file a public version
of the Confidential Filing on or before May 27, 2020.

Respectfully submitted,

*/s/ Steven L. Caponi*

Steven L. Caponi, Esq. (No. 3484)

Words: 99

*MANHATTAN TELECOMMUNICATIONS CORP. D/B/A METROPOLITAN TELECOMMUNICATIONS, A/K/A METTEL v. GRANITE TELECOMMUNICATIONS, LLC*
Court of Chancery of the State of Delaware
C.A. No. 2020-0380-JRS

A7
Letter to Register in Chancery from Steven Caponi
Providing Summons Instructions

05/19/20

**EFiled:  May 19 2020 10:32AM EDT**
**Transaction ID 65644538**
**Case No. 2020-0380-**

**K&L GATES**

May 19, 2020

Steven L. Caponi, Esq.
steven.caponi@klgates.com
T 302-416-7080

**VIA FILE & SERVE EXPRESS**
Register in Chancery
Court of Chancery
500 North King Street
Wilmington, DE 19801

**Re:** ***Manhattan Telecommunications Corp., d/b/a Metropolitan Telecommunications, a/k/a MetTel v. Granite Telecommunications, LLC***

Dear Register in Chancery,

This firm represents Plaintiff Manhattan Telecommunications Corp., d/b/a Metropolitan Telecommunications, a/k/a MetTel ("MetTel" or "Plaintiff") in the above-captioned matter filed on May 19, 2020.

I respectfully request that the Register in Chancery issue a Summons for the following Defendant (pursuant to 8 *Del. C.* § 321) to be served on the registered agent by hand delivery via special process server, Parcels, Inc.:

> Granite Telecommunications, LLC
> c/o Corporate Creations Network Inc.
> 3411 Silverside Road
> Tatnall Building, Suite 104
> Wilmington, DE, 19810

If you need any additional information or have any questions, please do not hesitate to contact me.

Respectfully submitted,

*/s/ Steven L. Caponi*

Steven L. Caponi (No. 3484)

Words: 97

*MANHATTAN TELECOMMUNICATIONS CORP. D/B/A METROPOLITAN*
*TELECOMMUNICATIONS, A/K/A METTEL v. GRANITE TELECOMMUNICATIONS, LLC*
Court of Chancery of the State of Delaware
C.A. No. 2020-0380-JRS

A8
Supplemental Information Sheet with Statement of Good Cause

05/19/20

SUPPLEMENTAL INFORMATION PURSUANT TO RULE 3(A)
OF THE RULES OF THE COURT OF CHANCERY

EFiled: May 19 2020 10:32AM EDT
Transaction ID 65644538
Case No. 2020-0380-

The information contained herein is for the use by the Court for statistical and administrative purposes only. Nothing stated herein shall be deemed an admission by or binding upon any party.

1. Caption of Case:

   Manhattan Telecommunications Corp., d/b/a Metropolitan Telecommunications, a/k/a MetTel v. Granite Telecommunications, LLC

2. Date Filed:  May 19, 2020

3. Name and address of counsel for plaintiff(s):
   Steven L. Caponi (No. 3484)
   Matthew B. Goeller (No. 6283)
   K&L Gates LLP
   600 N. King Street, Wilmington, DE 19801

4. Short statement and nature of claim asserted:
   This action seeks relief for tortious interference, trade libel, and violations of Delaware's Deceptive Trade Practices Act.

5. Substantive field of law involved (check one):

   | ____Administrative law | ____Labor law | ____Trusts, Wills and Estates |
   |---|---|---|
   | _X_Commercial law | ____Real Property | ____Consent trust petitions |
   | ____Constitutional law | ____348 Deed Restriction | ____Partition |
   | ___ Corporation law | ____Zoning | ____Rapid Arbitration (Rules 96,97) |
   | ____Trade secrets/trade mark/or other intellectual property | | ____Other |

6. Related cases, including any Register of Wills matters (this requires copies of all documents in this matter to be filed with the Register of Wills):



7. Basis of court's jurisdiction (including the citation of any statute(s) conferring jurisdiction):

   10 Del. C. § 341; Ct. Ch. R. 65

8. If the complaint seeks preliminary equitable relief, state the specific preliminary relief sought.
   The complaint seeks injunctive relief to enjoin Defendant from tortiously interfering with contractual relations, committing acts of trade libel, and violating the Deceptive Trade Practices Act.

9. If the complaint seeks a TRO, summary proceedings, a Preliminary Injunction, or Expedited Proceedings, check here _X_.  (If #9 is checked, a Motion to Expedite must accompany the transaction.)

10.   If the complaint is one that in the opinion of counsel should not be assigned to a Master in the first instance, check here and attach a statement of good cause. _X___

    /s/ Steven L. Caponi (No. 3484)
    _____
    Signature of Attorney of Record & Bar ID

**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

| | |
|---|---|
| MANHATTAN TELECOMMUNICATIONS CORP., D/B/A METROPOLITAN TELECOMMUNICATIONS, A/K/A METTEL, | |
| Plaintiff, | C.A. No. |
| v. | |
| GRANITE TELECOMMUNICATIONS, LLC, | |
| Defendant. | |

**STATEMENT OF GOOD CAUSE**

The undersigned counsel has reviewed the Verified Complaint and does not believe that this action is suitable for assignment to a Master in Chancery. This is an action seeking a temporary restraining order. As a result of the foregoing, this action should proceed directly before the Chancellor or a Vice Chancellor of this Court.

Dated: May 19, 2020

**K&L GATES LLP**

/s/ *Steven L. Caponi*
Steven L. Caponi (No. 3484)
Matthew B. Goeller (No. 6283)
600 King Street, Suite 901
Wilmington, DE 19801
Phone: (302) 416-7000
steven.caponi@klgates.com
matthew.goeller@klgates.com

*Counsel for Plaintiff Manhattan Telecommunications Corp.*

*MANHATTAN TELECOMMUNICATIONS CORP. D/B/A METROPOLITAN
TELECOMMUNICATIONS, A/K/A METTEL v. GRANITE TELECOMMUNICATIONS, LLC*
Court of Chancery of the State of Delaware
C.A. No. 2020-0380-JRS


A9
Issued (1) summons 5.19.20 to special process server (1 copy)

05/19/20



EFiled: May 19 2020 01:37PM EDT
Transaction ID 65645405
Case No. 2020-0380-JRS

May 19, 2020

Steven L. Caponi, Esq.
steven.caponi@klgates.com
T 302-416-7080

**VIA FILE & SERVE EXPRESS**
Register in Chancery
Court of Chancery
500 North King Street
Wilmington, DE 19801

*[handwritten: 5/19/20 - issued (1) Summons to SPS (1 copy)]*

Re: ***Manhattan Telecommunications Corp., d/b/a Metropolitan***
    ***Telecommunications, a/k/a MetTel v. Granite Telecommunications, LLC***

Dear Register in Chancery,   *[handwritten: 2020 - 0380 - JRS]*

      This firm represents Plaintiff Manhattan Telecommunications Corp., d/b/a

Metropolitan Telecommunications, a/k/a MetTel ("MetTel" or "Plaintiff") in the

above-captioned matter filed on May 19, 2020.

      I respectfully request that the Register in Chancery issue a Summons for the

following Defendant (pursuant to 8 *Del. C.* § 321) to be served on the registered

agent by hand delivery via special process server, Parcels, Inc.:

> Granite Telecommunications, LLC
> c/o Corporate Creations Network Inc.
> 3411 Silverside Road
> Tatnall Building, Suite 104
> Wilmington, DE, 19810

      If you need any additional information or have any questions, please do not

hesitate to contact me.

Respectfully submitted,

*/s/ Steven L. Caponi*

Steven L. Caponi (No. 3484)

Words: 97



## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| MANHATTAN TELECOMMUNICATIONS CORP., D/B/A METROPOLITAN TELECOMMUNICATIONS, A/K/A METTEL,<br><br>         Plaintiff,<br><br>v.<br><br>GRANITE TELECOMMUNICATIONS, LLC,<br><br>         Defendant. | )<br>)<br>)<br>) C.A. No. 2020-0380-JRS<br>)<br>) SUMMONS<br>)<br>)<br>)<br>)<br>) |

**THE STATE OF DELAWARE**

**TO: SPECIAL PROCESS SERVER – Parcels, Inc.:**

**YOU ARE COMMANDED**:

   To summon the above named defendants so that, within 20 days after service hereof upon defendants, exclusive of the day of service, defendants shall serve upon <u>Steven L. Caponi</u>, Esquire, Plaintiff's counsel, whose address is <u>K&L Gates LLP, 600 N. King Street, Suite 901, Wilmington, Delaware 19801,</u> an answer to the verified complaint.

   To serve upon defendants a copy hereof and of the complaint.

TO THE ABOVE NAMED DEFENDANTS:

   In case of your failure, within 20 days after service hereof upon you, exclusive of the day of service, to serve on plaintiff's attorney named above an answer to the complaint, judgment by default will be rendered against you for the relief demanded in the complaint.

Dated:  May 19, 2020

          *Susan Judge*

          _____

          Register in Chancery

C.A. # 2020-0380-JRS

MANHATTAN TELECOMMUNICATIONS CORP.,
D/B/A METROPOLITAN TELECOMMUNICATIONS, A/K/A METTEL,

Plaintiff,

v.

GRANITE TELECOMMUNICATIONS, LLC,

Defendant.

**SUMMONS**

Please effectuate service upon:

1.     **Granite Telecommunications, LLC**

       c/o Corporate Creations Network Inc.
       3411 Silverside Road
       Tatnall Building, Suite 104
       Wilmington, DE 19810

Pursuant to 8 Del.C. Sec. 321

SERVICE TO BE COMPLETED BY SPECIAL PROCESS SERVER –
Parcels, Inc.

Steven L. Caponi, Esquire
Plaintiff's Attorney

*MANHATTAN TELECOMMUNICATIONS CORP. D/B/A METROPOLITAN
TELECOMMUNICATIONS, A/K/A METTEL v. GRANITE TELECOMMUNICATIONS, LLC*
Court of Chancery of the State of Delaware
C.A. No. 2020-0380-JRS

A10
Notice of Service of Plaintiff's
First Set of Requests for the Production of Documents

05/19/20

**EFiled:  May 19 2020 05:10PM EDT**
**Transaction ID 65646454**
**Case No. 2020-0380-JRS**

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| MANHATTAN TELECOMMUNICATIONS CORP., D/B/A METROPOLITAN TELECOMMUNICATIONS, A/K/A METTEL,<br><br>       Plaintiff,<br><br>  v.<br><br>GRANITE TELECOMMUNICATIONS, LLC,<br><br>       Defendant. | C.A. No. 2020-0380-JRS |

### NOTICE OF SERVICE

**PLEASE TAKE NOTICE** that on May 19, 2020, a true and correct copy of

*Plaintiff's First Set of Requests for the Production of Documents* was served via

hand delivery upon the following:

> Granite Telecommunications, LLC
> c/o Corporate Creations Network Inc.
> 3411 Silverside Road
> Tatnall Building, Suite 104
> Wilmington, DE, 19810

Dated: May 19, 2020

**K&L GATES LLP**

*/s/ Steven L. Caponi*
Steven L. Caponi (No. 3484)
Matthew B. Goeller (No. 6283)
600 N. King St., Suite 901
Wilmington, DE 19801
Phone: (302) 416-7000
steven.caponi@klgates.com
matthew.goeller@klgates.com

*Attorneys for Plaintiff*

*MANHATTAN TELECOMMUNICATIONS CORP. D/B/A METROPOLITAN TELECOMMUNICATIONS, A/K/A METTEL v. GRANITE TELECOMMUNICATIONS, LLC*
Court of Chancery of the State of Delaware
C.A. No. 2020-0380-JRS

A11
Certificate of Service to Notice of Service of
Plaintiff's First Set of Requests for the Production of Documents

05/19/20

EFiled: May 19 2020 05:10PM EDT
Transaction ID 65646454
Case No. 2020-0380-JRS

# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

|  |  |
|---|---|
| MANHATTAN TELECOMMUNICATIONS CORP., D/B/A METROPOLITAN TELECOMMUNICATIONS, A/K/A METTEL, <br><br> Plaintiff, <br><br> v. <br><br> GRANITE TELECOMMUNICATIONS, LLC, <br><br> Defendant. | C.A. No. 2020-0380-JRS |

## CERTIFICATE OF SERVICE

I, Steven L. Caponi, hereby certify that on this 19th day of May, 2020, I caused

(1) *Notice of Service* and (2) this *Certificate of Service* to be served via hand delivery

upon:

> Granite Telecommunications, LLC
> c/o Corporate Creations Network Inc.
> 3411 Silverside Road
> Tatnall Building, Suite 104
> Wilmington, DE, 19810

*/s/ Steven L. Caponi*
Steven L. Caponi (No. 3484)

*MANHATTAN TELECOMMUNICATIONS CORP. D/B/A METROPOLITAN TELECOMMUNICATIONS, A/K/A METTEL v. GRANITE TELECOMMUNICATIONS, LLC*
Court of Chancery of the State of Delaware
C.A. No. 2020-0380-JRS


A12
Motion for Admission Pro Hac Vice
of Dana B. Parker on behalf of Plaintiff


05/20/20

**EFiled:  May 20 2020 10:37AM EDT**
**Transaction ID 65647374**
**Case No. 2020-0380-JRS**

# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| MANHATTAN TELECOMMUNICATIONS CORP., D/B/A METROPOLITAN TELECOMMUNICATIONS, A/K/A METTEL, <br><br>      Plaintiff, <br><br>   v. <br><br> GRANITE TELECOMMUNICATIONS, LLC, <br><br>      Defendant. | C.A. No. 2020-0380-JRS |

## MOTION FOR ADMISSION *PRO HAC VICE*

I, Steven L. Caponi, a member of the Delaware Bar ("Movant"), pursuant to Court of Chancery Rule 170(b), hereby move the admission on *pro hac vice* of Dana B. Parker, Esq. ("Applicant") of K&L Gates LLP, One Newark Center, Tenth Floor, Newark, NJ 07102, a member of the bars of New Jersey and New York, to represent Plaintiff.  Movant certifies that he maintains an office in Delaware, and that he finds Applicant to be a reputable and competent attorney, and he is in a position to recommend Applicant's admission.

*[Signature page to follow]*

Dated:  May 20, 2020                    **K&L GATES LLP**

                                        */s/ Steven L. Caponi*
                                        Steven L. Caponi (No. 3484)
                                        Matthew B. Goeller (No. 6283)
                                        600 N. King St., Suite 901
                                        Wilmington, DE 19801
                                        Tel: (302) 416-7000
                                        steven.caponi@klgates.com
                                        matthew.goeller@klgates.com

                                        *Attorneys for Plaintiff*

                                        Words: 93

*MANHATTAN TELECOMMUNICATIONS CORP. D/B/A METROPOLITAN
TELECOMMUNICATIONS, A/K/A METTEL v. GRANITE TELECOMMUNICATIONS, LLC*
Court of Chancery of the State of Delaware
C.A. No. 2020-0380-JRS

A13
[Proposed] Order Granting Motion for Admission Pro Hac Vice
of Dana B. Parker on behalf of Plaintiff

05/20/20

EFiled:  May 20 2020 10:37AM EDT
Transaction ID 65647374
Case No. 2020-0380-JRS

# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

MANHATTAN TELECOMMUNICATIONS
CORP., D/B/A METROPOLITAN
TELECOMMUNICATIONS, A/K/A
METTEL,

          Plaintiff,

    v.

GRANITE TELECOMMUNICATIONS, LLC,

          Defendant.

C.A. No. 2020-0380-JRS

## [PROPOSED] ORDER

The foregoing application of Dana B. Parker, Esq., for admission *pro hac vice* in this action is hereby granted.

SO ORDERED _____ day of _____, 2020.

_____
Vice Chancellor Joseph R. Slights

*MANHATTAN TELECOMMUNICATIONS CORP. D/B/A METROPOLITAN TELECOMMUNICATIONS, A/K/A METTEL v. GRANITE TELECOMMUNICATIONS, LLC*
Court of Chancery of the State of Delaware
C.A. No. 2020-0380-JRS

A14
Certification of Dana B. Parker Pursuant to Rule 170(c)
in Support of Motion for Admission Pro Hac Vice
of Dana B. Parker on behalf of Plaintiff

05/20/20

EFiled:  May 20 2020 10:37AM EDT
Transaction ID 65647374
Case No. 2020-0380-JRS

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

MANHATTAN TELECOMMUNICATIONS
CORP., D/B/A METROPOLITAN
TELECOMMUNICATIONS, A/K/A
METTEL,

        Plaintiff,

    v.

GRANITE TELECOMMUNICATIONS, LLC,

        Defendant.

C.A. No. 2020-0380-JRS

## CERTIFICATION OF DANA B. PARKER
## PURSUANT TO RULE 170(C)

I, Dana B. Parker, hereby certify that:

1.    I am a member in good standing of the bars of New Jersey and New York.

2.    If admitted *pro hac vice* for purposes of the above-captioned civil action, I consent to be bound by Delaware Lawyers' Rules of Professional Conduct and I have reviewed the Delaware State Bar Association Principles of Professionalism for Delaware Lawyers.

3.    I agree to be bound by all Rules of the Court.

4.    I hereby consent to the appointment of the Register in Chancery of New Castle County as my agent upon whom service of process may be made for all

actions, including disciplinary actions, that may arise out of the practice of law by me under Rule 170 and any activities related thereto.

5.      In the preceding twelve (12) months, I have not appeared in any actions in the Courts of this state.

6.      A payment for the *pro hac vice* admission assessment in the amount of $422, if not waived, will be deposited in the Supreme Court Registration Fund by File & Serve Express, for the purpose of governance of the Bar of its Court and may be distributed pursuant to Supreme Court Rule 69.

7.      I have not been disbarred or suspended and am not the object of pending disciplinary proceedings in any jurisdiction where I have been admitted generally, *pro hac vice*, or in any other way.

8.      I am generally admitted in the following jurisdictions:

      a.      Bar of New Jersey and

      b.      Bar of New York.

Dated: May 20, 2020

_____

Dana B. Parker

*MANHATTAN TELECOMMUNICATIONS CORP. D/B/A METROPOLITAN
TELECOMMUNICATIONS, A/K/A METTEL v. GRANITE TELECOMMUNICATIONS, LLC*
Court of Chancery of the State of Delaware
C.A. No. 2020-0380-JRS


A15
Certificate of Service to Motion for Admission Pro Hac Vice
of Dana B. Parker on behalf of Plaintiff

05/20/20

**EFiled:  May 20 2020 10:37AM EDT**
**Transaction ID 65647374**
**Case No. 2020-0380-JRS**

**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

|  |  |
|---|---|
| MANHATTAN TELECOMMUNICATIONS CORP., D/B/A METROPOLITAN TELECOMMUNICATIONS, A/K/A METTEL, <br><br> Plaintiff, <br><br> v. <br><br> GRANITE TELECOMMUNICATIONS, LLC, <br><br> Defendant. | C.A. No. 2020-0380-JRS |

## <u>CERTIFICATE OF SERVICE</u>

I, Steven L. Caponi, hereby certify that on this 20th day of May, 2020, I caused (1) *Motion for Admission Pro Hac Vice*, (2) *Proposed Order*, (3) *Certification of Dana B. Parker Pursuant to Rule 170(c)*, and (4) this *Certificate of Service* to be filed and served by U.S. Mail on the following:

> Granite Telecommunications, LLC
> c/o Corporate Creations Network Inc.
> 3411 Silverside Road
> Tatnall Building, Suite 104
> Wilmington, DE, 19810

<i>/s/ Steven L. Caponi</i><br>Steven L. Caponi (No. 3484)

*MANHATTAN TELECOMMUNICATIONS CORP. D/B/A METROPOLITAN TELECOMMUNICATIONS, A/K/A METTEL v. GRANITE TELECOMMUNICATIONS, LLC*
Court of Chancery of the State of Delaware
C.A. No. 2020-0380-JRS

A16
Motion for Admission Pro Hac Vice
of Charles F. Rysavy on behalf of Plaintiff

05/20/20

**EFiled:  May 20 2020 10:46AM EDT**
**Transaction ID 65647399**
**Case No. 2020-0380-JRS**

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

MANHATTAN TELECOMMUNICATIONS
CORP., D/B/A METROPOLITAN
TELECOMMUNICATIONS, A/K/A
METTEL,

       Plaintiff,

  v.

GRANITE TELECOMMUNICATIONS, LLC,

       Defendant.

C.A. No. 2020-0380-JRS

## MOTION FOR ADMISSION *PRO HAC VICE*

I, Steven L. Caponi, a member of the Delaware Bar ("Movant"), pursuant to Court of Chancery Rule 170(b), hereby move the admission on *pro hac vice* of Charles F. Rysavy, Esq. ("Applicant") of K&L Gates LLP, One Newark Center, Tenth Floor, Newark, NJ 07102, a member of the bar of New Jersey, to represent Plaintiff.  Movant certifies that he maintains an office in Delaware, and that he finds Applicant to be a reputable and competent attorney, and he is in a position to recommend Applicant's admission.

*[Signature page to follow]*

Dated:  May 20, 2020                    **K&L GATES LLP**

                                        */s/ Steven L. Caponi*
                                        Steven L. Caponi (No. 3484)
                                        Matthew B. Goeller (No. 6283)
                                        600 N. King St., Suite 901
                                        Wilmington, DE 19801
                                        Tel: (302) 416-7000
                                        steven.caponi@klgates.com
                                        matthew.goeller@klgates.com

                                        *Attorneys for Plaintiff*

                                        Words: 90

*MANHATTAN TELECOMMUNICATIONS CORP. D/B/A METROPOLITAN TELECOMMUNICATIONS, A/K/A METTEL v. GRANITE TELECOMMUNICATIONS, LLC*
Court of Chancery of the State of Delaware
C.A. No. 2020-0380-JRS

A17
[Proposed] Order Granting Motion for Admission Pro Hac Vice
of Charles F. Rysavy on behalf of Plaintiff

05/20/20

EFiled:  May 20 2020 10:46AM EDT
Transaction ID 65647399
Case No. 2020-0380-JRS

**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

|  |  |
|---|---|
| MANHATTAN TELECOMMUNICATIONS CORP., D/B/A METROPOLITAN TELECOMMUNICATIONS, A/K/A METTEL, | |
| Plaintiff, | C.A. No. 2020-0380-JRS |
| v. | |
| GRANITE TELECOMMUNICATIONS, LLC, | |
| Defendant. | |

## **[PROPOSED] ORDER**

The foregoing application of Charles F. Rysavy, Esq., for admission *pro hac vice* in this action is hereby granted.

SO ORDERED _____ day of _____, 2020.

_____

Vice Chancellor Joseph R. Slights

*MANHATTAN TELECOMMUNICATIONS CORP. D/B/A METROPOLITAN TELECOMMUNICATIONS, A/K/A METTEL v. GRANITE TELECOMMUNICATIONS, LLC*
Court of Chancery of the State of Delaware
C.A. No. 2020-0380-JRS


A18
Certification of Charles F. Rysavy Pursuant to Rule 170(c)
in Support of Motion for Admission Pro Hac Vice
of Charles F. Rysavy on behalf of Plaintiff


05/20/20

EFiled:  May 20 2020 10:46AM EDT
Transaction ID 65647399
Case No. 2020-0380-JRS

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

MANHATTAN TELECOMMUNICATIONS
CORP., D/B/A METROPOLITAN
TELECOMMUNICATIONS, A/K/A
METTEL,

             Plaintiff,

    v.

GRANITE TELECOMMUNICATIONS, LLC,

             Defendant.

C.A. No. 2020-0380-JRS

## CERTIFICATION OF CHARLES F. RYSAVY
## PURSUANT TO RULE 170(C)

I, Charles F. Rysavy, hereby certify that:

1.     I am a member in good standing of the bar of New Jersey.

2.     If admitted *pro hac vice* for purposes of the above-captioned civil action, I consent to be bound by Delaware Lawyers' Rules of Professional Conduct and I have reviewed the Delaware State Bar Association Principles of Professionalism for Delaware Lawyers.

3.     I agree to be bound by all Rules of the Court.

4.     I hereby consent to the appointment of the Register in Chancery of New Castle County as my agent upon whom service of process may be made for

all actions, including disciplinary actions, that may arise out of the practice of law by me under Rule 170 and any activities related thereto.

5.    In the preceding twelve (12) months, I have not appeared in any actions in the Courts of this state.

6.    A payment for the *pro hac vice* admission assessment in the amount of $422, if not waived, will be deposited in the Supreme Court Registration Fund by File & Serve Express, for the purpose of governance of the Bar of its Court and may be distributed pursuant to Supreme Court Rule 69.

7.    I have not been disbarred or suspended and am not the object of pending disciplinary proceedings in any jurisdiction where I have been admitted generally, *pro hac vice*, or in any other way.

8.    I am generally admitted in the following jurisdictions:

a.    Bar of New Jersey;

b.    Supreme Court of the United States;

c.    United States Court of Appeals for the Second Circuit;

d.    United States Court of Appeals for the Tenth Circuit; and

e.    United States Court of Appeals for the Third Circuit.

Dated: May 19 2020

_____
Charles F. Rysavy

2

*MANHATTAN TELECOMMUNICATIONS CORP. D/B/A METROPOLITAN*
*TELECOMMUNICATIONS, A/K/A METTEL v. GRANITE TELECOMMUNICATIONS, LLC*
Court of Chancery of the State of Delaware
C.A. No. 2020-0380-JRS


A19
Certificate of Service to Motion for Admission Pro Hac Vice
of Charles F. Rysavy on behalf of Plaintiff


05/20/20

EFiled:  May 20 2020 10:46AM EDT
Transaction ID 65647399
Case No. 2020-0380-JRS

**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

| | |
|---|---|
| MANHATTAN TELECOMMUNICATIONS CORP., D/B/A METROPOLITAN TELECOMMUNICATIONS, A/K/A METTEL, <br><br>     Plaintiff, <br><br>   v. <br><br> GRANITE TELECOMMUNICATIONS, LLC, <br><br>     Defendant. | C.A. No. 2020-0380-JRS |

## <u>CERTIFICATE OF SERVICE</u>

I, Steven L. Caponi, hereby certify that on this 20th day of May, 2020, I caused (1) *Motion for Admission Pro Hac Vice*, (2) *Proposed Order*, (3) *Certification of Charles F. Rysavy Pursuant to Rule 170(c)*, and (4) this *Certificate of Service* to be filed and served by U.S. Mail on the following:

> Granite Telecommunications, LLC
> c/o Corporate Creations Network Inc.
> 3411 Silverside Road
> Tatnall Building, Suite 104
> Wilmington, DE, 19810

> */s/ Steven L. Caponi*
> Steven L. Caponi (No. 3484)

*MANHATTAN TELECOMMUNICATIONS CORP. D/B/A METROPOLITAN*
*TELECOMMUNICATIONS, A/K/A METTEL v. GRANITE TELECOMMUNICATIONS, LLC*
Court of Chancery of the State of Delaware
C.A. No. 2020-0380-JRS


A20
Granted ([Proposed] Order Granting Motion
for Admission Pro Hac Vice of Dana B. Parker on behalf of Plaintiff)


05/20/20

**GRANTED**

EFiled: May 20 2020 11:48AM EDT
Transaction ID 65647667
Case No. 2020-0380-JRS

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| MANHATTAN TELECOMMUNICATIONS CORP., D/B/A METROPOLITAN TELECOMMUNICATIONS, A/K/A METTEL, | |
| Plaintiff, | C.A. No. 2020-0380-JRS |
| v. | |
| GRANITE TELECOMMUNICATIONS, LLC, | |
| Defendant. | |

## [PROPOSED] ORDER

The foregoing application of Dana B. Parker, Esq., for admission *pro hac vice* in this action is hereby granted.

SO ORDERED _____ day of _____, 2020.

_____
Vice Chancellor Joseph R. Slights

This document constitutes a ruling of the court and should be treated as such.

|  |  |
|---|---|
| **Court:** | DE Court of Chancery Civil Action |
| **Judge:** | Joseph Slights |
| **File & Serve Transaction ID:** | 65647374 |
| **Current Date:** | May 20, 2020 |
| **Case Number:** | 2020-0380-JRS |
| **Case Name:** | CONF COMPLAINT Manhattan Telecommunications Corp. v. Granite Telecommunications, LLC |
| **Court Authorizer:** | Slights, Joseph |

**/s/ Judge Slights, Joseph**

*MANHATTAN TELECOMMUNICATIONS CORP. D/B/A METROPOLITAN TELECOMMUNICATIONS, A/K/A METTEL v. GRANITE TELECOMMUNICATIONS, LLC*
Court of Chancery of the State of Delaware
C.A. No. 2020-0380-JRS


A21
Granted ([Proposed] Order Granting Motion
for Admission Pro Hac Vice of Charles F. Rysavy on behalf of Plaintiff)


05/20/20

**GRANTED**

EFiled: May 20 2020 11:49AM EDT
Transaction ID 65647673
~~Case No. 2020-0380-JRS~~

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

MANHATTAN TELECOMMUNICATIONS
CORP., D/B/A METROPOLITAN
TELECOMMUNICATIONS, A/K/A
METTEL,

          Plaintiff,

v.

GRANITE TELECOMMUNICATIONS, LLC,

          Defendant.

C.A. No. 2020-0380-JRS

### [PROPOSED] ORDER

The foregoing application of Charles F. Rysavy, Esq., for admission *pro hac vice* in this action is hereby granted.

SO ORDERED _____ day of _____, 2020.

_____
Vice Chancellor Joseph R. Slights

This document constitutes a ruling of the court and should be treated as such.

| | |
|---|---|
| **Court:** | DE Court of Chancery Civil Action |
| **Judge:** | Joseph Slights |
| **File & Serve Transaction ID:** | 65647399 |
| **Current Date:** | May 20, 2020 |
| **Case Number:** | 2020-0380-JRS |
| **Case Name:** | CONF COMPLAINT Manhattan Telecommunications Corp. v. Granite Telecommunications, LLC |
| **Court Authorizer:** | Slights, Joseph |

**/s/ Judge Slights, Joseph**

*MANHATTAN TELECOMMUNICATIONS CORP. D/B/A METROPOLITAN*
*TELECOMMUNICATIONS, A/K/A METTEL v. GRANITE TELECOMMUNICATIONS, LLC*
Court of Chancery of the State of Delaware
C.A. No. 2020-0380-JRS

A22

Summons with Affidavit of Service to Granite Telecommunications, LLC
on May 20, 2020 by Special Process Server

05/20/20



EFiled:  May 20 2020 02:44PM EDT
Transaction ID 65648415
Case No. 2020-0380-JRS

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

|  |  |
|---|---|
| MANHATTAN TELECOMMUNICATIONS CORP., D/B/A METROPOLITAN TELECOMMUNICATIONS, A/K/A METTEL, | ) ) |
|                                           Plaintiff, | ) ) |
| v. | ) ) |
| GRANITE TELECOMMUNICATIONS, LLC, | ) ) |
|                                           Defendant. | ) ) |

C.A. No. 2020-0380-JRS

SUMMONS

**THE STATE OF DELAWARE**

**TO:   SPECIAL PROCESS SERVER – Parcels, Inc.:**

**YOU ARE COMMANDED**:

To summon the above named defendants so that, within 20 days after service hereof upon defendants, exclusive of the day of service, defendants shall serve upon Steven L. Caponi, Esquire, Plaintiff's counsel, whose address is K&L Gates LLP, 600 N. King Street, Suite 901, Wilmington, Delaware 19801, an answer to the verified complaint.

To serve upon defendants a copy hereof and of the complaint.

TO THE ABOVE NAMED DEFENDANTS:

In case of your failure, within 20 days after service hereof upon you, exclusive of the day of service, to serve on plaintiff's attorney named above an answer to the complaint, judgment by default will be rendered against you for the relief demanded in the complaint.

Dated:        May 19, 2020

_Susan Judge_

_____
Register in Chancery

C.A. # 2020-0380-JRS

MANHATTAN TELECOMMUNICATIONS CORP.,
D/B/A METROPOLITAN TELECOMMUNICATIONS, A/K/A METTEL,

Plaintiff,

v.

GRANITE TELECOMMUNICATIONS, LLC,

Defendant.

**SUMMONS**

Please effectuate service upon:


1.     **Granite Telecommunications, LLC**

   c/o Corporate Creations Network Inc.
   3411 Silverside Road
   Tatnall Building, Suite 104
   Wilmington, DE 19810

Pursuant to 8 Del.C. Sec. 321



SERVICE TO BE COMPLETED BY SPECIAL PROCESS SERVER –
Parcels, Inc.




Steven L. Caponi, Esquire
Plaintiff's Attorney

AFFIDAVIT OF SERVICE

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

MANHATTAN TELECOMMUNICATIONS CORP., D/B/A
METROPOLITAN TELECOMMUNICATIONS, A/K/A
METTEL,

               Plaintiffs,

v.                                                        C.A. No. 2020-0380-

GRANITE TELECOMMUNICATIONS, LLC,

               Defendant,

STATE OF DELAWARE    }
                            } ss.
COUNTY OF NEW CASTLE  }

I, John Garber, of Parcels, Inc., the State of Delaware, County of New Castle, being duly sworn, says that on the 20th day of May, 2020, at 11:00 a.m., I personally served a copy of a [CONFIDENTIAL FILING] Verified Complaint for Injunctive Relief Summons, Verification of Mark Marshall to Verified Complaint, [CONFIDENTIAL FILING] Exhibits A-C to Verified Complaint, Plaintiff's Motion for a Temporary Restraining Order, [Proposed] Order Granting Plaintiff's Motion for a Temporary Restraining Order, Plaintiff's Motion to Expedite, [Proposed] Order Granting Plaintiff's Motion to Expedite, [CONFIDENTIAL FILING] Opening Brief in Support of Plaintiff's Motion for a Temporary Restraining Order and Motion to Expedite, Rule 5.1 Certification, Supplemental Information Sheet with Statement of Good Cause, Plaintiff's First Set for the Request for the Production of Documents, Notice of Service and Certificate of Service on **GRANITE TELECOMMUNICATIONS, LLC,** by serving the registered agent, Corporate Creations Network Inc., 3411 Silverside Road, Tatnall Building #104 Wilmington, Delaware 19810.

Name of individual accepting service: Jen Goetz-Authorized to accept
Description of individual: Caucasian female, 40 yrs. old, 120lbs., 5'8" with brown hair.

Subscribed and sworn before me
This 20th day of May, 2020
Notary Public

My commission expires: _____

*MANHATTAN TELECOMMUNICATIONS CORP. D/B/A METROPOLITAN*
*TELECOMMUNICATIONS, A/K/A METTEL v. GRANITE TELECOMMUNICATIONS, LLC*
Court of Chancery of the State of Delaware
C.A. No. 2020-0380-JRS


A23
Letter dated May 22, 2020, from VC Slights to counsel
scheduling a telephonic argument for June 3, 2020, at 11:00 a.m.
concerning (1) Plaintiff's Motion for a Temporary Restraining Order
and (2) Plaintiff's Motion to Expedite

05/22/20

**EFiled:  May 22 2020 10:41AM EDT**
**Transaction ID 65652738**
**Case No. 2020-0380-JRS**

# COURT OF CHANCERY
## OF THE
## STATE OF DELAWARE

JOSEPH R. SLIGHTS III
  VICE CHANCELLOR

417 S. State Street
Dover, Delaware 19901
Telephone:  (302) 739-4397
Facsimile:  (302) 739-6179

May 22, 2020

Steven L. Caponi, Esquire
Matthew B. Goeller, Esquire
K&L Gates LLP
600 King Street, Suite 901
Wilmington, DE  19801

      Re:   *Manhattan Telecommunications Corp. v.*
              *Granite Telecommunications, LLC*
          C.A. No. 2020-380-JRS

Dear Messrs. Caponi and Goeller:

     This will confirm that a telephonic argument is scheduled in the above-referenced matter for June 3, 2020, at 11:00 a.m. to address (1) Plaintiff's Motion for a Temporary Restraining Order and (2) Plaintiff's Motion to Expedite. The argument will be managed by Court-Solutions LLC.  As soon as you are able, please login to www.Court-Solutions.com and click on the "sign-up" button to register.   Once your registration is accepted, you will have access to the teleconference.

*Manhattan Telecommunications Corp. v.*
*Granite Telecommunications, LLC*
  C.A. No. 2020-380-JRS
May 22, 2020
Page 2


Opposition to the motions shall be filed by May 28, 2020, at 5:00 p.m.

Plaintiff may rely on June 1, 2020, at 5:00 p.m.  Thank you.

Very truly yours,

*/s/ Joseph R. Slights III*

JRSIII/cap
cc:    R. Judson Scaggs, Jr., Esquire
       Chancery Court Reporters
       Register in Chancery

*MANHATTAN TELECOMMUNICATIONS CORP. D/B/A METROPOLITAN TELECOMMUNICATIONS, A/K/A METTEL v. GRANITE TELECOMMUNICATIONS, LLC*
Court of Chancery of the State of Delaware
C.A. No. 2020-0380-JRS

A24
Letter to Vice Chancellor Joseph R. Slights III from Steven L. Caponi
enclosing courtesy copies of Plaintiff's Verified Complaint,
Motion for a Temporary Restraining Order, Motion to Expedite and related documents

05/22/20

EFiled:  May 22 2020 10:57AM EDT
Transaction ID 65652844
Case No. 2020-0380-JRS

**K&L GATES**

May 22, 2020

**VIA FILE & SERVEXPRESS**

Steven L. Caponi, Esq.
steven.caponi@klgates.com

T 302-416-7080

Vice Chancellor Joseph R. Slights III
Court of Chancery
38 The Green
Dover, DE 19901

**Re:  *Manhattan Telecommunications Corp. v. Granite Telecommunications, LLC*;
C.A. No. 220-0380-JRS**

Dear Vice Chancellor Slights,

Enclosed with this letter are two courtesy copies of the following documents

filed on May 19, 2020 in the above-captioned matter:

- Verified Complaint for Injunctive Relief;

- Exhibits A-C to Verified Complaint;

- Plaintiff's Motion for a Temporary Restraining Order;

- [Proposed] Order Granting Plaintiff's Motion for a Temporary Restraining Order;

- Plaintiff's Motion to Expedite;

- [Proposed] Order Granting Plaintiff's Motion to Expedite; and

- Opening Brief in Support of Plaintiff's Motion for a Temporary Restraining Order and Motion to Expedite.

If Your Honor has any questions, counsel is available at the Court's convenience.

Respectfully submitted,

*/s/ Steven L. Caponi*

Steven L. Caponi, Esq. (No. 3484)

Words: 89

*MANHATTAN TELECOMMUNICATIONS CORP. D/B/A METROPOLITAN
TELECOMMUNICATIONS, A/K/A METTEL v. GRANITE TELECOMMUNICATIONS, LLC*
Court of Chancery of the State of Delaware
C.A. No. 2020-0380-JRS


A25
COVID-19 Order re Public Filings of Documents Filed as Confidential Filings,
entered by Vice Chancellor Slights on May 22, 2020

05/22/20

EFiled:  May 22 2020 01:42PM EDT
Transaction ID 65653624
Case No. 2020-0380-JRS

# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| MANHATTAN TELECOMMUNICATIONS CORP., D/B/A METROPOLITAN TELECOMMUNICATIONS, A/K/A METTEL, | ) ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 2020-0380-JRS |
| GRANITE TELECOMMUNICATIONS, LLC | ) ) | |
| Defendant. | ) | |

## ORDER

**WHEREAS**, pursuant to the *In re COVID-19 Precautionary Measures* order (Del. May 14, 2020) (Administrative Order No. 6), this Court has the discretion to require the prompt filing of public versions of documents initially filed under seal.

**IT IS HEREBY ORDERED** this 22nd day of May, 2020, that public versions of documents initially filed under seal in this Action shall be filed in accordance with the deadlines set forth in Chancery Court Rule 5.1, as ordinarily applicable.  To the extent that the Complaint and related documents were filed as a Confidential Filing under Rule 5.1(e), the deadlines of the Rule shall apply as though the Complaint had been filed as of the date of this Order.  Any party may seek relief from this Order, and requests for relief relating to the current COVID-19 health emergency shall be liberally considered.

_____*/s/ Joseph R. Slights III*_____
Vice Chancellor

*MANHATTAN TELECOMMUNICATIONS CORP. D/B/A METROPOLITAN*
*TELECOMMUNICATIONS, A/K/A METTEL v. GRANITE TELECOMMUNICATIONS, LLC*
Court of Chancery of the State of Delaware
C.A. No. 2020-0380-JRS


A26
Entry of Appearance of R. Judson Scaggs, Jr., Barnaby Grzaslewicz and A. Gage Whirley
of Morris, Nichols, Arsht & Tunnell LLP on behalf of
Defendant Granite Telecommunications, LLC with Certificate of Service


05/26/20

**EFiled:  May 26 2020 10:47AM EDT**
**Transaction ID 65655528**
**Case No. 2020-0380-JRS**

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| Manhattan Telecommunications Corp., | ) | |
| D/B/A Metropolitan Telecommuni- | ) | |
| cations, A/K/A Mettel, | ) | |
| | ) | |
| Plaintiff, | ) | C.A. No. 2020-0380-JRS |
| | ) | |
| v. | ) | |
| | ) | |
| Granite Telecommunications, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

## <u>ENTRY OF APPEARANCE</u>

PLEASE ENTER THE APPEARANCE of R. Judson Scaggs, Jr., Barnaby Grzaslewicz and A. Gage Whirley of Morris, Nichols, Arsht & Tunnell LLP on behalf of Defendant Granite Telecommunications, LLC, in the above-captioned action.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ A. Gage Whirley*
R. Judson Scaggs, Jr. (#2676)
Barnaby Grzaslewicz (#6037)
A. Gage Whirley (#6707)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
   *Attorneys for Defendant*

May 26, 2020

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 26, 2020, the foregoing document was served by File & Serve*Xpress* on the following attorneys of record:

Steven L. Caponi
Matthew B. Goeller
K&L Gates
600 N. King St., Suite 901
Wilmington, DE 19801


*/s/ A. Gage Whirley*
A. Gage Whirley (#6707)

*MANHATTAN TELECOMMUNICATIONS CORP. D/B/A METROPOLITAN TELECOMMUNICATIONS, A/K/A METTEL v. GRANITE TELECOMMUNICATIONS, LLC*
Court of Chancery of the State of Delaware
C.A. No. 2020-0380-JRS


A27
Motion for Admission Pro Hac Vice of Joshua N. Ruby on behalf of
Defendant Granite Telecommunications, LLC with Certificate of Service


05/26/20

EFiled:  May 26 2020 10:47AM EDT
Transaction ID 65655528
Case No. 2020-0380-JRS

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| Manhattan Telecommunications Corp., | ) | |
| D/B/A Metropolitan Telecommuni- | ) | |
| cations, A/K/A Mettel, | ) | |
| | ) | |
| Plaintiff, | ) | C.A. No. 2020-0380-JRS |
| | ) | |
| v. | ) | |
| | ) | |
| Granite Telecommunications, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

## MOTION FOR ADMISSION
## *PRO HAC VICE* OF JOSHUA N. RUBY

A. Gage Whirley, a member of the bar of the State of Delaware, pursuant to Rule 170(b) moves the admission *pro hac vice* of Joshua N. Ruby of Donnelly, Conroy & Gelhaar, LLP, 260 Franklin Street, Suite 1600, Boston, MA 02110 to represent Defendant Granite Telecommunications, LLC in this action. Movant certifies that he finds the applicant to be a reputable and a competent attorney, and that he is in a position to recommend the applicant's admission.  The applicant is admitted, practicing and in good standing in the Commonwealth of Massachusetts.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP


*/s/ A. Gage Whirley*
R. Judson Scaggs, Jr. (#2676)
Barnaby Grzaslewicz (#6037)
A. Gage Whirley (#6707)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
  *Attorneys for Defendant*

Word Count:  91

May 26, 2020

2

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 26, 2020, the foregoing document was served by File & Serve*Xpress* on the following attorneys of record:

Steven L. Caponi
Matthew B. Goeller
K&L Gates
600 N. King St., Suite 901
Wilmington, DE 19801


*/s/ A. Gage Whirley*
A. Gage Whirley (#6707)

3

*MANHATTAN TELECOMMUNICATIONS CORP. D/B/A METROPOLITAN*
*TELECOMMUNICATIONS, A/K/A METTEL v. GRANITE TELECOMMUNICATIONS, LLC*
Court of Chancery of the State of Delaware
C.A. No. 2020-0380-JRS


A28
Proposed Order for Admission Pro Hac Vice of Joshua N. Ruby
on behalf of Defendant Granite Telecommunications, LLC

05/26/20

**EFiled: May 26 2020 10:47AM EDT**
**Transaction ID 65655528**
**Case No. 2020-0380-JRS**

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| Manhattan Telecommunications Corp., | ) | |
| D/B/A Metropolitan Telecommuni- | ) | |
| cations, A/K/A Mettel, | ) | |
| | ) | |
| Plaintiff, | ) | C.A. No. 2020-0380-JRS |
| | ) | |
| v. | ) | |
| | ) | |
| Granite Telecommunications, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

### <u>ORDER</u>

The foregoing application of Joshua N. Ruby for admission to practice

in this action *pro hac vice* is hereby granted.

IT IS SO ORDERED, this _____ day of May, 2020.

_____
Vice Chancellor

*MANHATTAN TELECOMMUNICATIONS CORP. D/B/A METROPOLITAN TELECOMMUNICATIONS, A/K/A METTEL v. GRANITE TELECOMMUNICATIONS, LLC*
Court of Chancery of the State of Delaware
C.A. No. 2020-0380-JRS


A29

Certification for Admission Pro Hac Vice of Joshua N. Ruby
on behalf of Defendant Granite Telecommunications, LLC


05/26/20

EFiled: May 26 2020 10:47AM EDT
Transaction ID 65655528
Case No. 2020-0380-JRS

## <u>CERTIFICATION</u>

Joshua N. Ruby hereby certifies:

1.      That he is a member in good standing of the bar of the Commonwealth of Massachusetts;

2.      That he shall be bound by the Delaware Lawyers' Rules of Professional Conduct and has reviewed the Principles of Professionalism for Delaware Lawyers, as effective on November 1, 2003, and as amended;

3.      That he and all attorneys of the applicant's firm who directly or indirectly provide services to the party or cause at issue shall be bound by all Rules of the Court;

4.      That, without exception, he does not maintain an office in the State of Delaware, and consents to the appointment of the Register of Chancery of New Castle County as agent upon whom service of process may be made for all actions, including disciplinary actions, that may arise out of the practice of law under this Rule and any activities related thereto;

5.      That he has not appeared in any actions in the courts of record in Delaware in the preceding twelve months;

6.      That a payment for the *pro hac vice* admission assessment in the amount of $422.00 is attached to be deposited in the Supreme Court

registration fund for the purpose of the governance of the Bar of its Court and may be distributed pursuant to Supreme Court Rule 71;

7.    That, without exception, he has not been disbarred or suspended, and is not the object of any pending disciplinary proceedings in any jurisdiction where the applicant has been admitted generally, *pro hac vice*, or in any other way; and

8.    That he has been admitted generally to the bar of the following states and other jurisdictions:  the Commonwealth of Massachusetts; the State of New York; the Commonwealth of Pennsylvania; the U.S. Courts of Appeals for the First, Second, Third, and D.C. Circuits; and the U.S. District Courts for the Northern District of Florida, District of Massachusetts, Southern District of New York, and Eastern District of Pennsylvania.

Dated: May 26, 2020

Joshua N. Ruby

2

*MANHATTAN TELECOMMUNICATIONS CORP. D/B/A METROPOLITAN TELECOMMUNICATIONS, A/K/A METTEL v. GRANITE TELECOMMUNICATIONS, LLC*
Court of Chancery of the State of Delaware
C.A. No. 2020-0380-JRS

A30
Defendant's Motion for Confidential Treatment
(with Certificate of Service)

05/26/20

EFiled:  May 26 2020 03:51PM EDT
Transaction ID 65657331
Case No. 2020-0380-JRS

# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| MANHATTAN TELECOMMUNICATIONS CORP. D/B/A METROPOLITAN TELECOMMUNICATIONS, A/K/A METTEL | ) ) ) ) | |
| | ) | |
| Plaintiff, | ) ) | C.A. No. 2020-0380-JRS |
| v. | ) ) | |
| GRANITE TELECOMMUNICATIONS, LLC | ) ) | |
| Defendant. | ) | |

## DEFENDANT'S MOTION FOR CONFIDENTIAL TREATMENT

Pursuant to Court of Chancery Rule 5.1, Defendant Granite Telecommunications, LLC ("Granite") by and through its undersigned counsel, moves the Court for an Order permitting the filing of Granite's opposition to Plaintiff's Opening Brief in Support of Plaintiff's Motion for a Temporary Restraining Order and Motion to Expedite and any related papers (the "Opposition"), as Confidential Filings.  The grounds for this motion are as follows:

1.    Court of Chancery Rule 5.1 authorizes the Court to permit documents to be filed confidentially where "good cause exists for Confidential Treatment."  Ch. Ct. R. 5.1(b)(1).  Good cause exists where "the public interest in access to Court proceedings is outweighed by the harm that public disclosures of sensitive, non-public information would cause."  Ct. Ch. R. 5.1(b)(2).  Information

that may qualify for Confidential Treatment under Rule 5.1 includes "sensitive proprietary information" or "sensitive financial, business, or personnel information." *Id.*

2. There is good cause for Confidential Treatment here because the Opposition will refer to Plaintiff's Verified Complaint, Opening Brief in Support of Plaintiff's Motion for a Temporary Restraining Order and Motion to Expedite, and related filings, which were filed under seal. These documents contain non-public business information that has been designated for Confidential Treatment by Plaintiff and Defendant. Defendant might also need to file additional non-public business information as part of its Opposition. Filing the Opposition under seal will permit Plaintiff an opportunity to review the Opposition and determine what information, if any, Plaintiff designates for Confidential Treatment.

3. Granite will comply with the provisions of Rule 5.1 and will give notice to each attorney who has entered an appearance no later than 3:00 p.m. on the next business day after the filing of the Opposition, and, within five business days after making the Confidential Filing, will file redacted public versions with the Court.

2

4.      Granite respectfully requests that the Court enter the attached form of Order permitting the Opposition, and any related papers, to be filed as Confidential Filings.

MORRIS, NICHOLS, ARSHT
 & TUNNELL LLP


*/s/ R. Judson Scaggs, Jr.*
OF COUNSEL:                         R. Judson Scaggs, Jr. (#2676)
                                    Barnaby Grzaslewicz (#6037)
DONNELLY, CONROY &                  A. Gage Whirley (#6707)
GELHAAR, LLP                        1201 North Market Street 16th Floor
T. Christopher Donnelly (*pro hac vice*   Wilmington, Delaware 19801
*forthcoming*)                      (302) 351-9200
Joshua N. Ruby (*pro hac vice*
*forthcoming*)                          *Attorneys for Defendant*
260 Franklin Street, Suite 1600
Boston, MA 02110                    WORDS: 325
(617) 720-2880



May 26, 2020

## **CERTIFICATE OF SERVICE**

I hereby certify that on May 26, 2020, the foregoing document was

served by File & Serve*Xpress* on the following attorneys of record:

> Steven L. Caponi
> Matthew B. Goeller
> K&L Gates
> 600 N. King St., Suite 901
> Wilmington, DE 19801

*/s/ Barnaby Grzaslewicz*
Barnaby Grzaslewicz (#6037)

*MANHATTAN TELECOMMUNICATIONS CORP. D/B/A METROPOLITAN TELECOMMUNICATIONS, A/K/A METTEL v. GRANITE TELECOMMUNICATIONS, LLC*
Court of Chancery of the State of Delaware
C.A. No. 2020-0380-JRS

A31

[Proposed] Order Granting Defendant's Motion for Confidential Treatment

05/26/20

EFiled:  May 26 2020 03:51PM EDT
Transaction ID 65657331
Case No. 2020-0380-JRS

# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| MANHATTAN TELECOMMUNICATIONS CORP. D/B/A METROPOLITAN TELECOMMUNICATIONS, A/K/A METTEL | ) ) ) ) | |
| Plaintiff, | ) ) ) | C.A. No. 2020-0380-JRS |
| v. | ) ) | |
| GRANITE TELECOMMUNICATIONS, LLC | ) ) | |
| Defendant. | ) | |

## [PROPOSED] ORDER GRANTING DEFENDANTS' MOTION FOR CONFIDENTIAL TREATMENT

Defendant Granite Telecommunications, LLC ("Granite") having filed a Motion for Confidential Treatment (the "Motion"), and for good cause shown,

IT IS HEREBY ORDERED, this ___ day of May, 2020, that:

1. The Motion is GRANTED; and

2. Granite may file its opposition to Plaintiff's Opening Brief in Support of Plaintiff's Motion for a Temporary Restraining Order and Motion to Expedite, and any related papers, as Confidential Filings subject to the requirements of Court of Chancery Rule 5.1.

_____
Vice Chancellor

*MANHATTAN TELECOMMUNICATIONS CORP. D/B/A METROPOLITAN TELECOMMUNICATIONS, A/K/A METTEL v. GRANITE TELECOMMUNICATIONS, LLC*
Court of Chancery of the State of Delaware
C.A. No. 2020-0380-JRS

A32
Motion for Admission Pro Hac Vice of T. Christopher Donnelly
on behalf of Defendant Granite Telecommunications, LLC
(with Certificate of Service)

05/27/20

**EFiled:  May 27 2020 12:59PM EDT**
**Transaction ID 65659404**
**Case No. 2020-0380-JRS**

# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

MANHATTAN TELECOMMUNICATIONS )
CORP. D/B/A METROPOLITAN )
TELECOMMUNICATIONS, )
A/K/A METTEL )
                 )
           Plaintiff, )    C.A. No. 2020-0380-JRS
                 )
    v. )
                 )
GRANITE TELECOMMUNICATIONS, LLC )
                 )
       Defendant. )

## MOTION FOR ADMISSION *PRO HAC VICE*

A. Gage Whirley, a member of the bar of the State of Delaware, pursuant to Rule 170(b) moves the admission *pro hac vice* of T. Christopher Donnelly, of Donnelly, Conroy & Gelhaar, LLP, 260 Franklin Street, Suite 1600, Boston, MA 02110 to represent defendant Granite Telecommunications, LLC in this action.  Movant certifies that he finds the applicant to be a reputable and a competent attorney, and that he is in a position to recommend the applicant's admission.  The applicant is admitted, practicing and in good standing in the Commonwealth of Massachusetts.

MORRIS, NICHOLS, ARSHT
& TUNNELL LLP


*/s/ A. Gage Whirley*
R. Judson Scaggs, Jr. (#2676)
Barnaby Grzaslewicz (#6037)
A. Gage Whirley (#6707)
1201 North Market Street 16th Floor
Wilmington, Delaware 19801
(302) 351-9200

*Attorneys for Defendant*

Words:  91

May 27, 2020

2

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 27, 2020, the foregoing document was

served by File & Serve*Xpress* on the following attorneys of record:

> Steven L. Caponi
> Matthew B. Goeller
> K&L Gates
> 600 N. King St., Suite 901
> Wilmington, DE 19801

> */s/ A. Gage Whirley*
> A. Gage Whirley (#6707)

*MANHATTAN TELECOMMUNICATIONS CORP. D/B/A METROPOLITAN TELECOMMUNICATIONS, A/K/A METTEL v. GRANITE TELECOMMUNICATIONS, LLC*
Court of Chancery of the State of Delaware
C.A. No. 2020-0380-JRS

A33
Certification of T. Christopher Donnelly
in support of Motion for Admission Pro Hac Vice

05/27/20

EFiled: May 27 2020 12:59PM EDT
Transaction ID 65659404
Case No. 2020-0380-JRS

# **CERTIFICATION**

T. Christopher Donnelly hereby certifies:

1.      That he is a member in good standing of the bar of the Commonwealth of Massachusetts;

2.      That he shall be bound by the Delaware Lawyers' Rules of Professional Conduct and has reviewed the Principles of Professionalism for Delaware Lawyers, as effective on November 1, 2003, and as amended;

3.      That he and all attorneys of the applicant's firm who directly or indirectly provide services to the party or cause at issue shall be bound by all Rules of the Court;

4.      That, without exception, he does not maintain an office in the State of Delaware, and consents to the appointment of the Register of Chancery of New Castle County as agent upon whom service of process may be made for all actions, including disciplinary actions, that may arise out of the practice of law under this Rule and any activities related thereto;

5.      That he has not appeared in any actions in the courts of record in Delaware in the preceding twelve months;

6.      That a payment for the *pro hac vice* admission assessment in the amount of $422.00 is attached to be deposited in the Supreme Court

registration fund for the purpose of the governance of the Bar of its Court and may be distributed pursuant to Supreme Court Rule 71;

7.   That, without exception, he has not been disbarred or suspended, and is not the object of any pending disciplinary proceedings in any jurisdiction where the applicant has been admitted generally, *pro hac vice*, or in any other way; and

8.   That he has been admitted generally to the bar of the following states and other jurisdictions:  the Commonwealth of Massachusetts, the United States Supreme Court, the United States District Court for the District of Massachusetts, and the United States Courts of Appeals for the First, Second, Ninth, District of Columbia, and Federal Circuits.

Dated:  5/27/2020

T. Christopher Donnelly

2

*MANHATTAN TELECOMMUNICATIONS CORP. D/B/A METROPOLITAN
TELECOMMUNICATIONS, A/K/A METTEL v. GRANITE TELECOMMUNICATIONS, LLC*
Court of Chancery of the State of Delaware
C.A. No. 2020-0380-JRS

A34

[Proposed] Order Granting the Admission Pro Hac Vice of T. Christopher Donnelly
on behalf of Defendant Granite Telecommunications, LLC

05/27/20

EFiled:  May 27 2020 12:59PM EDT
Transaction ID 65659404
Case No. 2020-0380-JRS

**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

| | | |
|---|---|---|
| MANHATTAN TELECOMMUNICATIONS | ) | |
| CORP. D/B/A METROPOLITAN | ) | |
| TELECOMMUNICATIONS, | ) | |
| A/K/A METTEL | ) | |
| | ) | |
| Plaintiff, | ) | C.A. No. 2020-0380-JRS |
| | ) | |
| v. | ) | |
| | ) | |
| GRANITE TELECOMMUNICATIONS, LLC | ) | |
| | ) | |
| Defendant. | ) | |

**[PROPOSED] ORDER FOR ADMISSION *PRO HAC VICE***

The foregoing application of T. Christopher Donnelly for admission to

practice in this action *pro hac vice* is hereby granted.

IT IS SO ORDERED, this ____ day of _____, 2020.

_____

Vice Chancellor

*MANHATTAN TELECOMMUNICATIONS CORP. D/B/A METROPOLITAN*
*TELECOMMUNICATIONS, A/K/A METTEL v. GRANITE TELECOMMUNICATIONS, LLC*
Court of Chancery of the State of Delaware
C.A. No. 2020-0380-JRS

A35
Granted ([Proposed] Order Granting Defendant's Motion for Confidential Treatment)

05/27/20

**GRANTED**

EFiled:  May 27 2020 03:09PM EDT
Transaction ID 65660186
Case No. 2020-0380-JRS

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

|  |  |  |
|---|---|---|
| MANHATTAN TELECOMMUNICATIONS CORP. D/B/A METROPOLITAN TELECOMMUNICATIONS, A/K/A METTEL | ) ) ) ) | |
| Plaintiff, | ) ) ) | C.A. No. 2020-0380-JRS |
| v. | ) ) | |
| GRANITE TELECOMMUNICATIONS, LLC | ) ) | |
| Defendant. | ) | |

### [PROPOSED] ORDER GRANTING DEFENDANTS' MOTION FOR CONFIDENTIAL TREATMENT

Defendant Granite Telecommunications, LLC ("Granite") having filed a Motion for Confidential Treatment (the "Motion"), and for good cause shown,

IT IS HEREBY ORDERED, this ___ day of May, 2020, that:

1.    The Motion is GRANTED; and

2.    Granite may file its opposition to Plaintiff's Opening Brief in Support of Plaintiff's Motion for a Temporary Restraining Order and Motion to Expedite, and any related papers, as Confidential Filings subject to the requirements of Court of Chancery Rule 5.1.

_____
                    Vice Chancellor

This document constitutes a ruling of the court and should be treated as such.

| | |
|---|---|
| **Court:** | DE Court of Chancery Civil Action |
| **Judge:** | Joseph Slights |
| **File & Serve Transaction ID:** | 65657331 |
| **Current Date:** | May 27, 2020 |
| **Case Number:** | 2020-0380-JRS |
| **Case Name:** | CONF COMPLAINT Manhattan Telecommunications Corp. v. Granite Telecommunications, LLC |
| **Court Authorizer:** | Slights, Joseph |

**/s/ Judge Slights, Joseph**

*MANHATTAN TELECOMMUNICATIONS CORP. D/B/A METROPOLITAN TELECOMMUNICATIONS, A/K/A METTEL v. GRANITE TELECOMMUNICATIONS, LLC*
Court of Chancery of the State of Delaware
C.A. No. 2020-0380-JRS


A36

Granted ([Proposed] Order for Admission Pro Hac Vice of Joshua N. Ruby
on behalf of Defendant Granite Telecommunications, LLC)


05/27/20



**GRANTED**

EFiled: May 27 2020 03:11PM EDT
Transaction ID 65660165
Case No. 2020-0380-JRS

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| Manhattan Telecommunications Corp., | ) | |
| D/B/A Metropolitan Telecommuni- | ) | |
| cations, A/K/A Mettel, | ) | |
| | ) | |
| Plaintiff, | ) | C.A. No. 2020-0380-JRS |
| | ) | |
| v. | ) | |
| | ) | |
| Granite Telecommunications, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

## <u>ORDER</u>

The foregoing application of Joshua N. Ruby for admission to practice

in this action *pro hac vice* is hereby granted.

IT IS SO ORDERED, this _____ day of May, 2020.

_____

Vice Chancellor

**This document constitutes a ruling of the court and should be treated as such.**

| | |
|---|---|
| **Court:** | DE Court of Chancery Civil Action |
| **Judge:** | Joseph Slights |
| **File & Serve Transaction ID:** | 65655528 |
| **Current Date:** | May 27, 2020 |
| **Case Number:** | 2020-0380-JRS |
| **Case Name:** | CONF COMPLAINT Manhattan Telecommunications Corp. v. Granite Telecommunications, LLC |
| **Court Authorizer:** | Slights, Joseph |

**/s/ Judge Slights, Joseph**

*MANHATTAN TELECOMMUNICATIONS CORP. D/B/A METROPOLITAN*
*TELECOMMUNICATIONS, A/K/A METTEL v. GRANITE TELECOMMUNICATIONS, LLC*
Court of Chancery of the State of Delaware
C.A. No. 2020-0380-JRS


A37
Granted ([Proposed] Order Granting the Admission Pro Hac Vice of
T. Christopher Donnelly on behalf of Defendant Granite Telecommunications, LLC)


05/27/20

**GRANTED**

EFiled:  May 27 2020 03:49PM EDT
Transaction ID 65660358
~~Case No. 2020-0380-JRS~~

# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

|  |  |  |
|---|---|---|
| MANHATTAN TELECOMMUNICATIONS CORP. D/B/A METROPOLITAN TELECOMMUNICATIONS, A/K/A METTEL | ) ) ) ) | |
| | ) | |
| Plaintiff, | ) | C.A. No. 2020-0380-JRS |
| | ) | |
| v. | ) | |
| | ) | |
| GRANITE TELECOMMUNICATIONS, LLC | ) | |
| | ) | |
| Defendant. | ) | |

## [PROPOSED] ORDER FOR ADMISSION *PRO HAC VICE*

The foregoing application of T. Christopher Donnelly for admission to practice in this action *pro hac vice* is hereby granted.

IT IS SO ORDERED, this ____ day of _____, 2020.

_____
Vice Chancellor

This document constitutes a ruling of the court and should be treated as such.

| | |
|---|---|
| **Court:** | DE Court of Chancery Civil Action |
| **Judge:** | Joseph Slights |
| **File & Serve Transaction ID:** | 65659404 |
| **Current Date:** | May 27, 2020 |
| **Case Number:** | 2020-0380-JRS |
| **Case Name:** | CONF COMPLAINT Manhattan Telecommunications Corp. v. Granite Telecommunications, LLC |
| **Court Authorizer:** | Slights, Joseph |

**/s/ Judge Slights, Joseph**

*MANHATTAN TELECOMMUNICATIONS CORP. D/B/A METROPOLITAN TELECOMMUNICATIONS, A/K/A METTEL v. GRANITE TELECOMMUNICATIONS, LLC*
Court of Chancery of the State of Delaware
C.A. No. 2020-0380-JRS

A38
Public Version of Verified Complaint

05/27/20

EFiled:  May 27 2020 04:47PM EDT
Transaction ID 65660504
Case No. 2020-0380-JRS

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| MANHATTAN TELECOMMUNICATIONS CORP., D/B/A METROPOLITAN TELECOMMUNICATIONS, A/K/A METTEL, | C.A. No. |
| Plaintiff, | ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ |
| v. | **PUBLIC VERSION**<br>**FILED MAY 27, 2020** |
| GRANITE TELECOMMUNICATIONS, LLC, | |
| Defendant. | |

### VERIFIED COMPLAINT

Plaintiff Manhattan Telecommunications Corp., d/b/a Metropolitan Telecommunications, a/k/a MetTel ("MetTel" or "Plaintiff"), by way of its Complaint against Defendant Granite Telecommunications, LLC ("Granite" or "Defendant"), alleges as follows:

### NATURE OF ACTION

1.     It is often said that a crisis will bring out the best and the worst in people.  Defendant Granite falls decidedly into the latter category.

2.     During these unprecedented times, when Americans are being exhorted to join together, to use their resources to help one another and defeat a common enemy, Granite has taken the lowest of roads.  It is taking advantage of the legitimate fear and uncertainty gripping the nation by using an ongoing campaign to spread

*even more—but completely false—fear and uncertainty* about a competitor, MetTel, so it can steal MetTel's current and potential clients and thereby increase its own profits.

3.     MetTel discovered that Granite has undertaken a coordinated effort, which appears to stretch from entry level sales personnel all the way to the CEO, to contact current and potential MetTel clients and tell them that ███████████████ ████████████████████████████████████████ These statements are completely false without any basis in fact, and Granite either knows they are false or is recklessly indifferent to whether they are true or false.  Granite is making these false statements to sow doubt with MetTel's existing and potential clients about ██████ ████ ███ ████ ███ ████ ███ ████ ██ ████ ████ ████████████████████████████████

4.     Granite's conduct is even more despicable because many of MetTel's clients are in healthcare, public service, public safety, and federal, state and local governments.  MetTel provides essential services for its clients—a service all the more essential under the current circumstances, when the majority of employees in the U.S. who are able to do so are working solely by telecommuting, and telecommunications is the only practical way to remain connected to patients, customers and the public.  Even more so during these times, clients need to know they are partnered with████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████ which they are with MetTel.  False word of

MetTel's ████████████████████████ is the kind of rumor that will spread

throughout the market and poison MetTel's prospects, particularly among those for

whom an interruption in telecommunications services would be the most devastating

at this time: healthcare and government operations on the front lines of the pandemic.

5.      Without this Court's immediate intervention, there is a high probability

that Granite's malicious campaign will succeed, and MetTel's business and its

reputation will be irreparably damaged.

### PARTIES

6.      Plaintiff MetTel is a privately-held corporation organized under the

laws of Delaware, with its principal place of business in New York, New York.

MetTel's registered agent for service of process is: Corporation Service Company,

251 Little Falls Drive, Wilmington, DE 19808.

7.      Defendant Granite is a limited liability company organized under the

laws of Delaware, with its principal place of business in Quincy, Massachusetts.  Its

registered agent for service of process is Corporate Creations Network Inc., 3411

Silverside Road, Tatnall Building, Suite 104, Wilmington, DE, 19810.

## JURISDICTION

8.     This Court has subject matter jurisdiction in accordance with 10 *Del. C.* § 341.

9.     This Court has jurisdiction to award injunctive relief in accordance with Ct. Ch. R. 65.

## FACTS

10.     MetTel provides customized, integrated and managed communications solutions for enterprise clients.    By converging all communications over a proprietary network, MetTel enables clients to deploy and manage technology-driven voice, data, wireless, and cloud solutions globally.  Its MetTel Portal® enables clients to manage their inventory, usage, spend, and repairs from one simple, user-friendly interface.

11.     Granite describes itself as one of the premier telecommunications solutions providers for businesses across the United States and Canada, and the leading corporate phone service provider to multi-location companies.

12.     MetTel has spent more than twenty years building a reputation for reliability among its clients and in the marketplace.    Reliability is a critical characteristic for telecommunications companies.    One key to reliability is ███
██████████████████████    That, in turn, makes ████████████████████████
critically important to its clients.

The Pandemic

13.     The global crisis caused by the COVID-19 pandemic is without parallel since the Spanish Flu pandemic of a century ago.  To date, approximately 1.5 million people in the United States have contracted the virus and approximately 90,000 have died.  Of those numbers, approximately 153,000 nursing home residents and workers have been infected and approximately 28,100 have died.

14.     The COVID-19 pandemic has had a devastating economic impact as well.  The U.S. economy suffered its most severe contraction in more than a decade in the first quarter of the year.  To date, more than 36 million American workers have filed for unemployment benefits since the pandemic took hold and the national unemployment rate is nearly 15 percent.  The Dow Jones Industrial Average is down approximately 17% year to date.

15.     COVID-19 has also caused unprecedented disruptions in the daily lives of all Americans, resulting in major changes in behavioral patterns with the usual day-to-day functioning being put on hold for an indefinite period.  Not surprisingly, experts have reported a significant increase in depression, post-traumatic stress disorder, substance abuse, domestic violence, and child abuse.

16.     It is this grim reality that Granite saw as a shameful opportunity to enrich itself by capitalizing on the public's fears.  Not content to simply capitalize

on the public's existing, well-founded fears, Granite took an even lower step by generating *new* fears with misinformation about MetTel.

Granite's Ongoing Campaign of Lies

17.    Granite has begun telling MetTel's current and potential clients—falsely ███████████████████████████████████████████

████████████████████    The purpose of the campaign is to convince MetTel's clients and potential clients that MetTel is ██████████████████████████████████████

██████████████████████████████████████████████

18.    Granite has executed this ongoing campaign via e-mails, voice mail messages, and telephone conversations with MetTel clients for the specific purpose of damaging MetTel's business and harming its reputation.

19.    In late April 2020, MetTel learned for the first time that Granite might be spreading false information about MetTel.  MetTel received an email from one of its clients that was concerned and confused about a voice mail it received on April 24, 2020, from a client relations professional at Granite.  The caller indicated he had some unsettling information about MetTel that he would share when the client returned the call.  ███████████████████████████████████

██████████████████████████████████████████████

████████████████████████Exhibit A.

███████████████████████████████████████████

20.     On May 12, 2020, MetTel learned that Granite had contacted another MetTel client, this one an operator of assisted living and memory care retirement communities.  The client forwarded to MetTel an email by the Senior Director of Healthcare at Granite, who was attempting to schedule a call between Granite's Chief Executive Officer and the Chairman of the Board and CEO of the client.  In a follow-up email of the same date explaining the purpose for the call, the Senior Director made it clear that Granite wanted to take the client's business away from MetTel.  As a rationale for why the client would be interested in leaving MetTel and taking its business to Granite, he said that ████████████████████████
█████████████████████████████████████████ Exhibit B.

21.     The client was understandably confused and concerned about this information and sought reassurances from MetTel.

22.     These statements were blatantly false.  MetTel is not ████████████
██████████████████████████████████████████████████████████
██████████████████████

23.     Moreover, there is no legitimate way that Granite had ████████████
████ upon which to base these statements. ████████████████████████
██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

Granite was spreading harmful "facts" about MetTel with a gross indifference to whether those "facts" were true or false. Obviously, the truth or falsity of these statements did not matter to Granite because the statements benefitted Granite.

24.    The Chief Information Officer of the same client that was contacted on May 12, 2020, informed MetTel that around the same time as the Granite Senior Director's email, Granite personnel called the client's CEO's assistant with the message that MetTel was ██████████████. Exhibit C. The client's CIO reported that the CEO was *very* concerned by this information and that the news had spread very quickly within the client's organization. *Id.*

25.    Again, this information was false. ████████████████████. And Granite was not privy to any valid information that would have allowed it to reach that conclusion legitimately.

26.    Finally, in his May 11, 2020, email, the Granite Senior Director stated that Granite had made presentations to some of MetTel's other clients, all of whom were in the healthcare field. Upon information and belief, Granite made the same misrepresentations about ██████████████████.

27.    One of these clients has not returned MetTel's calls and has rejected efforts to set up a meeting with MetTel since being contacted by Granite. Met Tel

███████████████████████████████████

has concluded that it most likely lost that client's future business due to Granite's campaign.

28.     Granite's campaign of misinformation against MetTel cannot be excused as the actions of one or two rogue employees.  The Granite Senior Director was attempting to set up a call between the client's CEO *and the CEO of Granite*. Thus, the campaign apparently is being orchestrated with the knowledge, approval, and participation of the highest level executives at Granite.

The Harm to MetTel

29.     MetTel believes that Granite personnel have contacted many, if not all, of MetTel's other current clients, as well as its prospective clients, and disseminated the same or similar false, misleading, and defamatory statements about MetTel.  This belief is based on the fact that: (i) MetTel has received these reports from two different clients, who have no relationship to one another; (ii) one of the emails from Granite reveals that it has met with several MetTel customers; (iii) the apparent involvement of Granite's CEO indicates that this was not a one-off incident; and (iv) the messages to MetTel's clients involved different Granite personnel in different geographic regions.

30.     Given the critical nature of telecommunications services, once a doubt has been raised about ███████████████, a client would be duty-bound to investigate; it could not ignore an assertion of risk to its critical infrastructure.  Once

that seed has been planted, the client will undertake a critical look at a provider with which it had been perfectly happy.  The client may terminate the contract based on a pretext when the termination is actually caused by unresolved doubts about █████

████████████

31.     Given the importance of ████████████████████████ of a telecommunications provider, there is a real risk that MetTel will be asked to bid on fewer and fewer contracts going forward as Granite's lies circulate throughout the marketplace.

32.     Thus, the irreparable harm to MetTel's reputation and business will continue, most likely increasing substantially, if Granite is not brought to task and ordered to terminate its campaign immediately.

33.     Moreover, MetTel's reputation and goodwill in the industry has already been harmed.  It appears likely that it has already lost clients or potential clients. Granite must be held liable to compensate MetTel for these losses.

## COUNT ONE
### Defamation

34.     All paragraphs set forth above are incorporated by reference as if fully set forth herein.

35.     Granite published and continues to publish to third persons false and defamatory statements about MetTel, as detailed above.

36.     These third parties have understood the nature of these statements, that they referred to MetTel, and that they were damaging to MetTel's reputation.

37.     These statements also constitute defamation *per se* in that they were and are made with actual malice, attempting to take advantage of the fear and uncertainty of a global catastrophe, and contain false and defamatory information about MetTel's business.

38.     As a direct and proximate result of Granite's defamation and defamation *per se*, MetTel has suffered damages, including general (presumed) damages, actual damages (e.g., loss of future or continued business from current clients and prospective clients) and irreparable to its business reputation and goodwill, and will continue to suffer such harm in the future.

## COUNT TWO
### Tortious Interference with Prospective Economic Advantage

39.     All paragraphs set forth above are incorporated by reference as if fully set forth herein.

40.     The false and misleading statements by Granite interfered with MetTel's prospective economic advantage.  Upon information and belief, one or more clients were prepared to enter into a business relationship with MetTel, but were persuaded not to do so by Granite's dissemination of false information.

41.     The false and misleading statements by Granite interfered with MetTel's prospective economic advantage by also inducing a currently unknown

number of prospective clients to not enter into business relationships with MetTel. The number and identities of these additional prospective clients are known only to Granite and will be revealed in discovery.

42.   Granite's actions were intentional and without justification, leveraging a national emergency for personal gain.

43.   As a direct and proximate result of Granite's actions, MetTel has suffered significant harm and will continue to suffer significant harm in the future, which may not be adequately compensable with monetary damages.

44.   MetTel has no adequate remedy at law.

## COUNT THREE
### Tortious Interference with Contractual Relations

45.   All paragraphs set forth above are incorporated by reference as if fully set forth herein.

46.   Granite was, and is, aware of the business and contractual relationships between MetTel and its clients.

47.   MetTel has a reasonable expectation that its business and contractual relationships with its clients will continue.

48.   As described in detail herein, Granite's intentional interference with MetTel's rights has deprived, and continues to deprive, MetTel of the benefit of its bargains, and impaired the value of its contractual relationships with its clients.

49.     Granite's ongoing campaign to interfere with MetTel's business and contractual relationships with its clients is designed for an improper purpose, uses improper means, and is not legally justified.

50.     Granite's ongoing interference with MetTel's business and contractual relationships has directly and proximately caused, and will in the future directly and proximately cause, significant harm to MetTel, including monetary damages.

51.     As a direct and proximate result of Granite's actions, MetTel has suffered significant harm and will continue to suffer significant harm in the future, which may not be adequately compensable with monetary damages.

52.     MetTel has no adequate remedy at law.

**COUNT FOUR**
**Trade Libel**

53.     All paragraphs set forth above are incorporated by reference as if fully set forth herein.

54.     Granite has made, published, and transmitted statements directed to MetTel's *existing* clients that Granite knows are false or were made with reckless disregard for the truth or falsity of the statements, and that were intended to result in harm to MetTel, and Granite continues to do so.

55.     Upon information and belief, Granite has made, published, and transmitted statements directed to MetTel's *prospective* clients that Granite knows are false, that were made with reckless disregard for the truth or falsity of the

statements, and that were intended to result in harm to MetTel, and Granite continues to do so.

56. Granite's conduct exploits a national crisis with the specific intent of prejudicing MetTel in the conduct of its business and causing it monetary and reputational harm.

57. Granite does not enjoy any privilege to make false, misleading and/or disparaging statements about MetTel.

58. As a direct and proximate result of Granite's actions, MetTel has suffered significant harm and will continue to suffer significant harm in the future, which may not be adequately compensable with monetary damages.

59. Without judicial intervention, Granite will continue to falsely disparage MetTel.

60. MetTel has no adequate remedy at law.

**COUNT FIVE**

**Deceptive Trade Practices, 6 Del. C. § 2532**

61. All paragraphs set forth above are incorporated by reference as if fully set forth herein.

62. Delaware Statute 6 *Del. C.* § 2532, which prohibits deceptive trade practices, provides in relevant part:

> (a) A person engages in a deceptive trade practice when, in the course of a business, vocation, or occupation, that person:

\* \* \*

(8)  Disparages the goods, services, or business of another by false
or misleading representation of fact;

\* \* \*

(12)  Engages in any other conduct which similarly creates a
likelihood of confusion or of misunderstanding.

63.  Granite and MetTel are in commercial competition in the market for
telecommunications solutions.

64.  As part of an ongoing campaign to influence clients to purchase
Granite's services, Granite has disparaged MetTel through false and misleading
statements in emails, voice mails, and in telephone calls to MetTel's *existing* clients
regarding MetTel's ███████████████████████████████

███████████████████████████████████████

████████

65.  Upon information and belief, as part of an ongoing campaign to
influence clients to purchase Granite's services, Granite has disparaged MetTel
through false and misleading statements in emails, voice mails, and in telephone
calls to MetTel's *prospective* clients regarding MetTel's ██████████████

████████████████████████████████████████

██████████████████████

66.     Granite's false and misleading statements have violated 6 *Del. C.* §§ 2532(a)(8) and (a)(12) by misrepresenting and disparaging MetTel's business operations.

67.     Granite's false and misleading statements have deceived and/or have the tendency to deceive MetTel's clients and potential clients and the public in general regarding the characteristics and qualities of MetTel's services and commercial activities.

68.     Granite's false and misleading statements are material because they are likely to influence the decisions of clients and potential clients of MetTel's services, and/or have the tendency to deceive MetTel's clients and potential clients and the public in general regarding the critical issue of ███████████████████

██████████████████████

69.     Granite's actions have been intentionally and deliberately undertaken during a global pandemic for the purposes of causing confusion, mistake and deception and for the purpose of enabling Granite to profit unfairly and at the expense of MetTel.

70.     As a direct and proximate result of Granite's actions, MetTel has suffered significant harm to date, including monetary damages, and will continue to cause significant harm in the future.

## **REQUEST FOR RELIEF**

WHEREFORE, MetTel requests judgment against Granite as follows:

A.    Preliminarily enjoining Granite from making any statements about MetTel or its business operations to any current MetTel client;

B.    Preliminarily and permanently enjoining Granite from making any false or misleading statements about MetTel or its business operations;

C.    Finding that Granite defamed MetTel;

D.    Finding that Granite tortiously interfered with MetTel's contractual rights;

E.    Finding that Granite tortiously interfered with MetTel's prospective economic advantage;

F.    Finding that Granite committed trade libel;

G.    Finding that Granite violated Delaware Statute 6 *Del. C.* § 2532;

H.    Awarding damages to compensate MetTel for harm it has sustained in consequence of Granite's actions, including prejudgment and post-judgment interest;

I.    Awarding MetTel permissible statutory damages pursuant to Delaware Statute 6 *Del. C.* § 2532, including but not limited to treble damages and attorneys' fees;

J.     Referring this matter to the Delaware Attorney General upon finding of Granite's willful violation of Delaware Statute 6 *Del. C.* § 2532 for possible imposition of a civil fine pursuant to 6 *Del. C.* § 2533(e);

K.     Awarding MetTel its costs and attorneys' fees; and

L.     Granting other and further relief as this Court deems just and proper.

Dated: May 19, 2020          **K&L GATES LLP**

*/s/ Steven L. Caponi*
Steven L. Caponi (No. 3484)
Matthew B. Goeller (No. 6283)
600 King Street, Suite 901
Wilmington, DE 19801
Phone: (302) 416-7000
steve.caponi@klgates.com
matthew.goeller@klgates.com

*Counsel for Plaintiff Manhattan Telecommunications Corp.*

*MANHATTAN TELECOMMUNICATIONS CORP. D/B/A METROPOLITAN
TELECOMMUNICATIONS, A/K/A METTEL v. GRANITE TELECOMMUNICATIONS, LLC*
Court of Chancery of the State of Delaware
C.A. No. 2020-0380-JRS


A39
Certificate of Service to Public Version of Verified Complaint


05/27/20

EFiled:  May 27 2020 04:47PM EDT
Transaction ID 65660504
Case No. 2020-0380-JRS

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

MANHATTAN TELECOMMUNICATIONS
CORP., D/B/A METROPOLITAN
TELECOMMUNICATIONS, A/K/A
METTEL,

        Plaintiff,

   v.

GRANITE TELECOMMUNICATIONS, LLC,

        Defendant.

C.A. No. 2020-0380-JRS

### CERTIFICATE OF SERVICE

I, Steven L. Caponi, hereby certify that on this 27th day of May, 2020, I caused (1) *Public Version of Plaintiff's Verified Complaint* and (2) this *Certificate of Service* to be filed and served by electronic filing on the following:

        MORRIS, NICHOLS, ARSHT
        & TUNNELL LLP
        R. Judson Scaggs, Jr.
        Barnaby Grzaslewicz
        A. Gage Whirley
        1201 North Market Street, 16th Floor
        Wilmington, Delaware 19801

                */s/ Steven L. Caponi*
                Steven L. Caponi (No. 3484)

*MANHATTAN TELECOMMUNICATIONS CORP. D/B/A METROPOLITAN TELECOMMUNICATIONS, A/K/A METTEL v. GRANITE TELECOMMUNICATIONS, LLC*
Court of Chancery of the State of Delaware
C.A. No. 2020-0380-JRS


A40
Public Version of Opening Brief in Support of Plaintiff's Motion
for a Temporary Restraining Order and Motion to Expedite

05/27/20

**EFiled: May 27 2020 04:52PM EDT**
**Transaction ID 65660589**
**Case No. 2020-0380-JRS**

# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

MANHATTAN TELECOMMUNICATIONS
CORP., D/B/A METROPOLITAN
TELECOMMUNICATIONS, A/K/A
METTEL,

      Plaintiff,

   v.

GRANITE TELECOMMUNICATIONS, LLC,

    Defendant.

C.A. No.

███████████████

**PUBLIC VERSION**
**FILED MAY 27, 2020**

## OPENING BRIEF IN SUPPORT OF PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER AND MOTION TO EXPEDITE

**K&L GATES LLP**
Steven L. Caponi (No. 3484)
Matthew B. Goeller (No. 6283)
600 King Street, Suite 901
Wilmington, DE 19801
Phone: (302) 416-7000
steve.caponi@klgates.com
matthew.goeller@klgates.com

*Counsel for Plaintiff Manhattan*
*Telecommunications Corp.*

Dated: May 19, 2020

# TABLE OF CONTENTS

**Page(s)**

I.   INTRODUCTION ............................................................... 1

II.  FACTUAL BACKGROUND........................................................ 2

    A.   MetTel and Granite .................................................. 2

    B.   The COVID-19 Pandemic ............................................... 3

    C.   Granite's Ongoing Campaign of Lies .................................. 4

    D.   The Harm to MetTel .................................................. 8

III. ARGUMENT................................................................... 9

    A.   Legal Standards ..................................................... 9

    B.   MetTel Has Asserted Colorable Claims................................ 11

        1.   Defamation...................................................... 11

        2.   Tortious Interference with Prospective Economic Advantage ...................................................... 12

        3.   Tortious Interference with Contractual Relations.................. 13

        4.   Trade Libel..................................................... 14

        5.   Deceptive Trade Practices....................................... 15

    C.   MetTel Is Suffering and Will Continue to Suffer Irreparable Harm ............................................................... 17

    D.   The Balance of Equities Favors an Injunction ....................... 20

    E.   The Court Should Grant Expedition .................................. 21

IV.  CONCLUSION................................................................ 22

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Allen v. News Corp.*,
  2005 WL 415095 (Del. Ch. Feb. 3, 2005) ...................................................10, 21

*Arkema Inc. v. Dow Chem. Co.*,
  2010 WL 2334386 (Del. Ch. May 25, 2010)...................................................9

*Bancroft Life & Cas. ICC, Ltd. v. Intercontinental Mgmt. Ltd.*,
  456 F. App'x 184 (3d cir. 2012) ...........................................................19

*Box v. Box*,
  697 A.2d 395 (Del. 1997) .................................................................10

*CapStack Nashville 3 LLC v. MACC Venture Partners*,
  2018 WL 3949274 (Del. Ch. Aug. 16, 2018) ..................................................20

*Dieleuterio v. Pennell*,
  1985 WL 4567 (Del. Ch. Dec. 13, 1985).......................................................17

*Horizon Pers. Commc'ns, Inc. v. Sprint Corp.*,
  WL 2337592 (Del. Ch. Augu. 4, 2006) .............................................................18

*IMO Daniel Kloiber Dynasty Trust*,
  98 A.3d 924 (Del. Ch. 2014) ...................................................................17

*J. C. Pitman & Sons v. Pitman*,
  47 A.2d 721 (1946)..........................................................................18

*Morton v. Am. Mktg. Indus. Holdings, Inc.*,
  1995 WL 1791090 (Del. Ch. Oct. 5, 1995) .......................................................10

*Organovo Holdings, Inc. v. Dimitrov*,
  162 A.3d 102 (Del. Ch. 2017) ........................................................12, 14, 19, 20

*Police & Fire Ret. Sys. of City of Detroit v. Bernal*,
  2009 WL 1873144 (Del. Ch. June 26, 2009).....................................................11

*Preston Hollow Capital LLC v. Nuveen LLC*,
  216 A.3d 1 (Del. Ch. 2019) ......................................................................11, 14

*Renco Grp., Inc. v. MacAndrews AMG Holdings*,
  2013 WL 209124 (Del. Ch. Jan. 18, 2013)......................................................10

*T. Rowe Price Recovery Fund, L.P. v. Rubin*,
  770 A.2d 536 (Del. Ch. 2000) ..........................................................................20

*Trilogy Portfolio Co., LLC v. Brookfield Real Estate Fin. Partners, LLC*,
  2012 WL 120201 (Del. Ch. Jan. 30, 2012)..........................................................9

*WaveDivision Holdings, LLC v. Highland Capital Mgmt., L.P.*,
  49 A.3d 1168 (Del. 2012) .................................................................................13

**Statutes**

6 *Del. C.* § 2531 *et seq.* .......................................................................15, 16, 17, 18

iii

## I.   INTRODUCTION

During these unprecedented times, when Americans are being exhorted to join together, to use their resources to help one another and defeat a common enemy, Defendant Granite Telecommunications, LLC ("Granite") has taken the lowest of roads. It is taking advantage of the legitimate fear and uncertainty gripping the nation by using an ongoing campaign to spread *even more—but completely false— fear and uncertainty* about a competitor, Plaintiff Manhattan Telecommunications Corp., d/b/a Metropolitan Telecommunications, a/k/a MetTel ("MetTel"). Granite has orchestrated this campaign in order to steal MetTel's current and potential clients and thereby increase its own profits.

MetTel has discovered that Granite has undertaken a coordinated effort, which appears to stretch from entry level sales personnel all the way to the CEO, to contact current and potential MetTel clients and tell them that MetTel ███████████ ███████████████████████████████ These statements are completely false without any basis in fact, and Granite either knows they are false or is recklessly indifferent to whether they are true or false. Granite is making these false statements to sow doubt with MetTel's existing and potential clients about ██████ ███ ███ ████████ and generate fear of losing essential telecommunications services in the near future.

Granite's conduct is even more despicable because many of MetTel's clients ███████████████████████████████████████████████████████████.

are in healthcare, public service, public safety, and federal, state and local governments.  MetTel provides essential services for its clients—a service all the more essential under the current circumstances, when the majority of employees in the U.S. who are able to do so are working solely by telecommuting, and telecommunications is the only practical way to remain connected to patients, customers, and the public.  Even more so during these times, clients need to know that ███████████████████████████████████████████████████████ ███████████████████████████████████████ False word of ███████████████████████████████ is the kind of rumor that will spread throughout the market and poison MetTel's prospects, particularly among those for whom an interruption in telecommunications services would be the most devastating at this time: healthcare and government operations on the front lines of the pandemic.

Without this Court's immediate intervention, there is a high probability that Granite's malicious campaign will succeed, and MetTel's business and its reputation will be irreparably damaged.

## II.    FACTUAL BACKGROUND

### A.    MetTel and Granite

Plaintiff MetTel is a privately-held corporation organized under the laws of Delaware, with its principal place of business in New York, New York.  Defendant

██████████████████████████████████
██████████████████████████████████████████.

Granite is a limited liability company organized under the laws of Delaware, with its principal place of business in Quincy, Massachusetts.

MetTel provides customized, integrated and managed communications solutions for enterprise clients.  By converging all communications over a proprietary network, MetTel enables clients to deploy and manage technology-driven voice, data, wireless, and cloud solutions globally.  Its MetTel Portal® enables clients to manage their inventory, usage, spend, and repairs from one simple, user-friendly interface.  Granite describes itself as one of the premier telecommunications solutions providers for businesses across the United States and Canada, and the leading corporate phone service provider to multi-location companies.

MetTel has spent more than twenty years building a reputation for reliability among its clients and in the marketplace.  Reliability is a critical characteristic for telecommunications companies.  One key to reliability is the ████████████ ████████ That, in turn, makes the ████████████████ critically important to its clients.

## B.    The COVID-19 Pandemic

The global crisis caused by the COVID-19 pandemic is without parallel since the Spanish Flu pandemic of a century ago.  To date, approximately 1.5 million people in the United States have contracted the virus and approximately 90,000 have

died.  Of those numbers, approximately 153,000 nursing home residents and workers have been infected and approximately 28,100 have died.

The COVID-19 pandemic has had a devastating economic impact as well. The U.S. economy suffered its most severe contraction in more than a decade in the first quarter of the year.  To date, more than 36 million American workers have filed for unemployment benefits since the pandemic took hold and the national unemployment rate is nearly 15 percent.  The Dow Jones Industrial Average is down approximately 17% year to date.

COVID-19 has also caused unprecedented disruptions in the daily lives of all Americans, resulting in major changes in behavioral patterns with the usual day-to-day functioning being put on hold for an indefinite period.  Not surprisingly, experts have reported a significant increase in depression, post-traumatic stress disorder, substance abuse, domestic violence, and child abuse.

It is this grim reality that Granite saw as a shameful opportunity to enrich itself by capitalizing on the public's fears.  Not content to simply capitalize on the public's existing, well-founded fears, Granite took an even lower step by generating *new* fears with misinformation about MetTel.

## C.    Granite's Ongoing Campaign of Lies

Granite has begun telling MetTel's current and potential clients—falsely—

███ The purpose of the campaign is to convince MetTel's clients and potential clients that MetTel is a decidedly unreliable telecom provider that will likely leave them without essential services when they are needed most.

Granite has executed this ongoing campaign via e-mails, voice mail messages, and telephone conversations with MetTel clients for the specific purpose of damaging MetTel's business and harming its reputation.

In late April 2020, MetTel learned for the first time that Granite might be spreading false information about MetTel.  MetTel received an email from one of its clients that was concerned and confused about a voice mail it had received on April 24, 2020, from a client relations professional at Granite.  The caller indicated that he had some unsettling information about MetTel that he would share when the client returned the call. ████████████████████████████

████████████████████████████████████████████

██████████████████████ *See* Compl. Ex. A.

On May 12, 2020, MetTel learned that Granite had contacted another MetTel client, this one an operator of assisted living and memory care retirement communities.  The client forwarded to MetTel an email by the Senior Director of Healthcare at Granite, who was attempting to schedule a call between Granite's Chief Executive Officer and the Chairman of the Board and CEO of the client.  In a follow-up email of the same date explaining the purpose for the call, the Senior

████████████████████████

██████████████████████████████████████.

Director made it clear that Granite wanted to take the client's business away from MetTel.  As a rationale for why the client would be interested in leaving MetTel and taking its business to Granite, he said that ████████████████████████████ ████████████████████████████████████ *See* Compl. Ex. B.   The client was understandably confused and concerned about this information and sought reassurances from MetTel.

These statements were blatantly false.  MetTel is not ██████████████ ████████████████████████████████████████████████ ██████████████████ ████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████ Granite was spreading harmful "facts" about MetTel with a gross indifference to whether those "facts" were true or false.  Obviously, the truth or falsity of these statements did not matter to Granite because the statements benefitted Granite.

6

████████████████████████████████████
██████████████████████████████████████████

The Chief Information Officer of the same client that was contacted on May 11, 2020, informed MetTel that around the same time as the Granite Senior Director's email, Granite personnel called the client's CEO's assistant with the message that MetTel was ███████████████. *See* Compl. Ex. C.  The client's CIO reported that the CEO was *very* concerned by this information and that the news had spread very quickly within the client's organization.  *Id.*

Again, this information was false.  ███████████████████████.  And Granite was not privy to any valid information that would have allowed it to reach that conclusion legitimately.

Finally, in his May 11, 2020, email, the Granite Senior Director stated that Granite had made presentations to some of MetTel's other clients, all of whom were in the healthcare field.  Upon information and belief, Granite made the same misrepresentations about MetTel's ████████████ to those clients.

One of these clients has not returned MetTel's calls and has rejected efforts to set up a meeting with MetTel since being contacted by Granite.  MetTel has concluded that it most likely lost that client's future business due to Granite's campaign.

Granite's campaign of misinformation against MetTel cannot be excused as the actions of one or two rogue employees.  The Granite Senior Director was attempting to set up a call between the client's CEO *and the CEO of Granite*.  Thus,

7

███████████████████████
███████████████████████████████████████.

the campaign apparently is being orchestrated with the knowledge, approval, and participation of the highest level executives at Granite.

### D.     The Harm to MetTel

MetTel believes that Granite personnel have contacted many, if not all, of MetTel's other current clients, as well as its prospective clients, and disseminated the same or similar false, misleading, and defamatory statements about MetTel.  This belief is based on the fact that: (i) MetTel has received these reports from two different clients, who have no relationship to one another; (ii) one of the emails from Granite reveals that it has met with several MetTel customers; (iii) the apparent involvement of Granite's CEO indicates that this was not a one-off incident; and (iv) the messages to MetTel's clients involved different Granite personnel in different geographic regions.

Given the critical nature of telecommunications services, once a doubt has been raised about a provider's reliability, a client would be duty-bound to investigate; it could not ignore an assertion of risk to its critical infrastructure.  Once that seed has been planted, the client will undertake a critical look at a provider with which it had been perfectly happy.  The client may terminate the contract based on a pretext when the termination is actually caused by unresolved doubts about ■

■■■■■■■

██ ████ ███ ██ ███ ████ █ ██ ████ █████ ██ █

███████████████ means that there is a real risk that MetTel will be asked to bid on fewer and fewer contracts going forward as Granite's lies circulate throughout the marketplace. Thus, the irreparable harm to MetTel's reputation and business will continue, most likely increasing substantially, if Granite is not brought to task and ordered to terminate its campaign immediately. Moreover, MetTel's reputation and goodwill in the industry has already been harmed. It appears likely that it has already lost clients or potential clients. Granite must be held liable to compensate MetTel for these losses.

## III.   ARGUMENT

### A.   Legal Standards

"A TRO is a special remedy of short duration designed primarily to prevent imminent irreparable injury pending a preliminary injunction or final resolution of a matter." *Trilogy Portfolio Co., LLC v. Brookfield Real Estate Fin. Partners, LLC*, 2012 WL 120201, at *4 (Del. Ch. Jan. 30, 2012). To obtain a Temporary Restraining Order, the applicant need only demonstrate: (1) a colorable claim on the merits; (2) a threat of irreparable harm if relief is not granted; and (3) a balance of the hardships that favors the applicant. *Arkema Inc. v. Dow Chem. Co*., 2010 WL 2334386, at *3 (Del. Ch. May 25, 2010) (citation omitted).

In addition, this Court has broad power to expedite proceedings.  Delaware courts are "always receptive to expediting any type of litigation in the interests of affording justice to the parties."  *Box v. Box*, 697 A.2d 395, 399 (Del. 1997).  The threshold for obtaining expedited proceedings is low—plaintiffs seeking expedited proceedings need only show that their claims are "sufficiently colorable" and that "there is the possibility of a threatened irreparable injury."  *Allen v. News Corp*., 2005 WL 415095, at *1 (Del. Ch. Feb. 3, 2005).  Whether that showing is met is assessed on the face of the pleadings—when considering whether to grant expedition, the Court does not judge the merits of the case or "even the legal sufficiency of the pleadings." *Morton v. Am. Mktg. Indus. Holdings, Inc*., 1995 WL 1791090, at *2 (Del. Ch. Oct. 5, 1995).

As this Court has instructed, "[t]he burden on a plaintiff in seeking an expedited proceeding is not high. 'A party's request to schedule an application for a preliminary injunction, and to expedite the discovery related thereto, is normally routinely granted.  Exceptions to that norm are rare.'"  *Renco Grp., Inc. v. MacAndrews AMG Holdings*, 2013 WL 209124, at *1 (Del. Ch. Jan. 18, 2013) (quoting *In re Ness Technologies, Inc.*, 2011 WL 3444573, at *2 (Del. Ch. Aug. 3, 2011)).

The Court should grant the Motion for a Temporary Restraining Order because MetTel has demonstrated "a sufficiently colorable claim and the possibility

10

of irreparable harm in the absence of relief." *See Police & Fire Ret. Sys. of City of Detroit v. Bernal*, 2009 WL 1873144, at *1 (Del. Ch. June 26, 2009).  The verified allegations set forth in the Complaint justify the relative expense and inconvenience of expedited proceedings in this action.

### B.     MetTel Has Asserted Colorable Claims

#### 1.     Defamation

MetTel has asserted a valid claim for defamation.  "Defamation is generally understood as 'a false publication calculated to bring one into disrepute.' Ordinarily, the elements of defamation are: (1) defamatory communication; (2) publication; (3) reference to the plaintiff; (4) third party's understanding of the communication's defamatory character; and (5) injury."  *Preston Hollow Capital LLC v. Nuveen LLC*, 216 A.3d 1, 9 (Del. Ch. 2019) (internal citations omitted).  As MetTel explains in its Complaint, Granite published and continues to publish to third persons false and defamatory statements about MetTel.  These third parties have understood the nature of these statements, that they referred to MetTel, and that they were damaging to MetTel's reputation.  These statements also constitute defamation *per se* in that they were and are made with actual malice and contain false and defamatory information about MetTel's business.

As a direct and proximate result of Granite's defamation and defamation *per se*, MetTel has suffered damages, including the loss of future business from current

clients and prospective clients, and irreparable harm to its business reputation and goodwill.  Without judicial intervention, MetTel will continue to suffer such harm in the future.

### 2.      Tortious Interference with Prospective Economic Advantage

MetTel has asserted a valid claim for tortious interference with prospective economic advantage.  To state such a claim, MetTel must plead "(a) the reasonable probability of a business opportunity, (b) the intentional interference by the defendant with that opportunity, (c) proximate causation, and (d) damages." *Organovo Holdings, Inc. v. Dimitrov*, 162 A.3d 102, 122 (Del. Ch. 2017).

As explained in the Complaint, Granite's false and misleading statements have interfered with MetTel's prospective economic advantage.  Upon information and belief, one or more clients were prepared to enter into a business relationship with MetTel, but were persuaded not to do so by Granite's dissemination of false information.   The false and misleading statements by Granite interfered with MetTel's prospective economic advantage by also inducing a currently unknown number of prospective clients to not enter into business relationships with MetTel. The number and identities of these additional prospective clients are known only to Granite and will be revealed in discovery.  Granite's actions were intentional and without justification, leveraging a national emergency for personal gain.

12

### 3.    Tortious Interference with Contractual Relations

MetTel has asserted a valid claim for tortious interference with contractual relations.  To prevail on a claim for tortious interference with contractual relations, MetTel must show that: "(1) there was a contract, (2) about which the particular defendant knew, (3) an intentional act that was a significant factor in causing the breach of contract, (4) the act was without justification, and (5) it caused injury." *WaveDivision Holdings, LLC v. Highland Capital Mgmt., L.P.*, 49 A.3d 1168, 1174 (Del. 2012).

MetTel has various existing contractual relations with its customers and clients.  Granite was, and is, aware of these contractual relationships.  MetTel has a reasonable expectation that its business and contractual relationships with its clients will continue.  As described in the Complaint, Granite's intentional interference with MetTel's rights has deprived, and continues to deprive, MetTel of the benefit of its bargains, and impaired the value of its contractual relationships with its clients.  Granite's ongoing campaign to interfere with MetTel's business and contractual relationships with its clients is designed for an improper purpose, uses improper means, and is not legally justified.  Granite's ongoing interference with MetTel's business and contractual relationships has directly and proximately caused, and will in the future directly and proximately cause, significant harm to MetTel.

### 4.     Trade Libel

MetTel has asserted a valid claim for trade libel.  Trade libel is "a libelous statement to consumers that falsely disparages a plaintiff's goods or services." *Preston Hollow Capital LLC*, 216 A.3d at 13.  Plaintiffs are entitled to relief under the concept of trade libel for "any injury to economic advantage arising from false derogatory statements." *Organovo Holdings, Inc.*, 162 A.3d at 120.

As explained in the Complaint, Granite has made, published, and transmitted statements directed to MetTel's *existing* clients that Granite knows are false or were made with reckless disregard for the truth or falsity of the statements, and that were intended to result in harm to MetTel.  And Granite continues to do so.  Upon information and belief, Granite has also made, published, and transmitted statements directed to MetTel's *potential* clients that Granite knows are false, that were made with reckless disregard for the truth or falsity of the statements, and that were intended to result in harm to MetTel.  And Granite continues to do so.

Granite's conduct was undertaken with the specific intent of prejudicing MetTel in the conduct of its business, disparaging its goods and services, and causing it monetary and reputational harm.  Granite does not enjoy any privilege to make false, misleading and/or disparaging statements about MetTel.  As a direct and proximate result of Granite's actions, MetTel has suffered significant harm and will

14

continue to suffer significant harm in the future, which may not be adequately compensable with monetary damages.

### 5.    Deceptive Trade Practices

MetTel has asserted a valid claim that Granite has violated Delaware's Uniform Deceptive Trade Practices Act. 6 *Del. C.* § 2531 *et seq.*  Under this statute,

> (a) A person engages in a deceptive trade practice when, in the course of a business, vocation, or occupation, that person:
>
> \*   \*   \*
>
> (8)    Disparages the goods, services, or business of another by false or misleading representation of fact;
>
> \*   \*   \*
>
> (12) Engages in any other conduct which similarly creates a likelihood of confusion or of misunderstanding.

6 *Del. C.* § 2532(a).

As explained in the Complaint, Granite and MetTel are in commercial competition in the market for telecommunications solutions.  As part of an ongoing campaign to influence clients to purchase Granite's services, Granite has disparaged MetTel through false and misleading statements in emails, voice mails, and in telephone calls to MetTel's *existing* clients regarding ███████████████████

████████████████████████████████████████████████

███████████████████████████████

Upon information and belief, as part of an ongoing campaign to influence clients to purchase Granite's services, Granite has disparaged MetTel through false

and misleading statements in emails, voice mails, and in telephone calls to MetTel's *prospective* clients regarding ████████████████████████████

████████████████████████████████████████████

████████████████████████ Granite's false and misleading statements have violated 6 *Del. C.* §§ 2532(a)(8) and (a)(12) by misrepresenting and disparaging MetTel's business operations.

Granite's false and misleading statements have deceived and/or have the tendency to deceive MetTel's clients and potential clients and the public in general regarding the characteristics and qualities of MetTel's services and commercial activities. Granite's false and misleading statements are material because they are likely to influence the decisions of clients and potential clients of MetTel's services, and/or have the tendency to deceive MetTel's clients and potential clients and the public in general regarding the critical issue of ████████████████████ ████████████████████████ Granite's actions have been intentionally and deliberately undertaken for the purposes of causing confusion, mistake and deception and for the purpose of enabling Granite to profit unfairly and at the expense of MetTel. As a direct and proximate result of Granite's actions, MetTel has suffered significant harm to date, including monetary damages, and will continue to cause significant harm in the future.

16

These allegations present a valid claim for a violation of Delaware's Deceptive Trade Practices Act.  Under 6 *Del C.* § 2533(a), "[a] person likely to be damaged by a deceptive trade practice of another may be granted an injunction against it under the principles of equity and on terms that the court considers reasonable."  Granite's violation of the Deceptive Trade Practices Act may also result in referral to the Delaware Attorney General.  *See* 6 *Del. C.* § 2533(e) ("If a court of competent jurisdiction finds that any person has willfully violated this subchapter, upon petition to the court by the Attorney General in the original complaint or at any time following the court's finding of a willful violation, the person shall forfeit and pay to the State a civil penalty of not more than $10,000 for each violation.").

### C.    MetTel Is Suffering and Will Continue to Suffer Irreparable Harm

Of the three factors necessary for this Court to issue a temporary restraining order, irreparable harm is the most important: "it is the *sine qua non* for this form of relief." *IMO Daniel Kloiber Dynasty Trust*, 98 A.3d 924, 937 (Del. Ch. 2014).  "The purpose of a temporary restraining order is to preserve the *status quo* to enable the plaintiff to adequately . . . prepare his case and demonstrate his entitlement to ultimate relief." *Dieleuterio v. Pennell*, 1985 WL 4567, at *2 (Del. Ch. Dec. 13, 1985).  "[Courts] usually enjoin the continued publication of a trade libel incident thereto. That is true when the libel is accompanied by some act of unfair business

17

competition, if irreparable damage is imminent." *J. C. Pitman & Sons v. Pitman*, 47 A.2d 721, 725 (1946).  Injunctive relief is also appropriate and necessary to address Granite's tortious interference and violations of the Deceptive Trade Practices Act. *See Organovo Holdings, Inc.*, 162 A.3d at 122; 6 *Del. C.* § 2533(a) ("A person likely to be damaged by a deceptive trade practice of another may be granted an injunction against it under the principles of equity and on terms that the court considers reasonable.").

Here, Granite has caused, and, without judicial intervention, will continue to cause imminent and irreparable harm to MetTel's business reputation and its relationship with its customers.  "The loss of control of reputation, loss of trade, and loss of goodwill constitute irreparable injury." *Horizon Pers. Commc'ns, Inc. v. Sprint Corp.*, 2006 WL 2337592, at *24 (Del. Ch. Aug. 4, 2006).  Injunctive relief is necessary to enjoin Granite from continuing to disparage MetTel's services and cause harm to its business reputation and relations with clients.

As explained throughout the Complaint, MetTel has a reasonable basis to believe that Granite personnel have contacted many, if not all, of MetTel's current clients, as well as its prospective clients, and disseminated false, misleading, and defamatory statements about MetTel's services, impugning its reliability and misrepresenting that ███████████████████████.  MetTel has received reports from at least two different clients, and emails MetTel has obtained

reveal that Granite has met with several other MetTel customers. This ongoing campaign appears to have been orchestrated by Granite's top management.

MetTel's reputation and goodwill in the industry have already been harmed. It appears likely that it has already lost clients and potential clients, and that it will continue to lose clients and potential clients in the future if Granite is not stopped. Given the importance of ██████ ████ █ ██ ████ ██████ █ █ ██████████████████████ MetTel risks losing out on contracts going forward as Granite's lies about ██████████████ spread rapidly throughout the marketplace. The irreparable harm to MetTel's reputation and business will continue if Granite is not brought to task and ordered to terminate its campaign immediately.

In addition, Granite's intentional interference with MetTel's contracts has deprived, and continues to deprive, MetTel of the benefit of its bargains, and impaired the value of its contractual relationships with its clients. This misconduct cannot be remedied by monetary damages alone. *See Organovo Holdings, Inc.*, 162 A.3d at 122 ("Courts have recognized that a request for equitable remedies for tortious interference with prospective economic advantage can provide the requisite basis for equitable jurisdiction that can justify a related injunction against future speech."); *see also Bancroft Life & Cas. ICC, Ltd. v. Intercontinental Mgmt. Ltd.*, 456 F. App'x 184, 190 (3d Cir. 2012) (ruling that injunction for tortious interference

was warranted).   Granite's ongoing interference with MetTel's business and contractual relationships has directly and proximately caused, and will in the future directly and proximately cause, irreparable harm to MetTel without judicial intervention.

### D.    The Balance of Equities Favors an Injunction

Where the absence of an injunction would cause "substantial, imminent, and irreparable harm" to the movant, and the nonmovant is "not threatened with any harm," the balance of the equities favors the issuance of injunctive relief. *T. Rowe Price Recovery Fund, L.P. v. Rubin*, 770 A.2d 536, 558-59 (Del. Ch. 2000). Delaware courts have noted that speech could be used as a bludgeon to destroy competition without effective redress at law and are "receptive to the idea that such malicious business falsehoods were subject to injunctive restraint, particularly when the statements invoked another tort doctrine as well." *CapStack Nashville 3 LLC v. MACC Venture Partners*, 2018 WL 3949274, at *6 (Del. Ch. Aug. 16, 2018) (citing *Organovo Holdings, Inc.*, 162 A.3d at 120).

The balance of the equities clearly favors MetTel.  Through its ongoing efforts to disparage MetTel, Granite continues to impugn MetTel's services and impair MetTel's contractual relationships with customers, clients, and business partners.  In that way, Granite's case is not like *CapStack Nashville 3 LLC*, which involved merely lying in an offering memorandum, thereby harming the plaintiffs' pecuniary

interests.  2018 WL 3949274, at *6 (Del. Ch. Aug. 16, 2018).  Here, Granite is directly harming MetTel's services and disrupting MetTel's ongoing contractual relations with its clients.  In contrast, Granite would suffer no harm if the requested injunctive relief is ordered.  A temporary restraining order would not risk restraining free speech, as Granite would being enjoined only from continuing tortious conduct that also violates the Deceptive Trade Practices Act and may result in referral to the Delaware Attorney General.

### E.    The Court Should Grant Expedition

Plaintiffs seeking expedited proceedings need only show that their claims are "sufficiently colorable" and that "there is the possibility of a threatened irreparable injury." *Allen*, 2005 WL 415095, at *1. For all of the same reasons that the Court should grant the requested injunctive relief, MetTel urges this Court to expedite these proceedings.   Expedited proceedings are especially critical in order to determine the full extent of the harm caused by Granite so that MetTel can act quickly to correct and mitigate the damage before MetTel's customers leave MetTel based on Granite's false statements.  In the absence of judicial intervention, MetTel will continue to suffer irreparable injury as a result of Granite's misconduct.

## IV.    CONCLUSION

For the foregoing reasons, MetTel respectfully requests that the Court grant

the Motion for a Temporary Restraining Order and Motion to Expedite and enter an

order in the proposed form filed with this Motion.

Dated: May 19, 2020                          **K&L GATES LLP**

                                             */s/ Steven L. Caponi*
                                             Steven L. Caponi (No. 3484)
                                             Matthew B. Goeller (No. 6283)
                                             600 King Street, Suite 901
                                             Wilmington, DE 19801
                                             Phone: (302) 416-7000
                                             steve.caponi@klgates.com
                                             matthew.goeller@klgates.com

                                             *Counsel for Plaintiff Manhattan*
                                             *Telecommunications Corp.*

                                             Words: 4,689

*MANHATTAN TELECOMMUNICATIONS CORP. D/B/A METROPOLITAN TELECOMMUNICATIONS, A/K/A METTEL v. GRANITE TELECOMMUNICATIONS, LLC*
Court of Chancery of the State of Delaware
C.A. No. 2020-0380-JRS


A41
Certificate of Service to Public Version of Opening Brief in Support of
Plaintiff's Motion for a Temporary Restraining Order and Motion to Expedite

05/27/20

EFiled:  May 27 2020 04:52PM EDT
Transaction ID 65660589
Case No. 2020-0380-JRS

**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

MANHATTAN TELECOMMUNICATIONS
CORP., D/B/A METROPOLITAN
TELECOMMUNICATIONS, A/K/A
METTEL,

        Plaintiff,

     v.

GRANITE TELECOMMUNICATIONS, LLC,

        Defendant.

C.A. No. 2020-0380-JRS

## <u>CERTIFICATE OF SERVICE</u>

I, Steven L. Caponi, hereby certify that on this 27th day of May, 2020, I
caused (1) *Public Version of Opening Brief in Support of Plaintiff's Motion for a
Temporary Restraining Order and Motion to Expedite* and (2) this *Certificate of
Service* to be filed and served by electronic filing on the following:

MORRIS, NICHOLS, ARSHT
& TUNNELL LLP
R. Judson Scaggs, Jr.
Barnaby Grzaslewicz
A. Gage Whirley
1201 North Market Street, 16th Floor
Wilmington, Delaware 19801

        /s/ Steven L. Caponi
        Steven L. Caponi (No. 3484)

*MANHATTAN TELECOMMUNICATIONS CORP. D/B/A METROPOLITAN TELECOMMUNICATIONS, A/K/A METTEL v. GRANITE TELECOMMUNICATIONS, LLC*
Court of Chancery of the State of Delaware
C.A. No. 2020-0380-JRS

A42
Motion for Admission Pro Hac Vice
of Anthony P. La Rocco on behalf of Plaintiff

05/28/20

EFiled: May 28 2020 04:43PM EDT
Transaction ID 65663586
Case No. 2020-0380-JRS

# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

MANHATTAN TELECOMMUNICATIONS
CORP., D/B/A METROPOLITAN
TELECOMMUNICATIONS, A/K/A
METTEL,

        Plaintiff,

    v.

GRANITE TELECOMMUNICATIONS, LLC,

        Defendant.

C.A. No. 2020-0380-JRS

## MOTION FOR ADMISSION *PRO HAC VICE*

I, Steven L. Caponi, a member of the Delaware Bar ("Movant"), pursuant to Court of Chancery Rule 170(b), hereby move the admission on *pro hac vice* of Anthony P. La Rocco, Esq. ("Applicant") of K&L Gates LLP, One Newark Center, Tenth Floor, Newark, NJ 07102, a member of the bar of New Jersey, to represent Plaintiff.  Movant certifies that he maintains an office in Delaware, and that he finds Applicant to be a reputable and competent attorney, and he is in a position to recommend Applicant's admission.

*[Signature page to follow]*

Dated:  May 28, 2020                    **K&L GATES LLP**

                                        */s/ Steven L. Caponi*
                                        Steven L. Caponi (No. 3484)
                                        Matthew B. Goeller (No. 6283)
                                        600 N. King St., Suite 901
                                        Wilmington, DE 19801
                                        Tel: (302) 416-7000
                                        steven.caponi@klgates.com
                                        matthew.goeller@klgates.com

                                        *Attorneys for Plaintiff*

                                        Words: 90

*MANHATTAN TELECOMMUNICATIONS CORP. D/B/A METROPOLITAN TELECOMMUNICATIONS, A/K/A METTEL v. GRANITE TELECOMMUNICATIONS, LLC*
Court of Chancery of the State of Delaware
C.A. No. 2020-0380-JRS

A43
Certificate of Service to Motion for Admission Pro Hac Vice
of Anthony P. La Rocco on behalf of Plaintiff

05/28/20

EFiled:  May 28 2020 04:43PM EDT
Transaction ID 65663586
Case No. 2020-0380-JRS

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| MANHATTAN TELECOMMUNICATIONS CORP., D/B/A METROPOLITAN TELECOMMUNICATIONS, A/K/A METTEL, <br><br>       Plaintiff, <br><br>    v. <br><br> GRANITE TELECOMMUNICATIONS, LLC, <br><br>       Defendant. | C.A. No. 2020-0380-JRS |

## <u>CERTIFICATE OF SERVICE</u>

I, Steven L. Caponi, Esq., hereby certify that on this 28th day of May, 2020,

I caused (1) *Motion for Admission Pro Hac Vice*, (2) *Proposed Order*, (3)

*Certification of Anthony P. La Rocco, Esq. Pursuant to Rule 170(c)*, and (4) this

*Certificate of Service* to be filed and served by electronic filing on the following:

> MORRIS, NICHOLS, ARSHT
> & TUNNELL LLP
> R. Judson Scaggs, Jr.
> Barnaby Grzaslewicz
> A. Gage Whirley
> 1201 North Market Street, 16th Floor
> Wilmington, Delaware 19801

> /s/ Steven L. Caponi
> Steven L. Caponi (# 3484)

*MANHATTAN TELECOMMUNICATIONS CORP. D/B/A METROPOLITAN TELECOMMUNICATIONS, A/K/A METTEL v. GRANITE TELECOMMUNICATIONS, LLC*
Court of Chancery of the State of Delaware
C.A. No. 2020-0380-JRS


A44
[Proposed] Order Granting Motion for Admission Pro Hac Vice
of Anthony P. La Rocco on behalf of Plaintiff


05/28/20

EFiled: May 28 2020 04:43PM EDT
Transaction ID 65663586
Case No. 2020-0380-JRS

**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

MANHATTAN TELECOMMUNICATIONS
CORP., D/B/A METROPOLITAN
TELECOMMUNICATIONS, A/K/A
METTEL,

            Plaintiff,

   v.

GRANITE TELECOMMUNICATIONS, LLC,

            Defendant.

C.A. No. 2020-0380-JRS

## **[PROPOSED] ORDER**

The foregoing application of Anthony P. La Rocco, Esq., for admission *pro hac vice* in this action is hereby granted.

SO ORDERED _____ day of _____, 2020.

_____
Vice Chancellor Joseph R. Slights

*MANHATTAN TELECOMMUNICATIONS CORP. D/B/A METROPOLITAN TELECOMMUNICATIONS, A/K/A METTEL v. GRANITE TELECOMMUNICATIONS, LLC*
Court of Chancery of the State of Delaware
C.A. No. 2020-0380-JRS


A45

Certification of Anthony P. La Rocco Pursuant to Rule 170(c) in Support of Motion for
Admission Pro Hac Vice of Anthony P. La Rocco on behalf of Plaintiff


05/28/20

EFiled:  May 28 2020 04:43PM EDT
Transaction ID 65663586
Case No. 2020-0380-JRS

# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

MANHATTAN TELECOMMUNICATIONS
CORP., D/B/A METROPOLITAN
TELECOMMUNICATIONS, A/K/A
METTEL,

        Plaintiff,

      v.

GRANITE TELECOMMUNICATIONS, LLC,

        Defendant.

C.A. No. 2020-0380-JRS

## CERTIFICATION OF ANTHONY P. LA ROCCO
## PURSUANT TO RULE 170(C)

I, Anthony P. La Rocco, hereby certify that:

1.      I am a member in good standing of the bar of New Jersey.

2.      If admitted *pro hac vice* for purposes of the above-captioned civil action, I consent to be bound by Delaware Lawyers' Rules of Professional Conduct and I have reviewed the Delaware State Bar Association Principles of Professionalism for Delaware Lawyers.

3.      I agree to be bound by all Rules of the Court.

4.      I hereby consent to the appointment of the Register in Chancery of New Castle County as my agent upon whom service of process may be made for

all actions, including disciplinary actions, that may arise out of the practice of law by me under Rule 170 and any activities related thereto.

5.    In the preceding twelve (12) months, I have not appeared in any actions in the Courts of this state.

6.    A payment for the *pro hac vice* admission assessment in the amount of $422, if not waived, will be deposited in the Supreme Court Registration Fund by File & Serve Express, for the purpose of governance of the Bar of its Court and may be distributed pursuant to Supreme Court Rule 69.

7.    I have not been disbarred or suspended and am not the object of pending disciplinary proceedings in any jurisdiction where I have been admitted generally, *pro hac vice*, or in any other way.

8.    I am generally admitted in the following jurisdictions:

    a.  Bar of New Jersey;

    b.  Bar of New York;

    c.  United States Court of Appeals for the Third Circuit;

    d.  United States District Court for the District of New Jersey;

    e.  United States District Court for the Southern District of New York; and

    f.  United States District Court for the Eastern District of New York.

Dated: May 28, 2020

_____
Anthony P. La Rocco

2

*MANHATTAN TELECOMMUNICATIONS CORP. D/B/A METROPOLITAN TELECOMMUNICATIONS, A/K/A METTEL v. GRANITE TELECOMMUNICATIONS, LLC*
Court of Chancery of the State of Delaware
C.A. No. 2020-0380-JRS


A46

Exhibits 1-3 to Defendant's Brief In Opposition to Plaintiff's Motion
For A Temporary Restraining Order And Motion to Expedite

05/28/20

EFiled: May 28 2020 04:54PM EDT
Transaction ID 65663306
Case No. 2020-0380-JRS

# Exhibit 1

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

**FORM 10-Q**

☑    Quarterly Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934
For the quarterly period ended March 31, 2020
or

☐    Transition Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934
For the transition period from _____ to _____

**Commission File Number 001-35965**

# GTT Communications, Inc.

(Exact Name of Registrant as Specified in Its Charter)

| | |
|---|---|
| **Delaware** | **20-2096338** |
| (State or Other Jurisdiction of Incorporation or Organization) | (I.R.S. Employer Identification No.) |
| **7900 Tysons One Place**<br>**Suite 1450**<br>**McLean Virginia** | **22102** |
| (Address of principal executive offices) | (Zip code) |

(703) 442-5500
(Registrant's telephone number, including area code)

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common stock, par value $.0001 per share | GTT | The New York Stock Exchange |
| Series A Junior Participating Cumulative Preferred Stock Purchase Rights | | |

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15 (d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☑ No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). Yes ☑ No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large Accelerated Filer | ☑ | Accelerated Filer | ☐ |
| Non-Accelerated Filer | ☐ | Smaller reporting company | ☐ |
| | | Emerging growth company | ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐ No ☑

As of May 6, 2020, 58,819,538 shares of common stock, par value $.0001 per share, of the registrant were outstanding.

|  | Page |
|---|---|
| **PART I — FINANCIAL INFORMATION** | 4 |
| Item 1. Financial Statements | 4 |
| Condensed Consolidated Balance Sheets | 4 |
| Condensed Consolidated Statements of Operations | 5 |
| Condensed Consolidated Statements of Comprehensive Loss | 6 |
| Condensed Consolidated Statements of Stockholders' Equity | 7 |
| Condensed Consolidated Statements of Cash Flows | 8 |
| Notes to Condensed Consolidated Financial Statements | 10 |
| Item 2. Management's Discussion and Analysis of Financial Condition and Results of Operations | 28 |
| Item 3. Quantitative and Qualitative Disclosures about Market Risk | 39 |
| Item 4. Controls and Procedures | 40 |
| **PART II — OTHER INFORMATION** | 42 |
| Item 1. Legal Proceedings | 42 |
| Item 1A. Risk Factors | 42 |
| Item 2. Unregistered Sales of Equity Securities and Use of Proceeds | 42 |
| Item 3. Defaults Upon Senior Securities | 42 |
| Item 4. Mine Safety Disclosures | 43 |
| Item 5. Other Information | 43 |
| Item 6. Exhibits | 44 |
| **SIGNATURES** | 45 |
| **CERTIFICATIONS** | |

**PART I – FINANCIAL INFORMATION**

ITEM 1. *FINANCIAL STATEMENTS*

**GTT Communications, Inc.**
**Condensed Consolidated Balance Sheets**
(Unaudited)
(Amounts in millions, except for share and per share data)

| | March 31, 2020 | December 31, 2019 |
|---|---|---|
| **ASSETS** | | |
| **Current assets:** | | |
| Cash and cash equivalents | $ 106.4 | $ 41.8 |
| Accounts receivable, net of allowances of $23.0 and $14.3, respectively | 149.9 | 162.1 |
| Prepaid expenses and other current assets | 82.1 | 50.4 |
| **Total current assets** | 338.4 | 254.3 |
| Property and equipment, net | 1,765.4 | 1,817.4 |
| Operating lease right of use assets | 335.9 | 357.5 |
| Intangible assets, net | 465.4 | 490.7 |
| Goodwill | 1,763.7 | 1,768.6 |
| Other long-term assets | 70.2 | 69.2 |
| **Total assets** | $ 4,739.0 | $ 4,757.7 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | |
| **Current liabilities:** | | |
| Accounts payable | $ 101.4 | $ 69.4 |
| Accrued expenses and other current liabilities | 273.4 | 240.8 |
| Operating lease liabilities | 72.6 | 74.9 |
| Finance lease liabilities | 5.4 | 4.6 |
| Long-term debt, current portion | 29.6 | 30.2 |
| Deferred revenue | 83.8 | 67.0 |
| **Total current liabilities** | 566.2 | 486.9 |
| Operating lease liabilities, long-term portion | 254.7 | 272.9 |
| Finance lease liabilities, long-term portion | 36.4 | 37.3 |
| Long-term debt, long-term portion | 3,228.4 | 3,192.6 |
| Deferred revenue, long-term portion | 255.2 | 266.5 |
| Deferred tax liabilities | 167.7 | 171.3 |
| Other long-term liabilities | 33.6 | 39.1 |
| **Total liabilities** | 4,542.2 | 4,466.6 |
| **Commitments and contingencies** | | |
| **Stockholders' equity:** | | |
| Common stock, par value $.0001 per share, 80,000,000 shares authorized, 58,451,083 and 56,686,459 shares issued and outstanding as of March 31, 2020 and December 31, 2019, respectively | — | — |
| Additional paid-in capital | 850.4 | 842.4 |
| Accumulated deficit | (566.6) | (474.2) |
| Accumulated other comprehensive loss | (87.0) | (77.1) |
| **Total stockholders' equity** | 196.8 | 291.1 |
| **Total liabilities and stockholders' equity** | $ 4,739.0 | $ 4,757.7 |

The accompanying notes are an integral part of these Condensed Consolidated Financial Statements

**GTT Communications, Inc.**
**Condensed Consolidated Statements of Operations**
(Unaudited)
(Amounts in millions, except for share and per share data)

|  | Three Months Ended March 31, | | | |
|  | 2020 | | 2019 | |
|---|---|---|---|---|
| **Revenue:** | | | | |
| Telecommunications services | $ | 424.7 | $ | 450.2 |
| | | | | |
| **Operating expenses:** | | | | |
| Cost of telecommunications services | | 237.7 | | 241.8 |
| Selling, general and administrative expenses | | 108.2 | | 104.1 |
| Severance, restructuring and other exit costs | | 2.1 | | 2.8 |
| Depreciation and amortization | | 67.5 | | 62.8 |
| Total operating expenses | | 415.5 | | 411.5 |
| Operating income | | 9.2 | | 38.7 |
| | | | | |
| **Other expenses:** | | | | |
| Interest expense, net | | (48.8) | | (48.2) |
| Loss on debt extinguishment | | (2.3) | | — |
| Other expenses, net | | (43.3) | | (16.0) |
| Total other expenses | | (94.4) | | (64.2) |
| Loss before income taxes | | (85.2) | | (25.5) |
| (Benefit from) provision for income taxes | | (1.9) | | 1.8 |
| **Net loss** | $ | (83.3) | $ | (27.3) |
| Loss per share: | | | | |
| Basic | $ | (1.45) | $ | (0.49) |
| Diluted | $ | (1.45) | $ | (0.49) |
| | | | | |
| Weighted average shares: | | | | |
| Basic | | 57,259,699 | | 55,839,212 |
| Diluted | | 57,259,699 | | 55,839,212 |

The accompanying notes are an integral part of these Condensed Consolidated Financial Statements

5

**GTT Communications, Inc.**
**Condensed Consolidated Statements of Comprehensive Loss**
(Unaudited)
(Amounts in millions)

| | Three Months Ended March 31, | | | |
|---|---|---|---|---|
| | **2020** | | **2019** | |
| Net loss | $ | (83.3) | $ | (27.3) |
| | | | | |
| Other comprehensive loss: | | | | |
| Foreign currency translation adjustment | | (9.9) | | (35.9) |
| Comprehensive loss | $ | (93.2) | $ | (63.2) |

The accompanying notes are an integral part of these Condensed Consolidated Financial Statements

6

**GTT Communications, Inc.**
**Condensed Consolidated Statements of Stockholders' Equity**
(Unaudited)
(Amounts in millions, except for share data)

| | Common Stock | | Additional Paid-In Capital | Accumulated Deficit | Accumulated Other Comprehensive Loss | Total |
|---|---|---|---|---|---|---|
| | Shares | Amount | | | | |
| **Balance, December 31, 2019** | 56,686,459 | $ — | $ 842.4 | $ (474.2) | $ (77.1) | $ 291.1 |
| Adoption of ASU 2016-13 | — | — | — | (9.1) | — | (9.1) |
| Share-based compensation for restricted stock issued | 1,764,788 | — | 8.2 | — | — | 8.2 |
| Tax withholding related to the vesting of restricted stock | (23,783) | — | (0.3) | — | — | (0.3) |
| Stock issued in connection with employee stock purchase plan | 23,619 | — | 0.1 | — | — | 0.1 |
| Net loss | — | — | — | (83.3) | — | (83.3) |
| Foreign currency translation | — | — | — | — | (9.9) | (9.9) |
| **Balance, March 31, 2020** | 58,451,083 | $ — | $ 850.4 | $ (566.6) | $ (87.0) | $ 196.8 |

| | Common Stock | | Additional Paid-In Capital | Accumulated Deficit | Accumulated Other Comprehensive Loss | Total |
|---|---|---|---|---|---|---|
| | Shares | Amount | | | | |
| **Balance, December 31, 2018** | 55,625,149 | $ — | $ 809.9 | $ (368.3) | $ (26.9) | $ 414.7 |
| Share-based compensation for options issued | — | — | 0.2 | — | — | 0.2 |
| Share-based compensation for restricted stock issued | 562,385 | — | 8.5 | — | — | 8.5 |
| Tax withholding related to the vesting of restricted stock | (9,307) | — | (0.3) | — | — | (0.3) |
| Stock issued in connection with employee stock purchase plan | 14,061 | — | 0.1 | — | — | 0.1 |
| Stock issued in connection with acquisitions | (6,954) | — | (0.3) | — | — | (0.3) |
| Stock options exercised | 41,704 | — | 0.4 | — | — | 0.4 |
| Net loss | — | — | — | (27.3) | — | (27.3) |
| Foreign currency translation | — | — | — | — | (35.9) | (35.9) |
| **Balance, March 31, 2019** | 56,227,038 | $ — | $ 818.5 | $ (395.6) | $ (62.8) | $ 360.1 |

The accompanying notes are an integral part of these Condensed Consolidated Financial Statements

7

**GTT Communications, Inc.**
**Condensed Consolidated Statements of Cash Flows**
(Unaudited)
(Amounts in millions)

| | Three Months Ended March 31, | |
| --- | --- | --- |
| | 2020 | 2019 |
| Cash flows from operating activities: | | |
| Net loss | $ (83.3) | $ (27.3) |
| Adjustments to reconcile net loss to net cash provided by operating activities: | | |
| Depreciation and amortization | 67.5 | 62.8 |
| Share-based compensation | 8.3 | 8.7 |
| Debt discount amortization | 1.8 | 1.9 |
| Loss on debt extinguishment | 2.3 | — |
| Amortization of debt issuance costs | 1.4 | 1.2 |
| Change in fair value of derivative financial liability | 33.5 | 15.3 |
| Excess tax benefit from stock-based compensation | 1.0 | 0.3 |
| Deferred income taxes | (4.5) | 1.0 |
| Changes in operating assets and liabilities, net of acquisitions: | | |
| Accounts receivable, net | 0.2 | (53.7) |
| Prepaid expenses and other current assets | (32.5) | (5.4) |
| Other long-term assets | 9.7 | 1.8 |
| Accounts payable | 26.2 | 12.1 |
| Accrued expenses and other current liabilities | 3.0 | (12.1) |
| Operating lease liabilities | 2.1 | — |
| Deferred revenue | 9.7 | 2.6 |
| Other long-term liabilities | (4.9) | 6.9 |
| Net cash provided by operating activities | 41.5 | 16.1 |
| | | |
| Cash flows from investing activities: | | |
| Acquisition of businesses, net of cash acquired | — | (0.5) |
| Purchases of property and equipment | (22.0) | (32.1) |
| **Net cash used in investing activities** | (22.0) | (32.6) |
| | | |
| Cash flows from financing activities: | | |
| Proceeds from revolving line of credit | 55.0 | 26.0 |
| Repayment of revolving line of credit | (130.0) | — |
| Proceeds from term loans, net of original issuance discount and costs paid to lenders | 131.0 | — |
| Repayment of term loans | (6.5) | (6.5) |
| Repayment of other secured borrowings | (2.3) | (5.1) |
| Payment of holdbacks | — | (3.3) |
| Debt issuance costs paid to third parties | (2.3) | — |
| Repayment of finance leases | (2.1) | (0.6) |
| Proceeds from issuance of common stock under employee stock purchase plan | 0.4 | 0.1 |
| Tax withholding related to the vesting of restricted stock | (0.3) | (0.3) |
| Exercise of stock options | — | 0.4 |
| Net cash provided by financing activities | 42.9 | 10.7 |
| | | |
| Effect of exchange rate changes on cash | 2.2 | 1.2 |
| | | |
| Net increase (decrease) in cash, cash equivalents, and restricted cash | 64.6 | (4.6) |
| | | |
| Cash, cash equivalents, and restricted cash at beginning of period | 41.8 | 55.3 |
| | | |
| Cash, cash equivalents, and restricted cash at end of period | $ 106.4 | $ 50.7 |
| | | |
| Supplemental disclosure of cash flow information: | | |
| Cash paid for interest | $ 32.0 | $ 32.0 |
| Cash paid for income taxes, net | — | (0.1) |

The accompanying notes are an integral part of these Condensed Consolidated Financial Statements

9

GTT Communications, Inc.
Notes to Condensed Consolidated Financial Statements
(Unaudited)

## NOTE 1 — ORGANIZATION AND BUSINESS

*Organization and Business*

GTT Communications, Inc. ("GTT" or the "Company") serves large enterprise and carrier clients with complex national and global networking needs, and differentiates itself from the competition by providing an outstanding service experience built on its core values of simplicity, speed and agility. The Company operates a global Tier 1 internet network ranked among the largest in the industry, and owns a fiber network that includes an expansive pan-European footprint and subsea cables. The Company's global network includes over 600 points of presence ("PoPs") spanning six continents, and the Company provides services in more than 140 countries.

*Basis of Presentation*

The accompanying unaudited condensed consolidated financial statements have been prepared pursuant to the rules and regulations of the Securities and Exchange Commission ("SEC") and should be read in conjunction with the Company's audited financial statements and footnotes thereto for the fiscal year ended December 31, 2019, included in the Company's Annual Report on Form 10-K filed on March 2, 2020. Certain information and footnote disclosures normally included in financial statements prepared in accordance with accounting principles generally accepted in the United States of America ("GAAP") have been omitted pursuant to such rules and regulations.

The condensed consolidated financial statements reflect all adjustments (consisting of normal recurring adjustments) that are, in the opinion of management, necessary for a fair presentation of the Company's consolidated financial position and its results of operations. The operating results for the three months ended March 31, 2020 are not necessarily indicative of the results to be expected for the full fiscal year 2020 or for any other interim period. The December 31, 2019 consolidated balance sheet is condensed from the audited financial statements as of that date.

*Use of Estimates and Assumptions*

The preparation of financial statements in accordance with GAAP requires management to make estimates and assumptions that affect certain reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenue and expenses during the reporting period. Significant estimates are used when establishing allowances for doubtful accounts, accruals for billing disputes and exit activities, determining useful lives for depreciation and amortization, assessing the need for impairment charges (including those related to intangible assets and goodwill), determining the fair values of assets acquired and liabilities assumed in business combinations, assessing the fair value of derivative financial instruments, accounting for income taxes and related valuation allowances against deferred tax assets, and estimating the grant date fair values used to compute the share-based compensation expense. Management evaluates these estimates and judgments on an ongoing basis and makes estimates based on historical experience, current conditions, and various other assumptions that are believed to be reasonable under the circumstances. The results of these estimates form the basis for making judgments about the carrying values of assets and liabilities as well as identifying and assessing the accounting treatment with respect to commitments and contingencies. Actual results may differ from these estimates under different assumptions or conditions, including but not limited to assumptions or conditions due to uncertainty of the magnitude and duration of the impacts of the COVID-19 pandemic in the current economic environment.

*Revenue Recognition*

The Company's revenue is derived primarily from telecommunications services, which includes both revenue from contracts with customers and lease revenues. Lease revenue services include dark fiber, duct, and colocation services. All other services are considered revenue from contracts with customers. Revenue from contracts with customers is recognized when services are provided to the customer, in an amount that reflects the consideration the Company expects to receive in exchange for those services. Lease revenue represents an arrangement where the customer has the right to use an identified asset for a specified term and such revenue is recognized over the term the customer is given exclusive access to the asset.

*Primary geographical market.* The Company's operations are located primarily in the United States and Europe. The nature and timing of revenue from contracts with customers across geographic markets is similar. The following table presents the

10

Company's revenue from contracts with customers disaggregated by primary geographic market based on legal entities (in millions):

|  | Three Months Ended March 31, | | | |
|---|---|---|---|---|
|  | 2020 | | 2019 | |
| Primary geographic market: | | | | |
| United States | $ | 171.7 | $ | 204.2 |
| Europe | | 205.3 | | 196.5 |
| Other | | 9.0 | | 11.9 |
| Total revenue from contracts with customers | | 386.0 | | 412.6 |
| Lease revenue | | 38.7 | | 37.6 |
| Total telecommunications services revenue | $ | 424.7 | $ | 450.2 |

*Universal Service Fund ("USF"), Gross Receipts Taxes and Other Surcharges.* USF fees and other surcharges billed to customers and recorded on a gross basis (as service telecommunications services revenue and cost of telecommunications services) were $5.6 million and $5.9 million for the three months ended March 31, 2020 and 2019, respectively.

*Contract balances.* Contract assets consist of conditional or unconditional rights to consideration. Accounts receivable represent amounts billed to customers where the Company has an enforceable right to payment for performance completed to date (i.e., unconditional rights to consideration). The Company does not have contract assets that represent conditional rights to consideration. The Company's accounts receivable balance at March 31, 2020 and December 31, 2019 includes $134.4 million and $145.9 million, respectively, related to contracts with customers. There were no other contract assets as of March 31, 2020 or December 31, 2019.

Contract liabilities are generally limited to deferred revenue. Deferred revenue is a contract liability, representing advance consideration received from customers primarily related to the pre-paid capacity sales, where transfer of control occurs over time, and therefore revenue is recognized over the related contractual service period. The Company's contract liabilities were $82.0 million and $76.0 million as of March 31, 2020 and December 31, 2019, respectively. The change in contract liabilities during the three months ended March 31, 2020 included $3.8 million for revenue recognized that was included in the contract liability balance as of January 1, 2020 and $10.7 million for new contract liabilities net of amounts recognized as revenue during the three months ended March 31, 2020.

The following table includes estimated revenue from contracts with customers expected to be recognized for each of the years subsequent to March 31, 2020 related to performance obligations that are unsatisfied (or partially unsatisfied) at March 31, 2020 and have an original expected duration of greater than one year (amounts in millions):

| | | |
|---|---|---|
| 2020 remaining | $ | 13.7 |
| 2021 | | 15.2 |
| 2022 | | 14.4 |
| 2023 | | 12.8 |
| 2024 | | 8.0 |
| 2025 and beyond | | 17.9 |
| | $ | 82.0 |

For a table of estimated revenue to be recognized for consolidated deferred revenue for each of the years subsequent to March 31, 2020 refer to Note 6 - Deferred revenue.

*Deferred costs to obtain a contract.* Deferred sales commissions were $24.7 million and $23.0 million as of March 31, 2020 and December 31, 2019, respectively. There were no other significant amounts of assets recorded related to contract costs as of March 31, 2020 or December 31, 2019.

**Property and Equipment**

Depreciation expense associated with property and equipment, including amortization of finance lease assets, was $46.4 million and $40.7 million for the three months ended March 31, 2020 and 2019, respectively.

The Company capitalized labor costs, including indirect and overhead costs, of $3.8 million and $4.2 million for the three months ended March 31, 2020 and 2019, respectively. The Company capitalized software costs of $1.1 million and $1.1 million for the three months ended March 31, 2020 and 2019, respectively.

The Company reviews long-lived assets for impairment whenever events or changes in circumstances indicate that the carrying amount of the assets may not be recoverable. If the carrying amount of an asset were to exceed its estimated future undiscounted cash flows, the asset would be considered to be impaired. Impairment losses would then be measured as the amount by which the carrying amount of the asset exceeds the fair value of the asset. Assets to be disposed of, if any, are reported at the lower of the carrying amount or fair value less costs to sell.

*Disputed Supplier Expenses*

In the normal course of business, the Company identifies errors by suppliers with respect to the billing of services. The Company performs bill verification procedures to ensure that errors in the Company's suppliers' billed invoices are identified and resolved. If the Company concludes that a vendor has billed inaccurately, the Company will record a liability only for the amount that it believes is owed. As of March 31, 2020 and December 31, 2019, the Company had open disputes not accrued for of $28.8 million and $12.2 million, respectively, and open paid disputes in the form of receivables from suppliers of $36.0 million and $10.7 million, respectively.

*Newly Adopted Accounting Principles*

In June 2016, the FASB issued ASU 2016-13, *Financial Instruments - Credit Losses (Topic 326): Measurement of Credit Losses on Financial Instruments*, and subsequent amendment to the initial guidance, ASU 2018-19, in November 2018. The updated guidance introduces a new forward-looking approach, based on expected losses, to estimate credit losses on certain types of financial instruments, including trade receivables. The new guidance is effective for interim and annual reporting periods beginning after December 15, 2019. The standard requires a modified retrospective approach through a cumulative-effect adjustment to retained earnings as of the beginning of the first reporting period in which the guidance is effective. The Company adopted ASU 2016-13 as of January 1, 2020 using the modified retrospective approach related to its accounts receivables, resulting in a cumulative adjustment to retained earnings of approximately $9.1 million.

In August 2018, the FASB issued ASU No. 2018-13, *Fair Value Measurement (Topic 820): Disclosure Framework - Changes to the Disclosure Requirements for Fair Value Measurement*, which modifies the disclosure requirements for fair value measurements by removing, modifying, or adding certain disclosures. The new guidance is effective for interim and annual reporting periods beginning after December 15, 2019. The removed and modified disclosures are adopted on a retrospective basis and the new disclosures are adopted on a prospective basis. The Company adopted the guidance as of January 1, 2020. The adoption of the new standard did not have a material impact on the Company's condensed consolidated financial statements.

*Recent Accounting Pronouncements*

Other recent accounting pronouncements issued by the FASB during 2020 and through the filing date did not and are not believed by management to have a material impact on the Company's present or historical consolidated financial statements.

## NOTE 2 — BUSINESS ACQUISITIONS

Since its formation, the Company has consummated a number of transactions accounted for as business combinations as part of its growth strategy. The acquisitions of these businesses, which are in addition to periodic purchases of client contracts, have allowed the Company to increase the scale at which it operates, which in turn affords the Company the ability to increase its operating leverage, extend its network, and broaden its client base.

The accompanying condensed consolidated financial statements include the operations of the acquired entities from their respective acquisition dates. All of the acquisitions have been accounted for as a business combination. Accordingly, consideration paid by the Company to complete the acquisitions is initially allocated to the acquired assets and liabilities based upon their estimated acquisition date fair values. The recorded amounts for assets acquired and liabilities assumed are provisional and subject to change during the measurement period, which is up to 12 months from the acquisition date.

There were no acquisitions completed during the three months ended March 31, 2020.

For material acquisitions completed during 2019, 2018, and 2017, refer to Note 3 - Business Acquisitions to the consolidated financial statements contained in the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2019. During the three months ended March 31, 2020, certain immaterial measurement period adjustments were recorded to adjust provisional amounts for acquisitions completed during 2019.

**Acquisition Method Accounting Estimates**

The Company initially recognizes the assets and liabilities acquired from the acquisitions based on its preliminary estimates of their acquisition date fair values. As additional information becomes known concerning the acquired assets and assumed liabilities, management may make adjustments to the opening balance sheet of the acquired company up to the end of the measurement period, which is a period of no longer than one year following the acquisition date. The determination of the fair values of the acquired assets and liabilities assumed (and the related determination of estimated lives of depreciable tangible and identifiable intangible assets) requires significant judgment.

**Transaction Costs**

Transaction costs describe the broad category of costs the Company incurs in connection with signed and/or closed acquisitions. There are two types of costs that the Company accounts for:

- Severance, restructuring and other exit costs
- Transaction and integration costs

Severance, restructuring and other exit costs include severance and other one-time benefits for terminated employees, termination charges for leases and supplier contracts, and other costs incurred associated with an exit activity. These costs are reported separately in the condensed consolidated statements of operations during the three months ended March 31, 2020 and 2019. Refer to Note 12 - Severance, Restructuring, and Other Exit Costs of these condensed consolidated financial statements for further information.

Transaction and integration costs include expenses associated with legal, accounting, regulatory, and other transition services rendered in connection with acquisition, travel expense, and other non-recurring direct expenses associated with acquisitions. Transaction and integration costs are expensed as incurred in support of the integration. The Company incurred transaction and integration costs of $2.2 million and $9.2 million during the three months ended March 31, 2020 and 2019, respectively. Transaction and integration costs have been included in selling, general and administrative expenses in the condensed consolidated statements of operations and in cash flows from operating activities in the condensed consolidated statements of cash flows.

<u>NOTE 3 — GOODWILL AND INTANGIBLE ASSETS</u>

The goodwill balance was $1,763.7 million and $1,768.6 million as of March 31, 2020 and December 31, 2019, respectively. Additionally, the Company's intangible asset balance was $465.4 million and $490.7 million as of March 31, 2020 and December 31, 2019, respectively.

The change in the carrying amount of goodwill for the three months ended March 31, 2020 was as follows (amounts in millions):

| | | |
|---|---|---|
| **Goodwill - December 31, 2019** | $ | 1,768.6 |
| Adjustments to 2019 business combinations | | (0.6) |
| Foreign currency translation adjustments | | (4.3) |
| **Goodwill - March 31, 2020** | $ | 1,763.7 |

Goodwill is reviewed for impairment at least annually, in October, or more frequently if a triggering event occurs between impairment testing dates. There were no triggering events or goodwill impairments identified for the three months ended March 31, 2020 and 2019.

The following table summarizes the Company's intangible assets as of March 31, 2020 and December 31, 2019 (amounts in millions):

| | Amortization Period | **March 31, 2020** | | | **December 31, 2019** | | |
|---|---|---|---|---|---|---|---|
| | | Gross Asset Cost | Accumulated Amortization | Net Book Value | Gross Asset Cost | Accumulated Amortization | Net Book Value |
| Customer lists | 3-20 years | $ 775.2 | $ 331.7 | $ 443.5 | $ 781.1 | $ 313.7 | $ 467.4 |
| Non-compete agreements | 3-5 years | 4.7 | 4.7 | — | 4.7 | 4.6 | 0.1 |
| Intellectual property | 10 years | 38.0 | 16.3 | 21.7 | 38.3 | 15.4 | 22.9 |
| Tradename | 1-3 years | 6.1 | 5.9 | 0.2 | 6.2 | 5.9 | 0.3 |
| | | $ 824.0 | $ 358.6 | $ 465.4 | $ 830.3 | $ 339.6 | $ 490.7 |

Amortization expense was $21.1 million and $22.1 million for the three months ended March 31, 2020 and 2019, respectively.

Estimated amortization expense related to intangible assets subject to amortization at March 31, 2020 in each of the years subsequent to March 31, 2020 is as follows (amounts in millions):

| | | |
|---|---|---|
| 2020 remaining | $ | 63.3 |
| 2021 | | 82.6 |
| 2022 | | 69.5 |
| 2023 | | 57.0 |
| 2024 | | 51.5 |
| 2025 and beyond | | 141.5 |
| Total | $ | 465.4 |

The Company reviews its intangible assets for impairment whenever events or circumstances indicate that the carrying amount of an asset may not be fully recoverable. There were no triggering events or intangible asset impairments recognized for the three months ended March 31, 2020 and 2019.

## NOTE 4 — PREPAID EXPENSES AND OTHER CURRENT ASSETS

The following table summarizes the Company's prepaid expenses and other current assets as of March 31, 2020 and December 31, 2019 (amounts in millions):

| | **March 31, 2020** | | **December 31, 2019** | |
|---|---|---|---|---|
| Receivables from suppliers | $ | 36.0 | $ | 10.7 |
| Prepaid cost of telecommunications services | | 19.4 | | 11.8 |
| Prepaid selling, general and administrative | | 12.6 | | 13.1 |
| Deferred commissions | | 11.3 | | 9.8 |
| Other | | 2.8 | | 5.0 |
| | $ | 82.1 | $ | 50.4 |

**NOTE 5 — ACCRUED EXPENSES AND OTHER CURRENT LIABILITIES**

The following table summarizes the Company's accrued expenses and other current liabilities as of March 31, 2020 and December 31, 2019 (amounts in millions):

|  | March 31, 2020 | December 31, 2019 |
|---|---|---|
| Cost of telecommunications services | $ 91.7 | $ 105.3 |
| Interest rate swaps | 86.7 | 53.5 |
| Compensation and benefits | 25.6 | 24.4 |
| Taxes payable | 26.2 | 28.3 |
| Selling, general and administrative | 19.4 | 18.1 |
| Interest | 11.8 | 0.4 |
| Restructuring, current portion | 6.7 | 6.4 |
| Other | 5.3 | 4.4 |
|  | $ 273.4 | $ 240.8 |

**NOTE 6 — DEFERRED REVENUE**

Total deferred revenue as of March 31, 2020 and December 31, 2019 was $339.0 million and $333.5 million, respectively, consisting of unamortized prepaid services, IRUs, and deferred non-recurring revenue. Deferred revenue is recognized as current and long-term deferred revenue on the condensed consolidated balance sheets.

Significant changes in deferred revenue balances during the period are as follows (amounts in millions):

|  | Three Months Ended March 31, 2020 | | |
|---|---|---|---|
|  | Contract Term | | |
|  | Less than 1 Year | Greater than 1 Year | Total |
| Balance, December 31, 2019 | $ 22.5 | $ 311.0 | $ 333.5 |
| Revenue recognized from beginning balance | (17.9) | (10.3) | (28.2) |
| Increase in deferred revenue (gross) | 49.2 | 10.9 | 60.1 |
| Revenue recognized on increase in deferred revenue | (22.0) | (0.2) | (22.2) |
| Foreign currency translation adjustments | (0.1) | (4.1) | (4.2) |
| Balance, March 31, 2020 | $ 31.7 | $ 307.3 | $ 339.0 |

Remaining amortization at March 31, 2020 and in each of the years subsequent to March 31, 2020 is as follows (amounts in millions):

|  | Contract Term | | |
|---|---|---|---|
|  | Less than 1 Year | Greater than 1 Year | Total |
| 2020 remaining | $ 31.6 | $ 32.7 | $ 64.3 |
| 2021 | 0.1 | 41.3 | 41.4 |
| 2022 | — | 37.8 | 37.8 |
| 2023 | — | 36.0 | 36.0 |
| 2024 | — | 28.2 | 28.2 |
| 2025 and beyond | — | 131.3 | 131.3 |
|  | $ 31.7 | $ 307.3 | $ 339.0 |

**NOTE 7 — DEBT**

As of March 31, 2020 and December 31, 2019, long-term debt was as follows (amounts in millions):

|  | March 31, 2020 | December 31, 2019 |
|---|---|---|
| US Term loan due 2025 | $ 1,739.0 | $ 1,743.5 |
| EMEA Term loan due 2025 | 951.5 | 828.8 |
| 7.875% Senior unsecured notes due 2024 | 575.0 | 575.0 |
| Revolving line of credit due 2023 | 65.0 | 140.0 |
| Other secured loans | 2.1 | 4.3 |
| Total debt obligations | 3,332.6 | 3,291.6 |
| Unamortized debt issuance costs | (26.6) | (28.0) |
| Unamortized original issuance discount, net | (48.0) | (40.8) |
| Carrying value of debt | 3,258.0 | 3,222.8 |
| Less current portion | (29.6) | (30.2) |
| Long-term debt less current portion | $ 3,228.4 | $ 3,192.6 |

*2018 Credit Agreement*

On May 31, 2018, the Company entered into a credit agreement (the "2018 Credit Agreement") that provides for (1) a $1,770.0 million term loan B facility (the "US Term Loan Facility"), (2) a €750.0 million term loan B facility (the "EMEA Term Loan Facility"), and (3) a $200.0 million revolving credit facility (the "Revolving Line of Credit Facility") (which includes a $50.0 million letter of credit facility). The US Term Loan Facility was issued at an original issuance discount of $8.9 million and the EMEA Term Loan Facility was issued at an original issuance discount of €3.8 million. The Company is the borrower under the U.S. Term Loan Facility and the Revolving Line of Credit Facility. The Company's wholly-owned subsidiary GTT Communications B.V. is the borrower under the EMEA Term Loan Facility (the "EMEA Borrower").

The maturity date of the US Term Loan Facility and the EMEA Term Loan Facility (collectively the "Term Loan Facilities") is May 31, 2025 and the maturity date of the Revolving Line of Credit Facility is May 31, 2023. Each maturity date may be extended per the terms of the 2018 Credit Agreement.

The principal amounts of the US Term Loan Facility and EMEA Term Loan Facility are payable in equal quarterly installments of $4.425 million and €1.875 million, respectively, commencing on September 30, 2018 and continuing thereafter until the maturity date when the remaining balances of outstanding principal amount is payable in full.

The Company may prepay loans under the 2018 Credit Agreement at any time, subject to certain notice requirements, LIBOR breakage costs, and prepayment fees noted above.

At the Company's election, the US Term Loan Facility may be made as either Base Rate Loans or Eurocurrency Loans. The EMEA Term Loan Facility will bear interest at the European Money Markets Institute EURIBOR plus the applicable margin. The applicable margin for the US Term Loan Facility is 1.75% for Base Rate Loans and 2.75% for Eurocurrency Loans, subject to a "LIBOR floor" of 0.00%.  The applicable margin for the EMEA Term Loan Facility is 3.25%, subject to a "EURIBOR floor" of 0.00%. The applicable margin for revolving loans under the Revolving Line of Credit Facility is 1.75% for Base Rate Loans, 2.75% for Eurocurrency Loans denominated in U.S. Dollars and certain other approved currencies other than Euros, and 3.25% for revolving loans denominated in Euros.

The proceeds from the US Term Loan Facility and EMEA Term Loan Facility were used to finance the acquisition of Interoute Communications Holdings S.A., to repay amounts outstanding under the Company's prior term loan facility, and to pay costs associated with such transactions.
On June 5, 2019, the Company entered into an Incremental Revolving Credit Assumption Agreement ("Incremental Agreement") to the 2018 Credit Agreement. The Incremental Agreement establishes $50.0 million in new revolving credit commitments, bringing the total sum of revolving credit commitments under the 2018 Credit Agreement, as modified by the Incremental Agreement, to $250.0 million. The revolving credit commitments made pursuant to the Incremental Agreement have terms and conditions identical to the existing revolving credit commitments under the 2018 Credit Agreement.

On February 28, 2020, the Company entered into an amendment to the 2018 Credit Agreement ("Amendment No. 2"), which established incremental term loan commitments for $140 million of EMEA term loans (the "2020 EMEA Term Loan Facility"), bringing the total amounts of EMEA term loans outstanding under the 2018 Credit Agreement, as modified by Amendment No. 2, to €750 million in Euro-denominated loans and $140 million in US Dollar-denominated loans. The EMEA term loans under the 2020 EMEA Term Loan Facility were incurred with an original issue discount of $5.6 million.

The 2020 EMEA Term Loan Facility has terms substantially identical to the existing EMEA Term Loan Facility, except that: (1) each quarterly amortization payment on the 2020 EMEA Term Loan Facility will be $350,000; (2) the EMEA Term Loan Facility has a prepayment penalty of 2.0% for certain mandatory and voluntary prepayments occurring on or prior to the one year anniversary of the effective date of the EMEA Term Loan Facility and 1.0% for certain mandatory and voluntary prepayments occurring following the one year anniversary of the effective date of the EMEA Term Loan Facility and until the second year anniversary thereof; (3) Amendment No. 2 added, for the benefit of the lenders under the 2020 EMEA Term Loan Facility, the same covenant restrictions contained in Amendment No. 1, except that (a) the amount of secured debt that can be incurred on a pari passu basis with the 2020 EMEA Term Loan Facility and certain types of debt incurred by non-credit parties is limited to $50 million in the aggregate and (b) certain excess asset sale proceeds will be required to prepay outstanding EMEA term loans or reinvest in long-term assets useful in the business within 30 days following receipt of such proceeds, which covenant restrictions will remain in place for so long as the existing Revolving Line of Credit Facility and the 2020 EMEA Term Loan Facility remain in effect; and (4) the applicable margin for the 2020 EMEA Term Loan Facility is (a) 3.25% for Base Rate Loans and 4.25% for Eurocurrency Loans for the first two years following the effective date of the 2020 EMEA Term Loan Facility and (b) 3.75% for Base Rate Loans and 4.75% for Eurocurrency Loans on and following the second anniversary of the effective date of the 2020 EMEA Term Loan Facility.

The proceeds of the 2020 EMEA Term Loan Facility were used to repay amounts outstanding under the Revolving Line of Credit Facility and for general corporate purposes.

The unused and available amount of the Revolving Line of Credit Facility at March 31, 2020 was as follows (amounts in millions):

| | | |
|---|---|---:|
| Committed capacity | $ | 250.0 |
| Borrowings outstanding | | (65.0) |
| Letters of credit issued | | (10.9) |
| Unused and available | $ | 174.1 |

The obligations of the Company under the 2018 Credit Agreement are secured by the substantial majority of the tangible and intangible assets of the Company. The obligations of the Company under the U.S. Term Loan Facility and the Revolving Line of Credit Facility are guaranteed by certain of its domestic subsidiaries, but not by any of the Company's foreign subsidiaries. The obligations of the EMEA Borrower under the EMEA Term Loan Facility are guaranteed by the Company and certain of its domestic and foreign subsidiaries. None of the foreign subsidiary guarantors of the EMEA Term Loan Facility provide cross-guarantees of the guarantees of the EMEA Term Loan Facility provided by the Company and its domestic subsidiaries.

The 2018 Credit Agreement does not contain a financial covenant for the US Term Loan Facility or the EMEA Term Loan Facility, but it does include a maximum Consolidated Net Secured Leverage Ratio applicable to the Revolving Line of Credit Facility in the event that utilization exceeds 30% of the revolving loan facility commitment. At March 31, 2020, the Company's utilization (as defined) of the Revolving Line of Credit Facility commitment was approximately 26%. On August 8, 2019, the Company entered into Amendment No. 1 to the 2018 Credit Agreement, which amends the Consolidated Net Secured Leverage Ratio applicable to the Revolving Line of Credit Facility for each fiscal quarter ending September 30, 2019 through December 31, 2020. If triggered, the covenant, as amended, requires the Company to maintain a Consolidated Net Secured Leverage Ratio, on a Pro Forma Basis, below the maximum ratio specified as follows:

| Fiscal Quarter Ending | Maximum Ratio |
|---|---|
| March 31, 2020 | 6.50:1 |
| June 30, 2020 | 6.50:1 |
| September 30, 2020 | 6.25:1 |
| December 31, 2020 | 6.25:1 |
| March 31, 2021 | 5.50:1 |
| June 30, 2021 | 5.00:1 |
| September 30, 2021 | 5.00:1 |
| December 31, 2021 | 4.50:1 |
| March 31, 2022 | 4.50:1 |
| June 30, 2022 and thereafter | 4.25:1 |

While the financial covenant was not required to be measured as a result of the utilization level of the Revolving Line of Credit Facility as of March 31, 2020, the Company's Consolidated Net Secured Leverage Ratio, as defined in the 2018 Credit Agreement, was approximately 6.53:1.

In addition, Amendment No. 1 to the 2018 Credit Agreement added certain restrictions, which remain in place from the effective date of the Amendment No. 1 until the delivery of the compliance certificate for the quarter ending March 31, 2021, demonstrating compliance with the Consolidated Net Secured Leverage Ratio for that quarter, including without limitation the following: the Company and its restricted subsidiaries (as defined in the 2018 Credit Agreement) may not make certain dividends, distributions and other restricted payments (as defined in the 2018 Credit Agreement), including that the Company may not pay dividends; the Company and its restricted subsidiaries may not designate any subsidiary an "Unrestricted Subsidiary" (which would effectively remove such subsidiary from the restrictions of the 2018 Credit Agreement); the Company and its restricted subsidiaries may not make "permitted acquisitions" (as defined in the 2018 Credit Agreement) or certain other investments, unless the Company and its restricted subsidiaries have liquidity (i.e., unrestricted cash and cash equivalents and availability under the revolving credit facility under the 2018 Credit Agreement) of at least $250 million (other than the acquisition of KPN Eurorings B.V., a private limited liability company (*besloten vennootschap met beperkte aansprakelijkheid*) incorporated under the laws of the Netherlands with respect to which this liquidity requirement is not applicable); and the amount of incremental borrowings under the 2018 Credit Agreement that the Company and its subsidiaries may request when the Consolidated Net Secured Leverage Ratio is above 4.40 to 1.00 the Company and its subsidiaries was reduced to $300 million minus amounts previously requested (which amount is $50 million requested under the Incremental Agreement described above).

*Interest Rate Swaps*

In April and May 2018, the Company entered into the following interest rate swap arrangements to partially mitigate the variability of cash flows due to changes in the Eurodollar rate, specifically related to interest payments on our term loans under the 2018 Credit Agreement:

| Trade date | April 6, 2018 | May 17, 2018 | May 17, 2018 | May 17, 2018 |
|---|---|---|---|---|
| Notional amount (in millions) | $ 500.0 | $ 200.0 | $ 300.0 | € 317.0 |
| Term (years) | 5 | 7 | 3 | 7 |
| Effective date | 4/30/2018 | 6/29/2018 | 6/29/2018 | 6/29/2018 |
| Termination date | 4/30/2023 | 5/31/2025 | 6/30/2021 | 5/31/2025 |
| Fixed rate | 2.6430 % | 3.0370 % | 2.8235 % | 0.8900 % |
| Floating rate | 1-month LIBOR | 1-month LIBOR | 1-month LIBOR | 1-month EURIBOR |

The interest rate swaps do not qualify for hedge accounting.

18

The fair value of the interest rate swaps at March 31, 2020 and December 31, 2019 was as follows (in millions):

| | | | | Fair Value | | | | |
| | | | | March 31, 2020 | | December 31, 2019 | | |
| Derivative Instrument | Aggregate Notional Amount | Effective Date | Maturity Date | Asset Derivatives | Liability Derivatives | Asset Derivatives | Liability Derivatives |
| --- | --- | --- | --- | --- | --- | --- | --- |
| Interest rate swap | $ 500.0 | 4/30/2018 | 4/30/2023 | $ — | $ (36.1) | $ — | $ (18.2) |
| Interest rate swap | $ 200.0 | 6/29/2018 | 5/31/2025 | — | (27.1) | — | (15.3) |
| Interest rate swap | $ 300.0 | 6/29/2018 | 6/30/2021 | — | (9.5) | — | (5.8) |
| Interest rate swap | € 317.0 | 6/29/2018 | 5/31/2025 | — | (14.0) | — | (14.2) |
| | | | | $ — | $ (86.7) | $ — | $ (53.5) |

The Company records the fair value of interest rate swaps in its condensed consolidated balance sheets within prepaid expenses and other current assets when in an asset position and within accrued expenses and other current liabilities when in a liability position. Due to the change in fair value of its interest rate swaps, the Company recognized a loss of $33.5 million and $15.3 million in other expense, net for the three months ended March 31, 2020 and 2019, respectively.

*7.875% Senior Unsecured Notes*

During 2016 and 2017, the Company completed three private offerings for $575.0 million aggregate principal amount of its 7.875% senior unsecured notes due in 2024 (collectively the "7.875% Senior Unsecured Notes"). Each offering was treated as a single series of debt securities. The 7.875% Senior Unsecured Notes have identical terms other than the issuance date and offering price. The 7.875% Senior Unsecured Notes were issued at a combined premium of $16.5 million.

The 7.875% Senior Unsecured Notes are guaranteed by the Company's domestic subsidiaries that guarantee the Company's obligations under the U.S. Term Loan Facility and the Revolving Line of Credit Facility, but not by any of the Company's foreign subsidiaries. We are in compliance with the subsidiary guarantee requirements for the 7.875% Senior Unsecured Notes.

*Other Secured Loans*

In connection with the Interoute acquisition in May 2018, the Company acquired other loans secured by certain network assets. The balance of other secured loans at March 31, 2020 and December 31, 2019 was $2.1 million and $4.3 million, respectively.

*Effective Interest Rate*

The effective interest rate on the Company's long-term debt at March 31, 2020 and December 31, 2019 was 5.2% and 5.2%, respectively. The effective interest rate considers the impact of the interest rate swaps.

*Long-term Debt Contractual Maturities*

The aggregate contractual maturities of long-term debt (excluding unamortized debt issuance costs and unamortized original issuance discounts and premiums) were as follows as of March 31, 2020 (amounts in millions):

| | Total Debt |
| --- | --- |
| 2020 remaining | $ 22.9 |
| 2021 | 27.3 |
| 2022 | 27.5 |
| 2023 | 92.5 |
| 2024 | 602.4 |
| 2025 and beyond | 2,560.0 |
| | $ 3,332.6 |

19

*Debt Issuance Costs and Original Issuance Discounts and Premiums*

The following table summarizes the debt issuance costs activity for the three months ended March 31, 2020 (amounts in millions):

|  | US Term Loan | EMEA Term Loan | 7.875% Senior Unsecured Notes | Revolving Line of Credit | Total |
|---|---|---|---|---|---|
| Balance, December 31, 2019 | $ (9.9) | $ (2.7) | $ (12.3) | $ (3.1) | $ (28.0) |
| Debt issuance costs incurred | — | (2.3) | — | — | (2.3) |
| Amortization | 0.4 | 0.3 | 0.5 | 0.2 | 1.4 |
| Loss on debt extinguishment | — | 2.3 | — | — | 2.3 |
| Balance, March 31, 2020 | $ (9.5) | $ (2.4) | $ (11.8) | $ (2.9) | $ (26.6) |

Debt issuance costs are presented in the condensed consolidated balance sheets as a reduction to long-term debt. Interest expense associated with the amortization of debt issuance costs was $1.4 million and $1.2 million for the three months ended March 31, 2020 and 2019, respectively.

The following table summarizes the original issuance (discount) and premium activity for the three months ended March 31, 2020 (amounts in millions):

|  | US Term Loan | EMEA Term Loan | 7.875% Senior Unsecured Notes | Total |
|---|---|---|---|---|
| Balance, December 31, 2019 | $ (34.2) | $ (18.7) | $ 12.1 | $ (40.8) |
| New Original Issuance Discount | — | (5.6) | — | (5.6) |
| Fees paid to lenders | — | (3.4) | — | (3.4) |
| Amortization | 1.4 | 0.9 | (0.5) | 1.8 |
| Balance, March 31, 2020 | $ (32.8) | $ (26.8) | $ 11.6 | $ (48.0) |

Original issuance discounts and premiums are presented in the condensed consolidated balance sheets as a reduction to long-term debt. Amortization of original issuance discounts and premiums was $1.8 million and $1.9 million for the three months ended March 31, 2020 and 2019, respectively.

## NOTE 8 — FAIR VALUE MEASUREMENTS

The Company measures certain financial assets and liabilities at fair value on a recurring basis. For additional information on the Company's fair value policies refer to Note 2 - Significant Accounting Policies to the consolidated financial statements contained in the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2019.

*Recurring Fair Value Measurements*

The following table presents the Company's financial assets and liabilities that are required to be measured and recognized at fair value on a recurring basis classified under the appropriate level of the fair value hierarchy as of March 31, 2020 and December 31, 2019. There were no transfers between Level 1 and Level 2 during the three months ended March 31, 2020 and 2019.

| | Total | | Quoted Prices in Active Markets Level 1 | | Significant Other Observable Inputs Level 2 | | Significant Unobservable Inputs Level 3 |
|---|---|---|---|---|---|---|---|
| **March 31, 2020** | | | | | | | |
| **Assets:** | | | | | | | |
| Interest rate swap agreements | $ | — | $ | — | $ | — | $ — |
| | | | | | | | |
| **Liabilities:** | | | | | | | |
| Interest rate swap agreements | $ | (86.7) | $ | — | $ | (86.7) | $ — |

| | Total | | Quoted Prices in Active Markets Level 1 | | Significant Other Observable Inputs Level 2 | | Significant Unobservable Inputs Level 3 |
|---|---|---|---|---|---|---|---|
| **December 31, 2019** | | | | | | | |
| **Assets:** | | | | | | | |
| Interest rate swap agreements | $ | — | $ | — | $ | — | $ — |
| | | | | | | | |
| **Liabilities:** | | | | | | | |
| Interest rate swap agreements | $ | (53.5) | $ | — | $ | (53.5) | $ — |

*Non-recurring Fair Value Measurements*

In addition to assets and liabilities that are recorded at fair value on a recurring basis, the Company records assets and liabilities at fair value on a non-recurring basis as required by GAAP.

Assets measured at fair value on a non-recurring basis include goodwill, tangible assets, and intangible assets. Such assets are reviewed quarterly for impairment indicators. If a triggering event has occurred, the assets are re-measured when the estimated fair value of the corresponding asset group is less than the carrying value. The fair value measurements, in such instances, are based on significant unobservable inputs (Level 3).

*Other Fair Value Measurements*

As of March 31, 2020 and December 31, 2019, the carrying amounts reflected in the accompanying consolidated balance sheets for cash and cash equivalents, accounts receivable, accounts payable, accrued expenses and other current liabilities approximated fair value due to the short-term nature of these instruments.

The table below presents the fair values for the Company's long-term debt as well as the input level used to determine these fair values as of March 31, 2020 and December 31, 2019. The carrying amounts exclude any debt issuance costs or original issuance discount (amounts in millions):

21

| | Total Carrying Value in Consolidated Balance Sheet | | Fair Value Measurement Using Unadjusted Quoted Prices in Active Markets for Identical Assets or Liabilities [1] (Level 1) | |
|---|---|---|---|---|
| | March 31, 2020 | December 31, 2019 | March 31, 2020 | December 31, 2019 |
| *Liabilities not recorded at fair value in the Financial Statements:* | | | | |
| Long-term debt, including the current portion: | | | | |
| US Term loan due 2025 | $ 1,739.0 | $ 1,743.5 | $ 1,208.6 | $ 1,464.5 |
| EMEA Term loan due 2025 | 951.5 | 828.8 | 777.9 | 787.9 |
| 7.875% Senior unsecured notes due 2024 | 575.0 | 575.0 | 370.9 | 435.6 |
| Revolving line of credit due 2023 | 65.0 | 140.0 | 65.0 | 140.0 |
| Other secured loans | 2.1 | 4.3 | 2.1 | 4.3 |
| Total long-term debt, including current portion | $ 3,332.6 | $ 3,291.6 | $ 2,424.5 | $ 2,832.3 |

[1] Fair value based on the bid quoted price, except for the revolving line of credit and other secured loans for which carrying value approximates fair value.

## NOTE 9 — SHARE-BASED COMPENSATION

### *Share-Based Compensation Plan*

The Company grants share-based equity awards, including stock options and restricted stock, under the GTT Communications, Inc. 2018 Stock Option and Incentive Plan (the "GTT Stock Plan"). The GTT Stock Plan is limited to an aggregate 14,250,000 shares of which 12,622,117 have been issued and are outstanding as of March 31, 2020.

The GTT Stock Plan permits the granting of time-based stock options, time-based restricted stock, and performance-based restricted stock to employees and consultants of the Company, and non-employee directors of the Company.

Time-based options granted under the GTT Stock Plan have an exercise price of at least 100% of the fair market value of the underlying stock on the grant date and expire no later than 10 years from the grant date. The Company uses the Black-Scholes option-pricing model to determine the fair value of its stock option awards at the time of grant. The stock options generally vest over four years with 25% of the options becoming exercisable one year from the date of grant and the remaining vesting annually or quarterly over the following three years.

Time-based restricted stock granted under the GTT Stock Plan is valued at the share price of our common stock as reported on the NYSE on the date of grant. Time-based restricted stock generally vests over four years with 25% of the shares becoming unrestricted one year from the date of grant and the remaining vesting 75% annually or quarterly over the following three years.

Performance-based restricted stock is granted under the GTT Stock Plan subject to the achievement of certain performance measures. Once achievement of these performance measures is considered probable, the Company starts to expense the fair value of the grant over the vesting period. The performance-based restricted stock is valued at the share price of our common stock as reported on the NYSE on the date of grant. The performance grant vests quarterly over the vesting period once achievement of the performance measure has been met and approved by the Compensation Committee, typically one to two years.

The Compensation Committee of the Board of Directors, as administrator of the GTT Stock Plan, has the discretion to authorize a different vesting schedule for any awards.

In 2019, the Company implemented a sell-to-cover program for employees who elect to sell shares to cover any withholding taxes due upon vesting. Previously the Company netted shares upon vesting and paid the withholding taxes directly.

### *Share-Based Compensation Expense*

The following tables summarize the share-based compensation expense recognized as a component of selling, general and administrative expenses in the condensed consolidated statements of operations (amounts in millions):

|  | Three Months Ended March 31, | |
|---|---|---|
|  | **2020** | **2019** |
| Stock options | $ — | $ 0.2 |
| Restricted stock | 8.2 | 8.3 |
| ESPP | 0.1 | 0.2 |
| Total | $ 8.3 | $ 8.7 |

As of March 31, 2020, there was $50.1 million of total unrecognized compensation cost related to unvested share-based compensation awards. The following table summarizes the unrecognized compensation cost and the weighted average period over which the cost is expected to be amortized (amounts in millions):

|  | March 31, 2020 | |
|---|---|---|
|  | **Unrecognized Compensation Cost** | **Weighted Average Remaining Period to be Recognized (Years)** |
| Time-based stock options | $ — | 0.25 |
| Time-based restricted stock | 48.1 | 2.64 |
| Performance-based restricted stock [1] | 2.0 | 0.25 |
| Total | $ 50.1 | 2.54 |

[1] Excludes $8.1 million, $25.1 million, and $12.1 million of unrecognized compensation cost related to the 2020 Performance Awards, 2018 Performance Awards, and 2017 Performance Awards, respectively, where achievement of the performance criteria was not probable as of March 31, 2020.

The following table summarizes the restricted stock granted during the three months ended March 31, 2020 and 2019 (amounts in millions, except shares data):

|  | Three Months Ended March 31, | |
|---|---|---|
|  | **2020** | **2019** |
| Time-based restricted stock granted | 1,183,525 | 598,141 |
| Fair value of time-based restricted stock granted | $ 14.6 | $ 19.3 |
|  |  |  |
| Performance-based restricted stock granted | 651,350 | 24,000 |
| Fair value of performance-based restricted stock granted | $ 8.1 | $ 0.8 |

No stock options were issued in any period presented.

***Performance-based Restricted Stock***

The Company granted $17.4 million of restricted stock during 2015 and 2017 contingent upon the achievement of certain performance criteria (the "2015 Performance Awards"). The fair value of the 2015 Performance Awards was calculated using the value of GTT common stock on the respective grant dates. Upon announcement of the Hibernia acquisition in November 2016, the achievement of two of the four performance criteria became probable and the Company started recognizing share-based compensation expense for these grants. Expense recognition concluded during the first quarter of 2019. Additionally, upon announcement of the Global Capacity acquisition in June 2017, the achievement of the final two performance criteria became probable and the Company started recognizing share-based compensation expense for these grants. The Company did not recognize share-based compensation expense related to the 2015 Performance awards during the three months ended March 31, 2020 as the awards were fully vested. The Company recognized share-based compensation expense related to the 2015 Performance Awards of $1.1 million for the three months ended March 31, 2019. As of December 31, 2019, the 2015 Performance Awards were fully vested, and accordingly, the Company recognized no share-based compensation expense for the three months ended March 31, 2020.

The Company granted $32.6 million of restricted stock during 2017 and 2018 contingent upon the achievement of certain performance criteria (the "2017 Performance Awards"). The fair value of the 2017 Performance Awards was calculated using the value of GTT common stock on the grant date. Upon the closing of the Interoute acquisition in May 2018, the achievement of two

23

of the four performance criteria became probable and the Company started recognizing share-based compensation expense for these grants. Expense recognition is expected to continue through the second quarter of 2020. The Company recognized share-based compensation expense related to the 2017 Performance Awards of $1.0 million and $1.8 million for the three months ended March 31, 2020 and 2019, respectively. As of March 31, 2020, $5.4 million of unvested 2017 Performance Awards had been forfeited due to departures and remaining unrecognized compensation cost related to the unvested 2017 Performance Awards was $13.8 million, inclusive of unrecognized compensation cost where achievement of the performance criteria was not probable as of March 31, 2020.

The Company granted $31.2 million of restricted stock during 2018 and 2019 contingent upon the achievement of certain performance criteria (the "2018 Performance Awards"). The fair value of the 2018 Performance Awards was calculated using the value of GTT common stock on the grant date. As of March 31, 2020, achievement of the performance criteria was not probable. Accordingly, the Company recognized no share-based compensation expense for the three months ended March 31, 2020. As of March 31, 2020, $6.1 million of unvested 2018 Performance Awards had been forfeited due to departures and remaining unrecognized compensation cost related to the unvested 2018 Performance Awards was $25.1 million.

The Company granted $8.1 million of restricted stock during the three months ended March 31, 2020 contingent upon the achievement of certain performance criteria ("the 2020 Performance Awards"). The fair value of the 2020 Performance Awards was calculated using the value of GTT common stock on the grant date. As of March 31, 2020, achievement of the performance criteria was not probable. Accordingly, the Company recognized no share-based compensation expense for the three months ended March 31, 2020.

*Employee Stock Purchase Plan*

The Company has an Employee Stock Purchase Plan ("ESPP") that permits eligible employees to purchase common stock through payroll deductions at the lesser of the opening stock price or 85% of the closing stock price of the common stock during each of the three-month offering periods. The Company expenses the discount offered as additional share-based compensation expense. The offering periods generally commence on the first day and the last day of each quarter. At March 31, 2020, 241,902 shares were available for issuance under the ESPP.

## NOTE 10 — LOSS PER SHARE

Basic loss per share is computed by dividing net loss available to common stockholders by the weighted average number of common shares outstanding. Diluted loss per share reflects, in periods with earnings and in which it has a dilutive effect, the effect of common shares issuable upon exercise of stock options and warrants.

The table below details the calculations of loss per share (in millions, except for share and per share amounts):

| | Three Months Ended March 31, | | | |
|---|---|---|---|---|
| | **2020** | | **2019** | |
| Numerator for basic and diluted EPS – net loss available to common stockholders | $ | (83.3) | $ | (27.3) |
| Denominator for basic EPS – weighted average shares | | 57,259,699 | | 55,839,212 |
| Effect of dilutive securities | | — | | — |
| Denominator for diluted EPS – weighted average shares | | 57,259,699 | | 55,839,212 |
| | | | | |
| Loss per share: | | | | |
| Basic | $ | (1.45) | $ | (0.49) |
| Diluted | $ | (1.45) | $ | (0.49) |

All outstanding stock options were anti-dilutive as of March 31, 2020 and 2019 due to the net loss incurred during the periods. There were approximately 376,960 and 474,880 outstanding stock options as of March 31, 2020 and 2019, respectively.

## NOTE 11 — INCOME TAXES

The Company's provision for income taxes is determined using an estimate of its annual effective tax rate, adjusted for the effect of discrete items arising in the quarter. Each quarter the Company updates its estimate of the annual effective tax rate.

The quarterly tax provision and the quarterly estimate of the Company's annual effective tax rate is subject to significant variation due to several factors, including variability in accurately predicting pre-tax and taxable income (loss) and the mix of jurisdictions to which they relate, effects of acquisitions and integrations, audit-related developments, changes in the Company's stock price, foreign currency gains (losses), and tax law developments. Additionally, the Company's effective tax rate may be more or less volatile based on the amount of pre-tax income or loss and impact of discrete items.

The Company recorded a (benefit from) provision for income taxes of $(1.9) million and $1.8 million for the three months ended March 31, 2020 and 2019, respectively.

The Company assesses the available positive and negative evidence to estimate whether sufficient future taxable income will be generated to permit use of the Company's existing deferred tax assets. A significant piece of objective negative evidence identified during the Company's evaluation was the cumulative loss incurred over the three year period ended December 31, 2019. Such objective evidence limits the ability to consider other subjective evidence, such as the Company's forecasts of future taxable income and tax planning strategies. On the basis of this evaluation as of March 31, 2020 and December 31, 2019, the Company recognized a valuation allowance against its net U.S. deferred tax assets under the criteria of ASC 740 of $100.7 million and $100.7 million, respectively, and the Company recognized a valuation allowance against its net foreign deferred tax assets under the criteria of ASC 740 of $111.3 million and $110.6 million, respectively. The amount of U.S. deferred tax asset considered realizable, has been recorded to recognize only the portion of the deferred tax asset that is more likely than not to be realized. The amount of the deferred tax asset considered realizable, however, could be adjusted if objective negative evidence in the form of cumulative losses is no longer present and additional weight is given to subjective evidence such as forecasted taxable income. The Company will continue to evaluate the need to record valuation allowances against deferred tax assets and will make adjustments in accordance with ASC 740.

On March 27, 2020, the Coronavirus Aid, Relief and Economic Security Act (the "CARES Act") was signed into law in response to the COVID-19 pandemic. The CARES Act provides numerous tax provisions and stimulus measures, including temporary changes regarding the prior and future utilization of net operating losses, temporary changes to the prior and future limitations on interest deductions, and technical corrections from prior tax legislation for tax depreciation of certain qualified improvement property. The Company has evaluated the provisions of the CARES Act relating to income taxes which will result in adjustments to certain deferred tax assets and liabilities. Due to the Company's U.S. valuation allowance, the Company does not expect the provisions of the CARES Act to have a material impact on its consolidated financial statements.

**NOTE 12 — SEVERANCE, RESTRUCTURING, AND OTHER EXIT COSTS**

The Company incurred severance, restructuring and other exit costs associated with 2019 and 2018 acquisitions and in connection with the termination of certain facility leases. These costs include employee severance costs, termination costs associated with facility leases and network agreements, and other exit costs related to the transactions. The Company records the current portion of severance, restructuring and other exit costs as a component of accrued expenses and other current liabilities and the long-term portion of severance, restructuring and other exit costs as a component of other long-term liabilities.

The exit costs recorded and paid are summarized as follows for the three months ended March 31, 2020 (amounts in millions):

|  | Balance, December 31, 2019 | | Charges | | Payments | | Balance, March 31, 2020 |
|---|---|---|---|---|---|---|---|
| Employee termination benefits | $ | 2.7 | $ | 0.1 | $ | (0.6) | $ | 2.2 |
| Lease terminations |  | 7.6 |  | 2.0 |  | (0.8) |  | 8.8 |
| Other contract terminations |  | 3.6 |  | — |  | (0.4) |  | 3.2 |
|  | $ | 13.9 | $ | 2.1 | $ | (1.8) | $ | 14.2 |

During the three months ended March 31, 2019, the Company incurred severance, restructuring and other exit costs of $2.8 million and made payments of $8.4 million.

**NOTE 13 — LEASES**

The Company enters into contracts to lease real estate, equipment, and vehicles, and has identified embedded leases within its colocation, dark fiber, and duct supplier contracts. The lease contracts have remaining lease terms up to 31 years and certain leases include options to extend the lease term. The Company is not party to any lease contracts with related parties. The Company's lease agreements do not contain any residual value guarantees or restrictive covenants.

The Company's lease expense is split between cost of telecommunications services and selling, general and administrative expenses in the condensed consolidated statement of operations based on the use of the asset for which lease expense is being paid. The components of lease expense for the period were as follows (amounts in millions):

| | Three Months Ended March 31, | | | |
| --- | --- | --- | --- | --- |
| | **2020** | | **2019** | |
| Operating lease expense | $ | 23.8 | $ | 28.6 |
| Finance lease expense: | | | | |
| Amortization of right of use assets | | 0.5 | | 0.6 |
| Interest on lease liabilities | | 1.3 | | 1.1 |
| Total finance lease expense | | 1.8 | | 1.7 |
| Short-term lease expense | | 5.0 | | 6.2 |
| Variable lease expense | | 5.6 | | 7.7 |
| Total lease expense | $ | 36.2 | $ | 44.2 |

Supplemental cash flow information related to leases for the period was as follows (amounts in millions):

| | Three Months Ended March 31, | | | |
| --- | --- | --- | --- | --- |
| | **2020** | | **2019** | |
| Cash paid for amounts included in the measurement of lease liabilities: | | | | |
| Operating cash flows from operating leases | $ | 21.7 | $ | 34.0 |
| Operating cash flows from finance leases | | 1.3 | | 1.1 |
| Financing cash flows from finance leases | | 2.1 | | 0.6 |
| | | | | |
| Right of use assets obtained in exchange for new operating lease liabilities | | 2.4 | | 8.0 |
| Right of use assets obtained in exchange for new finance lease liabilities | | 1.0 | | — |

Supplemental balance sheet information related to leases for the period was as follows:

| | March 31, 2020 |
| --- | --- |
| Weighted average remaining lease term (amounts in years) | |
| Operating leases | 6.25 |
| Finance leases | 22.82 |
| | |
| Weighted average discount rate | |
| Operating leases | 5.6 % |
| Finance leases | 13.0 % |

Maturities of lease liabilities were as follows (amounts in millions):

|  | Operating Leases | Finance Leases |
|---|---|---|
| 2020 remaining | $ 68.0 | $ 5.1 |
| 2021 | 81.5 | 5.1 |
| 2022 | 63.5 | 5.2 |
| 2023 | 48.0 | 5.2 |
| 2024 | 34.3 | 5.3 |
| 2025 and beyond | 95.3 | 111.2 |
| Total lease payments | 390.6 | 137.1 |
| Less: Present value discount | (63.3) | (95.3) |
| Present value of lease obligations | $ 327.3 | $ 41.8 |

**NOTE 14 — COMMITMENTS AND CONTINGENCIES**

Estimated annual commitments under contractual obligations, excluding those related to long-term debt and operating and finance leases, are as follows at March 31, 2020 (amounts in millions):

|  | Network Supply | Other |
|---|---|---|
| 2020 remaining | $ 369.1 | $ 12.1 |
| 2021 | 367.1 | 6.6 |
| 2022 | 272.5 | 3.7 |
| 2023 | 85.0 | 2.8 |
| 2024 | 26.6 | 2.4 |
| 2025 and beyond | 65.6 | 7.2 |
|  | $ 1,185.9 | $ 34.8 |

Refer to Note 7 - Debt for the aggregate contractual maturities of long-term debt (excluding unamortized debt issuance costs and unamortized original issuance discounts and premiums) at March 31, 2020 and refer to Note 13 - Leases for the aggregate contractual maturities of operating leases and finance leases at March 31, 2020.

*Network Supply Agreements*

As of March 31, 2020, the Company had purchase obligations of $1,185.9 million associated with the telecommunications services that the Company has contracted to purchase from its suppliers that are not accounted for as operating leases. The Company's supplier agreements fall into two key categories, the Company's core IP backbone and client specific locations (also referred to as "last mile" locations). Supplier agreements associated with the Company's core IP backbone are typically contracted on a one year term and do not relate to any specific underlying client commitments. The short-term duration allows the Company to take advantage of favorable pricing trends.

Supplier agreements associated with the Company's client specific locations, which represent the substantial majority of the Company's network spending, are typically contracted so the terms and conditions in both the vendor and client contracts are substantially the same in terms of duration and capacity. The back-to-back nature of the Company's contracts means that its network supplier obligations are generally mirrored by its clients' commitments to purchase the services associated with those obligations.

*Legal Proceedings*

From time to time, the Company is a party to legal proceedings arising in the normal course of its business. Except as disclosed below, the Company does not believe that it is a party to any current or pending legal action that could reasonably be expected to have a material adverse effect on its financial condition or results of operations and cash flow.

On July 30, 2019, a purported class action complaint was filed against the Company and certain of its current and former officers and directors in the U.S District Court for the Eastern District of Virginia (Case No. 1:19-cv-00982) on behalf of certain GTT stockholders. The complaint alleges that defendants made false or misleading statements and omissions of purportedly material

fact, in violation of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5 thereunder, in connection with disclosures relating to GTT's acquisition and integration of Interoute Communications Holdings S.A. The complaint seeks unspecified damages. The Company believes that the claims in this lawsuit are without merit and intends to defend against them vigorously. At this time, no assessment can be made as to its likely outcome or whether the outcome will be material to the Company.

## ITEM 2. *MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS*

*The following discussion and analysis of our financial condition and results of operations should be read together with our condensed consolidated financial statements and the related notes and the other financial information included elsewhere in this Quarterly Report on Form 10-Q, as well as the consolidated financial statements and Management's Discussion and Analysis ("MD&A") in our Annual Report on Form 10-K for the fiscal year ended December 31, 2019. In addition to historical consolidated financial information, the following discussion contains forward-looking statements that reflect our plans, estimates and beliefs.*

*We have attempted to identify these forward-looking statements by the use of words such as "may," "will," "seek," "expects," "anticipates," "believes," "targets," "intends," "should," "estimates," "could," "continue," "assume," "projects," "plans" or similar expressions. Our actual results, performance or achievements could differ materially from those discussed in the forward-looking statements. Factors that could cause or contribute to these differences include, but are not limited to:*

  • *We are subject to risks associated with the actions of network providers and a concentrated number of vendors and clients.*
  • *We could be subject to cyber-attacks and other security breaches.*
  • *Our network could suffer serious disruption if certain locations experience damage or as we add features and update our network.*
  • *We are subject to risks associated with purchase commitments to vendors for longer terms or in excess of the volumes committed by our underlying clients, or sales commitments to clients that extend beyond our commitments from our underlying suppliers.*
  • *We may be unable to establish and maintain peering relationships with other providers or agreements with carrier neutral data center operators.*
  • *Our business, results of operation and financial condition are subject to the impacts of the COVID-19 pandemic and related market and economic conditions.*
  • *We may be affected by information systems that do not perform as expected or by consolidation, competition, regulation, or a downturn in our industry.*
  • *We may be liable for the material that content providers distribute over our network.*
  • *We have generated net losses historically and may continue to do so.*
  • *We may fail to successfully integrate any future acquisitions or to efficiently manage our growth.*
  • *We may be unable to retain or hire key employees.*
  • *We are subject to risks relating to the international operations of our business.*
  • *We may be affected by future increased levels of taxation.*
  • *We have substantial indebtedness, which could prevent us from fulfilling our obligations under our debt agreements or subject us to interest rate risk.*

*For a more complete description of the risks noted above and other risks that could cause our actual results to materially differ from our current expectations, please see Part I, Item 1A "Risk Factors" in our Annual Report on Form 10-K for the fiscal year ended December 31, 2019, which we refer to as our Annual Report and Part II, Item 1A "Risk Factors" in this Quarterly Report on Form 10-Q. We assume no obligation to update or revise publicly any forward-looking statements, whether as a result of new information, future events or otherwise, unless required by law.*

*Unless otherwise indicated or unless the context requires otherwise, all references in this report to "we," "us," "our," "GTT," or the "Company" mean GTT Communications, Inc. together with its consolidated subsidiaries.*

### *Executive Summary*

GTT Communications, Inc. serves large enterprise and carrier clients with complex national and global networking needs, and differentiates itself from the competition by providing an outstanding service experience built on our core values of simplicity, speed and agility. We operate a Tier 1 internet network ranked among the largest in the industry, and own a fiber network that includes an expansive pan-European footprint and subsea cables. Our global network includes over 600 unique points of presence (PoPs) spanning six continents, and we provide services in more than 140 countries. Our comprehensive portfolio of cloud networking services includes:

28

- Wide area networking, including software-defined wide area networking ("SD-WAN"), multiprotocol label switching ("MPLS"), and virtual private LAN service ("VPLS");
- Internet, including IP transit, dedicated internet access, and broadband internet;
- Transport, including dedicated Ethernet and video transport;
- Infrastructure, including wavelength, colocation, and dark fiber;
- Unified Communication ("UC"), including Session Initiation Protocol ("SIP") trunking, cloud unified communication service, and traditional analog voice (POTS);
- Managed network services, including managed equipment and managed security; and
- Advanced solutions, including premium security services, hybrid cloud services, database and application management.

*Impact of the COVID-19 Pandemic*

In March 2020, the World Health Organization declared the outbreak of COVID-19 to be a pandemic, which continues to be spread throughout the U.S. and the world. The impact from the rapidly changing market and economic conditions due to the COVID-19 outbreak is uncertain. It has disrupted the business of our clients and suppliers, will impact our business and consolidated results of operations and could impact our financial condition in the future. While we have not incurred significant disruptions thus far from the COVID-19 outbreak, we are unable to accurately predict the full impact that COVID-19 will have due to numerous uncertainties, including the severity of the disease, the duration of the outbreak, actions that may be taken by governmental authorities, the impact to the business of our customers and partners and other factors identified in Part II, Item 1A "Risk Factors" in this Form 10-Q. We believe that our financial resources will allow us to manage the impact of COVID-19 on our business operations for the foreseeable future, but we are continuing to actively monitor the situation and are developing plans should we begin to experience material impacts.

During the three months ended March 31, 2020, the pandemic did not have a material impact on our financial results.

With respect to the remainder of 2020, the negative impact COVID-19 may have on the broader global economy and the pace of the economic recovery is unknown. Given the unknown magnitude of the depth and duration of this crisis, we anticipate a more challenging macroeconomic environment in the remainder of the year.

In March 2020, we directed our workforce to work from home and severely limited all international and domestic travel.

Cash from operations could also be affected by various risks and uncertainties, including, but not limited to, the effects of the COVID-19 pandemic and other risks detailed in Part II, Item 1A titled "Risk Factors" of this Quarterly Report on Form 10-Q. However, based on our current revenue outlook, we believe that existing cash balances, together with funds generated from operations and amounts available under our credit facility, will be sufficient to finance our operations and meet our foreseeable cash requirements through at least the next 12 months from the date of this filing.

*Wide Area Networking*

We provide a variety of wide area networking solutions to meet the growing needs of our clients, including SD-WAN, MPLS, and VPLS. Our wide area networking solutions are positioned to provide the highest network quality and value with global reach, offering bandwidth speeds from 10 Mbps to 100 Gbps per port with burstable and aggregate bandwidth capabilities. Our VPLS service provides an any-to-any Layer 2 Virtual Private Network ("VPN") service in a fully meshed configuration with multiple classes of service for prioritization of traffic types. Our MPLS service is an any-to-any Layer 3 IP VPN service with the option of full management in a meshed configuration, providing a private IP network based on the client's routing plan.

SD-WAN is an enterprise networking technology in the stage of accelerated market adoption with projected high growth based on industry forecasts. The software-based network intelligence in SD-WAN enables more efficient delivery of traffic across a mix of access types, accelerates the speed of service deployments, and improves application visibility and performance. Our service leverages GTT's global, Tier 1 IP network, securely connecting client locations to any destination on the internet or to any cloud service provider. We offer the widest range of access options and use multiple network technologies, allowing us to provide tailored solutions to meet the specific requirements of our clients.

Through GTT's wide area networking services, clients can securely connect to cloud service providers in data centers and exchanges around the world. Our Cloud Connect feature provides private, secure, pre-established connectivity to leading cloud

service providers. Using GTT's global network, clients can connect to any office location in the world and to any application in the cloud.

*Internet*

GTT operates one of the largest Tier 1 global IP networks. Utilizing that platform we offer clients scalable, high-bandwidth global internet connectivity and IP transit with guaranteed availability and packet delivery. Over 60 percent of our clients' IP traffic is delivered on-net, utilizing our Tier 1 global IP network that is ranked among the largest in the industry for the breadth of connections to other autonomous sysersm ("AS") numbers.*

Our internet services offer flexible connectivity with ports available at up to 100 Gbps. We also offer a wide range of broadband internet and wireless internet access services. We support a dual stack of IPv4 and IPv6 protocols, enabling the delivery of seamless IPv6 services alongside existing IPv4 services.

* Based on CAIDA's ranking of AS which approximately map to internet service providers and organizations (which are a collection of one or more ASes). This ranking is derived from topological data collected by CAIDA's Archipelago Measurement Infrastructure and Border Gateway Protocol (BGP) routing data collected by the Route Views Project and RIPE NCC.

*Transport*

GTT offers transport services, including dedicated ethernet and video transport.

GTT's ethernet service enables clients to design a network environment best suited to their needs, with point-to-point and point-to-multipoint topology options, and dynamic or fixed routing. GTT's ethernet direct service provides enhanced performance capabilities for clients seeking guaranteed routes and latency Service-Level Agreement ("SLAs") between key data centers and carrier hotels over a service-specific platform.

We offer video transport for clients in the media and entertainment industry, designed to support broadcast quality transmission of live events, sports entertainment, and news. We can manage individual services, multicast distribution, and entire client networks, supporting all video formats required for today's media workflow.

*Infrastructure*

We provide a suite of infrastructure services over our fiber network, enabling the transport of high volume data between data centers, large enterprise office locations, and media hubs. Our service is differentiated based on an expansive pan-European fiber footprint and subsea cable infrastructure, network diversity, and low latency connections between major financial and commercial centers in North America and Europe. Our clients for these services include internet-based technology companies and Over-The-Tops, large banks, and other service providers requiring network infrastructure. All services are available on a protected basis with the ability to specify pre-configured alternate routes to minimize the impact of any network disruption.

GTT's wavelength service is designed to deliver scalable high-performance optical connectivity over a state-of-the-art dense wave division multiplexing platform. We offer low latency services between the major financial centers and exchanges, tailored to meet the requirements of proprietary trading firms for the fastest connections. In particular, GTT's Express transatlantic cable offers industry leading lowest latency between North America and Europe. We also offer dark fiber and duct services across our fiber network.

We offer colocation services in over 100 facilities in Europe and North America. The turnkey service offering includes cabinets, racks, suites, and technical support services, providing clients with efficient and secure access to other carrier networks.

*Unified Communication*

We offer unified communications globally including local voice services in over 55 countries around the world, along with global long-distance and toll-free services. Our Session Initiation Protocol trunking service delivers worldwide Public Switched Telephone Network access to client telephony equipment over an integrated data connection, driving efficiency and productivity organization-wide while allowing clients to retain control of their core voice infrastructure. Our Cloud UC service allows clients to eliminate traditional voice infrastructure with communication services delivered through the cloud, based on a soft client, offering a wide array of features and customization choices for each site and user. In the US, we offer traditional analog voice services for clients with legacy or specialized telephony needs.

*Managed Network*

We offer fully managed network services, including managed equipment and security.

GTT's managed equipment provides a turnkey solution for the end-to-end management of customer premise equipment. This includes the design, procurement, implementation, monitoring, and maintenance of equipment including routers, switches, servers, and Wi-Fi access points.

GTT's managed security is available as a cloud-based or premises-based security service and provides a comprehensive, multi-layered security solution that protects the network while meeting the most stringent security standards. Our unified threat management services include advanced firewall, intrusion detection, anti-virus, web filtering, and anti-spam. We offer a full range of compliancy packages, which include developing, deploying, configuring, and monitoring network and security assets, and providing documentation to comply with audits.

*Advanced Solutions*

The advanced solutions portfolio comprises three areas - (i) advanced security, (ii) hybrid cloud, and (iii) advanced and professional services.

GTT's advanced security portfolio provides premium and standard security services including security consulting, Security Information and Event Management/Security Operations Center event monitoring and response and other advanced security options on a customized basis, as well as firewalling, Distributed Denial-of-Service and other services.

GTT's hybrid cloud service provides cloud and compute infrastructure services underpinned by GTT's cloud networking capabilities. We provide managed hybrid compute capabilities utilizing our own global compute platform, Virtual Data Center, as well as public cloud offerings from Amazon Web Services and Microsoft Azure.

GTT's advanced services portfolio provides a broad array of managed services for our clients including tailored SLAs covering networking, compute, and application infrastructure. These services include consultancy and support for database systems - Oracle, Microsoft SQL, MySQL and others - as well as services further up the application stack.

GTT provides an array of professional services to support our clients and augment the standard portfolio services, providing service, technical, and project management, as well as consultancy for our clients across the globe.

*Client and Network Supplier Contracts*

Our client contracts are most commonly two to three years for the initial term but can range from one to five years or sometimes longer. Following the initial term, these agreements typically provide for automatic renewal for specified periods ranging from one month to one year. Our prices are fixed for the duration of the contract, and we typically bill monthly in advance for such services. If a client terminates its agreement, the terms of our client contracts typically require full recovery of any amounts due for the remainder of the term or, at a minimum, our liability to any underlying suppliers.

Our revenue is composed of recurring revenue and non-recurring revenue. Recurring revenue relates to contracted ongoing service that is generally fixed in price and paid by the client on a monthly basis for the contracted term. For the three months ended March 31, 2020, recurring revenue was approximately 94% of our total revenue. Non-recurring revenue primarily includes installation and equipment charges to clients, one-time termination charges for clients who cancel their services prior to the contract termination date, and usage revenue which represents variable revenue based on whether a client exceeds its committed usage threshold as specified in the contract.

Our network supplier contracts do not have any market related net settlement provisions. We have not entered into, and do not plan to enter into, any supplier contracts which involve financial or derivative instruments. The supplier contracts are entered into solely for the direct purchase of telecommunications capacity, which is resold by us in the normal course of business.

Other than cost of telecommunication services provided, our most significant operating expenses are employment costs. As of March 31, 2020, we had approximately 3,100 full-time equivalent employees. For the three months ended March 31, 2020, the total employee cash compensation and benefits represented approximately 14% of total revenue.

**Recent Developments Affecting Our Results**

*Business Acquisitions*

Since our formation, we have consummated a number of transactions accounted for as business combinations which were executed as part of our strategy of expanding through acquisitions. These acquisitions, which are in addition to our periodic purchases of client contracts, have allowed us to increase the scale at which we operate which in turn affords us the ability to increase our operating leverage, extend our network, and broaden our client base. The accompanying condensed consolidated financial statements include the operations of the acquired entities from their respective acquisition dates.

There were no acquisitions completed during the three months ended March 31, 2020.

For material acquisitions completed during 2019, 2018, and 2017, refer to Note 3 - Business Acquisitions to the consolidated financial statements contained in the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2019.

*Indebtedness*

As of March 31, 2020 and December 31, 2019, long-term debt was as follows (amounts in millions):

|  | March 31, 2020 | December 31, 2019 |
|---|---|---|
| US Term loan due 2025 | $ 1,739.0 | $ 1,743.5 |
| EMEA Term loan due 2025 | 951.5 | 828.8 |
| 7.875% Senior unsecured notes due 2024 | 575.0 | 575.0 |
| Revolving line of credit due 2023 | 65.0 | 140.0 |
| Other secured loans | 2.1 | 4.3 |
| Total debt obligations | 3,332.6 | 3,291.6 |
| Unamortized debt issuance costs | (26.6) | (28.0) |
| Unamortized original issuance discount, net | (48.0) | (40.8) |
| Carrying value of debt | 3,258.0 | 3,222.8 |
| Less current portion | (29.6) | (30.2) |
| Long-term debt less current portion | $ 3,228.4 | $ 3,192.6 |

On May 31, 2018, the Company entered into a credit agreement (the "2018 Credit Agreement") that provides for (1) a $1,770.0 million term loan B facility (the "US Term Loan Facility"), (2) a €750.0 million term loan B facility (the "EMEA Term Loan Facility"), and (3) a $200.0 million revolving credit facility (the "Revolving Line of Credit Facility") (which includes a $50.0 million letter of credit facility). In addition, we may request incremental term loan commitments and/or incremental revolving loan commitments in an aggregate amount not to exceed the sum of $575.0 million and an unlimited amount that is subject to pro forma compliance with a net secured leverage ratio test. The US Term Loan Facility was issued at an original issuance discount of $8.9 million and the EMEA Term Loan Facility was issued at an original issuance discount of €3.8 million.

On June 5, 2019, we entered into an Incremental Revolving Credit Assumption Agreement ("Incremental Agreement") to the 2018 Credit Agreement. The Incremental Agreement establishes $50.0 million in new revolving credit commitments, bringing the total sum of revolving credit commitments under the 2018 Credit Agreement, as modified by the Incremental Agreement, to $250.0 million. The revolving credit commitments made pursuant to the Incremental Agreement have terms and conditions identical to the existing revolving credit commitments under the 2018 Credit Agreement.

The obligations of the Company under the 2018 Credit Agreement are secured by the substantial majority of the tangible and intangible assets of the Company. The obligations of the Company under the U.S. Term Loan Facility and the Revolving Line of Credit Facility are guaranteed by certain of its domestic subsidiaries, but not by any of the Company's foreign subsidiaries. The obligations of the EMEA Borrower under the EMEA Term Loan Facility are guaranteed by the Company and certain of its domestic and foreign subsidiaries. None of the foreign subsidiary guarantors of the EMEA Term Loan Facility provide cross-guarantees of the guarantees of the EMEA Term Loan Facility provided by the Company and its domestic subsidiaries.

The 2018 Credit Agreement does not contain a financial covenant for the US Term Loan Facility or the EMEA Term Loan Facility, but it does include a maximum Consolidated Net Secured Leverage Ratio applicable to the Revolving Line of Credit Facility in the event that utilization exceeds 30% of the revolving loan facility commitment. At March 31, 2020, our utilization (as

defined) of the Revolving Line of Credit Facility commitment was approximately 26%. On August 8, 2019, we entered into Amendment No. 1 to the 2018 Credit Agreement, which amends the Consolidated Net Secured Leverage Ratio applicable to the Revolving Line of Credit Facility for each fiscal quarter ending September 30, 2019 through December 31, 2020. If triggered, the covenant, as amended, requires us to maintain a Consolidated Net Secured Leverage Ratio, on a Pro Forma Basis, below the maximum ratio specified as follows:

| Fiscal Quarter Ending | Maximum Ratio |
|---|---|
| March 31, 2020 | 6.50:1 |
| June 30, 2020 | 6.50:1 |
| September 30, 2020 | 6.25:1 |
| December 31, 2020 | 6.25:1 |
| March 31, 2021 | 5.50:1 |
| June 30, 2021 | 5.00:1 |
| September 30, 2021 | 5.00:1 |
| December 31, 2021 | 4.50:1 |
| March 31, 2022 | 4.50:1 |
| June 30, 2022 and thereafter | 4.25:1 |

While the financial covenant was not required to be measured as a result of the utilization level of the Revolving Line of Credit Facility as of March 31, 2020, our Consolidated Net Secured Leverage Ratio, as defined in the 2018 Credit Agreement, was 6.53:1.

In addition, Amendment No. 1 to the 2018 Credit Agreement added certain restrictions, which remain in place from the effective date of the Amendment No. 1 until the delivery of the compliance certificate for the quarter ending March 31, 2021, demonstrating compliance with the Consolidated Net Secured Leverage Ratio for that quarter, including without limitation the following: the Company and its restricted subsidiaries (as defined in the 2018 Credit Agreement) may not make certain dividends, distributions and other restricted payments (as defined in the 2018 Credit Agreement), including that the Company may not pay dividends; the Company and its restricted subsidiaries may not designate any subsidiary an "Unrestricted Subsidiary" (which would effectively remove such subsidiary from the restrictions of the 2018 Credit Agreement); the Company and its restricted subsidiaries may not make "permitted acquisitions" (as defined in the 2018 Credit Agreement) or certain other investments, unless the Company and its restricted subsidiaries have liquidity (i.e., unrestricted cash and cash equivalents and availability under the revolving credit facility under the 2018 Credit Agreement) of at least $250 million (other than the acquisition of KPN Eurorings B.V., a private limited liability company (*besloten vennootschap met beperkte aansprakelijkheid*) incorporated under the laws of the Netherlands with respect to which this liquidity requirement is not applicable); and the amount of incremental borrowings under the 2018 Credit Agreement that the Company and its subsidiaries may request when the Consolidated Net Secured Leverage Ratio is above 4.40 to 1.00 the Company and its subsidiaries was reduced to $300 million minus amounts previously requested (which amount is $50 million requested under the Incremental Agreement described above).

On February 28, 2020, the Company entered into an amendment to the 2018 Credit Agreement ("Amendment No. 2"), which established incremental term loan commitments for $140 million of EMEA term loans (the "2020 EMEA Term Loan Facility"), bringing the total amounts of EMEA term loans outstanding under the 2018 Credit Agreement, as modified by Amendment No. 2, to €750 million in Euro-denominated loans and $140 million in US Dollar-denominated loans. The EMEA term loans under the 2020 EMEA Term Loan Facility were incurred with an original issue discount of $5.6 million.

The 2020 EMEA Term Loan Facility has terms substantially identical to the existing EMEA Term Loan Facility, except that: (1) each quarterly amortization payment on the 2020 EMEA Term Loan Facility will be $350,000; (2) the EMEA Term Loan Facility has a prepayment penalty of 2.0% for certain mandatory and voluntary prepayments occurring on or prior to the one year anniversary of the effective date of the EMEA Term Loan Facility and 1.0% for certain mandatory and voluntary prepayments occurring following the one year anniversary of the effective date of the EMEA Term Loan Facility and until the second year anniversary thereof; (3) Amendment No. 2 added, for the benefit of the lenders under the 2020 EMEA Term Loan Facility, the same covenant restrictions contained in Amendment No. 1, except that (a) the amount of secured debt that can be incurred on a pari passu basis with the 2020 EMEA Term Loan Facility and certain types of debt incurred by non-credit parties is limited to $50 million in the aggregate and (b) certain excess asset sale proceeds will be required to prepay outstanding EMEA term loans or reinvest in long-term assets useful in the business within 30 days following receipt of such proceeds, which covenant restrictions will remain in place for so long as the existing Revolving Line of Credit Facility and the 2020 EMEA Term Loan Facility remain

in effect; and (4) the applicable margin for the 2020 EMEA Term Loan Facility is (a) 3.25% for Base Rate Loans and 4.25% for Eurocurrency Loans for the first two years following the effective date of the 2020 EMEA Term Loan Facility and (b) 3.75% for Base Rate Loans and 4.75% for Eurocurrency Loans on and following the second anniversary of the effective date of the 2020 EMEA Term Loan Facility.

The proceeds of the 2020 EMEA Term Loan Facility were used to repay amounts outstanding under the Revolving Line of Credit Facility and for general corporate purposes.

### *Critical Accounting Policies and Estimates*

Our consolidated financial statements have been prepared in accordance with GAAP. For information regarding our critical accounting policies and estimates, please refer to "Management's Discussion and Analysis of Financial Condition and Results of Operations—Critical Accounting Policies and Estimates" contained in our Annual Report on Form 10-K for the fiscal year ended December 31, 2019 and Note 2 - Significant Accounting Policies to our consolidated financial statements contained therein. There have been no material changes to the critical accounting policies previously disclosed in that report, except as described in Note 1 - Organization and Business to our condensed consolidated financial statements contained herein.

### Results of Operations

### *Three months ended March 31, 2020 compared to three months ended March 31, 2019*

*Overview.* The financial information presented in the tables below is comprised of the unaudited condensed consolidated financial information for the three months ended March 31, 2020 and 2019 (amounts in millions):

| | Three Months Ended March 31, | | | | | | |
|---|---|---|---|---|---|---|---|
| | **2020** | | **2019** | | **$ Variance** | | **% Change** |
| **Revenue:** | | | | | | | |
| Telecommunications services | $ | 424.7 | $ | 450.2 | $ | (25.5) | (5.7)% |
| | | | | | | | |
| **Operating expenses:** | | | | | | | |
| Cost of telecommunications services | | 237.7 | | 241.8 | | (4.1) | (1.7)% |
| Selling, general and administrative expenses | | 108.2 | | 104.1 | | 4.1 | 3.9 % |
| Severance, restructuring and other exit costs | | 2.1 | | 2.8 | | (0.7) | (25.0)% |
| Depreciation and amortization | | 67.5 | | 62.8 | | 4.7 | 7.5 % |
| Total operating expenses | | 415.5 | | 411.5 | | 4.0 | 1.0 % |
| Operating income | | 9.2 | | 38.7 | | (29.5) | (76.2)% |
| | | | | | | | |
| **Other expenses:** | | | | | | | |
| Interest expense, net | | (48.8) | | (48.2) | | (0.6) | 1.2 % |
| Loss on debt extinguishment | | (2.3) | | — | | (2.3) | * |
| Other expenses, net | | (43.3) | | (16.0) | | (27.3) | 170.6 % |
| Total other expenses | | (94.4) | | (64.2) | | (30.2) | 47.0 % |
| Loss before income taxes | | (85.2) | | (25.5) | | (59.7) | 234.1 % |
| (Benefit from) provision for income taxes | | (1.9) | | 1.8 | | (3.7) | (205.6)% |
| **Net loss** | $ | (83.3) | $ | (27.3) | $ | (56.0) | 205.1 % |
| * - Not meaningful | | | | | | | |

### *Revenue*

Our revenue decreased by $25.5 million, or 5.7%, from $450.2 million for the three months ended March 31, 2019 to $424.7 million for the three months ended March 31, 2020. Recurring revenue was approximately 94% and 93% of total revenue for the three months ended March 31, 2020 and 2019, respectively. The decrease in revenue was primarily due to negative net installs,

non-recurring revenue, and the effects of fluctuating foreign currency exchange rates, partially offset by an increase in revenue from the 2019 acquisition of KPN International ("KPN").

On a constant currency basis using the average exchange rates in effect during the three months ended March 31, 2019, revenue would have been higher by $5.8 million for the three months ended March 31, 2020.

*Cost of Telecommunications Services Provided*

Cost of telecommunications services provided decreased by $4.1 million, or 1.7%, from $241.8 million for the three months ended March 31, 2019 to $237.7 million for the three months ended March 31, 2020. Recurring cost of telecommunications services was approximately 92% and 94% of total cost of telecommunications services for the three months ended March 31, 2020 and 2019, respectively. Consistent with our decrease in revenue, the decrease in cost of telecommunications services provided was principally driven by a corresponding reduction in costs related to negative net installs, cost synergies realized in 2020, and the effects of fluctuating foreign currency exchange rates, partially offset by an increase in cost of telecommunications services from KPN.

On a constant currency basis using the average exchange rates in effect during the three months ended March 31, 2019, cost of telecommunications services provided would have been higher by $3.1 million for the three months ended March 31, 2020.

*Operating Expenses*

*Selling, General and Administrative Expenses.* Selling, general and administrative expenses increased by $4.1 million, or 3.9%, from $104.1 million for the three months ended March 31, 2019 to $108.2 million for the three months ended March 31, 2020. The following table summarizes the major categories of selling, general and administrative expenses for the three months ended March 31, 2020 and 2019 (amounts in millions):

| | Three Months Ended March 31, | | | |
| | 2020 | 2019 | $ Variance | % Change |
|---|---|---|---|---|
| Employee related compensation (excluding share-based compensation) | $ 59.6 | $ 53.6 | $ 6.0 | 11.2 % |
| Share-based compensation | 8.3 | 8.7 | (0.4) | (4.6)% |
| Transaction and integration expense | 2.2 | 9.2 | (7.0) | (76.1)% |
| Other SG&A[1] | 38.1 | 32.6 | 5.5 | 16.9 % |
| Total | $ 108.2 | $ 104.1 | $ 4.1 | 3.9 % |

[1] Includes bad debt expense, professional fees, marketing costs, facilities, and other general support costs.

Employee related compensation increased primarily due to an increased investment in headcount. Share-based compensation expense decreases were primarily driven by the 2015 performance awards becoming fully vested in the first quarter of the prior year. Transaction and integration costs decreased as we have not made any acquisitions in 2020 and we continue to move away from the 2018 and 2019 Acquisitions. Other SG&A expense increased due to an increase in bad debt expense.

On a constant currency basis using the average exchange rates in effect during the three months ended March 31, 2019, selling, general and administrative expenses would have been higher by $1.1 million for the three months ended March 31, 2020.

*Severance, Restructuring and Other Exit Costs.* For the three months ended March 31, 2020, we incurred severance, restructuring and other exit costs of $2.1 million primarily costs associated with charges incurred in connection with the termination of certain lease facilities. For the three months ended March 31, 2019, we incurred exit costs of $2.8 million primarily relating to Interoute Communications Holdings S.A ("Interoute").

*Depreciation and Amortization.* Amortization of intangible assets decreased $1.0 million or 5%, from $22.1 million for the three months ended March 31, 2019 to $21.1 million for the three months ended March 31, 2020, primarily due to intangibles from prior year acquisitions becoming fully amortized during the current and prior periods partially offset by the amortization of KPN intangibles. Depreciation expense increased $5.7 million or 14%, from $40.7 million for the three months ended March 31, 2019 to $46.4 million for the three months ended March 31, 2020, primarily due to depreciation on prior year and current year capital expenditures as well as depreciation of KPN assets.

35

*Other Expense*. Other expense increased by $30.2 million to $94.4 million for the three months ended March 31, 2020, compared to $64.2 million for the three months ended March 31, 2019. This is primarily due to the three months ended March 31, 2020 including a non-cash mark-to-market loss on derivative financial instruments of $33.5 million whereas the three months ended March 31, 2019 included a non-cash mark-to-market gain on derivative financial instruments of $15.3 million.

**Liquidity and Capital Resources**

In March 2020, the World Health Organization declared the outbreak of COVID-19 to be a pandemic. COVID-19 has caused, and could continue to cause, significant disruptions to the U.S. and global economy. The impact from the rapidly changing market and economic conditions due to the COVID-19 outbreak is uncertain and ensuring adequate liquidity is critical. We believe that our financial resources will allow us to manage the anticipated impact of COVID-19 on our business operations for the foreseeable future, but we are continuing to actively monitor the situation and are developing plans should we begin to experience material impacts.

Cash from operations could also be affected by various risks and uncertainties, including, but not limited to, the effects of the COVID-19 pandemic and other risks detailed in Part II, Item 1A "Risk Factors" of this Quarterly Report on Form 10-Q. However, based on our current revenue outlook, we believe that existing cash balances, together with funds generated from operations and amounts available under our credit facility, will be sufficient to finance our operations and meet our foreseeable cash requirements through at least the next 12 months from the date of this filing.

Our primary sources of liquidity have been cash provided by operations, equity offerings, and debt financings. Our principal uses of cash have been acquisitions, working capital, capital expenditures, and debt service requirements. We anticipate that our principal uses of cash in the future will be for acquisitions, capital expenditures, working capital, and debt service.

Management monitors cash flow and liquidity requirements on a regular basis, including an analysis of the anticipated working capital requirements for the next 12 months from the date of this filing. This analysis assumes our ability to manage expenses, capital expenditures, indebtedness, and the anticipated revenue trajectory. If our operating performance differs significantly from our forecasts, we may be required to reduce our operating expenses and curtail capital spending, and we may not remain in compliance with our debt covenants. In addition, if we are unable to fully fund our cash requirements through operations and current cash on hand, we may need to obtain additional financing through a combination of equity and debt financings and/or renegotiation of terms of our existing debt. If any such activities become necessary, there can be no assurance that we would be successful in obtaining additional financing or modifying our existing debt terms.

Our capital expenditures decreased by $10.1 million, or 31.5% from $32.1 million (7.1% of revenue) for the three months ended March 31, 2019 to $22.0 million (5.2% of revenue) for the three months ended March 31, 2020. We anticipate that we will incur capital expenditures of approximately 5-6% of revenue going forward. We continue to expect that our capital expenditures will be primarily success-based, i.e., in support of specific revenue opportunities.

We believe that our cash flows from operating activities, in addition to cash on-hand and undrawn Revolving Line of Credit Facility, will be sufficient to fund our operating activities and capital expenditures for the foreseeable future, and in any event for at least the next 12 to 18 months from the date of this filing. However, no assurance can be given that this will be the case.

The Company may also, from time-to-time, seek to retire or purchase its outstanding debt obligations and/or equity in open market purchases, block trades, privately negotiated purchase transactions, exchange transactions or otherwise and may seek to refinance some or all of its indebtedness based upon market conditions. Any such retirement, purchase or exchange of debt and/or equity may be funded with operating cash flows of the business or other sources and will depend upon prevailing market conditions, liquidity requirements, contractual restrictions and other factors, and the amounts involved may be material.

*Cash Flows*

The following table summarizes the components of our cash flows for the three months ended March 31, 2020 and 2019 (amounts in millions):

| Condensed Consolidated Statements of Cash Flows Data | Three Months Ended March 31, | | |
|---|---|---|---|
| | **2020** | **2019** | **$ Variance** |
| Net cash provided by operating activities | $    41.5 | $    16.1 | $    25.4 |
| Net cash used in investing activities | (22.0) | (32.6) | 10.6 |
| Net cash provided by financing activities | 42.9 | 10.7 | 32.2 |

*Cash Provided by Operating Activities*

Our largest source of cash provided by operating activities is monthly recurring revenue from our clients. Our primary uses of cash are payments to network suppliers, compensation-related costs, interest expense, and third-party vendors such as agents, contractors, and professional service providers.

Net cash flows from operating activities increased by $25.4 million, from $16.1 million for the three months ended March 31, 2019 to $41.5 million for the three months ended March 31, 2020. This increase was primarily due to the three months ended March 31, 2019 being negatively impacted by a use of cash related to an increase in accounts receivable, due to the integration of Interoute's clients into GTT's billing system, which led to delays in invoice deliveries and corresponding client payments, as well as lower non-recurring cash payments for severance and exit costs, and for transaction and integration costs during three months ended March 31, 2020.

*Cash Used in Investing Activities*

Our primary uses of cash include acquisitions, purchases of client contracts, and capital expenditures.

Net cash flows used in investing activities decreased by $10.6 million, from $32.6 million for the three months ended March 31, 2019 to $22.0 million for the three months ended March 31, 2020.

Cash used for the three months ended March 31, 2020 consisted of capital expenditures of approximately $22.0 million. Cash used for the three months ended March 31, 2019 consisted of $0.5 million of additional cash consideration paid for API and capital expenditures of $32.1 million.

*Cash Provided by Financing Activities*

Our primary source of cash from financing activities are proceeds from debt and equity issuances. Our primary use of cash for financing activities is the refinancing of our debt and repayment of principal pursuant to the debt agreements.

Net cash flows provided by financing activities increased by $32.2 million, from $10.7 million for the three months ended March 31, 2019 to $42.9 million for the three months ended March 31, 2020. Cash provided for the three months ended March 31, 2019 consisted primarily of proceeds from the Revolving Line of Credit Facility, partially offset by repayments of principal on term loans and other secured borrowings. Cash provided for the three months ended March 31, 2020 consisted primarily of net proceeds from the 2020 EMEA Term Loan Facility, partially offset by net repayments on the Revolving Line of Credit Facility, payment of debt issuance costs in connection with Amendment No. 2 to the 2018 Credit Agreement, and repayments of principal on term loans and other secured borrowings.

**Contractual Obligations and Commitments**

The following table summarizes our significant contractual obligations as of March 31, 2020 (amounts in millions):

| | Total | Less than 1 year | 1-3 years | 3-5 years | More than 5 years |
|---|---|---|---|---|---|
| Term loans | $ 2,690.5 | $ 27.6 | $ 55.2 | $ 55.2 | $ 2,552.5 |
| 7.875% senior note | 575.0 | — | — | 575.0 | — |
| Other secured loans | 2.1 | 2.1 | — | — | — |
| Revolving line of credit | 65.0 | — | — | 65.0 | — |
| Operating leases | 390.6 | 87.6 | 138.7 | 75.6 | 88.7 |
| Finance leases | 137.2 | 6.4 | 10.3 | 10.6 | 109.9 |
| Network supplier agreements [1] | 1,185.9 | 369.1 | 639.6 | 111.6 | 65.6 |
| Other [2] | 34.8 | 13.3 | 9.7 | 5.2 | 6.6 |
| | $ 5,081.1 | $ 506.1 | $ 853.5 | $ 898.2 | $ 2,823.3 |

[1] Excludes contracts where the initial term has expired and we are currently in month-to-month status.
[2] "Other" consists of vendor contracts associated with network monitoring and maintenance services.

**Off-Balance Sheet Arrangements**

As of March 31, 2020, we did not have any off-balance sheet arrangements, other than the contractual obligations disclosed in the table above, that have or are reasonably likely to have a current or future effect on our financial condition, changes in financial condition, revenues or expenses, results of operations, liquidity, capital expenditures, or capital resources that is material to investors.

**Non-GAAP Financial Measures**

In addition to financial measures prepared in accordance with accounting principles generally accepted in the United States ("GAAP"), from time to time we may use or publicly disclose certain "non-GAAP financial measures" in the course of our financial presentations, earnings releases, earnings conference calls, and otherwise. For these purposes, the U.S. Securities and Exchange Commission ("SEC") defines a "non-GAAP financial measure" as a numerical measure of historical or future financial performance, financial positions, or cash flows that (i) exclude amounts, or is subject to adjustments that effectively exclude amounts, included in the most directly comparable measure calculated and presented in accordance with GAAP in financial statements, and (ii) include amounts, or is subject to adjustments that effectively include amounts, that are excluded from the most directly comparable measure so calculated and presented.

Non-GAAP financial measures are provided as additional information to investors to provide an alternative method for assessing our financial condition and operating results. We believe that these non-GAAP measures, when taken together with our GAAP financial measures, allow us and our investors to better evaluate our performance and profitability. These measures are not in accordance with, or a substitute for, GAAP, and may be different from or inconsistent with non-GAAP financial measures used by other companies. These measures should be used in addition to and in conjunction with results presented in accordance with GAAP and should not be relied upon to the exclusion of GAAP financial measures.

Pursuant to the requirements of Regulation G, whenever we refer to a non-GAAP financial measure we will also generally present the most directly comparable financial measure calculated and presented in accordance with GAAP, along with a reconciliation of the differences between the non-GAAP financial measure we reference with such comparable GAAP financial measure.

***Adjusted Earnings before Interest, Taxes, Depreciation and Amortization ("Adjusted EBITDA")***

Adjusted EBITDA is defined by us as income/(loss) before interest, income taxes, depreciation and amortization ("EBITDA") adjusted to exclude severance, restructuring and other exit costs, acquisition-related transaction and integration costs, losses on extinguishment of debt, share-based compensation, and from time to time, other non-cash or non-recurring items.

We use Adjusted EBITDA to evaluate operating performance, and this financial measure is among the primary measures we use for planning and forecasting future periods. We further believe that the presentation of Adjusted EBITDA is relevant and useful for investors because it allows investors to view results in a manner similar to the method used by management and makes it easier to compare our results with the results of other companies that have different financing and capital structures. In addition, we have debt covenants that are based on a leverage ratio that utilizes a modified EBITDA calculation, as defined by our Credit

38

Agreement. The modified EBITDA calculation is similar to our definition of Adjusted EBITDA; however, it includes the pro forma Adjusted EBITDA of and expected cost synergies from the companies acquired by us during the applicable reporting period. Finally, Adjusted EBITDA results, along with other quantitative and qualitative information, are utilized by management and our compensation committee for purposes of determining bonus payouts to our employees.

The following is a reconciliation of Adjusted EBITDA from Net loss (amounts in millions):

| | Three Months Ended March 31, | | | |
|---|---|---|---|---|
| | 2020 | | 2019 | |
| Net loss | $ | (83.3) | $ | (27.3) |
| Provision for (benefit from) income taxes | | (1.9) | | 1.8 |
| Interest expense, net | | 48.8 | | 48.2 |
| Other expenses (income), net | | 43.3 | | 16.0 |
| Loss on debt extinguishment | | 2.3 | | — |
| Depreciation and amortization | | 67.5 | | 62.8 |
| Severance, restructuring and other exit costs | | 2.1 | | 2.8 |
| Transaction and integration costs | | 2.2 | | 9.2 |
| Share-based compensation | | 8.3 | | 8.7 |
| **Adjusted EBITDA** | $ | 89.3 | $ | 122.2 |

**Free Cash Flow**

Free Cash Flow is defined by us as net cash provided by operating activities less purchases of property and equipment.

We use Free Cash Flow as a measure to evaluate cash generated through normal operating activities. We believe that the presentation of Free Cash Flow is relevant and useful to investors because it provides a measure of cash available to pay the principal on our debt and pursue acquisitions of businesses or other strategic investments or uses of capital.

The following is a reconciliation of Free Cash Flow from Cash provided by operating activities (amounts in millions):

| | Three Months Ended March 31, | | | |
|---|---|---|---|---|
| | 2020 | | 2019 | |
| Net cash provided by operating activities | $ | 41.5 | $ | 16.1 |
| Purchases of property and equipment | | (22.0) | | (32.1) |
| **Free Cash Flow** | $ | 19.5 | $ | (16.0) |

**ITEM 3.** *QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK*

We are exposed to certain market risks. These risks, which include interest rate risk and foreign currency exchange risk, arise in the normal course of our business rather than from trading activities.

**Interest Rate Sensitivity**

Our exposure to market risk for changes in interest rates is primarily related to our outstanding term loans and revolving loans. As of March 31, 2020, we had $2,690.5 million in term loans and $65.0 million in revolving loans with variable interest rates. The interest expense associated with our term loan and revolving loan will vary with market rates.

The US Term Loan Facility carries an interest rate equal to either Base Rate Loans with applicable margin at 1.75% or Eurocurrency Loans at 2.75%, subject to a floor of 0.00%. Based on current rates, a hypothetical 100 basis point increase in Eurodollar rate would increase annual interest expense by approximately $7.4 million, which would decrease our income and cash flows by the same amount. This sensitivity analysis takes into account the impact of the LIBOR-based interest rate swaps entered into during 2018.

The EMEA Term Loan Facility carries an interest rate equal to the European Money Markets Institute EURIBOR plus the applicable margin of 3.25%, subject to a EURIBOR floor of 0.00%. Based on current rates, a hypothetical 100 basis point increase in EURIBOR rate would increase annual interest expense by approximately $4.0 million, which would decrease our income and cash flows by the same amount. This sensitivity analysis takes into account the impact of the EURIBOR-based interest rate swap entered into during 2018.

We may enter into additional derivative financial instruments in the future.

**Exchange Rate Sensitivity**

Our exposure to market risk for changes in foreign currency rate relates to our global operations. Our condensed consolidated financial statements are denominated in U.S. Dollars, but a portion of our revenue and expenses are recorded in the local currency of our foreign subsidiaries. Accordingly, changes in exchange rates between the applicable foreign currency and the U.S. Dollar will affect the translation of each foreign subsidiary's financial results into U.S. Dollars for purposes of reporting consolidated financial results.

The following is a summary of our revenues and expenses generated by non-US entities for the three months ended March 31, 2020:

| | Three Months Ended March 31, 2020 | | | | |
|---|---|---|---|---|---|
| | Revenues | Cost of Telecommunication Services | Selling, general and administrative expenses | Depreciation and amortization | Interest expense, net |
| EUR | 39 % | 32 % | 32 % | 39 % | 21 % |
| GBP | 12 % | 22 % | 7 % | 10 % | 1 % |
| Other | 2 % | 3 % | 1 % | 3 % | — % |
| **Total non-US** | 53 % | 57 % | 40 % | 52 % | 22 % |

We did not have any foreign currency derivatives as of March 31, 2020 but we may enter into derivative financial instruments in the future.

**ITEM 4.** *CONTROLS AND PROCEDURES*

**Evaluation of Disclosure Controls and Procedures**

Our management carried out an evaluation required by Rule 13a-15 under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), under the supervision of and with the participation of our Chief Executive Officer ("CEO") and Chief Financial Officer ("CFO"), of the effectiveness of our disclosure controls and procedures as defined in Rule 13a-15 and 15d-15 under the Exchange Act ("Disclosure Controls").

Based on our evaluation, our CEO and CFO concluded that our disclosure controls and procedures are designed at a reasonable assurance level and are effective to provide reasonable assurance that information we are required to disclose in reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in Securities and Exchange Commission rules and forms and that such information is accumulated and communicated to our management, including our CEO and CFO, as appropriate, to allow timely decisions regarding required disclosure.

The CEO and the CFO, with assistance from other members of management, have reviewed the effectiveness of our disclosure controls and procedures as of March 31, 2020, and based on their evaluation, have concluded that the disclosure controls and procedures were effective as of such date.

**Changes in Internal Control over Financial Reporting**

There were no changes in our internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) as of March 31, 2020, that have materially affected, or are reasonably likely to materially affect our internal control over financial reporting.

41

## PART II – OTHER INFORMATION

**ITEM 1.** *LEGAL PROCEEDINGS*

From time to time, we are party to legal proceedings arising in the normal course of business. Except as disclosed below, we do not believe that we are party to any current or pending legal action that could reasonably be expected to have a material adverse effect on our financial condition or results of operations and cash flow.

On July 30, 2019, a purported class action complaint was filed against the Company and certain of its current and former officers and directors in the U.S District Court for the Eastern District of Virginia (Case No. 1:19-cv-00982) on behalf of certain GTT stockholders. The complaint alleges that defendants made false or misleading statements and omissions of purportedly material fact, in violation of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5 thereunder, in connection with disclosures relating to GTT's acquisition and integration of Interoute Communications Holdings S.A. The complaint seeks unspecified damages. The Company believes that the claims in this lawsuit are without merit and intends to defend against them vigorously. At this time, no assessment can be made as to its likely outcome or whether the outcome will be material to the Company.

**ITEM 1A.** *RISK FACTORS*

The following risk factor supplements the risk factors described under Part I, Item 1A. "Risk Factors" in our Annual Report on Form 10-K for the year ended December 31, 2019, and should be read in conjunction with the other risk factors presented in the Annual Report on Form 10-K.

***The COVID-19 pandemic and the resulting macroeconomic disruption have materially affected how we and our customers are operating our businesses, and the duration and extent to which this will impact our future results of operations and overall financial performance remains uncertain.***

In March 2020, the World Health Organization declared the outbreak of COVID-19 to be a global pandemic. COVID-19 has caused, and could continue to cause, significant disruptions to the United States and global economy and has contributed to significant volatility and negative pressure in financial markets. The global impact of the outbreak is continually evolving. Certain states and cities, including those in which our offices are located, have also reacted by instituting quarantines, restrictions on travel, "shelter in place" rules, and restrictions on the types of business that may continue to operate.

As of the date of this Quarterly Report on Form 10-Q, we have temporarily closed our offices (including our corporate headquarters) in the United States and several other impacted locations and implemented certain travel restrictions, both of which have begun to disrupt how we operate our business. In addition, the conditions caused by the COVID-19 pandemic could adversely affect our clients' ability or willingness to purchase our service offerings, delay prospective clients' purchasing decisions, adversely impact our ability to provide or deliver services to our clients, delay the provisioning of our service offerings, or lengthen payment terms, all of which could adversely affect our future sales, operating results and overall financial performance.

While the potential economic impact brought by COVID-19 may be difficult to assess or predict, the pandemic has resulted in significant disruption of global financial markets, and a recession or long-term market correction resulting from the spread of COVID-19 could cause severe disruption and instability in the global financial markets or deteriorations in credit and financing conditions, which could make it difficult for us to access debt and equity capital on attractive terms, or at all, and impact our ability to fund business activities and repay debt on a timely basis.

The duration and extent of the impact from the COVID-19 pandemic depends on future developments that cannot be accurately predicted at this time, such as the severity and transmission rate of the virus, the extent and effectiveness of containment actions and the impact of these and other factors on our employees, customers, partners and vendors. If we are not able to respond to and manage the impact of such events effectively, our business will be harmed.

**ITEM 2.** *UNREGISTERED SALES OF EQUITY SECURITIES AND USE OF PROCEEDS*

None.

**ITEM 3.** *DEFAULTS UPON SENIOR SECURITIES*

None.

**ITEM 4.** *MINE SAFETY DISCLOSURES*

None.

**ITEM 5.** *OTHER INFORMATION*

None.

43

**ITEM 6.** *EXHIBITS*

The following exhibits, which are numbered in accordance with Item 601 of Regulation S-K, are filed herewith or, as noted, incorporated by reference herein:

| Exhibit Number | Description of Document |
|---|---|
| 3.1 | Second Amended and Restated Certificate of Incorporation, dated October 16, 2006 (incorporated herein by reference to Exhibit 3.1 to the Registrant's Current Report on Form 8-K filed October 19, 2006). |
| 3.2 | Certificate of Amendment to Second Amended and Restated Certificate of Incorporation, dated December 31, 2013 (incorporated herein by reference to Exhibit 3.1 to the Registrant's Current Report on Form 8-K filed January 6, 2014). |
| 3.3 | Certificate of Designations (incorporated herein by reference to Exhibit 3.1 to the Registrant's Current Report on Form 8-K filed with the Commission on August 8, 2019). |
| 3.4 | Amended and Restated By-laws, dated April 16, 2019 (incorporated by reference to Exhibit 3.1 to the Registrant's Current Report on Form 8-K filed April 22, 2019). |
| 3.5 | Amendment No. 1 to Amended and Restated Bylaws of GTT Communications, Inc. (incorporated herein by reference to Exhibit 3.1 to the Registrant's Current Report on Form 8-K filed February 25, 2020). |
| 10.1* | Amendment No. 2 to Credit Agreement, dated as of February 28, 2020, among GTT Communications, Inc., a Delaware corporation, as the borrower, GTT Communications B.V., KeyBank National Association, as administrative agent, and the lenders party thereto. |
| 10.2+ | Employment Agreement, dated April 6, 2020, between Steven Berns and GTT Communications, Inc. (incorporated herein by reference to Exhibit 10.1 to the Registrant's Current Report on Form 8-K filed April 6, 2020). |
| 10.3*+ | Employment Agreement, dated March 10, 2014, by and between Global Telecom & Technology Americas, Inc. and Daniel M. Fraser, |
| 10.4*+ | Amendment No. 1 to the Employment Agreement, dated October 17, 2019, by and between GTT Americas, LLC (formerly Global Telecom & Technology Americas, Inc.) for Daniel M. Fraser. |
| 31.1* | Certification of Chief Executive Officer of the Registrant, pursuant to Rules 13a-14(a) of the Securities Exchange Act of 1934. |
| 31.2* | Certification of Chief Financial Officer of the Registrant, pursuant to Rules 13a-14(a) of the Securities Exchange Act of 1934. |
| 32.1** | Certification of Chief Executive Officer of the Registrant, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |
| 32.2** | Certification of Chief Financial Officer of the Registrant, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |
| 101.SCH* | Inline XBRL Taxonomy Extension Schema Document. |
| 101.CAL* | Inline XBRL Taxonomy Extension Calculation Linkbase Document. |
| 101.DEF* | Inline XBRL Taxonomy Extension Definition Linkbase Document. |
| 101.LAB* | Inline XBRL Taxonomy Extension Label Linkbase Document. |
| 101.PRE* | Inline XBRL Taxonomy Extension Presentation Linkbase Document. |
| 104* | Cover Page Interactive Data File (formatted as inline XBRL with applicable taxonomy extension information contained in Exhibits 101.*) |

\*    Filed herewith

\*\*    Furnished herewith

\+    Denotes a management or compensatory plan or arrangement

44

SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

GTT Communications, Inc.

By: /s/ Richard D. Calder, Jr.

Richard D. Calder, Jr.

President, Chief Executive Officer and

Director (Principal Executive Officer)

By: /s/ Steven Berns

Steven Berns

Chief Financial Officer

(Principal Financial Officer)

By: /s/ Daniel M. Fraser

Daniel M. Fraser

Senior Vice President, Corporate Controller and

(Principal Accounting Officer)

Date:   May 8, 2020

45

# Exhibit 2

Before the
Pennsylvannia Public Utility Commission

In the Matter of Registration of )
)
Sercurity Certificate of )          Docket No. S-2017-_____
)
Metropolitan Telecommunications Corporation )
    of PA d/b/a MetTel )

<u>Securities Certificate</u>

    Metropolitan Telecommunications Corporation of PA d/b/a MetTel ("MetTel"), by undersigned counsel and pursuant to Section 1901 of the Public Utility Code, 66 Pa. C.S. § 1901, and Section 3.601 of the Pennsylvania Public Utility Commission's ("Commission") regulations, 52 Pa. Code § 3.601, hereby requests the Commission register this Securities Certificate describing MetTel's participation in a financing transaction whereby it will pledge its assets, including the Certificate of Public Convenience and Necessity currently held by MetTel for services offered in the Commonwealth of Pennsylvania, to guarantee and secure debt in an amount of up to approximately $95 million (the "Proposed Transaction").[1]

    MetTel's participation in the financing transaction is conditioned on receiving the applicable regulatory approvals, including the grant of the instant request. MetTel respectfully requests that the Commission expeditiously grant the requested Securities Certificate no later than its scheduled Public Meeting on March 2, 2017, so that the financing transaction may proceed on a timely basis.

    In support of this Securities Certificate, MetTel provides the following information:

I.    <u>DESCRIPTION OF THE REGISTRANT</u>

    MetTel is a privately held corporation organized pursuant to the laws of Delaware whose principal business is telecommunications. MetTel is a wholly owned subsidiary of Manhattan

---

[1] On January 24, 2017, the Delaware Public Service Commission took no action on a similar application filed by MetTel's Delaware affiliate, allowing the application to be approved by operation of law. *See In the Matter of the Application of Metropolitan Telecommunications of Delaware Inc. for the Approval of Participation in Financing Arrangement Pursuant to Del. C. §215*, Docket No. 16-1163.

Telecommunications Corporation and indirect subsidiary of Metropolitan Telecommunications Holding Company ("MetTel Holding"), a privately held Delaware holding company.

MetTel Holding, through its subsidiaries, is a strategic partner providing a comprehensive suite of voice and data solutions as well as telecommunications consulting services to leading businesses nationwide.  From traditional voice services to MPLS networks and Voice over IP technologies, MetTel Holding offers a complete portfolio of products.  MetTel was authorized by the Commission to provide local and interexchange telecommunications services in Docket Nos. A-310933 and A-310933F0002 on August 17, 2000 and expanded local exchange service in Docket Nos. A-2010-2161948, *et al.*, on May 10, 2010 and Docket Nos. A-2011-2269103, *et al.*, on December 16, 2011 (the "PA CPCN").

In addition to the services provided by MetTel to Pennsylvania customers, MetTel's affiliates are authorized by the various state public service commissions to provide facilities-based and/or resold interexchange telecommunications services, and competitive local exchange services in 49 other states, the District of Columbia, Puerto Rico, and Canada, pursuant to certification, registration or tariff requirements, or on a deregulated basis.

Further information regarding MetTel's legal, technical, financial and managerial qualifications to provide telecommunications service to customers in Pennsylvania may be found in MetTel's initial application for the PA CPCN as a matter of public record.  MetTel respectfully requests that the Commission take official notice of the information contained in the Pennsylvania application and incorporate it herein for reference.

II.     <u>Designated Contacts</u>

Questions, correspondence or other communications concerning this filing should be directed to:

Karl C. Helgerson
Kutak Rock LLP
Two Liberty Place, Suite 28B
Philadelphia, PA 19102
Tel: (215) 299-4384
Fax: (215) 981-0719
Email: <u>Karl.Helgerson@KutakRock.com</u>

With a copy for MetTel to:                    And:


Joseph Farano                                 Michael P. Donahue
General Counsel                               Nathaniel J. Hardy
MetTel                                        Marashlian & Donahue, PLLC
BellWorks 101 Crawfords Corner Road,          1420 Spring Hill Road, Suite 401
#4-202                                        McLean, VA 22102
Holmdel, NJ 07733                             Tel: (703) 714-1319
Tel: 212-359-5037                             Fax: (703) 563-6222
E-mail: jfarano@mettel.net                    Email: mpd@commlawgroup.com
                                                     njh@commlawgroup.com

III.    SECURITIES CERTIFICATE

Pursuant to Section 3.601 of the Commission's regulations, 52 Pa. Code § 3.601, MetTel

submits the following information in support of its request:

A.      Name and Address of Utility

Metropolitan Telecommunications Corporation of PA d/b/a MetTel
BellWorks 101 Crawfords Corner Road,
#4-202
Holmdel, NJ 07733

B.      Name and Address of Utility's Attorney

Inquires and copies of any correspondence, orders, or other materials pertaining to this

Securities Certificate should be directed to the contacts provided in Section II, above.

C.      History and Description of Pennsylvania Services

MetTel obtained the PA CPCN on August 7, 2000, and expanded the scope of its authority

on May 10, 2010 and December 16, 2011.  MetTel currently provides competitive resold local

exchange and interexchange telecommunications services in Pennsylvania pursuant to the PA

CPCN.

D.      Corporate Structure

As mentioned above, MetTel is a wholly owned subsidiary of Manhattan

Telecommunications Corporation and indirect subsidiary of MetTel Holding, a privately held

Delaware holding company.  A chart depicting the corporate organizational structure of MetTel

Holding is attached hereto as Exhibit A.

3

E.      Description of the Proposed Transaction

MetTel Holding, and all of its direct and indirect subsidiaries, including MetTel, will enter into a Second Amended and Restated Credit Agreement and related Security Agreement with JP Morgan Chase Bank, N.A. (the "Agreement").  JP Morgan Chase Bank, N.A. ("JP Morgan") shall serve as the Administrative Agent under the Agreement for a series of lenders.  MetTel Holding chose JP Morgan as Administrative Agent due to the company's well known and longstanding reputation and ability to provide favorable terms to MetTel.  Pursuant to the Agreement, MetTel Holding will receive a revolving credit facility and additional term loan capacity.  Specifically, MetTel Holding will receive a revolving credit facility of $15,000,000 and additional term loan capacity of (a) up to $50,000,000 under a Senior Secured Term Loan and (b) up to $30,000,000 for an acquisition basket.

The obligations of the revolving credit facility and the additional term loan capacity shall be secured by a security interest in all of the assets of MetTel Holding and its subsidiaries, including MetTel.  The proceeds of the revolving credit facility will be used for general corporate purposes of MetTel Holdings, while the proceeds of the additional term loan capacity will be used for dividends and/or acquisitions.

MetTel's assets, including the PA CPCN, will not be collateralized to secure the debt until the Commission authorizes the Proposed Transaction.

The Agreement is intended to sustain MetTel's provisioning of competitive services and to enable MetTel and its owners to improve the operational and cost efficiencies of its business.  The transaction will directly benefit Pennsylvania customers by facilitating the continued provision of innovative, high-quality telecommunications services to the public and thereby promoting competition in the Pennsylvania telecommunications market.

MetTel therefore requests Commission authorization, to the extent necessary, for MetTel to pledge its assets as security for the Proposed Transaction in an aggregate amount of up to $95 million consistent with the parameters outlined above.

As specifically requested in Section 3.601(5)(iv) of the Commission's rules, MetTel provides the following:

(1)     Nominal date of issue

MetTel and its lenders desire to consummate the proposed Transaction as quickly as possible after they receive the applicable regulatory approvals.  They will notify the Commission once the Proposed Transaction has been consummated.

(2)     Date of maturity

Except for the revolving credit facility, the specific maturity date of the debt instruments comprising the Proposed Transaction will be subject to negotiations between MetTel and its lenders and will be subject to credit conditions at the time they are negotiated and issued.  The revolving credit facility will not have a maturity date.  MetTel expects that the debt instruments will mature within five (5) years of issuance, subject to any acceleration clauses that may be negotiated between MetTel and its lenders.  To maintain flexibility in its negotiations, MetTel requests Commission approval to participate in debt instruments with a maturity date of up to ten (10) years after issuance.

(3)     Interest rate and payment dates

The interest rates will reflect market rates for similar financing and will not be determined until the various debt instruments are finalized.  MetTel foresees that the interest rates could be fixed rates based on a currently recognized rate index such as LIBOR or the Federal Funds Rate with potential additional margin rates, a floating rate consisting of a base rate with a float rate based on a currently recognized rate index in addition to any applicable margin rate, or a combination of fixed and floating rates.  To maintain flexibility in its negotiations, MetTel requests Commission approval to participate in debt instruments with interest rates that reflect current market conditions for similar types of instruments.

(4)     Extent to which taxes on securities are assumed by the issuer

Not applicable.

(5)      Callability and conversion provisions

Not applicable.

(6)      Maintenance

MetTel will maintain its debt pursuant to the terms negotiated with its lenders.  MetTel does not foresee that there will be any non-standard debt maintenance requirements placed on it by the lenders.  MetTel can notify the Commission of the maintenance terms post-consummation of the Proposed Transaction.

(7)      Depreciation and sinking or other fund provision

Not applicable.

(8)      Name and address of trustee and whether affiliated with the public utility

There is no trustee in the proposed transaction.  JP Morgan shall serve as Administrative Agent for the Proposed Transactions.  JP Morgan's address is as follows:

> JP Morgan Chase Bank, N.A.
> 270 Park Avenue, 42nd Floor
> New York, New York 10017-2014

F.      Use of the Proceeds

The proceeds of the revolving credit facility will be used for working capital purposes of MetTel Holdings, while the proceeds of the additional term loan capacity will be used for dividends and/or acquisitions.  Potential acquisitions have yet to be identified, but MetTel can update the Commission when and if plans for future acquisitions become more concrete.

G.      Filings with the Securities and Exchange Commission

As MetTel Holding is a private company and this transaction is not subject to the registration requirements of the Securities Act of 1933, as amended, there will not be any filings made with the Securities and Exchange Commission related to this transaction.

H.      Section 3.601(c)(9) Requirements

In accordance with 52 Pa. Code § 3.601(c)(9), MetTel respectfully attaches hereto and makes part hereof the following exhibits:

Exhibit A        CONFIDENTIAL & PROPRIETARY - Metropolitan Telecommunications Holding Company Organizational Chart

Exhibit B        CONFIDENTIAL & PROPRIETARY - Balance sheet of MetTel as of December 16, 2016 (the most recent balance sheets available).

Exhibit C        CONFIDENTIAL & PROPRIETARY - Income statement of MetTel as of December 16, 2016 (the most recent income statements available).

Exhibit D        A statement with respect to the plant accounts appearing on the balance sheets referred to in Exhibit B.

Exhibit E        A statement of securities of other corporations and entities owned by MetTel.

Exhibit F        A statement showing the status of MetTel's funded debt outstanding as of December 16, 2016.  (No material changes in the funded debt outstanding have taken place since December 16, 2016.)

Exhibit G        A statement showing the status of MetTel's Capital Stock as of December 16, 2016.  (No material changes in the Capital Stock have taken place since December 16, 2016.)

Exhibit H        A statement that no registration statement has been filed with the Securities and Exchange Commission under the Securities Act of 1933 with respect to the Second Amended and Restated Credit Agreement and related Security Agreement.

Exhibit I         A statement that no applications or declarations have been filed with the Securities and Exchange Commission with respect to the Second Amended and Restated Credit Agreement and related Security Agreement pursuant to the Public Utility Holding Company Act of 1935.

Exhibit J         A copy of the resolutions of the officers of MetTel authorizing the inclusion of MetTel as an additional borrower under the Second Amended and Restated Credit Agreement and related Security Agreement.

Exhibit K        A statement that no journal entry will be made on the books of account of MetTel as a result of the Second Amended and Restated Credit Agreement and related Security Agreement.

Exhibit L        Affidavit of an Officer of MetTel in the form prescribed by 52 Pa. Code §§ 1.35 and 1.36.

MetTel notes that copies of the Second Amended and Restated Credit Agreement and related Security Agreement are not provided with this Security Certificate as they have not been

finalized as of the date of submission.  MetTel will provide the Commission with copies of these agreements upon request as soon as they are completed.

IV.    <u>PUBLIC INTEREST CONSIDERATIONS</u>

Consummation of the Proposed Transaction will serve the public interest in promoting competition among telecommunications carriers by providing MetTel with the opportunity to strengthen its competitive position by providing additional working capital and the ability to finance acquisitions to enhance the company's services.  The financing arrangements are necessary and appropriate, will not impair MetTel's ability to perform such services to the public, and will promote the corporate purposes of MetTel.  The Proposed Transaction will not involve an assignment of the PA CPCN or a change in the day-to-day operations of the certificated company.  In addition, there will be no change in the services offered to MetTel's customers or the rates for MetTel's regulated services.  The transaction will be completely transparent to MetTel's customers.

WHEREFORE, MetTel respectfully requests that the Commission promptly approve the above-referenced financing arrangement, register this Abbreviated Securities Certificate, and issue a Notice of Registration, pursuant to Sections 1901 of the Public Utility Code, 66 Pa. C.S. § 1901, and Section 3.602(c) of the Commission's regulations, 52 Pa. Code § 3.602(c), and the interrelated affiliate transaction, if necessary, under Section 2102 of the Public Utility Code, 66 Pa. C.S. § 2102, as soon as possible authorizing MetTel to participate in the financing arrangements described herein.

As required by the Commission's rules, a filing fee in the amount of $25.00 is being paid by credit card through the Commission's eFiling system.  Please acknowledge receipt and acceptance of this filing.  Please do not hesitate to contact us if you have any questions.

Respectfully submitted,


    */s/ Karl C. Helgerson*
Karl C. Helgerson
Kutak Rock LLP
Two Liberty Place, Suite 28B
Philadelphia, PA 19102

Tel:  (215) 299-4384
Fax: (215) 981-0719
Email: Karl.Helgerson@KutakRock.com

<u>EXHIBIT A</u>

CONFIDENTIAL & PROPRIETARY

Metropolitan Telecommunications Holding Company Organizational Chart

<u>PUBLIC VERSION</u>

[REDACTED]

EXHIBIT B

CONFIDENTIAL & PROPRIETARY

Balance sheet of
Metropolitan Communications of PA d/b/a/ MetTel
as of December 31, 2016.

There have not been any transactions which occurred between the date of the balance sheet and the submission date and there are no major contingent liabilities faced by the MetTel at the time of submission.

PUBLIC VERSION

[REDACTED]

EXHIBIT C

CONFIDENTIAL & PROPRIETARY

Income Statement of
Metropolitan Communications of PA d/b/a/ MetTel
for the twelve months ending December 31, 2016

PUBLIC VERSION

[REDACTED]

EXHIBIT D


The Plant of MetTel is carried on the books of account at its original cost as required by the FCC Part 32 Uniform System of Accounts.  (Please see Exhibit B for further details).

<u>EXHIBIT E</u>

<u>Other Securities</u>

MetTel does not own any securities in any other corporation.

<u>EXHIBIT F</u>

<u>Statement showing status of MetTel's funded debt outstanding as of
December 31, 2016.</u>

MetTel does not carry any funded debt.

Exhibit G

Capital Stock of MetTel as of December 31, 2016.

There are 200 shares of capital stock of MetTel authorized for issuance, of which 100 have been issued and remain outstanding. There have been no changes in the capital stock of the company since the date above.

Exhibit H

Registration Statement with SEC

No registration statement has been filed with the Securities and Exchange Commission under the Securities Act of 1933 with respect to the Second Amended and Restated Credit Agreement and related Security Agreement.

Exhibit I

Applications or Declarations filed with the SEC

No applications or declarations have been filed with the Securities and Exchange Commission with respect to the Second Amended and Restated Credit Agreement and related Security Agreement under the Public Utility Holding Company Act of 1935.

<u>Exhibit J</u>

<u>Corporate Consent</u>

Unanimous Written Consent of MetTel, authorizing the inclusion of MetTel as an additional borrower under the Second Amended and Restated Credit Agreement and related Security Agreement.

## METROPOLITAN TELECOMMUNICATIONS CORPORATION OF PA d/b/a METTEL

### Unanimous Written Consent of the Directors

### February 2, 2017

Metropolitan Telecommunications Corporation of PA d/b/a MetTel ("MetTel") is a privately held corporation organized pursuant to the laws of Delaware whose principal business is telecommunications.

The undersigned directors, constituting the entire Board of Directors (the "Board") of MetTel, acting without a meeting pursuant to Section 141(f) of the Delaware General Corporation Law, as amended, do hereby waive all call and notice requirements and consent to, and adopt the following resolutions by unanimous written consent.

WHEREAS, MetTel is a wholly owned subsidiary of Manhattan Telecommunications Corporation and indirect subsidiary of Metropolitan Telecommunications Holding Company ("MetTel Holding"), a privately held Delaware holding company.

WHEREAS, MetTel Holding will enter into a Second Amended and Restated Credit Agreement with JP Morgan Chase serving as Administrative Agent for several financial institutions ("Further Amended Credit Agreement") amending and restating their credit agreement as amended with JP Morgan Chase, et al. ("Prior Credit Agreement") and the related Security Agreement (with the Further Amended Credit Agreement, the "Agreements");

WHEREAS, the Further Amended Credit Agreement consists of a $15,000,000 revolving credit facility and additional term loan capacity ("Term Loan") of (a) up to $50,000,000 under a Senior Secured Term Loan and (b) up to $30,000,000 for an acquisition basket.  The Further Amended Credit Agreement is secured by substantially all of the assets of MetTel Holding and its subsidiaries; and

WHEREAS, the Board has determined that it is in the best interest of MetTel for it to be a borrower under the Agreements.

NOW, THEREFORE, BE IT RESOLVED that MetTel is hereby authorized to join the Agreements as an additional borrower;

FURTHER RESOLVED, that any one or more of the Chief Executive Officer, the President, the Chief Financial Officer, any Vice President (however designated), the Treasurer or the Secretary (each, an "Authorized Officer" and collectively, the "Authorized Officers") are, and each of them is, hereby authorized to execute, and deliver for, in the name and on behalf of MetTel, the Agreements in each case in such form and with such terms and provisions as may be approved by such officer, such approval to be conclusively evidenced by such officer's execution thereof;

FURTHER RESOLVED, that the Authorized Officers are, and each of them is, hereby authorized and directed to file with the Pennsylvania Public Utility Commission such Securities Certificate as counsel deems appropriate under the Pennsylvania Public Utility Code to register MetTel's assumption of its obligations under the Agreements, effective upon registration of MetTel's Securities Certificate;

FURTHER RESOLVED, that consummation of all transactions contemplated by, and performance by MetTel of all of its obligations under, the Agreements be and hereby are, deemed by the Board to be advisable and in the best interest of the MetTel and are approved in all respects;

FURTHER RESOLVED, that the Board hereby approves and authorizes MetTel to enter into all arrangements, agreements, certificates, instruments, notices, documents or other writings to be executed

and delivered by MetTel in connection with the transactions contemplated by the Agreements and the execution, delivery and performance by MetTel of any and all such arrangements, agreements, certificates, instruments, notices, documents or other writings;

FURTHER RESOLVED, that any Authorized Officer be, and each of them hereby is, authorized, directed and empowered in the name and on behalf of MetTel to negotiate, enter into, execute, deliver and perform the documents and obligations necessary to complete the Agreements;

FURTHER RESOLVED, that any Authorized Officer be, and each of them hereby is, authorized, directed and empowered in the name and on behalf of MetTel to do or to cause to be done all further acts and things, in the name and on behalf of the MetTel, as any such officer deems necessary or appropriate to effect the Agreements;

FURTHER RESOLVED, that any Authorized Officer be, and hereby is, authorized and empowered for and in the name of MetTel to amend, supplement or otherwise modify the terms of any document, filing or agreement authorized pursuant to the foregoing resolutions on any terms and subject to any conditions not inconsistent with these resolutions;

FURTHER RESOLVED, that all acts and deeds heretofore done or actions taken by any director, officer or agent of MetTel, for and on behalf of MetTel in entering into, executing, acknowledging or attesting any arrangements, agreements, certificates, instruments, notices or documents in carrying out the terms and intentions of the foregoing recitals and resolutions and each of them are hereby in all respects ratified, approved and confirmed;

FURTHER RESOLVED, that no Authorized Officer shall cause MetTel Holding or MetTel to draw upon the Term Loan without further Board approval, except at closing in connection with refinancing the existing facilities;

FURTHER RESOLVED, that in connection with the transactions contemplated in the preceding resolutions, each Authorized Officer be, and hereby is, authorized in the name and on behalf of the MetTel, to certify any more formal or detailed resolutions as such Authorized Officer may deem necessary, desirable, advisable or appropriate to consummate, effectuate, carry out or further the transactions contemplated by and the intent and purposes of the foregoing resolutions; and that thereupon, such resolutions shall be deemed adopted as and for the resolutions of the Board as if set forth at length herein;

FURTHER RESOLVED, that the omission from these resolutions of any agreement or other arrangement contemplated by any of the agreements or instruments described in the foregoing resolutions or any action to be taken in accordance with any requirements of any of the agreements or instruments described in the foregoing resolutions shall in no manner derogate from the authority of the Authorized Officer to take all actions necessary, desirable, advisable or appropriate to consummate, effectuate, carry out or further the transactions contemplated by and the intent and purposes of the foregoing resolutions;

FURTHER RESOLVED, that the officers of MetTel are, and each of them is, hereby authorized and directed to do and perform, or cause to be done and performed, all such acts and deeds and to make, executive and deliver, or cause to be made, executed and delivered, all such agreements, undertakings, documents, instruments, waivers, amendments or certificates in the name and on behalf of MetTel or otherwise as each such officer may deem necessary or appropriate to effectuate and carry out fully the purpose and intent of the foregoing resolutions and to cause MetTel to perform its obligations under any agreements or other instruments authorized by these resolutions.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the undersigned has executed and delivered this Written Consent of the Directors in lieu of meeting as of the date first above written.

Marshall Aronow

Andoni Economou

David Aronow

Joseph Aronow

Exhibit K

Journal Entry

No journal entry will be made on the books of accounts of MetTel as a result of the Second Amended and Restated Credit Agreement and related Security Agreement.

Exhibit L

Verification

STATE OF NEW JERSEY                    §
                                       §
COUNTY OF MONMOUTH                     §

## VERIFICATION

    I, Joseph Farano, state that I am the General Counsel of Metropolitan Telecommunications Corporation of PA ("MetTel"); that I am authorized to make this Verification on behalf of MetTel; that the foregoing filing was prepared under my direction and supervision; and that the contents are true and correct to the best of my knowledge, information, and belief.

Joseph Farano
General Counsel
Metropolitan Telecommunications Corporation of PA
d/b/a MetTel

SWORN TO AND SUBSCRIBED before me on the 2nd day of February, 2017.

Notary Public

My commission expires: _Jan 2nd 2018_

# Exhibit 3

**PUBLIC VERSION**

Before the
Pennsylvania Public Utility Commission

| | | |
|---|---|---|
| In the Matter of Registration of | ) | |
| | ) | |
| Security Certificate of | ) | Docket No. S-2019-_____ |
| | ) | |
| **Metropolitan Telecommunications Corporation** | ) | |
| **of PA d/b/a MetTel** | ) | |

<u>**Securities Certificate**</u>

Metropolitan Telecommunications Corporation of PA d/b/a MetTel ("MetTel"), by undersigned counsel and pursuant to Section 1901 of the Public Utility Code, 66 Pa. C.S. § 1901, and Section 3.601 of the Pennsylvania Public Utility Commission's ("Commission") regulations, 52 Pa. Code § 3.601, hereby request the Commission register this Securities Certificate describing MetTel's participation in a financing transaction whereby it will pledge its assets, including the Certificate of Public Convenience and Necessity currently held by MetTel for services offered in the Commonwealth of Pennsylvania, to guarantee and secure debt in an amount of up to approximately $130 million (the "Proposed Transaction"). The Commission approved a similar MetTel financing transaction in 2017 in Docket No. S-2017-2589999.

MetTel's participation in the financing transaction is conditioned on receiving the applicable regulatory approvals, including the grant of the instant request.  MetTel respectfully requests that the Commission expeditiously grant the requested Securities Certificate no later than its scheduled Public Meeting on October 3, 2019 or October 24, 2019, so that the financing transaction may proceed on a timely basis.

In support of this Securities Certificate, MetTel provides the following information:

I.     <u>**DESCRIPTION OF THE REGISTRANT**</u>

MetTel is a privately held corporation organized pursuant to the laws of Delaware whose principal business is telecommunications.  MetTel is a wholly owned subsidiary of Manhattan

**PUBLIC VERSION**

Telecommunications Corporation and indirect subsidiary of Metropolitan Telecommunications Holding Company ("MetTel Holding"), a privately held Delaware holding company.

MetTel Holding, through its subsidiaries, is a strategic partner providing a comprehensive suite of voice and data solutions as well as telecommunications consulting services to leading businesses nationwide.  From traditional voice services to MPLS networks and Voice over IP technologies, MetTel Holding offers a complete portfolio of products.  MetTel was authorized by the Commission to provide local and interexchange telecommunications services in Docket Nos.A-310933 and A-310933F0002 on August 17, 2000 and expanded local exchange service in Docket No. A-2010-2161948, *et al.*, on May 10, 2010 and Docket Nos. A-2011-2269103, *et al.*, on December 16, 2011 (the "PA CPCN").

In addition to the services provided by MetTel to Pennsylvania customers, MetTel's affiliates are authorized by the various state public service commissions to provide facilities-based and/or resold interexchange telecommunications services, and competitive local exchange services in 49 other states, the District of Columbia, Puerto Rico, and Canada, pursuant to certification, registration or tariff requirements, or on a deregulated basis.

Further information regarding MetTel's legal, technical, financial and managerial qualifications to provide telecommunications service to customers in Pennsylvania may be found in MetTel's initial application for the PA CPCN as a matter of public record.  MetTel respectfully requests that the Commission take official notice of the information contained in the Pennsylvania application and incorporate it herein for reference.

## II.   Designated Contacts

Questions, correspondence or other communications concerning this filing should be directed to:

**PUBLIC VERSION**

Amy Blumenthal
Kutak Rock LLP
1760 Market Street, Suite 1100
Philadelphia, PA 19103-4104
Phone: (215) 586-4188
Fax:    (215) 981-0719
Email:  amy.blumenthal@kutakrock.com

With a copy for MetTel to:

Joseph Farano
General Counsel
MetTel
BellWorks 101 Crawfords Corner Road, #311
Holmdel, NJ 07733
Tel: 212-359-5037
E-mail: jfarano@mettel.net

And:

Michael P. Donahue
Marashlian & Donahue, PLLC
1420 Spring Hill Road, Suite 401
McLean, VA 22102
Tel: (703) 714-1319
Fax: (703) 563-6222
Email: mpd@commlawgroup.com

**III.   SECURITIES CERTIFICATE**

Pursuant to Section 3.601 of the Commission's regulations, 52 Pa. Code § 3.601, MetTel

submits the following information in support of its request:

**A.   Name and Address of Utility**

Metropolitan Telecommunications Corporation of PA d/b/a MetTel
BellWorks 101 Crawfords Corner Road, #311
Holmdel, NJ 07733

**B.   Name and Address of Utility's Attorney**

Inquires and copies of any correspondence, orders, or other materials pertaining to this

Securities Certificate should be directed to the contacts provided in Section II, above.

**C.   History and Description of Pennsylvania Services**

3

**PUBLIC VERSION**

MetTel obtained the PA CPCN on August 7, 2000, and expanded the scope of its authority on May 10, 2010 and December 16, 2011.  MetTel currently provides competitive resold local exchange and interexchange telecommunications services in Pennsylvania pursuant to the PA CPCN.

**D.      Corporate Structure**

As mentioned above, MetTel is a wholly owned subsidiary of Manhattan Telecommunications Corporation and indirect subsidiary of MetTel Holding, a privately held Delaware holding company.  A chart depicting the corporate organizational structure of MetTel Holding is attached hereto as Exhibit A.

**E.      Description of the Proposed Transaction**

MetTel Holding, and all of its direct and indirect subsidiaries, including MetTel, will enter into a Third Amended and Restated Credit Agreement ("Agreement") with certain of such subsidiaries (other than MetTel) (collectively, the "Borrowers") also entering into a related Security Agreement with JPMorgan Chase Bank, N.A. ("JP Morgan"). JP Morgan shall serve as the Administrative Agent under the Agreement for a series of lenders. MetTel Holding chose JP Morgan as Administrative Agent due to the company's well known and longstanding reputation and ability to provide favorable terms to MetTel.  Pursuant to the Agreement, MetTel Holding will receive a revolving credit facility of $60,000,000 (with the ability to increase by up to an additional $30,000,000, to $90,000,000) and additional term loan capacity of up to $40,000,000 under a Senior Secured Term Loan.

The obligations of the revolving credit facility and the additional term loan capacity shall be secured by a security interest in all of the assets of the Borrowers.  While MetTel is not a Borrower under the Agreement, it will act it will act as a Guarantor of MetTel Holding and the other Borrowers.  As such, Manhattan Telecommunications will be jointly and severally liable for

**PUBLIC VERSION**

the full amount of the proceeds of the credit facility and term loan.  The proceeds of the credit facility will be used for general corporate purposes, dividends and/or acquisitions.

MetTel's assets, including the PA CPCN, will not be collateralized to secure the additional debt until the Commission authorizes the Proposed Transaction.

The Agreement is intended to sustain MetTel's provisioning of competitive services and to enable MetTel and its owners to improve the operational and cost efficiencies of its business.  The transaction will directly benefit Pennsylvania customers by facilitating the continued provision of innovative, high-quality telecommunications services to the public and thereby promoting competition in the Pennsylvania telecommunications market.

MetTel therefore requests Commission authorization, to the extent necessary, for MetTel to pledge its assets as security for the Proposed Transaction in an aggregate amount of up to $130 million consistent with the parameters outlined above.

As specifically requested in Section 3.601(5)(iv) of the Commission's rules, MetTel provides the following:

(1)    **Nominal date of issue**

MetTel and its lenders desire to consummate the proposed Transaction as quickly as possible after they receive the applicable regulatory approvals.  They will notify the Commission once the Proposed Transaction has been consummated and MetTel has been added as a guarantor.

(2)    **Date of maturity**

Except for the revolving credit facility, the specific maturity date of the debt instruments comprising the Proposed Transaction will be subject to negotiations between MetTel and its lenders and will be subject to credit conditions at the time they are negotiated and issued.  The revolving credit facility will not have a maturity date.  MetTel expects that the debt instruments will mature within five (5) years of issuance, subject to any acceleration clauses that may be

**PUBLIC VERSION**

negotiated between MetTel and its lenders.  To maintain flexibility in its negotiations, MetTel requests Commission approval to participate in debt instruments with a maturity date of up to ten (10) years after issuance.

### (3)   Interest rate and payment dates

The interest rates will reflect market rates for similar financing and will not be determined until the various debt instruments are finalized.  MetTel foresees that the interest rates could be fixed rates based on a currently recognized rate index such as LIBOR of the Federal Funds Rate with potential additional margin rates, a floating rate consisting of a base rate with a float rate based on a currently recognized rate index in addition to any applicable margin rate, or a combination of fixed and floating rates.  To maintain flexibility in its negotiations, MetTel requests Commission approval to participate in debt instruments with interest rates that reflect current market conditions for similar types of instruments.

### (4)   Extent to which taxes on securities are assumed by the issuer

Not applicable.

### (5)   Callability and conversion provisions

Not applicable.

### (6)   Maintenance

MetTel will maintain its debt pursuant to the terms negotiated with its lenders.  MetTel does not foresee that there will be any non-standard debt maintenance requirements placed on it by the lenders.  MetTel can notify the Commission of the maintenance terms post-consummation of the Proposed Transaction.

### (7)   Depreciation and sinking or other fund provision

Not applicable.

### (8)   Name and address of trustee and whether affiliated with the public utility

**PUBLIC VERSION**

There is no trustee in the proposed transaction.  JP Morgan shall serve as Administrative

Agent for the Proposed Transactions.  JP Morgan's address is as follows:

> JP Morgan Chase Bank, N.A.
> 270 Park Avenue, 42nd Floor
> New York, New York 10017-2014

**F.      Use of the Proceeds**

The proceeds of the revolving credit facility will be used for general corporate purposes of

MetTel Holdings and its affiliates, including MetTel, while the proceeds of the additional term loan

capacity will be used for dividends and/or acquisitions.   Potential acquisitions have yet to be

identified, but MetTel can update the Commission when and if plans for future acquisitions become

more concrete.

**G.      Filings with the Securities and Exchange Commission**

As MetTel Holding is a private company and this transaction is not subject to the

registration requirements of the Securities Act of 1933, as amended, there will not be any filings

made with the Securities and Exchange Commission related to this transaction.

**H.      Section 3.601(c)(9) Requirements**

In accordance with 52 Pa. Code § 3.601(c)(9), MetTel respectfully attaches hereto and

makes part hereof the following exhibits:

Exhibit A        **CONFIDENTIAL & PROPRIETARY** - Metropolitan Telecommunications
                 Holding Company Organizational Chart

Exhibit B        **CONFIDENTIAL & PROPRIETARY** - Balance sheet of MetTel as of
                 December 31, 2018 (the most recent balance sheets available).

Exhibit C        **CONFIDENTIAL & PROPRIETARY** - Income statement of MetTel as of
                 December 31, 2018 (the most recent income statements available).

Exhibit D        A statement with respect to the plant accounts appearing on the balance
                 sheets referred to in Exhibit B.

Exhibit E        A statement of securities of other corporations and entities owned by
                 MetTel.

**PUBLIC VERSION**

Exhibit F      **CONFIDENTIAL & PROPRIETARY** - A statement showing the status of MetTel's funded debt outstanding as of December 31, 2018.  (No material changes in the funded debt outstanding have taken place since December 31, 2018.)

Exhibit G      A statement showing the status of MetTel's Capital Stock as of December 31, 2018.  (No material changes in the Capital Stock have taken place since December 16, 2018.)

Exhibit H      A statement that no registration statement has been filed with the Securities and Exchange Commission under the Securities Act of 1933 with respect to the Second Amended and Restated Credit Agreement and related Security Agreement.

Exhibit I      A statement that no applications or declarations have been filed with the Securities and Exchange Commission with respect to the Second Amended and Restated Credit Agreement and related Security Agreement pursuant to the Public Utility Holding Company Act of 1935.

Exhibit J      A copy of the resolutions of the officers of MetTel authorizing the inclusion of MetTel as a Guarantor under the Third Amended and Restated Credit Agreement and related Security Agreement.

Exhibit K      A statement that no journal entry will be made on the books of account of MetTel as a result of the Third Amended and Restated Credit Agreement and related Security Agreement.

Exhibit L      Affidavit of an Officer of MetTel in the form prescribed by 52 Pa. Code §§ 1.35 and 1.36.

MetTel notes that copies of the Third Amended and Restated Credit Agreement and related Security Agreement are not provided with this Security Certificate as they have not been finalized as of the date of submission.  MetTel will provide the Commission with copies of these agreements upon request as soon as they are completed.

## IV.   **PUBLIC INTEREST CONSIDERATIONS**

Consummation of the Proposed Transaction will serve the public interest in promoting competition among telecommunications carriers by providing MetTel with the opportunity to strengthen its competitive position by providing additional working capital and the ability to finance acquisitions to enhance the company's services.  The financing arrangements are necessary and appropriate, will not impair MetTel's ability to perform such services to the public, and will promote

**PUBLIC VERSION**

the corporate purposes of MetTel.  The Proposed Transaction will not involve an assignment of the PA CPCN or a change in the day-to-day operations of the certificated company.  In addition, there will be no change in the services offered to MetTel's customers or the rates for MetTel's regulated services.  The transaction will be completely transparent to MetTel's customers.

WHEREFORE, MetTel respectfully requests that the Commission promptly approve the above-referenced financing arrangement, register this Abbreviated Securities Certificate, and issue a Notice of Registration, pursuant to Sections 1901 of the Public Utility Code, 66 Pa. C.S. § 1901, and Section 3.602(c) of the Commission's regulations, 52 Pa. Code § 3.602(c), and the interrelated affiliate transaction, if necessary, under Section 2102 of the Public Utility Code, 66 Pa. C.S. § 2102, as soon as possible authorizing MetTel to participate in the financing arrangements described herein.

As required by the Commission's rules, a filing fee in the amount of $25.00 is being paid by credit card through the Commission's eFiling system.  Please acknowledge receipt and acceptance of this filing.  Please do not hesitate to contact us if you have any questions.

Respectfully submitted,


/s/ Amy Blumenthal
Amy Blumenthal
Kutak Rock LLP
Two Liberty Place
1760 Market Street, Suite 1100
Philadelphia, PA 19103-4104
Phone: (215) 586-4188
Fax:    (215) 981-0719
Email:  amy.blumenthal@kutakrock.com

Dated: September 30, 2019

**PUBLIC VERSION**

**<u>EXHIBIT A</u>**

**CONFIDENTIAL & PROPRIETARY**

**Metropolitan Telecommunications Holding Company Organizational Chart**

**PUBLIC VERSION**

**[REDACTED]**

**PUBLIC VERSION**

**<u>EXHIBIT B</u>**

**CONFIDENTIAL & PROPRIETARY**

**Balance sheet of**
**Metropolitan Communications of PA d/b/a/ MetTel**
**<u>as of December 31, 2018.</u>**

**PUBLIC VERSION**

**[REDACTED]**

**PUBLIC VERSION**

**<u>EXHIBIT C</u>**

**CONFIDENTIAL & PROPRIETARY**

**Income Statement of**
**Metropolitan Communications of PA d/b/a/ MetTel**
**<u>for the twelve months ending December 31, 2018</u>**

**PUBLIC VERSION**

**[REDACTED]**

**PUBLIC VERSION**

**<u>EXHIBIT D</u>**


The Plant of MetTel is carried on the books of account at its original cost as required by the FCC Part 32 Uniform System of Accounts.  (Please see Exhibit B for further details).

**PUBLIC VERSION**

**EXHIBIT E**

**Other Securities**

MetTel does not own any securities in any other corporation.

**PUBLIC VERSION**

**<u>EXHIBIT F</u>**

**CONFIDENTIAL & PROPRIETARY**

**<u>Statement showing status of MetTel's funded debt outstanding as of December 31, 2018.</u>**

**<u>[REDACTED]</u>**

**PUBLIC VERSION**

**<u>Exhibit G</u>**

**<u>Capital Stock of MetTel as of December 31, 2018.</u>**

There are 200 shares of capital stock of MetTel authorized for issuance, of which 100 have been issued and remain outstanding. There have been no changes in the capital stock of the company since the date above.

**PUBLIC VERSION**

**Exhibit H**

**Registration Statement with SEC**

No registration statement has been filed with the Securities and Exchange Commission under the Securities Act of 1933 with respect to the Second Amended and Restated Credit Agreement and related Security Agreement.

**PUBLIC VERSION**

**Exhibit I**


**Applications or Declarations filed with the SEC**

No applications or declarations have been filed with the Securities and Exchange Commission with respect to the Second Amended and Restated Credit Agreement and related Security Agreement under the Public Utility Holding Company Act of 1935.

PUBLIC VERSION

<u>Exhibit I</u>

<u>Applications or Declarations filed with the SEC</u>

No applications or declarations have been filed with the Securities and Exchange Commission with respect to the Second Amended and Restated Credit Agreement and related Security Agreement under the Public Utility Holding Company Act of 1935.

PUBLIC VERSION

<u>Exhibit J</u>

<u>Corporate Consent</u>

Unanimous Written Consent of MetTel, authorizing the inclusion of MetTel as a Guarantor under the Third Amended and Restated Credit Agreement and related Security Agreement.

## CONSOLIDATED UNANIMOUS WRITTEN CONSENT OF
## THE SOLE EQUITY HOLDER AND THE BOARDS OF DIRECTORS OF
## SUBSIDIARIES OF METROPOLITAN TELECOMMUNICATIONS HOLDING COMPANY

The undersigned, being the sole equity holder (whether as a stockholder, shareholder, or otherwise) (the "Sole Equity Holder"), and all of the members of the Boards of Directors (each, a "Board"; together with the Sole Equity Holder, the "Undersigned"), of certain direct or indirect subsidiaries (each such subsidiary referred to as a "Company" and listed on Schedule 1 hereto) of Metropolitan Telecommunications Holding Company, a Delaware corporation ("MetTel Holding Company") who are a party to that certain Third Amended and Restated Credit Agreement (as hereinafter defined), acting by written consent without a meeting, do hereby consent to and approve, effective as of the 26 day of September 2019, the following resolutions and each and every action effected thereby:

**WHEREAS**, certain Companies have previously entered into an Amended and Restated Credit Agreement dated as of October 3, 2013, by and among MetTel Holding Company, certain direct and indirect subsidiaries of MetTel Holding Company (collectively, the "Initial Borrowers"), Metropolitan Telecommunications of Colorado, Inc. ("MetTel Colorado"), Metropolitan Telecommunications of Indiana, Inc. ("MetTel Indiana"), and JPMorgan Chase Bank, N.A. ("JPM") as the Administrative Agent and a Lender (as amended by the First Amendment dated as of December 19, 2013, the Second Amendment dated as of February 7, 2014, the Third Amendment and Waiver dated as of June 20, 2014, the Fourth Amendment dated as of October 14, 2014, the Fifth Amendment dated as of December 19, 2014, the Sixth Amendment dated as of August 13, 2015, the Seventh Amendment dated as of September 2, 2015, the Eighth Amendment dated as of December 21, 2016, the Ninth Amendment dated as of September 1, 2017 (as so amended, the "First Amended and Restated Credit Agreement"); and

**WHEREAS**, the First Amended and Restated Credit Agreement was further amended and restated by that certain Second Amended and Restated Credit Agreement dated as of September 29, 2017, as amended by the First Amendment dated as of March 26, 2018, the Second Amendment dated as of September 28, 2018, and the Third Amendment and Waiver dated as of June 20, 2019 (as so amended, the "Existing Credit Agreement"); and

**WHEREAS**, each Board has determined that it is desirable and in the best interest of its respective Company to (i) further amend and restate the Existing Credit Agreement in the form of the Third Amended and Restated Credit Agreement (as hereinafter defined), (ii) further amend and restate the Amended and Restated Pledge and Security Agreement, dated as of September 29, 2017, among the Initial Borrowers, certain other direct and indirect subsidiaries of MetTel Holding Company (each such subsidiary, together with the Initial Borrowers, the "Applicable Subsidiaries"), MetTel Colorado, MetTel Indiana, and the Administrative Agent in the form of the Second Amended and Restated Pledge and Security Agreement, (iii) remove certain Applicable Subsidiaries as Borrowers (as defined in the Existing Credit Agreement) under the Existing Credit Agreement and reinstate such subsidiaries as Guarantors under and as defined in the Third Amended and Restated Credit Agreement, (iv) make certain other modifications to the credit arrangement under the Existing Credit Agreement and the "Loan Documents" referred to therein, and (v) do all other transactions related thereto or contemplated thereby as hereinafter set forth in these resolutions.

### CREDIT FACILITY RESOLUTIONS

**WHEREAS,** each Board has determined that it is desirable and in the best interest of its respective Company to enter into the following agreements (collectively referred to as the "Transaction

Agreements"):

    (i)    Third Amended and Restated Credit Agreement (the "<u>Third Amended and Restated Credit Agreement</u>"), by and among MetTel Holding Company and each of its Applicable Subsidiaries that are Borrowers as identified therein (collectively, "Borrowers"), any additional entity that from time to time becomes a "Borrower" thereunder, the Applicable Subsidiaries that are Guarantors as identified therein ("Guarantors"), any additional entity that from time to time becomes a "Guarantor" thereunder, each financial institution that from time to time is a "Lender" thereunder, JPM, in its capacity as Administrative Agent for the Lenders, Sole Bookrunner and Sole Lead Arranger, and Wells Fargo Bank, N.A. ("<u>Wells Fargo</u>"), as Syndication Agent, providing for (a) a term loan in the aggregate amount of $40,000,000, and (b) revolving loans in the initial aggregate amount of $60,000,000;

    (ii)    Fourth Amended and Restated Revolving Loan Promissory Note, in the amount of $27,000,000, made by the Borrowers in favor of JPM (the "<u>JPMorgan Revolving Note</u>");

    (iii)    Amended and Restated Revolving Loan Promissory Note, in the amount of $18,000,000, made by the Borrowers in favor of Wells Fargo (the "<u>Wells Fargo Revolving Note</u>");

    (iv)    Revolving Loan Promissory Note, in the amount of $15,000,000, made by the Borrowers in favor of Citizens Bank, N.A. ("<u>Citizen's Bank</u>") (the "<u>Citizen's Bank Revolving Note</u>");

    (v)    Amended and Restated Term Loan Promissory Note, in the amount of $18,000,000, made by the Borrowers in favor of JPM (the "<u>JPMorgan Term Note</u>");

    (vi)    Amended and Restated Term Loan Promissory Note, in the amount of $12,000,000, made by the Borrowers in favor of Wells Fargo (the "<u>Wells Fargo Term Note</u>");

    (vii)    Term Loan Promissory Note, in the amount of $10,000,000, made by the Borrowers in favor of Citizen's Bank (the "<u>Citizen's Bank Term Note</u>");

    (viii)  Second Amended and Restated Pledge and Security Agreement among the Borrowers and the Administrative Agent (the "<u>Second Amended and Restated Security Agreement</u>"); and

**WHEREAS**, the latest drafts of the Transaction Agreements have been presented to, reviewed by and approved by, each Board.

**NOW, THEREFORE, BE IT RESOLVED**, that each Company is hereby authorized, empowered and directed by its respective Board and Sole Equity Holder to (i) enter into the Transaction Agreements, substantially in the form presented to each Company's respective Board with such changes, additions and modifications thereto as each respective Company's Chief Executive Officer, President, Executive Vice President, Chief Operating Officer, Treasurer, or Secretary (each an "<u>Authorized Officer</u>" and collectively, the "<u>Authorized Officers</u>"), acting singly, may approve (the "<u>Approved Changes</u>"), such approval to be conclusively evidenced by the execution thereof by such Authorized Officer, and (ii) perform its respective obligations under the Transaction Agreements; and it is further

**RESOLVED**, that the forms, terms, and provisions of the Transaction Agreements, each

substantially in the form presented to each Board, together with any Approved Changes, be, and they hereby are, authorized and approved in all respects; and it is further

**RESOLVED**, that the Authorized Officers be, and each hereby is, acting singly, authorized and directed to execute and deliver the Transaction Agreements, in the name of and on behalf of each Company; and it is further

**RESOLVED**, that the Authorized Officers be, and each hereby is, acting singly, authorized and empowered and directed, in the name of and on behalf of each Company, to negotiate, execute, deliver, record and/or file all documents, agreements and instruments (including, without limitation, (i) Uniform Commercial Code financing statements or termination statements, as applicable, in the name and on behalf of each Company relating to any collateral in possession of each Company, as applicable, and (ii) any notices or other filings required by the FCC, any State Public Utility Commissions or similar governing entities), and to do any and all other acts as may be required or as they, or any of them, may deem necessary or appropriate to carry out and perform, to give effect to, or to cause each Company, as applicable, to enter in to and comply with, the terms of, or the transactions contemplated by, the Third Amended and Restated Credit Agreement, the other Transaction Agreements and any other related agreement or document that any Authorized Officer may deem necessary or advisable to consummate the transactions contemplated by the foregoing and to honor and discharge its obligations thereunder; and it is further

**RESOLVED**, that the form, terms and provisions of and the transactions contemplated by the various agreements, instruments and documents referred to in or contemplated by the Transaction Agreements be and hereby are authorized and approved in all respects.

## General Resolutions

**RESOLVED**, that the Authorized Officers be, and each hereby is, acting singly, authorized, empowered and directed, for and on behalf of each respective Company, to take any and all actions, to negotiate for and enter into agreements and amendments or waivers to agreements, to perform all such acts and things, to execute, file, deliver or record in the name and on behalf of each Company, all such certificates, instruments, agreements or other documents, to engage such advisors, and to make all such payments as they, in their judgment, or in the judgment of any one or more of them, may deem necessary, advisable or appropriate in order to carry out the purpose and intent of, or consummate the transactions contemplated by, the foregoing resolutions and/or all of the transactions contemplated therein or thereby, the authorization therefor to be conclusively evidenced by the taking of such action or the execution and delivery of such certificates, instruments, agreements or documents; and it is further

**RESOLVED**, that the omission from these resolutions of any agreement, document or other arrangement contemplated by any of the agreements, documents or instruments described in the foregoing resolutions or any action to be taken in accordance with any requirement of any of the agreements, documents or instruments described in the foregoing resolutions shall in no manner derogate from the authority of the Authorized Officers to take all actions necessary, desirable, advisable or appropriate to consummate, effectuate, carry out or further the transactions contemplated by, and the intent and purposes of, the foregoing resolutions; and be it further

**RESOLVED**, that all actions heretofore taken by any Authorized Officer, director, employee or agent of each Company in connection with the foregoing transactions contemplated by the foregoing resolutions be, and they hereby are, authorized, ratified and approved in all respects; and be it further

**RESOLVED**, that these resolutions of each Board may be delivered by facsimile or other electronically transmitted means in any number of counterparts, all of which shall be valid as originals

3

and deemed to be one and the same instrument; and be it further

      **RESOLVED**, that the Secretary of each Company is hereby authorized to certify and deliver, to any person to whom such certification and delivery may be deemed necessary or appropriate in the opinion of such Secretary, a true copy of the foregoing resolutions.

[Signature Page to Follow]

**IN WITNESS WHEREOF**, the Undersigned, being the Sole Equity Holder and all of the members of each Board, have executed this consent as of the first date set forth above.

Metropolitan Telecommunications Holding Company, a Delaware corporation

By: _____
Name:  Andoni Economou
Title:  COO/EVP

_____
Marshall Aronow

_____
Andoni Economou

_____
Joseph Aronow

_____
David Aronow

**IN WITNESS WHEREOF**, the Undersigned, being the Sole Equity Holder and all of the members of each Board, have executed this consent as of the first date set forth above.

Metropolitan Telecommunications Holding Company, a Delaware corporation

By: _____
Name:
Title:


_____
Marshall Aronow


_____
Andoni Economou


_____
Joseph Aronow


_____
David Aronow

[SIGNATURE PAGE TO UNANIMOUS WRITTEN CONSENT OF THE BOARD OF DIRECTORS OF METROPOLITAN TELECOMMUNICATIONS HOLDING COMPANY]

PUBLIC VERSION

<u>Exhibit K</u>

<u>Journal Entry</u>

No journal entry will be made on the books of accounts of MetTel as a result of the Third Amended and Restated Credit Agreement and related Security Agreement.

PUBLIC VERSION

Exhibit L

<u>Verification</u>

STATE OF NEW JERSEY                §
                                   §
COUNTY OF MONMOUTH                 §

### VERIFICATION

I, Joseph Farano, state that I am the General Counsel of Metropolitan Telecommunications Corporation of PA ("MetTel"); that I am authorized to make this Verification on behalf of MetTel; that the foregoing filing was prepared under my direction and supervision; and that the contents are true and correct to the best of my knowledge, information, and belief.

Joseph Farano
General Counsel
Metropolitan Telecommunications Corporation of PA
d/b/a MetTel

SWORN TO AND SUBSCRIBED before me on the ___9th___ day of September, 2019.

Notary Public

My commission expires: _____   NJ attorney ID: 122522014
                                                Mariya Gelfond, Esq.
                                                Admission Date: 11/19/2014

*MANHATTAN TELECOMMUNICATIONS CORP. D/B/A METROPOLITAN
TELECOMMUNICATIONS, A/K/A METTEL v. GRANITE TELECOMMUNICATIONS, LLC*
Court of Chancery of the State of Delaware
C.A. No. 2020-0380-JRS


A47
Certificate of Service to Defendant's Brief In Opposition to
Plaintiff's Motion For A Temporary Restraining Order And Motion to Expedite


05/28/20

EFiled:  May 28 2020 04:54PM EDT
Transaction ID 65663306
Case No. 2020-0380-JRS

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 28, 2020, the foregoing document was

served by File & Serve*Xpress* on the following attorneys of record:

Steven L. Caponi
Matthew B. Goeller
K&L Gates
600 N. King St., Suite 901
Wilmington, DE 19801

*/s/ Barnaby Grzaslewicz*
Barnaby Grzaslewicz (#6037)

*MANHATTAN TELECOMMUNICATIONS CORP. D/B/A METROPOLITAN
TELECOMMUNICATIONS, A/K/A METTEL v. GRANITE TELECOMMUNICATIONS, LLC*
Court of Chancery of the State of Delaware
C.A. No. 2020-0380-JRS


A48

Certificate of Service to Declaration of James Balestraci Pursuant to Delaware Supreme Court
Administrative Order No. 6, In re COVID-19 Precautionary Measures


05/28/20

EFiled:  May 28 2020 04:54PM EDT
Transaction ID 65663306
Case No. 2020-0380-JRS

# <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 28, 2020, the foregoing document was

served by File & Serve*Xpress* on the following attorneys of record:

Steven L. Caponi
Matthew B. Goeller
K&L Gates
600 N. King St., Suite 901
Wilmington, DE 19801


*/s/ Barnaby Grzaslewicz*
Barnaby Grzaslewicz (#6037)

*MANHATTAN TELECOMMUNICATIONS CORP. D/B/A METROPOLITAN*
*TELECOMMUNICATIONS, A/K/A METTEL v. GRANITE TELECOMMUNICATIONS, LLC*
Court of Chancery of the State of Delaware
C.A. No. 2020-0380-JRS


A49

Certificate of Service to Declaration of Geoff Cookman Pursuant to Delaware Supreme Court
Administrative Order No. 6, In re COVID-19 Precautionary Measures


05/28/20

EFiled:  May 28 2020 04:54PM EDT
Transaction ID 65663306
Case No. 2020-0380-JRS

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 28, 2020, the foregoing document was

served by File & Serve*Xpress* on the following attorneys of record:

> Steven L. Caponi
> Matthew B. Goeller
> K&L Gates
> 600 N. King St., Suite 901
> Wilmington, DE 19801

*/s/ Barnaby Grzaslewicz*
Barnaby Grzaslewicz (#6037)

*MANHATTAN TELECOMMUNICATIONS CORP. D/B/A METROPOLITAN TELECOMMUNICATIONS, A/K/A METTEL v. GRANITE TELECOMMUNICATIONS, LLC*
Court of Chancery of the State of Delaware
C.A. No. 2020-0380-JRS


A50

Certificate of Service to Declaration of James Easton Pursuant to Delaware Supreme Court Administrative Order No. 6, In re COVID-19 Precautionary Measures


05/28/20

EFiled:  May 28 2020 04:54PM EDT
Transaction ID 65663306
Case No. 2020-0380-JRS

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 28, 2020, the foregoing document was

served by File & Serve*Xpress* on the following attorneys of record:

> Steven L. Caponi
> Matthew B. Goeller
> K&L Gates
> 600 N. King St., Suite 901
> Wilmington, DE 19801

> */s/ Barnaby Grzaslewicz*
> Barnaby Grzaslewicz (#6037)

*MANHATTAN TELECOMMUNICATIONS CORP. D/B/A METROPOLITAN TELECOMMUNICATIONS, A/K/A METTEL v. GRANITE TELECOMMUNICATIONS, LLC*
Court of Chancery of the State of Delaware
C.A. No. 2020-0380-JRS


A51

Certificate of Service to Declaration of Karen Hogle Pursuant to Delaware Supreme Court Administrative Order No. 6, In re COVID-19 Precautionary Measures


05/28/20

EFiled: May 28 2020 04:54PM EDT
Transaction ID 65663306
Case No. 2020-0380-JRS

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 28, 2020, the foregoing document was

served by File & Serve*Xpress* on the following attorneys of record:

>       Steven L. Caponi
>       Matthew B. Goeller
>       K&L Gates
>       600 N. King St., Suite 901
>       Wilmington, DE 19801

>       */s/ Barnaby Grzaslewicz*
>       Barnaby Grzaslewicz (#6037)

*MANHATTAN TELECOMMUNICATIONS CORP. D/B/A METROPOLITAN TELECOMMUNICATIONS, A/K/A METTEL v. GRANITE TELECOMMUNICATIONS, LLC*
Court of Chancery of the State of Delaware
C.A. No. 2020-0380-JRS


A52

Certificate of Service to Declaration of Charles Pagliazzo Pursuant to Delaware Supreme Court Administrative Order No. 6, In re COVID-19 Precautionary Measures

05/28/20

**EFiled:  May 28 2020 04:54PM EDT**
**Transaction ID 65663306**
**Case No. 2020-0380-JRS**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 28, 2020, the foregoing document was

served by File & Serve*Xpress* on the following attorneys of record:

> Steven L. Caponi
> Matthew B. Goeller
> K&L Gates
> 600 N. King St., Suite 901
> Wilmington, DE 19801

*/s/ Barnaby Grzaslewicz*
Barnaby Grzaslewicz (#6037)

*MANHATTAN TELECOMMUNICATIONS CORP. D/B/A METROPOLITAN*
*TELECOMMUNICATIONS, A/K/A METTEL v. GRANITE TELECOMMUNICATIONS, LLC*
Court of Chancery of the State of Delaware
C.A. No. 2020-0380-JRS


A53
Granted ([Proposed] Order Granting Motion for Admission Pro Hac Vice
of Anthony P. La Rocco on behalf of Plaintiff)


05/29/20

**GRANTED**

EFiled:  May 29 2020 09:15AM EDT
Transaction ID 65664395
Case No. 2020-0380-JRS

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

MANHATTAN TELECOMMUNICATIONS
CORP., D/B/A METROPOLITAN
TELECOMMUNICATIONS, A/K/A
METTEL,

        Plaintiff,

v.

GRANITE TELECOMMUNICATIONS, LLC,

        Defendant.

C.A. No. 2020-0380-JRS

## [PROPOSED] ORDER

The foregoing application of Anthony P. La Rocco, Esq., for admission *pro hac vice* in this action is hereby granted.

SO ORDERED _____ day of _____, 2020.

_____
Vice Chancellor Joseph R. Slights

This document constitutes a ruling of the court and should be treated as such.

| | |
|---|---|
| **Court:** | DE Court of Chancery Civil Action |
| **Judge:** | Joseph Slights |
| **File & Serve Transaction ID:** | 65663586 |
| **Current Date:** | May 29, 2020 |
| **Case Number:** | 2020-0380-JRS |
| **Case Name:** | CONF ORDER CONF COMPLAINT Manhattan Telecommunications Corp. v. Granite Telecommunications, LLC |
| **Court Authorizer:** | Slights, Joseph |

**/s/ Judge Slights, Joseph**

*MANHATTAN TELECOMMUNICATIONS CORP. D/B/A METROPOLITAN*
*TELECOMMUNICATIONS, A/K/A METTEL v. GRANITE TELECOMMUNICATIONS, LLC*
Court of Chancery of the State of Delaware
C.A. No. 2020-0380-JRS

A54

Letter to The Honorable Joseph R. Slights, III from A. Gage Whirley Having Hand Delivered to
Chambers Today two Chambers' Copies of (1) Defendant's Brief In Opposition to Plaintiff's
Motion For A Temporary Restraining Order And Motion to Expedite, (2) Declarations of James
Balestraci, Geoff Cookman, James Easton, Karen Hogle and Charles Pagliazzo and supporting
documents thereto, which were filed on May 28, 2020

05/29/20

EFiled:  May 29 2020 09:53AM EDT
Transaction ID 65664468
Case No. 2020-0380-JRS

# MORRIS, NICHOLS, ARSHT & TUNNELL LLP

1201 NORTH MARKET STREET
P.O. BOX 1347
WILMINGTON, DELAWARE  19899-1347

————

(302) 658-9200
(302) 658-3989 FAX

GAGE WHIRLEY

(302) 351-9216
(302) 425-4685 FAX
gwhirley@mnat.com

May 29, 2020

**BY E-FILING**

The Honorable Joseph R. Slights, III
Vice Chancellor
Court of Chancery
417 S. State Street
Dover, DE  19901

RE:   *Manhattan Telecommunications Corp., D/B/A Metropolitan*
*Telecommunications,    A/K/A    Mettel    v.    Granite*
*Telecommunications, LLC*, C.A. No. 2020-0380-JRS

Dear Vice Chancellor Slights:

Hand delivered to Chambers today will be two Chambers' copies of

(1) Defendant's Brief In Opposition to Plaintiff's Motion For A Temporary

Restraining Order And Motion to Expedite, (2) Declarations of James Balestraci,

Geoff Cookman, James Easton, Karen Hogle and Charles Pagliazzo and supporting

documents thereto, which were filed on May 28, 2020.

The Honorable Joseph R. Slights, III
May 29, 2020
Page 2

       If Your Honor has any questions, counsel are available at the convenience of the Court.

       Respectfully,

       */s/ A. Gage Whirley*

       A. Gage Whirley (#6707)
       Words: 68

cc:   Steven L. Caponi, Esq. (*via efiling*)
      Matthew B. Goeller, Esq. (*via efiling*)

*MANHATTAN TELECOMMUNICATIONS CORP. D/B/A METROPOLITAN TELECOMMUNICATIONS, A/K/A METTEL v. GRANITE TELECOMMUNICATIONS, LLC*
Court of Chancery of the State of Delaware
C.A. No. 2020-0380-JRS


A55
Declaration of Andoni Economou in Support of Reply Brief in Support of Plaintiff's Motion for a Temporary Restraining Order and Motion to Expedite in accordance with Delaware Supreme Court Administrative Order No. 6 In re COVID-19 Precautionary Measures

06/01/20

EFiled:  Jun 01 2020 04:59PM EDT
Transaction ID 65669361
Case No. 2020-0380-JRS

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| MANHATTAN TELECOMMUNICATIONS CORP., D/B/A METROPOLITAN TELECOMMUNICATIONS, A/K/A METTEL, <br><br> Plaintiff, <br><br> v. <br><br> GRANITE TELECOMMUNICATIONS, LLC, <br><br> Defendant. | C.A. No. 2020-0380-JRS |

## DECLARATION OF ANDONI ECONOMOU

| | | |
|---|---|---|
| STATE OF NEW YORK | ) | |
| | ) | SS |
| NEW YORK COUNTY | ) | |

I, Andoni Economou, declare under penalty of perjury under the laws of the State of Delaware that the following is true and correct:

1.      I make this declaration pursuant to 10 *Del.* C. § 3927 in accordance with Delaware Supreme Court Administrative Order No. 3 In re COVID-19 Precautionary Measures, dated March 22, 2020, and Delaware Supreme Court Administrative Order No. 6 In re COVID-19 Precautionary Measures, dated May 14, 2020.

2.     I am the Chief Operating Officer and Executive Vice President of Manhattan Telecommunications Corp. ("MetTel"), plaintiff in the above-captioned matter.

3.     I submit this Declaration based on my personal knowledge. I am over the age of 18 and am otherwise competent to testify.

4.     I understand that Defendant Granite Telecommunications, LLC, has alleged that I "ordered" or "directed" Timothy Hanley, a Senior Vice President of MetTel, in an email dated May 12, 2020, to "sow doubt about Granite's financial situation" by telling a customer that "Granite let go 20% of its employees." Ans. Br. 25.

5.     A complete and accurate copy of my May 12, 2020, email to Mr. Hanley is attached to MetTel's Complaint as Exhibit C.

6.     The exact quote from that email is as follows:  "Make sure you give them a firm assurance that we are financially sound and in a good position to get through the pandemic.  Let them know that we have not let go a single employee at this time.  I also heard that [G]ranite let go 20% of its employees."

7.     I did not "order" or "direct" Mr. Hanley to "sow doubt about Granite's financial situation."  I also did not "order" or "direct" him to tell a customer that "Granite let go 20% of its employees."  That was neither the substance nor the intent of my email.  I was simply recounting something to Mr. Hanley I had heard about

2

Granite that I felt indicated that it is Granite, and not MetTel, that is in financial trouble.

8.     It is my understanding from Mr. Hanley that, consistent with the intent of my email, he did not communicate what I had heard about Granite to this or any other customer.

9.     I also understand that Granite has claimed that an unidentified MetTel sales agent said that MetTel "is no longer paying its agents any commissions on the sale of certain types of voice lines in certain geographic regions of the United States."  C. Pagliazzo Decl. ¶ 6.  This is not true — MetTel did not cease paying commissions on voice lines to its sales agents at any time relevant to this dispute.

Dated: _____6/1/2020_____          _____
                                                      Andoni Economou

3

*MANHATTAN TELECOMMUNICATIONS CORP. D/B/A METROPOLITAN TELECOMMUNICATIONS, A/K/A METTEL v. GRANITE TELECOMMUNICATIONS, LLC*
Court of Chancery of the State of Delaware
C.A. No. 2020-0380-JRS


A56

Declaration of Timothy Hanley in Support of Reply Brief in Support of Plaintiff's Motion for a Temporary Restraining Order and Motion to Expedite in accordance with Delaware Supreme Court Administrative Order No. 6 In re COVID-19 Precautionary Measures

06/01/20

**EFiled:  Jun 01 2020 04:59PM EDT**
**Transaction ID 65669361**
**Case No. 2020-0380-JRS**

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| MANHATTAN TELECOMMUNICATIONS CORP., D/B/A METROPOLITAN TELECOMMUNICATIONS, A/K/A METTEL, | |
| Plaintiff, | C.A. No. 2020-0380-JRS |
| v. | |
| GRANITE TELECOMMUNICATIONS, LLC, | |
| Defendant. | |

### <u>DECLARATION OF TIMOTHY HANLEY</u>

STATE OF RHODE ISLAND   )
                                             )   SS
PROVIDENCE COUNTY      )

I, Timothy Hanley, declare under penalty of perjury under the laws of the State of Delaware that the following is true and correct:

1.     I make this declaration pursuant to 10 *Del.* C. § 3927 in accordance with Delaware Supreme Court Administrative Order No. 3 In re COVID-19 Precautionary Measures, dated March 22, 2020, and Delaware Supreme Court Administrative Order No. 6 In re COVID-19 Precautionary Measures, dated May 14, 2020.

2.     I am a Vice President of Manhattan Telecommunications Corp. ("MetTel"), plaintiff in the above-captioned matter.

3.    I submit this declaration based on my personal knowledge. I am over the age of 18 and am otherwise competent to testify.

4.    I understand Defendant Granite Telecommunications, LLC ("Granite") has alleged that Andoni Economou, MetTel's Chief Operating Officer and Executive Vice President, "ordered" me in a May 12, 2020, email to "sow doubt about Granite's financial situation" by telling a customer that "Granite let go 20% of its employees."

5.    A complete and accurate copy of Mr. Economou's email is attached to MetTel's Complaint as Exhibit C.

6.    Mr. Economou's email to me states:  "Make sure you give them a firm assurance that we are financially sound and in a good position to get through the pandemic. Let them know that we have not let go a single employee at this time. I also heard that [G]ranite let go 20% of its employees."

7.    I did not interpret this email as an order or directive to pass along this information to the customer, and I did not pass along the information to this or any other customer.

Dated: 6/1/2020                    _____
                                                Timothy Hanley

2

*MANHATTAN TELECOMMUNICATIONS CORP. D/B/A METROPOLITAN TELECOMMUNICATIONS, A/K/A METTEL v. GRANITE TELECOMMUNICATIONS, LLC*
Court of Chancery of the State of Delaware
C.A. No. 2020-0380-JRS

A57

Certificate of Service for Reply Brief in Support of Plaintiff's Motion for a Temporary Restraining Order and Motion to Expedite and related documents

06/01/20

EFiled:  Jun 01 2020 04:59PM EDT
Transaction ID 65669361
Case No. 2020-0380-JRS

**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

MANHATTAN TELECOMMUNICATIONS
CORP., D/B/A METROPOLITAN
TELECOMMUNICATIONS, A/K/A
METTEL,

      Plaintiff,

   v.

GRANITE TELECOMMUNICATIONS, LLC,

      Defendant.

C.A. No. 2020-0380-JRS

**CERTIFICATE OF SERVICE**

I, Steven L. Caponi, hereby certify that on this 1st day of June, 2020, I caused (1) *Reply Brief in Support of Plaintiff's Motion for a Temporary Restraining Order and Motion to Expedite*, (2) *Declaration of Andoni Economou*, (3) *Declaration of Timothy Hanley*, and (4) this *Certificate of Service* to be filed and served by electronic filing on the following:

     MORRIS, NICHOLS, ARSHT
     & TUNNELL LLP
     R. Judson Scaggs, Jr.
     Barnaby Grzaslewicz
     A. Gage Whirley
     1201 North Market Street, 16th Floor
     Wilmington, Delaware 19801

        */s/ Steven L. Caponi*
        Steven L. Caponi (No. 3484)

*MANHATTAN TELECOMMUNICATIONS CORP. D/B/A METROPOLITAN*
*TELECOMMUNICATIONS, A/K/A METTEL v. GRANITE TELECOMMUNICATIONS, LLC*
Court of Chancery of the State of Delaware
C.A. No. 2020-0380-JRS


A58

Letter to Vice Chancellor Slights from Steven L. Caponi Enclosing Courtesy Copies of Reply
Brief in Support of Plaintiff's Motion for a Temporary Restraining Order and Motion to
Expedite, Declaration of Andoni Economou, and Declaration of Timothy Hanley


06/02/20

EFiled: Jun 02 2020 03:04PM EDT
Transaction ID 65671813
Case No. 2020-0380-JRS

**K&L GATES**

June 2, 2020

Steven L. Caponi, Esq.
steven.caponi@klgates.com

T 302-416-7080

**VIA FILE & SERVEXPRESS AND
FEDERAL EXPRESS**

Vice Chancellor Joseph R. Slights III
Court of Chancery
38 The Green
Dover, DE 19901

**Re:**  *Manhattan Telecommunications Corp. v. Granite Telecommunications, LLC*;
   **C.A. No. 2020-0380-JRS**

Dear Vice Chancellor Slights,

  Enclosed with this letter are two courtesy copies of the following documents

filed on June 1, 2020 in the above-captioned matter:

- Reply Brief in Support of Plaintiff's Motion for a Temporary Restraining

  Order and Motion to Expedite;

- Declaration of Andoni Economou;

- Declaration of Timothy Hanley; and

- Certificate of Service.

  If Your Honor has any questions, counsel is available at the Court's

convenience.

Respectfully submitted,

*/s/ Steven L. Caponi*

Steven L. Caponi, Esq. (No. 3484)

K&L GATES LLP
600 N. KING STREET  SUITE 901  WILMINGTON  DE 19801
T +1 302 416 7000  F +1 302 416 7020  klgates.com

Words: 62

cc:   R. Judson Scaggs, Jr. (via electronic filing)
       Barnaby Grzaslewicz (via electronic filing)
       A. Gage Whirley (via electronic filing)

*MANHATTAN TELECOMMUNICATIONS CORP. D/B/A METROPOLITAN TELECOMMUNICATIONS, A/K/A METTEL v. GRANITE TELECOMMUNICATIONS, LLC*
Court of Chancery of the State of Delaware
C.A. No. 2020-0380-JRS

A59

Judicial Action Form -.Telephonic oral argument and rulings of the Court on plaintiff's motion for a TRO and Motion to Expedite held 06.03.2020. VC Slights. Karen Siedlecki, Court Reporter. Motion for TRO-Denied. Motion to Expedite is Denied, VCS proposed a November trial date. Parties should confer on scheduling and submit either agreed-upon scheduling order or competing orders.

06/04/20

## COURT OF CHANCERY JUDICIAL ACTION FORM

EFiled: Jun 04 2020 09:18AM EDT
Transaction ID 65676021
Case No. 2020-0380-JRS

**Date:** 6-3-2020          **Start Time:** 11:00 a.m.          **End Time:** 12:51 p.m.

**Plaintiff(s):** Manhattan Telecommunications Corp.

**Defendant(s):** Granite Telecommunications, LLC

**Civil Action No.** 2020-0380-JRS

☐ New Castle County          ■ Kent County          ☐ Sussex County

| | |
|---|---|
| ☐ Chancellor Bouchard | ☐ Vice Chancellor Zurn |
| ☐ Vice Chancellor Laster | ☐ Vice Chancellor McCormick |
| ☐ Vice Chancellor Glasscock | ☐ Master Griffin |
| ☐ Vice Chancellor Fioravanti | ☐ Master Molina |
| ■ Vice Chancellor Slights | |

**Proceeding:**

| | | |
|---|---|---|
| ☐ Motion for Def Judgment | ■ TRO | ☐ Settlement Hearing |
| ☐ Motion for Summary Judgment | ☐ Attorneys' Fees | ☐ Telephonic Bench Ruling |
| ☐ Motion to Dismiss | ☐ Office Conference | ☐ Pretrial Conference |
| ☐ Post-Trial Oral Argument | ☐ Tele Conf. Scheduling | ☐ §347 Mediation |
| ☐ Tele Conf. Status | ☐ Preliminary Injunction | |
| ☐ Other: | | |

**Reporter:**

| | | |
|---|---|---|
| ☐ Neith Ecker | ☐ Jeanne Cahill | ☐ Juli LaBadia |
| ☐ Debi Donnelly | ☐ Dennel Niezgoda | ■ Karen Siedlecki |

<u>Notes:</u>
Telephonic oral argument and rulings of the Court on plaintiff's motion for a TRO and motion to expedite. Motion for TRO-Denied. Motion to Expedite is Denied, VCS proposed a November trial date. Parties should confer on scheduling and submit either agreed-upon scheduling order or competing orders. See transcript

<u>Plaintiff(s) Attorney(s):</u>
Steven L. Caponi
Matthew B. Goeller
Anthony P. La Rocco
Dana B. Parker
Charles F. Rysavy

<u>Defendant(s) Attorney(s):</u>
R. Judson Scaggs, Jr.
Barnaby Grzaslewicz
A. Gage Whirley
Joshua N. Ruby

*MANHATTAN TELECOMMUNICATIONS CORP. D/B/A METROPOLITAN TELECOMMUNICATIONS, A/K/A METTEL v. GRANITE TELECOMMUNICATIONS, LLC*
Court of Chancery of the State of Delaware
C.A. No. 2020-0380-JRS


A60
[PUBLIC VERSION] Defendant's Brief In Opposition to Plaintiff's Motion For A Temporary Restraining Order And Motion to Expedite (with Certificate of Service)

06/04/20

EFiled: Jun 04 2020 04:46PM EDT
Transaction ID 65677741
Case No. 2020-0380-JRS

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| MANHATTAN TELECOMMUNICATIONS CORP. D/B/A METROPOLITAN TELECOMMUNICATIONS, A/K/A METTEL | ) ) ) ) | |
| Plaintiff, | ) ) | C.A. No. 2020-0380-JRS |
| v. | ) ) ) | **PUBLIC VERSION EFILED ON JUNE 4, 2020** |
| GRANITE TELECOMMUNICATIONS, LLC | ) ) | |
| Defendant. | ) | |

## DEFENDANT'S BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER AND MOTION TO EXPEDITE

DONNELLY, CONROY & GELHAAR, LLP
T. Christopher Donnelly (admitted *pro hac vice*)
Joshua N. Ruby (admitted *pro hac vice* )
260 Franklin Street, Suite 1600
Boston, MA 02110
(617) 720-2880

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
R. Judson Scaggs, Jr. (#2676)
Barnaby Grzaslewicz (#6037)
A. Gage Whirley (#6707)
1201 N. Market Street
Wilmington, DE 19801
(302) 658-9200

*Counsel for Defendant Granite Telecommunications, LLC*

May 28, 2020

## **TABLE OF CONTENTS**

I.    PRELIMINARY STATEMENT........................................................................1

II.   RELEVANT BACKGROUND ......................................................................4

   A. MetTel's Allegations Against Granite........................................................4

       ■    ██████████████ ......................................................5

       ■    ██████████████..........................................................5

      3.   The Unspecified Customer..........................................................7

      4.   Speculation About Other Customers.........................................8

   B. MetTel's ████████████ ........................................................8

     1.   The Highly Competitive Telecommunications Market ................9

     2.   MetTel's ██████████ .................................................10

     3.   MetTel's ██████████████████ ...................................11

III.  LEGAL STANDARD ...............................................................................13

IV.   METTEL'S MOTION FOR A TRO SHOULD BE DENIED ......................14

   A. Preliminary Injunctive Relief Is Unconstitutional And Unavailable Here .....14

   B. MetTel Has Not Shown That It Will Suffer Irreparable Harm ......................20

   C. The Balance Of Equities Favors Granite .......................................22

   D. MetTel Has Not Pleaded Colorable Claims .................................25

     1.   MetTel's Tortious Interference And Trade Libel Claims............26

     2.   MetTel's Defamation Claim .......................................29

     3.   MetTel's Claim Under The Delaware Deceptive Trade Practices Act........33

V.    METTEL'S MOTION TO EXPEDITE SHOULD BE DENIED ...................36

VI.   CONCLUSION .....................................................................................40

i

# TABLE OF AUTHORITIES

**Cases**                                                                                    **Page(s)**

*Agar v. Judy*,
    151 A.3d 456 (Del. Ch. 2017) ...........................................................................32

*Alexander v. United States*,
    509 U.S. 544 (1993)..................................................................................14, 20

*Alpha Builders, Inc. v. Sullivan*,
    2004 WL 5383570 (Del. Ch. Nov. 5, 2004) ................................................13, 21

*Aquila, Inc. v. Quanta Servs., Inc.*,
    805 A.2d 196 (Del. Ch. 2002) .............................................................13, 21, 23

*Auburn Police Union v. Carpenter*,
    8 F.3d 886 (1st Cir. 1993)........................................................................14, 16

*State ex rel. Brady v. Pettinaro Enters.*,
    870 A.2d 513 (Del. Ch. 2005) ...................................................................... 34-35

*CapStack Nashville 3 LLC v. MACC Venture Partners*,
    2018 WL 3949274 (Del. Ch. Aug. 16, 2018) (Glasscock, V.C.) ...............*passim*

*Conduent Business Servs., LLC v. Sky View Capital, LLC*,
    C.A. No. 2020-0232-JTL (Del. Ch. Mar. 30, 2020)..........................................39

*DeBonaventura v. Nationwide Mut. Ins. Co.*,
    419 A.2d 942 (Del. Ch. 1980) ........................................................................27

*Doe v. Delaware, Dep't of Servs. for Children, Youth & Their*
    *Families, Div. of Family Servs.*,
    2016 WL 5416679 (D. Del. Sept. 27, 2016)....................................................31

*EDIX Media Grp., Inc. v. Mahani*,
    2006 WL 3742595 (Del. Ch. Dec. 12, 2006)....................................................34

*Eureka Resources, LLC v. Range Resources-Appalachia, LLC*,
    62 A.3d 1233 (Del. Super. Ct. 2012)...............................................................26

ii

*In re Frontier Communications Corporation*,
　　Case No. 20-22476, ECF No. 1 (Bankr. S.D.N.Y. Apr. 14, 2020) ..................... 9

*Gannett Co. v. State*,
　　571 A.2d 735 (Del. 1989) ................................................................. 14

*Golden Cycle, LLC v. Allan*,
　　1998 WL 892631 (Del. Ch. Dec. 10, 1998) ........................................ 24

*Grand Ventures, Inc. v. Whaley*,
　　632 A.2d 63 (Del. 1993) ................................................................... 35

*Incyte Corp. v. Flexus Biosciences, Inc.*,
　　2017 WL 7803923 (Del. Super. Ct. Nov. 1, 2017) ........................... 27, 29

*Irgau v. Christiana Care Health Servs.*,
　　2008 WL 1724250 (Del. Super. Ct. Apr. 9, 2008) ............................. 28

*Ivanhoe Partners v. Newmont Mining Corp.*,
　　533 A.2d 585 (Del. Ch. 1987) ......................................................... 24

*J.C. Pitman & Sons v. Pitman*,
　　47 A.2d 721 (Del. Ch. 1946) ...................................................... 17-19

*Lipson v. Anesthesia Servs., P.A.*,
　　790 A.2d 1261 (Del. Super. Ct. 2001) .............................................. 23

*Nakahara v. NS 1991 Am. Trust*,
　　718 A.2d 518 (Del. Ch. 1998) ......................................................... 25

*Ninespots, Inc. v. Jupai Holdings, Ltd.*,
　　2018 WL 3626325 (D. Del. July 30, 2018) ....................................... 33

*Nyer v. Munoz-Mendoza*,
　　385 Mass. 184, 188, 430 N.E.2d 1214, 1217 (1982) ......................... 26

*Opportunity Partners L.P. v. Blackrock N.Y.*,
　　2011 WL 1379066 (Del. Ch. Mar. 28, 2011) .................................... 36

*Organovo Holdings, Inc. v. Dimitrov*,
　　162 A.3d 102 (Del. Ch. 2017) (Laster, V.C.) ............................. 16, 21-22

*Overdrive, Inc. v. Baker & Taylor, Inc.*,
  2011 WL 2448209 (Del. Ch. June 17, 2011)......................................................28

*Parsons v. Digital River, Inc.*,
  2015 WL 139760 (Del. Ch. Jan. 12, 2015)........................................................36

*Perlman v. Vox Media, Inc.*,
  2019 WL 2647520 (Del. Ch. June 27, 2019) (Slights, V.C.) ................ 21, 29-30

*Preston Hollow Capital LLC v. Nuveen LLC*,
  216 A.3d 1 (Del. Ch. 2019) (Glasscock, V.C.)..................................... 18-19, 30

*Regal Home Distribs. v. Gordon*,
  66 A.2d 754 (Del. Super. Ct. 1949).................................................................23

*Riley v. Moyed*,
  529 A.2d 248 (Del. 1987) ...............................................................................30

*Rosenberg Diamond Dev. Corp. v. Appel*,
  290 A.D.2d 239, 735 N.Y.S.2d 528 (1st Dep't 2002).......................................26

*Sherwood v. Ngon*,
  2011 WL 6355209 (Del. Ch. Dec. 20, 2011).....................................................25

*Singer v. Magnavox Co.*,
  380 A.2d 969 (Del. 1977), *overruled on other grounds*,
  *Weinberger v. UOP, Inc.*, 457 A.2d 701 (Del. 1983)........................................33

*Snow Phipps Grp., LLC v. KCake Acquisition, Inc.*,
  C.A. No. 2020-0282-KSJM (Del. Ch. Apr. 17, 2020).......................................39

*Sonet v. Plum Creek Timber Co.*,
  1998 WL 749445 (Del. Ch. Sept. 23, 1998).................................................. 37-38

*Southeastern Promotions, Ltd. v. Conrad*,
  420 U.S. 546 (1975)......................................................................... 15-16

*Stevens v. Independent Newspapers, Inc.*,
  1988 WL 25377, at *4 (Del. Super. Ct. Mar. 10, 1988)....................................31

*In re TriQuint Semiconductor, Inc. Stockholders Litig.*,
  2014 WL 2700964 (Del. Ch. June 13, 2014).....................................................36

*UbiquiTel Inc. v. Sprint Corp.*,
    2005 WL 3533697 (Del. Ch. Dec. 14, 2005)................................................26, 34

*The We Co. v. Softbank Grp. Corp.*,
    C.A. No. 2020-0258-AGB (Del. Ch. Apr. 17, 2020) .........................................39

*In re Williams Cos., Inc. Stockholder Litig.*,
    2016 WL 197177 (Del. Ch. Jan. 13, 2016).........................................................36

**Rules and Statutes**

6 *Del. C.* 2633(a)...................................................................................................13

**Other Authorities**

*In re Registration of Security Certificate of Metropolitan*
    *Telecommunications Corp. d/b/a MetTel*,
    Docket No. S-2017-2589999 (Pa. Pub. Utility Comm'n, Feb. 22,
    2017) ...................................................................................................................10

Defendant Granite Telecommunications, LLC ("Granite") submits this Opposition to the Motion for a Temporary Restraining Order and Motion to Expedite of Plaintiff Manhattan Telecommunications Corp., d/b/a Metropolitan Telecommunications, a/k/a MetTel ("MetTel").

## I.     PRELIMINARY STATEMENT

MetTel has rushed into this Court seeking a TRO that is *literally unprecedented*. MetTel has not cited a single case—from Delaware or anywhere else—where a court issued a TRO enjoining a competing business from making allegedly false statements to customers. Nor could any such authority exist, for such a TRO would impose a prior restraint in violation of the Constitutions of the United States and Delaware. Such a TRO would further violate the long-standing rule that equity will not enjoin a libel.

Moreover, MetTel revealingly does not seek a TRO limiting Granite from making certain specific statements about MetTel. Instead, MetTel has asked this Court to enjoin "Granite from making any statements about MetTel or its business operations to any current MetTel client." (Mot. for TRO at 1.) Such a wildly overbroad TRO would stop Granite from communicating at all with any MetTel customer about anything concerning MetTel. In effect, MetTel asks this Court to muzzle Granite from making even unquestionably true statements about MetTel

1

and end Granite's ability to compete with MetTel.  Such a sweeping injunction is plainly unconstitutional and unwarranted here.

Even leaving aside that MetTel has asked this Court for unconstitutional relief that this Court has no power to award, MetTel has not met the familiar elements for issuing a TRO.  First, and most importantly, MetTel has not shown that it has suffered or will suffer the irreparable harm—or any harm at all—necessary to issue a TRO.  MetTel has not alleged—and cannot allege—that it sustained any *actual* loss related to anything Granite purportedly did.  And even if such losses had been pleaded—and they have not—lost customers and business opportunities are harms which Delaware courts routinely address by awarding damages.

Nor has MetTel shown that the balance of equities tilts in its favor.  MetTel seeks a wildly overbroad TRO that would eliminate Granite's free speech rights and its right to compete with MetTel, which would ultimately result in less competition in the marketplace and concomitant harm to consumers.  ▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

MetTel's unconstitutional attempt to stifle legitimate competition coupled with its unclean hands on these matters foreclose any argument that the balance of the equities favors MetTel.

2

Furthermore, MetTel has not come to this Court with even colorable claims. At best, it alleges isolated, imprecise statements of opinion by two line-level Granite salespeople to two MetTel customers resulting in no harm to MetTel. Such bare-bones allegations do not make a colorable claim under any legal theory.

Moreover, even assuming arguendo the challenged opinions concerning MetTel's ████████████ could be construed as factual statements—which they cannot—those words are not untrue.  MetTel shows unmistakable signs of a ████████████████████ Even before the current economic crisis, ████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████ ████████████████████████ ████████████████████████████████████ ████████████████ And Granite understands that, also around the same time, MetTel may have ████████████████████████████ ████████████████████████████ Given the highly competitive telecommunications market—████████████████████████ ████████████████████████████████████—Granite had good reason to believe that MetTel ████████████████ Opining as much to MetTel's customers is therefore not actionable and provides no basis for issuing a

3

TRO to preclude Granite personnel from discussing that risk—or anything else about MetTel—with the businesses that would be most directly impacted.

MetTel has also failed to clear the threshold required to expedite these proceedings.  MetTel's claims are not colorable, and it has not alleged even a reasonable possibility of irreparable injury that would warrant imposing the extra costs of expedited proceedings on both Granite and this Court.

Accordingly, and as discussed in more detail below, MetTel's Motion for TRO and Motion to Expedite should be denied.

## II.    RELEVANT BACKGROUND

### A. MetTel's Allegations Against Granite

Although MetTel's Complaint is filled with rhetoric accusing Granite of "tak[ing] the lowest of roads" to exploit the pandemic and orchestrating an "[o]ngoing [c]ampaign of [l]ies" (Compl. at 6), the few specific, non-speculative factual allegations in the Complaint tell a decidedly different story.  According to MetTel, out of its entire nationwide customer base, Granite personnel contacted *two* customers—both current or former Granite customers—and made vague statements of opinion about ███████████████ during the course of ordinary sales calls.  And, again according to MetTel, neither customer changed its relationship with MetTel in any way as a result of these vague statements of opinion.

4

1. ███████████████

First, MetTel alleges that one customer—████████████████ a former Granite customer—received one vague voicemail from a Granite salesperson in late April 2020.  (*Id.*, ¶ 19 & Ex. A.)  According to an unverified transcription of the message, the Granite salesperson referred to ████████████████████ ██████████████████ and said that he "would like to bring that to your attention."  (*Id.*, Ex. A.)

MetTel pointedly does not allege that anyone from █████████████ ever returned this phone call or ever found out ███████████████████ (*See id.*, ¶ 19 & Ex. A.)  Instead, █████████████████ affirmatively stated that it would rely on MetTel—not Granite—for information about MetTel.  (*See id.*, Ex. A (email from █████████████ to MetTel stating, "[if there's anything to know, I want your input, not his.").)  Nor does MetTel allege that its business with ███████████ █████████has changed in any way since this contact.

2. ███████████████

MetTel also alleges that Granite contacted another customer—███████████████ ██████ which is also a current Granite customer, Easton Decl., ¶¶ 5-6— on May 11, once via email and once via phone.  In the email contact, Granite salesperson James Easton explained that he is attempting to set up a meeting between Granite's CEO and a senior ██████ executive to discuss "cost savings projects that [Granite

has] run" for other businesses similar to ███ (Compl., Ex. B.)  Mr. Easton also

expressed his opinion that an unnamed "current partner . . . ██████████████

████████████████████████████████████████████████████████████

(*Id.*)

As for the phone call contact, MetTel claims that an unidentified person—

not necessarily even a Granite employee—called an unspecified person at ███

and said something, which a different ███ employee summarized as ████████

██████████████ (*Id.*, ¶ 24 & Ex. C.)  Mr. Easton has no memory of ever

saying that MetTel ██████████████████████ to anyone at ███ Easton Decl., ¶

7.

MetTel pointedly does not allege that either of these contacts have resulted

in any change in its business relationship with ███ To the contrary, Tim Hanley,

a MetTel senior vice president, contacted ███ chief information officer and

reported to others at MetTel that the phone call had resolved any concerns ███

might have.  (Compl., Ex. C ("[The chief information officer] is going to level set.

He was very appreciative of the call.").)

Moreover, MetTel's senior management responded to word of the alleged

phone call by directing Mr. Hanley to spread false information to ███ about

██████████████████ Andoni Economou, MetTel's chief operating

officer, directed Mr. Hanley to "to call in and figure this out." (*Id.*)  Mr.

Economou further directed:



(*Id.* (emphasis added).)  The implication is clear: Mr. Economou ordered Mr.

Hanley to call the customer and reassure them as to ███████████████████

while simultaneously spreading the false and baseless rumor that ████████████

███████████████████████ (*See id.*); *see also* Hogle Decl., ¶ 5 ("At no

time during my employment at Granite has Granite ever ███████████████████

███████████).

### 3.  The Unspecified Customer

MetTel attempts to link the two customers that Granite salespeople did

contact to a different, unnamed customer, who "has not returned MetTel's calls

and has rejected efforts to set up a meeting with MetTel since being contacted by

Granite." (Compl., ¶ 27.)  MetTel pointedly fails to plead this customer's name, so

Granite has no way of even beginning to investigate this allegation.  Nor does

MetTel plead any facts to suggest that this customer actually was recently

contacted by Granite or, if so, what Granite personnel allegedly communicated to

the customer.  Indeed, the only information present in MetTel's pleadings shows

7

that any Granite communication to this customer was about "cost savings projects that [Granite has] run" for them, not about MetTel.  (*See id.*, Ex. B.)  Moreover, even MetTel concedes that this customer is still a MetTel client, and MetTel provides no factual basis for its speculative, conclusory assertion that it is likely to lose the customer's business.  (*Id.*, ¶ 27 ("MetTel has concluded that it *most likely* lost that client's *future* business. . . .") (emphasis added).)

### 4.  Speculation About Other Customers

Finally, MetTel speculates that Granite salespeople made similarly vague statements of opinion about MetTel's ▓▓▓▓▓▓▓▓ to customers mentioned in Mr. Easton's email.  (*Id.*, ¶ 26.)  MetTel admits it makes this accusation "upon information and belief" with no supporting evidence.  (*Id.*)  Again, the only available evidence is that any contact from Granite to any of these businesses was solely in connection with "cost savings projects that [Granite has] run" for them (*id.*, Ex. B), not about MetTel or ▓▓▓▓▓▓▓.

### B.  MetTel's ▓▓▓▓▓▓▓

Not only has MetTel come to this Court alleging a few vague statements of opinion that have not caused MetTel to lose a single customer or suffer any other harm, but the statements of opinion are based on an entirely reasonable view of the facts.  MetTel and Granite participate in a competitive market where ▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

8

████████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████ Taken together, these facts signal that MetTel ██

████████████████████████

###### 1. *The Highly Competitive Telecommunications Market*

MetTel and Granite are head-to-head competitors in the marketplace for

telecommunications solutions for businesses.  This market is saturated, and several

of Granite's and MetTel's other competitors ████████████████████████ in

recent years, ████████████████████████████████

████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████

██████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████

█████████████████████████████

9

2. *MetTel's* ███████████

Even before ████████████████████████████████████████████████████

████ In 2017, MetTel ███████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████

In 2019, MetTel ███████████████████████████████████████████████

████████████ ██████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

█████████████████████████████

---

[1] It is not clear from the publicly available documents whether the 2019 transaction
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████

3. *MetTel's* ████████████████████

Given the unstable nature of the telecommunications market dating back several years, ████████████████████████████████████████ ███████████████████████████████ MetTel could be expected to ████████████ ████████████ In April 2020, MetTel came to Granite ██████████████████ ██████████ 

████████████████████████████████████████████████████████████ ██████████████ At some locations—mostly shopping malls—Granite controls the telephone and data infrastructure, and MetTel purchases access services from Granite to resell to MetTel's own customers. *See* Balestraci Decl., ¶¶ 4-5. Facing the prospect that one of its major retail customers ███████████████████████ ████████████████████████████████████████████████ MetTel affirmatively approached Granite and pressed Granite to ██████████████████████████████ ██████████████ *See id.*, ¶¶ 6-8. The parties exchanged proposals but have not yet come to terms. *Id.*, ¶ 9.[2]

_____

[2] Emails exchanged between the parties about MetTel's ██████████████████████ show that even before the statements MetTel complains of here, Granite was appropriately evaluating ████████████████████████████████████████ *See* Balestraci Decl., ¶¶ 10-11; Balestraci Decl., Exs. A-B (showing that Mr. Balestraci advised MetTel that ████████████████████████████████████ ██████████████████████████████████████████████████████████ ████████████

Second, MetTel asked for Granite's help in negotiating for ███████

██████████████████████████████████████████████████████████

█████████████████████████████████████████████ Sean

Sullivan, a senior MetTel executive in charge of relationships with carriers, asked

Geoff Cookman, a senior Granite executive with similar responsibilities, about

███████████████████████████████████████. *See* Cookman Decl., ¶¶

6-8. ██████████████████████████████████

███████████████████████████████████████, Granite did

not pursue MetTel's proposal. *Id.*, ¶ 9.

Third, Granite recently received reports that MetTel ████████████

███████████████████████████████████ Pagliazzo

Decl., ¶ 6.  That MetTel would ██████████████████████████████

██████████████████████████████████████████████████

███ *Id.*, ¶ 7. ████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████ *Id.*, ¶ 8.

---

[3] Agents are non-employee sales personnel frequently used by telecommunications providers.  Pagliazzo Decl., ¶ 4.

## III.   LEGAL STANDARD

A temporary restraining order may be issued only "when the movant demonstrates that: [1] it has a colorable claim, [2] faces a likelihood of imminent, irreparable harm if relief is not granted, and [3] will suffer greater hardships if the TRO is not granted than the defendants would if the relief were granted." *CapStack Nashville 3 LLC v. MACC Venture Partners*, 2018 WL 3949274, at *3 (Del. Ch. Aug. 16, 2018) (Glasscock, V.C.) (quotations omitted).  "Of the three factors, irreparable harm is the most important; it is the *sine qua non* for this form of relief."  *IMO Daniel Kloiber Dynasty Trust*, 98 A.3d 924, 937 (Del. Ch. 2014). "Mere apprehension of uncertain damage or insufficient remedy will not support a finding of irreparable harm."  *Alpha Builders, Inc. v. Sullivan*, 2004 WL 5383570, at *5 (Del. Ch. Nov. 5, 2004).  "To demonstrate irreparable harm, . . . [t]he alleged injury must be imminent and genuine, as opposed to speculative."  *Aquila, Inc. v. Quanta Servs., Inc.*, 805 A.2d 196, 208 (Del. Ch. 2002).

The standard for granting a TRO is the same regardless of whether the underlying claims for relief are common law claims or claims under the Delaware Deceptive Trade Practices Act ("DTPA").  *See* 6 *Del. C.* 2633(a) (authorizing injunctive relief "under the principles of equity and on terms that the court considers reasonable").

13

## IV.   METTEL'S MOTION FOR A TRO SHOULD BE DENIED

### A.  Preliminary Injunctive Relief Is Unconstitutional And Unavailable Here

MetTel seeks an Order enjoining Granite from "making any statements about MetTel or its business operations to any current MetTel client." (Mot. for TRO at 1.) In short, MetTel seeks a TRO forbidding Granite's speech activity. MetTel does not cite a single case holding that this Court may issue such a TRO. Nor could any such authority exist, because such a TRO would be both unconstitutional and violate the maxim that a court of equity will not enjoin a libel. This Court therefore cannot grant the sweeping, unconstitutional, and unprecedented TRO that MetTel seeks here.

First, the TRO MetTel is requesting constitutes a prior restraint in violation of both the First Amendment to the United States Constitution and Article I of the Delaware Constitution.[4]  "Temporary restraining orders and permanent injunctions—*i.e.*, court orders that actually forbid speech activities—are classic examples of prior restraints."  *Alexander v. United States*, 509 U.S. 544, 550 (1993); *see also Auburn Police Union v. Carpenter*, 8 F.3d 886, 903 (1st Cir. 1993)

---

[4] *See Gannett Co. v. State*, 571 A.2d 735, 740 n.9 (Del. 1989) ("We have previously noted that [Article I, Section 5] has the same scope as the federal first amendment."); *CapStack*, 2018 WL 3949274, at *4 ("the Delaware Constitution appears to explicitly prohibit prior restraints, providing that 'any citizen may print on any subject, being responsible for the abuse of that liberty.'").

14

("[A] judicial injunction that prohibits speech prior to a determination that the speech is unprotected . . . constitutes a prior restraint.") (citation omitted). "Any system of prior restraint . . . comes to this Court bearing a heavy burden against its constitutional validity." *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 558 (1975) (quotation and citation omitted).

Moreover, at the TRO stage, MetTel seeks a prior restraint on the barest of records, prior to any adjudication that the speech is seeks to enjoin is unprotected. As explained in *CapStack*,

> the Plaintiffs ask me to temporarily enjoin future speech based solely on a finding that the Complaint pleads a *colorable claim* for defamation or trade libel. Colorability, in the TRO context, requires only that the claim not be frivolous; if a plaintiff pleads a non-frivolous claim of wrongful conduct and shows a threat of resulting imminent irreparable harm, a TRO may issue. A finding that the plaintiff's claim is *likely* to prevail is not required. In my view, to enjoin speech upon such a showing would amount to an unconstitutional prior restraint.

2018 WL 3942974, at *4 (emphasis in original). Indeed, granting MetTel's requested TRO could enjoin speech "that may ultimately prove to be protected." *See id.* (quotation omitted). And because a TRO requires a far lower evidentiary showing than a final adjudication on the merits, "the danger that the court will get it wrong and mistakenly restrict protected speech is even greater." *Id.* (quotations

15

omitted).  It follows that a TRO imposing prior restraint on speech activities is constitutionally impermissible and may not issue at all.  *See id.*

Second, MetTel's request runs afoul of the "traditional maxim that equity will not enjoin a libel." *CapStack*, 2018 WL 3949274, at *4 (quoting *Organovo Holdings, Inc. v. Dimitrov*, 162 A.3d 102, 115 (Del. Ch. 2017) (Laster, V.C.)). "Traditionally, the reason for the special rule was jurisdictional," but the rule is now grounded on additional considerations, primarily "the importance afforded to the constitutional protections of speech." *Organovo Holdings*, 162 A.3d at 115. "Regardless of the rationale supporting the rule, '[t]he upshot is the same: a court of equity generally cannot issue an injunction in a defamation case.'" *CapStack*, 2018 WL 3949274, at *4 (quoting *Organovo Holdings*, 162 A.3d at 119).

In certain circumstances, a *permanent* injunction enjoining speech is permissible, but only after a final adjudication that the speech to be enjoined is defamatory or otherwise unprotected.  *See, e.g.*, *Organovo Holdings*, 162 A.3d at 124-25; *see also Auburn Police Union*, 8 F.3d at 903.  But that is not what MetTel seeks here.  MetTel would have the Court restrain Granite's speech, including forbidding it from making *any* statements about MetTel to *any* of MetTel's customers, without first determining—or even hearing *evidence* regarding—what, exactly, Granite said, the truth of its statements, and whether the statements

16

constitute opinion or were otherwise privileged.  The relief sought is simply not available.

In its opening brief, MetTel entirely skips over the fact that its request for a TRO is constitutionally infirm and asks for relief outside the power of a court of equity.  MetTel does not cite a single case—from Delaware or anywhere else— holding that a TRO may issue solely to stop allegedly false and defamatory statements.  And MetTel offers no argument that the prior restraint doctrine or the limitations on equity's power to enjoin alleged libels do not apply here.

Rather than engage with the constitutional problems with its request for a TRO imposing unconstitutional prior restraint, MetTel cherry-picks quotations from certain factually inapposite cases discussing a non-binding doctrine that simply does not apply here.  In *J.C. Pitman & Sons v. Pitman*, 47 A.2d 721 (Del. Ch. 1946), the Court denied a demurrer to a counterclaim seeking to enjoin a course of conduct that included, as one component, alleged trade libel.  The Court concluded that, notwithstanding that a court of equity cannot enjoin a trade libel, "a continued course of wrongful action may, ordinarily, be stopped by injunction, although it includes a trade libel.  Intimidating possible customers by baseless threats to sue, should they deal with the complainant, comes within that rule."  *Id.* at 726 (citation omitted).  Stated differently, the mere presence of a trade libel claim does not necessarily deprive the court of the power to enjoin other, separate

17

acts of alleged unfair competition—such as baseless threats of litigation—that may be related to the alleged trade libel.  *See id.*; *see also Preston Hollow Capital LLC v. Nuveen LLC*, 216 A.3d 1, 5 (Del. Ch. 2019) (Glasscock, V.C.) (holding that, under *Pitman*, an injunction is only permissible where plaintiff alleges "other tortious activity where tradition and constitutional considerations do not require the findings of a jury").

Even were *Pitman* binding authority,[5] the doctrine it applied simply has nothing to do with MetTel's allegations here.  All of MetTel's claims are based on the allegations that Granite made false, misleading, and/or defamatory statements about MetTel to third parties.  (*See generally* Compl.)  In support of its claims for tortious interference and violations of the DTPA, MetTel alleges no *separate* acts other than the alleged false statements to customers.  (*See generally id.*)  MetTel makes no claim that Granite has engaged in unfair competition in any other way, such as by baselessly threatening litigation against MetTel customers, improperly using MetTel's confidential information or trade secrets, employing a former MetTel employee in violation of a restrictive covenant, or infringing on MetTel's

---

[5] *Pitman* was decided by a vice-chancellor nearly 75 years ago and has never been formally adopted by the Delaware Supreme Court.  Accordingly, this Court is free to disagree with the analysis in *Pitman*.

intellectual property rights.  The rule applied in *Pitman* therefore simply does not apply.[6]

Moreover, even if *Pitman* did apply—and it does not—simply pleading that alleged false statements *also* constitute a separate business tort does not transform *Pitman* into an all-purpose exception to the constitutional prohibition on prior restraints.  As Vice Chancellor Glasscock recognized in *CapStack*, such a reading of the law is impermissible:

> By characterizing a defamation claim as one for trade libel (and including in her complaint a separate tort, perhaps for intentional infliction of emotional distress), a plaintiff could circumvent the well-established prohibition on prior restraints. The exception would come nigh to swallowing the rule. Such an outcome could chill protected speech.

*CapStack*, 2018 WL 3949274, at *6.

*CapStack* is materially indistinguishable from this case.  There, the defendants accused the plaintiffs—their partners in a joint venture—of lying in a

---

[6] Even if *Pitman* applied here and could be read as broadly as MetTel implies—and, as discussed above, neither is true—*Pitman* still would not warrant granting MetTel's requested TRO.  First, *Pitman* was decided at the demurrer—*i.e.* the motion to dismiss—stage and awarded no injunctive relief to anyone.  47 A.2d at 726.  It does not stand for the proposition that preliminary or interim injunctive relief against allegedly false statements is constitutional, appropriate, or warranted.  *See CapStack*, 2018 WL 3949274, at *5.  Moreover, recent cases have limited *Pitman* to "traditional" claims of "trade libel," *i.e.*, disparagement of goods, as opposed to the types of statements alleged here.  *See, e.g.*, *Preston Hollow*, 216 A.3d at 4-5; *CapStack*, 2018 WL 3949274, at *6.

19

private placement memorandum and threatened to reveal the alleged lies unless the plaintiffs withdrew from the venture. *Id.* at \*2. The plaintiffs moved for a TRO seeking to enjoin their partners' threatened disclosure of these accusations of lying. *Id.* at \*3-4. Because the requested TRO sought to enjoin the defendants' speech— and *only* their speech—Vice Chancellor Glasscock held that a TRO would constitute unconstitutional prior restraint and could not issue. *See id.* at \*3-6.

The result should be the same here. As in *CapStack*, MetTel asks that this Court enjoin Granite's speech—and *only* its speech—to MetTel's customers. A TRO that does so is unconstitutional prior restraint and cannot be issued. *See CapStack*, 2018 WL 3949274, at \*6; *see also Alexander*, 509 U.S. at 550.

At bottom, MetTel has come to this Court seeking to stop Granite from saying anything about MetTel to any MetTel customers, speech which is constitutionally protected and which Granite is privileged to engage in. The Constitutions of Delaware and the United States do not permit such prior restraint, so MetTel's requested TRO must be denied.

**B.  MetTel Has Not Shown That It Will Suffer Irreparable Harm**

Even if MetTel sought a constitutionally permissible TRO—and, as shown above, it does not—MetTel also cannot satisfy the second, and most important, requirement for obtaining a TRO: irreparable harm. The Motion for a TRO should also be denied on this separate basis.

20

MetTel only alleges that Granite has contacted two customers out of its entire nationwide customer base, neither of which have altered their relationships with MetTel in any way as a result of the alleged false statements MetTel complains of here.  (Compl., ¶¶ 19-20, 24.)  At most, MetTel speculates that one unspecified customer "most likely" will move "future" business away from MetTel as a result of Granite's alleged false statements, but MetTel alleges such merely "upon information and belief."  (*Id.*, ¶¶ 26-27.)  Such speculation about uncertain future harm is not enough to warrant a TRO.  *See, e.g.*, *Alpha Builders*, 2004 WL 5383570, at *5 ("Mere apprehension of uncertain damage or insufficient remedy will not support a finding of irreparable harm."); *Aquila*, 805 A.2d at 208 ("To demonstrate irreparable harm, . . . [t]he alleged injury must be imminent and genuine, as opposed to speculative.").

Nor can MetTel show that it has no adequate remedy at law.  "Generally, a party injured as a result of a tort has a complete and adequate remedy at law in the form of an action for damages."  *Organovo Holdings*, 162 A.3d at 114 (quotation omitted).  This case is no exception.  MetTel's musings on the unique nature of the telecommunications industry notwithstanding, MetTel's allegations of harm boil down to (1) lost business and (2) damage to its reputation and goodwill.  (*See* Compl., ¶¶ 30-31, 33.)  To the extent MetTel has lost current and future business, that harm can be redressed through an award of damages. *See Perlman v. Vox*

21

*Media, Inc.*, 2019 WL 2647520, at *6 (Del. Ch. June 27, 2019) (Slights, V.C.)

("Although Plaintiffs try to dress their allegations of 'lost business opportunities

and lost investments' as irreparable harm, those losses, if proven, are readily and

historically compensable by damages.").  And to the extent its reputation has been

harmed, courts routinely quantify reputational harm into monetary damages

awards.  *See Organovo Holdings*, 162 A.3d at 114 n.51 ("Imperfect though it is, an

action for damages is the only hope for vindication or redress the law gives to a

man whose reputation has been falsely dishonored.") (quoting *Milkovich v. Lorain

Journal Co.*, 497 U.S. 1, 23 (1990)).  Calculating such damages is neither

impractical nor impossible.  *See id.* at 114.

Accordingly, MetTel's bare-bones allegations simply do not make out the

irreparable harm necessary to issue a TRO.  MetTel's Motion for a TRO should be

denied on this independent basis as well.

### C. The Balance Of Equities Favors Granite

MetTel is also not entitled to a TRO here because the balance of equities tips

in favor of Granite rather than MetTel.  A TRO is separately unwarranted for this

reason too.

First, as shown above, the requested TRO would act as a prior restraint on

protected speech, which is all the more troubling given the high likelihood that

statements of two sales representatives were non-actionable statements of opinion.

*See* Section IV.D.2, *infra*.  The requested TRO will also have a chilling effect on

Granite's ability to compete with MetTel for customers, which it is privileged to

do.  *See Lipson v. Anesthesia Servs., P.A.*, 790 A.2d 1261, 1287 (Del. Super. Ct.

2001) ("[T]he Court must be mindful of the privilege enjoyed by competitors in the

same market to compete aggressively for market share"); *Regal Home Distribs. v.

Gordon*, 66 A.2d 754, 754-55 (Del. Super. Ct. 1949) ("One is privileged purposely

to cause a third person not to enter into or continue a business relation with a

competitor of the actor if (a) the relation concerns a matter involved in the

competition between the actor and the competitor, and (b) the actor does not

employ improper means, and (c) the actor does not intend thereby to create or

continue an illegal restraint of competition, and (d) the actor's purpose is at least in

part to advance his interest in his competition with the other.").

Second, the TRO MetTel seeks is wildly overbroad and would compound

the chilling effect and harm on Granite's speech and competition rights.  MetTel

would have the Court enjoin Granite from making "*any* statements about MetTel

or its business operations to *any* current MetTel client."  (Mot. for TRO at 1

(emphasis added).)  Granting MetTel's requested TRO would thus enjoin entirely

truthful speech and legitimate, everyday competitive activities.  It would even

constrain Granite if a dissatisfied MetTel customer contacted Granite.  Such an

overbroad TRO is impermissible.  *See*, *e.g.*, *Aquila,* 805 A.2d at 202-203 ("[A]

23

preliminary injunction is an extraordinary remedy, which will not issue unless it

has been earned and will be denied where the remedy sought is excessive in

relation to, or unnecessary to prevent, the injury threatened."); *Ivanhoe Partners v.*

*Newmont Mining Corp.*, 533 A.2d 585, 609 (Del. Ch. 1987) ("[A]n injunctive

remedy should not be disproportionate or excessive in relation to the specific harm

that it is intended to prevent.").

Third, MetTel has tools at its disposal to mitigate and even cure any alleged

harm without the need for a court order restraining Granite's speech and

competition rights.  MetTel explains in its own Brief that it is willing to share

confidential information about ██████████████ with customers upon

execution of a non-disclosure agreement.  (MetTel Br. at 6.)  If MetTel's ██████

████████████████████████████████████████████

████████████████████  The existence of this remedy, and the

relative ease with which MetTel could implement it, weighs heavily against

granting an unwarranted and unconstitutional TRO.  *See Golden Cycle, LLC v.*

*Allan*, 1998 WL 892631, at *17 (Del. Ch. Dec. 10, 1998) (noting existence of non-

legal remedies and holding "[t]he availability of this self-help strongly suggests

that there is no need for injunctive relief here.").

Finally, MetTel comes to the Court with unclean hands.  MetTel's own

evidence shows that it engaged in the same conduct it accuses Granite of engaging

24

in here.  Mr. Economou, a senior MetTel executive, advised Mr. Hanley, the MetTel salesperson with the high-level contacts at ███ to use his contacts to reassure █████ that MetTel was ██████████████████████████████████

████████████████████████████████████████████████

████████████████████ (Compl. Ex. C.)  MetTel's agenda is clear: while reassuring █████ Mr. Hanley was being ordered to sow doubt about Granite's

█████████████ (*See id.*)  In these circumstances, "where the litigant's own acts offend the very sense of equity to which he appeals," the court should refuse equitable relief.  *Nakahara v. NS 1991 Am. Trust*, 718 A.2d 518, 522 (Del. Ch. 1998).

### D. MetTel Has Not Pleaded Colorable Claims

Even if injunctive relief were constitutionally permissible here—and it is not—and even if MetTel had satisfied the irreparable harm and balance of the equities elements for issuance of a TRO—and it has not—MetTel would still not be entitled to a TRO.  A TRO will not issue unless the underlying claim is "colorable."  *Sherwood v. Ngon*, 2011 WL 6355209, at \*6 (Del. Ch. Dec. 20, 2011).  Because MetTel cannot make even a colorable showing on its claims, its Motion for a TRO should be denied.

25

### 1. MetTel's Tortious Interference And Trade Libel Claims

MetTel's Complaint purports to state common law claims for tortious interference with prospective economic advantage (Count Two), tortious interference with contractual relations (Count Three), and trade libel (Count Four).[7]

---

[7] Granite assumes, solely for purposes of opposing MetTel's Motion for a TRO, that Delaware law applies to MetTel's common law claims. But it is far from clear that this is the case. Delaware follows the Restatement (Second) to determine choice-of-law questions, with consideration given to "(1) the place where the injury occurred; (2) the place where the conduct causing the injury occurred; (3) the domicile, residence, nationality, place of incorporation and place of business of the parties; and (4) the place where the relationship, if any, between the parties is centered." *Eureka Resources, LLC v. Range Resources-Appalachia, LLC*, 62 A.3d 1233, 1237 (Del. Super. Ct. 2012). MetTel is headquartered in New York, and Granite is headquartered in Massachusetts. None of the allegedly false statements were made either by or to any individuals located in Delaware. The only conceivable connection to Delaware is that MetTel and Granite are both organized under Delaware law, a connection that typically does not suffice to apply Delaware law to business torts. *See, e.g., UbiquiTel Inc. v. Sprint Corp.*, 2005 WL 3533697, at *4 (Del. Ch. Dec. 14, 2005) (applying Pennsylvania law to claim brought by Delaware corporation headquartered in Pennsylvania and noting, "the plaintiff's principal place of business is the single most important contact for determining the state of the applicable law as to most issues in situations involving . . . financial [or economic] injury. . . .") (quotations omitted, alteration in original). Both New York and Massachusetts law proscribe prior restraints. *See, e.g., Nyer v. Munoz-Mendoza*, 385 Mass. 184, 188, 430 N.E.2d 1214, 1217 (1982) ("[E]ven allegedly false and defamatory statements are protected from prior injunctive restraint by the First Amendment and art. 16 of the Massachusetts Declaration of Rights."); *Rosenberg Diamond Dev. Corp. v. Appel*, 290 A.D.2d 239, 239, 735 N.Y.S.2d 528, 529 (1st Dep't 2002) ("Prior restraints on speech are strongly disfavored. . . . Free speech is protected from censorship unless shown likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance or unrest. Prior restraints are not permissible, as here, merely to enjoin the publication of libel.") (citations omitted).

26

Even accepting all of MetTel's well-pleaded allegations as true, these claims are not even colorable because MetTel does not adequately allege causation or damages, which are essential elements of each of these claims.[8]

In its Complaint, MetTel identifies only two MetTel customers to whom Granite allegedly made false, misleading, and/or defamatory statements about MetTel. (Compl. ¶¶ 19, 20, 24.)  Based on these two isolated incidents, and without any evidence, MetTel speculates that it "*believes* that Granite personnel have contacted many, if not all, of MetTel's other current clients, as well as its prospective clients," and made similar statements.  (*Id.* ¶ 29 (emphasis added).) Tellingly, MetTel does not identify even a single customer or prospective customer it claims to have lost as a result of any Granite statement.  As a result, MetTel

---

[8] *DeBonaventura v. Nationwide Mut. Ins. Co.*, 419 A.2d 942, 947 (Del. Ch. 1980) ("interference with an existing contract requires (a) an intent to induce a breach (b) of an existing contract, (c) proximate causation, and (d) damages; a showing of deliberate interference with a prospective business opportunity requires (a) the reasonable probability of a business opportunity, (b) the intentional interference by defendant with that opportunity, (c) proximate causation, and (d) damages, all of which must be considered in light of a defendant's privilege to compete or protect his business interests in a fair and lawful manner"); *Incyte Corp. v. Flexus Biosciences, Inc.*, 2017 WL 7803923, at *7 (Del. Super. Ct. Nov. 1, 2017) (noting that no Delaware court has defined the elements of trade libel, but using the following definition: "Regardless of the label, the publication of a disparaging statement concerning the business of another is actionable where: (1) the statement is false; (2) the publisher either intends the publication to cause pecuniary loss or reasonably should recognize that publication will result in pecuniary loss; (3) pecuniary loss does in fact result; and (4) the publisher either knows that the statement is false or acts in reckless disregard of its truth or falsity.") (quotation omitted).

27

cannot point to any actual, concrete damages that have been caused by Granite's alleged conduct.

The closest MetTel comes is alleging that one of its *other* customers—not one of the two customers to whom Granite allegedly made false statements—"has not returned MetTel's calls and has rejected efforts to set up a meeting with MetTel since being contacted by Granite." (*Id.* ¶ 27.) Such speculation alleges nothing actionable. This unnamed customer presumably remains a MetTel customer—and MetTel has not alleged otherwise—so MetTel cannot claim to have lost that one customer's business. Nevertheless, MetTel apparently "conclude[s]" from the customer's silence that it has lost this customer's "future" business. (*Id.*) This alleged "injury" is purely speculative.

These allegations are insufficient to state colorable common law claims for tortious interference and trade libel. As shown above, MetTel "has not identified a single customer or prospective business relationship or opportunity that [Granite] interfered with; nor has [MetTel] pled any facts supporting proximate causation or alleging specific damages." *See Overdrive, Inc. v. Baker & Taylor, Inc.*, 2011 WL 2448209, at *9 (Del. Ch. June 17, 2011) (dismissing tortious interference claim); *see also See Irgau v. Christiana Care Health Servs.*, 2008 WL 1724250, at *6 (Del. Super. Ct. Apr. 9, 2008) (holding a tortious interference claim inadequately pleaded where "the injury is not actual, it is merely speculative."). Similarly, as to

trade libel, MetTel has not alleged facts sufficient to show that "pecuniary loss does [or will] in fact result." *Incyte Corp.*, 2017 WL 7803923, at *7 (addressing elements of trade libel).

Finally, as discussed in more detail below with respect to MetTel's defamation claim, the various statements MetTel attributes to Granite were either statements of pure opinion—not fact—or made no representations of fact whatsoever. *See* Section IV.D.2, *infra*. Moreover, to the extent that any of these statements implied any assertions of fact, MetTel cannot show that any such assertions were "false." *See id*. The requisite elements of improper means and falsity are therefore also not colorably alleged with respect to MetTel's tortious interference and trade libel claims.

### 2. *MetTel's Defamation Claim*

As a threshold matter, this Court has no jurisdiction to entertain MetTel's defamation claim or award preliminary injunctive relief based on the defamation claim. As this Court held in *Perlman*:

> In connection with a claim for defamation, the Court of Chancery, in all instances, lacks subject matter jurisdiction to adjudicate the questions of whether a defendant made a false statement about the plaintiff and whether it did so with actual malice. A defendant alleged to have committed the tort of defamation is entitled, should she wish, to have a jury decide those threshold questions. If the jury declares that the defendant is liable for defamation, then the plaintiff may seek to enforce that

29

> declaration of defamation with mandatory injunctive
> relief in Chancery, but only in the event the declaration is
> not enough to prompt the defendant to remove the
> defamatory content from the offending site.

*Perlman*, 2019 WL 2647520, at *1; *accord Preston Hollow Capital LLC*, 216 A.3d

at 16 ("[T]his Court is without jurisdiction to determine whether slander has

occurred here.").

Even if this Court has jurisdiction over the defamation claim, it is still not

colorably pleaded.  "Ordinarily, the elements of defamation are: (1) defamatory

communication; (2) publication; (3) reference to the plaintiff; (4) third party's

understanding of the communication's defamatory character; and (5) injury."

*Preston Hollow Capital*, 216 A.3d at 4.  Leaving aside that MetTel has not

colorably alleged injury or damages for the reasons discussed above, MetTel

cannot make a colorable showing that any of the alleged statements on which its

claims are based are defamatory in the first place.

First, MetTel alleges that ██████████████ received a voice message

from a Granite employee inquiring whether the customer was aware of ████

██████████████████████████ (Compl. ¶ 19 & Ex. A.)  But this

statement has no defamatory content—it does not even make a representation of

fact.  *See Riley v. Moyed*, 529 A.2d 248, 251 (Del. 1987) (to determine whether a

30

statement is actionable as defamation, the court must determine, among other things, "whether the statement can be objectively verified as true or false").

Second, MetTel alleges that ███ received an email from Granite stating that its "service provider … ████████████████████████████████████ ████████████████████████████ This is a classic statement of opinion.  (Compl. ¶ 20 & Ex. B.)  Nowhere on the face of the challenged statement is MetTel expressly mentioned and, as explained above, more than one carrier ███ ███████████████████████ *See* Section II.B.1, *supra* (listing four carriers who ████████████████████████████████████ ███████████).  Even if the statement could be interpreted as referring to MetTel, asserting that it is also ████████████████ is a subjective and imprecise assessment.  *See, e.g.*, *Stevens v. Independent Newspapers, Inc.*, 1988 WL 25377, at *4 (Del. Super. Ct. Mar. 10, 1988) ("The word 'abuse' is not fact-laden, but rather reflects the subjective perceptions of the speaker.  Indeed, the term 'abuse' is so imprecise that the Delaware Supreme Court has held the phrase 'abuse of office' to be an expression of opinion and not a word of art.").  A statement that MetTel ████████████████████████████ clearly expresses the author's opinion.  *See, e.g.*, *Doe v. Delaware, Dep't of Servs. for Children, Youth & Their Families, Div. of Family Servs.*, 2016 WL 5416679, at *7 (D. Del. Sept. 27, 2016) ("The words 'appear coerced' indicate that Quinn was describing her belief about

31

the veracity of the children's statements").  And a statement that MetTel is

██████████████████████ is both a subjective assessment and non-actionable

hyperbole.  *See, e.g.*, *Agar v. Judy*, 151 A.3d 456, 486 (Del. Ch. 2017) ("None of

these statements are defamatory. The statement of being 'forced kicking and

screaming to settle' is indeed nonsensical, which is also why it would be

understood by a reader as hyperbole and not literal truth."); *Stevens*, 1988 WL

25377, at *4.

      Third, MetTel alleges that Granite told an unnamed ██████ employee that

MetTel is ████████████████ (Compl. ¶ 24 & Ex. C.)  But there is no

evidence of what Mr. Easton or any other Granite employee allegedly said on the

relevant telephone call.  Instead, the characterization ████████████████████

██████████ is the summary that an ██████ employee—not the same ██████ employee

who spoke to the unidentified person on the telephone—provided to MetTel.  (*Id.*)

To the extent it is possible to make any assessment of the alleged statement—

which, as is clear from Exhibit C to the Complaint, is paraphrased and, at best for

MetTel, was conveyed secondhand—it is likewise a non-actionable statement of

opinion.

      Moreover, as discussed at length above, MetTel is currently ██████████████

████████████████████████ *See* Section II.B, *supra*.  Accordingly, to the

extent any of the alleged statements actually implicate any verifiable statements of

fact about MetTel's ████████████ Granite personnel had every reason to believe that those statements were factually accurate and could not have acted with the requisite reckless disregard for the truth.  *See*, *e.g.*, *CapStack*, 2018 WL 3949274, at *6 (listing elements of defamation).

Accordingly, MetTel's defamation claim is not colorable.

### 3.  MetTel's Claim Under The Delaware Deceptive Trade Practices Act

MetTel's claim under the DTPA fares no better, for the statute does not apply to conduct taking place entirely outside Delaware which causes no harm inside Delaware.  And even if the statute did apply, MetTel has not alleged the requisite pattern of conduct necessary to warrant an injunction under its terms.

First, MetTel has not shown that the DTPA even applies to any of the conduct alleged in its complaint.  "[T]he [DTPA] is not available to litigants who cannot show any evidence of wrongful conduct or injury taking place in Delaware."  *Ninespots, Inc. v. Jupai Holdings, Ltd.*, 2018 WL 3626325, at *13 (D. Del. July 30, 2018) (citing *Guidance Endodontics, LLC v. Dentsply Int'l, Inc.*, 663 F. Supp. 2d 1138 (D.N.M. 2009)).  This principle is consistent with the well-established presumption that "a law is not intended to apply outside the territorial jurisdiction of the State in which it is enacted."  *Singer v. Magnavox Co.*, 380 A.2d 969, 981 (Del. 1977), *overruled on other grounds*, *Weinberger v. UOP, Inc.*, 457 A.2d 701 (Del. 1983).

33

Here, none of the allegedly false or misleading statements occurred in Delaware because neither the speakers nor the recipients were located in Delaware. Nor could MetTel allege that it suffered any harm in Delaware.  Instead, MetTel's principal place of business is in New York, and "the plaintiff's principal place of business is the single most important contact for determining the state of the applicable law as to most issues in situations involving . . . financial [or economic] injury. . . ."  *UbiquiTel Inc. v. Sprint Corp.*, 2005 WL 3533697, at *4 (Del. Ch. Dec. 14, 2005) (quotation omitted).  It follows that the DTPA simply does not apply here, and MetTel's allegations do not state colorable claims under the statute.

 Second, even if the DTPA did apply, MetTel's allegations still do not make out colorable claims.  "The DTPA was designed to prevent patterns of deceptive conduct, not isolated incidents."  *EDIX Media Grp., Inc. v. Mahani*, 2006 WL 3742595, at *12 (Del. Ch. Dec. 12, 2006) (quotation omitted).  As such, "the failure of a party to be able to state a claim for injunctive relief at the time the suit is brought is fatal to claims under the Deceptive Trade Practices Act."  *State ex rel. Brady v. Pettinaro Enters.*, 870 A.2d 513, 537 (Del. Ch. 2005).

Again, here MetTel only alleges the three isolated statements discussed above.  While MetTel contends that Granite made similar statements to other MetTel customers, this allegation is purely speculative and based on nothing more

34

than "information and belief."  (*See* Compl. ¶¶ 26, 29.)  Thus, any purported

"pattern[] of deceptive conduct" is founded solely on surmise and conjecture,

which is insufficient to state a claim under the DTPA.  *See State ex rel. Brady*, 870

A.2d at 536 ("[A] claim for injunctive relief must be supported by the allegation of

facts that create a reasonable apprehension of a future wrong.") (quotation

omitted).  Accordingly, MetTel cannot obtain a TRO based on its DTPA claim.

Third, because MetTel's common law tort claims are not colorable for the

reasons discussed above, MetTel also cannot state colorable statutory claims.

"[T]he [DTPA] was not intended to create a new cause of action distinct from the

common law protections designed to secure businesses against the deceptive trade

practices of others." *Grand Ventures, Inc. v. Whaley*, 632 A.2d 63, 68 (Del. 1993).

Because MetTel has not alleged colorable common law claims, it has also not

alleged colorable claims under the DTPA, for the DTPA cannot serve as a

substitute where MetTel's other common law claims fail.

*          *          *

Simply put, MetTel has come to this Court seeking unconstitutional

emergency relief based on flimsy, speculative allegations.  This Court therefore

could not issue MetTel's requested TRO even if all the standard elements for

issuing a TRO were met, and MetTel has certainly not met those elements here.

MetTel's Motion for TRO should therefore be denied.

35

## V.   METTEL'S MOTION TO EXPEDITE SHOULD BE DENIED

MetTel's claims are so weak, the claimed injury so speculative, and the requested remedy so drastic that it has not even met the comparatively lower standard required for expediting these proceedings.  MetTel's Motion to Expedite should therefore also be denied.

"[M]otions to expedite are not granted automatically," rather, plaintiffs must "earn expedition."  *In re Williams Cos., Inc. Stockholder Litig.*, 2016 WL 197177, at *2 (Del. Ch. Jan. 13, 2016).  "Plaintiffs bear the burden of showing good cause for expedited proceedings."  *In re TriQuint Semiconductor, Inc. Stockholders Litig.*, 2014 WL 2700964, at *2 (Del. Ch. June 13, 2014).  "To prevail on a motion to expedite, a plaintiff must demonstrate a sufficiently colorable claim and show a sufficient possibility of threatened irreparable injury, as would justify imposing on the defendants and the public the extra (and substantial) costs of an expedited preliminary injunction proceeding."  *Parsons v. Digital River, Inc.*, 2015 WL 139760, at *1 (Del. Ch. Jan. 12, 2015) (quotation omitted).  MetTel has not made this showing.  As discussed above, MetTel's claims are not colorable, and MetTel has not shown that it will suffer irreparable harm.

"The colorable claim prong measures the substantive merits of the dispute and assures that the claim is worthy of the effort and expense of expedition." *Opportunity Partners L.P. v. Blackrock N.Y.*, 2011 WL 1379066, at *2 n.2 (Del.

36

Ch. Mar. 28, 2011).  As shown above, MetTel's purported claims are not colorable.

As a threshold and gating item, MetTel seeks to expedited proceedings to pursue

preliminary relief—prior restraint of allegedly false statements—that is

unconstitutional and that this Court lacks subject matter jurisdiction to grant.  *See*

Sections IV.A and IV.D.2, *supra*.  Moreover, MetTel fails to allege causation or

damages, because it does not identify even a single customer or prospective

customer it claims to have lost as a result of Granite's statements.  *See* Section

IV.D.1, *supra*.  MetTel also fails to adequately plead the pattern of conduct

necessary for a claim under the DTPA.  *See* Section IV.D.3, *supra*.  And MetTel's

defamation and trade libel claims also fail because Granite's alleged statements

were either statements of pure opinion or made no representations of fact

whatsoever (and, to the extent they did involve implied statements of fact, Granite

had ample reason to believe such statements were true).  *See* Section IV.D.2,

*supra*.

     As for irreparable harm, MetTel must establish that, absent expedition, it

will suffer "immediate, discernible harm for which there is no adequate remedy at

law."  *Sonet v. Plum Creek Timber Co.*, 1998 WL 749445, at *2 (Del. Ch. Sept. 23,

1998) (quotation omitted).  Expedited proceedings should not be granted if "the

injury is speculative or if the injury can be fully compensated after a full trial on

the merits, either by an award of damages or by any other form of final equitable

relief." *Id.* at *2 (quotation omitted).  As shown above, any future or ongoing harm to MetTel is purely speculative.  *See* Section IV.B, *supra*.  And the injury MetTel alleges—lost profits and damage to its reputation and goodwill—can be fully compensated by an award of damages.  *See id.*

Expedition is also not warranted here because of the substantial burden it will impose on Granite and the Court.  Even in normal times, it would be difficult for this case to proceed on an expedited schedule.  In addition to ordinary discovery, adjudication of MetTel's claims—to the extent such claims have more substance than the Complaint conveys—will require extensive third-party discovery.  For example, such third-party discovery will include obtaining documents and live testimony from numerous third-party witnesses located around the country—both the MetTel customers identified in the Complaint and other customers MetTel "believes" were contacted by Granite—in order to determine who Granite spoke with, the circumstances of those communications, the precise content of Granite's statements, whether and how MetTel's customers reacted to those communications, and any communications those customers received from MetTel.  In addition, the parties will require significant discovery of MetTel's ████████ in order to determine the extent and cause of any lost profits, as well as whether Granite's alleged statements about MetTel's ████████████ were substantially true.

38

These are not normal times.  The myriad closures and restrictions aimed at addressing the COVID-19 pandemic, as well as the resulting delays and disruption for individuals and businesses of all types, are by now all too familiar to the Court. Given that the evidence and witnesses in this case are spread across the country— indeed, it is not clear that *any* of the witnesses are located in Delaware—the current office closures and travel restrictions will make proceeding on even a normal schedule challenging.  Proceeding on an expedited basis would be substantially more difficult.  Indeed, this Court has denied several recent requests for expedition, recognizing that the COVID-19 pandemic has made the cost of expedition even greater than usual.  *See, e.g.*, *Snow Phipps Grp., LLC v. KCake Acquisition, Inc.*, C.A. No. 2020-0282-KSJM (Del. Ch. Apr. 17, 2020); *The We Co. v. Softbank Grp. Corp.*, C.A. No. 2020-0258-AGB (Del. Ch. Apr. 17, 2020); *Conduent Business Servs., LLC v. Sky View Capital, LLC*, C.A. No. 2020-0232- JTL (Del. Ch. Mar. 30, 2020).

Given the Complaint's thin allegations, the speculative nature of the alleged injury, and the substantially higher costs of proceeding on an expedited basis in these times, MetTel's Motion to Expedite is unwarranted.  Granite respectfully submits that this Court should deny the motion and order this matter to proceed in the ordinary course.

39

## VI.    CONCLUSION

For all of these reasons, Granite respectfully requests that the Court deny

MetTel's Motion for a Temporary Restraining Order and Motion to Expedite.

|  |  |
|---|---|
|  | MORRIS, NICHOLS, ARSHT<br>   & TUNNELL LLP |
| OF COUNSEL:<br>DONNELLY, CONROY &<br>GELHAAR, LLP<br>T. Christopher Donnelly (admitted<br>*pro hac vice* )<br>Joshua N. Ruby (admitted *pro hac vice*)<br>260 Franklin Street, Suite 1600<br>Boston, MA 02110<br>(617) 720-2880<br><br>May 28, 2020 | */s/ R. Judson Scaggs, Jr.*<br>R. Judson Scaggs, Jr. (#2676)<br>Barnaby Grzaslewicz (#6037)<br>A. Gage Whirley (#6707)<br>MORRIS, NICHOLS, ARSHT &<br>TUNNELL LLP<br>1201 N. Market Street<br>Wilmington, DE  19899-1347<br>(302) 658-9200<br><br>Words: 9,287 |

40

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 4, 2020, the foregoing document was

served by File & Serve*Xpress* on the following attorneys of record:

        Steven L. Caponi
        Matthew B. Goeller
        K&L Gates
        600 N. King St., Suite 901
        Wilmington, DE 19801

        */s/ A. Gage Whirley*
        A. Gage Whirley (#6707)

3

*MANHATTAN TELECOMMUNICATIONS CORP. D/B/A METROPOLITAN TELECOMMUNICATIONS, A/K/A METTEL v. GRANITE TELECOMMUNICATIONS, LLC*
Court of Chancery of the State of Delaware
C.A. No. 2020-0380-JRS

A61

[PUBLIC VERSION] Declaration of James Balestraci Pursuant to Delaware Supreme Court Administrative Order No. 6, In re COVID-19 Precautionary Measures
(with Certificate of Service)

06/04/20

**EFiled:  Jun 04 2020 04:46PM EDT**
**Transaction ID 65677741**
**Case No. 2020-0380-JRS**

# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

MANHATTAN TELECOMMUNICATIONS
CORP. D/B/A METROPOLITAN
TELECOMMUNICATIONS,
A/K/A METTEL

        Plaintiff,

        v.

GRANITE TELECOMMUNICATIONS, LLC

        Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)

C.A. No. 2020-0380-JRS

**PUBLIC VERSION**

**EFILED JUNE 4, 2020**

## DECLARATION OF JAMES BALESTRACI

        I, James Balestraci, declare under penalty of perjury under the laws of the State of Delaware that the following is true and correct:

        1.    I make this declaration pursuant to 10 *Del. C.* § 3927 in accordance with Delaware Supreme Court Administrative Order No. 3 In re COVID-19 Precautionary Measures, dated March 22, 2020, and Delaware Supreme Court Administrative Order No. 6 In re COVID-19 Precautionary Measures, dated May 14, 2020.

        2.    I am an employee of Granite Telecommunications, LLC ("Granite"), the defendant in this lawsuit.  I submit this affidavit based on my personal knowledge.  I am over the age of 18 and am otherwise competent to testify.

{999999-008/00039901-3}

3.    I have worked for Granite for over two years.  I currently serve as Vice President and General Manager of Wholesale in Granite's Quincy, Massachusetts office.

4.    As Vice President and General Manager of Wholesale, my duties include managing Granite's wholesale relationships with both end-user customers and resellers where Granite controls the telephone and data infrastructure.

5.    Although Granite and MetTel are competitors, MetTel is also a Granite customer for certain services.  For example, at some locations—mostly shopping malls—Granite owns the telephone and data infrastructure, and MetTel purchases access services from Granite to resell to MetTel's own customers.

6.    ████████████████████████████████████████████
████████████████████████████████████

7.    During these negotiations, Sean Sullivan, a MetTel employee, told me that ████████████████████████████████████
██████████████

8.    ██████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████



9.    Granite and MetTel have exchanged proposals but have not yet come to terms.

10.    Emails reflecting the exchange of proposals are attached hereto as Exhibits A and B.

11.    I was surprised that MetTel would try to negotiate ███████ ███████████████████████████████ Before MetTel began these negotiations, I would have expected MetTel ███████████████████ and would not have expected MetTel to be ███████████████ However, MetTel ████████████ ███████████████████████████

Executed on this 27 day of May, 2020.

James Balestraci

3



## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 4, 2020, the foregoing document was served by File & Serve*Xpress* on the following attorneys of record:

Steven L. Caponi
Matthew B. Goeller
K&L Gates
600 N. King St., Suite 901
Wilmington, DE 19801

*/s/ A. Gage Whirley*
A. Gage Whirley (#6707)

3

*MANHATTAN TELECOMMUNICATIONS CORP. D/B/A METROPOLITAN TELECOMMUNICATIONS, A/K/A METTEL v. GRANITE TELECOMMUNICATIONS, LLC*
Court of Chancery of the State of Delaware
C.A. No. 2020-0380-JRS

A62
[PUBLIC VERSION] Declaration of Geoff Cookman Pursuant to Delaware Supreme Court
Administrative Order No. 6, In re COVID-19 Precautionary Measures
(with Certificate of Service)

06/04/20

EFiled:  Jun 04 2020 04:46PM EDT
Transaction ID 65677741
Case No. 2020-0380-JRS

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

MANHATTAN TELECOMMUNICATIONS
CORP. D/B/A METROPOLITAN
TELECOMMUNICATIONS,
A/K/A METTEL

        Plaintiff,

        v.

GRANITE TELECOMMUNICATIONS, LLC

        Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)

C.A. No. 2020-0380-JRS

**PUBLIC VERSION EFILED ON
JUNE 4, 2020**

### DECLARATION OF GEOFF COOKMAN

        I, Geoff Cookman, declare under penalty of perjury under the laws of the State of Delaware that the following is true and correct:

        1.    I make this declaration pursuant to 10 *Del. C.* § 3927 in accordance with Delaware Supreme Court Administrative Order No. 3 In re COVID-19 Precautionary Measures, dated March 22, 2020, and Delaware Supreme Court Administrative Order No. 6 In re COVID-19 Precautionary Measures, dated May 14, 2020.

        2.    I am an employee of Granite Telecommunications, LLC ("Granite"), the defendant in this lawsuit.  I submit this affidavit based on my personal knowledge.  I am over the age of 18 and am otherwise competent to testify.

{999999-008/00039900-3}

3.      I have worked for Granite for seventeen years.  I currently serve as Director of Carrier Relations in Granite's Quincy, Massachusetts office.

4.      As Director of Carrier Relations, my duties include managing Granite's relationships with major carriers like AT&T, Verizon, and CenturyLink, which own most of the telephone and data infrastructure in the United States.

5.      Although Granite and MetTel are competitors, Granite and MetTel both purchase access to infrastructure from the major carriers.

6.      On or about April 6, 2020, I had a telephone conversation with Sean Sullivan, a senior MetTel executive in charge of MetTel's relationships with carriers.  An executive with a similar carrier relations function at another competitor also participated in the call.

7.      During the call, Mr. Sullivan asked about Granite's willingness to ███████████████████████████████████████████████ ████████████████████████

8.      Mr. Sullivan stated that it would be in the interests of both MetTel and Granite to ████████████████████████████████

9.      Granite ████████████████████████████████████████ ████████████████ ██ did not pursue MetTel's proposal.

Executed on this __28th__ day of May, 2020.

_____
Geoff Cookman

3

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 4, 2020, the foregoing document was

served by File & Serve*Xpress* on the following attorneys of record:

> Steven L. Caponi
> Matthew B. Goeller
> K&L Gates
> 600 N. King St., Suite 901
> Wilmington, DE 19801

> */s/ A. Gage Whirley*
> A. Gage Whirley (#6707)

3

*MANHATTAN TELECOMMUNICATIONS CORP. D/B/A METROPOLITAN*
*TELECOMMUNICATIONS, A/K/A METTEL v. GRANITE TELECOMMUNICATIONS, LLC*
Court of Chancery of the State of Delaware
C.A. No. 2020-0380-JRS


A63
[PUBLIC VERSION] Declaration of James Easton Pursuant to Delaware Supreme Court
Administrative Order No. 6, In re COVID-19 Precautionary Measures
(with Certificate of Service)

06/04/20

**EFiled:  Jun 04 2020 04:46PM EDT**
**Transaction ID 65677741**
**Case No. 2020-0380-JRS**

# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| MANHATTAN TELECOMMUNICATIONS CORP. D/B/A METROPOLITAN TELECOMMUNICATIONS, A/K/A METTEL | ) ) ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| GRANITE TELECOMMUNICATIONS, LLC | ) ) |
| Defendant. | ) ) |

C.A. No. 2020-0380-JRS

**PUBLIC VERSION**

**EFILED JUNE 4, 2020**

## <u>DECLARATION OF JAMES EASTON</u>

I, James Easton, declare under penalty of perjury under the laws of the State of Delaware that the following is true and correct:

1.    I make this declaration pursuant to 10 *Del. C.* § 3927 in accordance with Delaware Supreme Court Administrative Order No. 3 In re COVID-19 Precautionary Measures, dated March 22, 2020, and Delaware Supreme Court Administrative Order No. 6 In re COVID-19 Precautionary Measures, dated May 14, 2020.

2.    I am an employee of Granite Telecommunications, LLC ("Granite"), the defendant in this lawsuit.  I submit this affidavit based on my personal knowledge.  I am over the age of 18 and am otherwise competent to testify.

3.      I have worked for Granite for six years.  I currently serve as Senior Director of Healthcare, Rural Healthcare and State and Local Government and Education in Granite's West Palm Beach, Florida office.

4.      As Senior Director of Healthcare, Rural Healthcare and State and Local Government and Education, my duties include selling Granite's voice and data services to businesses in the healthcare space and state and local governments.  As part of my sales duties, I regularly contact both current Granite customers and businesses that are not current Granite customers in order to sell Granite products and services.

5.      ███████████████ is currently a Granite customer for a small number of telephone lines.  I am the sales representative in charge of the account.

6.      ████ formerly contracted with Granite for a larger set of voice and data products but moved much of this business to MetTel about two-and-a-half years ago.  I still maintain relationships with some ████ employees.

7.      I do not recall ever saying to anyone at ████ that MetTel was ███████████████

2

Executed on this 28th day of May, 2020.

_____
James Easton

3

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 4, 2020, the foregoing document was served by File & Serve*Xpress* on the following attorneys of record:

Steven L. Caponi
Matthew B. Goeller
K&L Gates
600 N. King St., Suite 901
Wilmington, DE 19801

*/s/ A. Gage Whirley*
A. Gage Whirley (#6707)

3

*MANHATTAN TELECOMMUNICATIONS CORP. D/B/A METROPOLITAN TELECOMMUNICATIONS, A/K/A METTEL v. GRANITE TELECOMMUNICATIONS, LLC*
Court of Chancery of the State of Delaware
C.A. No. 2020-0380-JRS


A64
[PUBLIC VERSION] Declaration of Karen Hogle Pursuant to Delaware Supreme Court
Administrative Order No. 6, In re COVID-19 Precautionary Measures
(with Certificate of Service)

06/04/20

EFiled: Jun 04 2020 04:46PM EDT
Transaction ID 65677741
Case No. 2020-0380-JRS

**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

MANHATTAN TELECOMMUNICATIONS
CORP. D/B/A METROPOLITAN
TELECOMMUNICATIONS,
A/K/A METTEL

        Plaintiff,

  v.

GRANITE TELECOMMUNICATIONS, LLC

        Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)

C.A. No. 2020-0380-JRS

**PUBLIC VERSION
EFILED JUNE 4, 2020**

<u>**DECLARATION OF KAREN HOGLE**</u>

I, Karen Hogle, declare under penalty of perjury under the laws of the State of Delaware that the following is true and correct:

1.    I make this declaration pursuant to 10 *Del. C.* § 3927 in accordance with Delaware Supreme Court Administrative Order No. 3 In re COVID-19 Precautionary Measures, dated March 22, 2020, and Delaware Supreme Court Administrative Order No. 6 In re COVID-19 Precautionary Measures, dated May 14, 2020.

2.    I am an employee of Granite Telecommunications, LLC ("Granite"), the defendant in this lawsuit. I submit this affidavit based on my personal knowledge. I am over the age of 18 and am otherwise competent to testify.

{999999-008/00039899-3}

3.      I have worked for Granite for 10 years.  I currently serve as Vice President of Revenue Assurance & Benefits in Granite's Quincy, Massachusetts office.

4.      As Vice President of Revenue Assurance & Benefits, my duties include overseeing human resources functions at Granite.

5.      At no time during my employment at Granite has Granite ever laid off 20 percent of its employees.

6.      This remains true in 2020.  Granite has not furloughed or laid off any of its over 2,000 permanent employees as a result of the COVID-19 pandemic, with the exception of ██████████████████████████████ ████████████████████████████████████████

Executed on this 28 day of May, 2020.

*Karen Hogle*
Karen Hogle

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 4, 2020, the foregoing document was served by File & Serve*Xpress* on the following attorneys of record:

Steven L. Caponi
Matthew B. Goeller
K&L Gates
600 N. King St., Suite 901
Wilmington, DE 19801


*/s/ A. Gage Whirley*
A. Gage Whirley (#6707)

3

*MANHATTAN TELECOMMUNICATIONS CORP. D/B/A METROPOLITAN*
*TELECOMMUNICATIONS, A/K/A METTEL v. GRANITE TELECOMMUNICATIONS, LLC*
Court of Chancery of the State of Delaware
C.A. No. 2020-0380-JRS

A65

[PUBLIC VERSION] Declaration of Charles Pagliazzo Pursuant to
Delaware Supreme Court Administrative Order No. 6, In re
COVID-19 Precautionary Measures (with Certificate of Service)

06/04/20

EFiled:  Jun 04 2020 04:46PM EDT
Transaction ID 65677741
Case No. 2020-0380-JRS

### IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| MANHATTAN TELECOMMUNICATIONS CORP. D/B/A METROPOLITAN TELECOMMUNICATIONS, A/K/A METTEL )<br><br>Plaintiff, )<br><br>v. )<br><br>GRANITE TELECOMMUNICATIONS, LLC )<br><br>Defendant. ) | C.A. No. 2020-0380-JRS<br><br>**PUBLIC VERSION EFILED ON JUNE 4, 2020** |

MANHATTAN TELECOMMUNICATIONS )
CORP. D/B/A METROPOLITAN )
TELECOMMUNICATIONS, )
A/K/A METTEL )
                                        )
            Plaintiff, )       C.A. No. 2020-0380-JRS
                                        )
     v.                              )   **PUBLIC VERSION EFILED**
                                        )   **ON JUNE 4, 2020**
GRANITE TELECOMMUNICATIONS, LLC )
                                        )
            Defendant. )

## <u>DECLARATION OF CHARLES PAGLIAZZO</u>

I, Charles Pagliazzo, declare under penalty of perjury under the laws of the State of Delaware that the following is true and correct:

1. I make this declaration pursuant to 10 *Del. C.* § 3927 in accordance with Delaware Supreme Court Administrative Order No. 3 In re COVID-19 Precautionary Measures, dated March 22, 2020, and Delaware Supreme Court Administrative Order No. 6 In re COVID-19 Precautionary Measures, dated May 14, 2020.

2. I am an employee of Granite Telecommunications, LLC ("Granite"), the defendant in this lawsuit. I submit this affidavit based on my personal knowledge. I am over the age of 18 and am otherwise competent to testify.

3. I have worked for Granite for seventeen years. I currently serve as Vice President of Channel Sales in Granite's Quincy, Massachusetts office.

4.     My duties include managing Granite's sales agents.  Agents are non-employee sales personnel frequently used by telecommunications providers.

5.     In the course of my duties, I regularly interact with sales agents who have relationships with Granite, MetTel, or both.  I also frequently interact with and customers and potential customers who have interacted with MetTel sales agents.

6.     ███████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████

7.     In my experience, ██████████████████████████

███████████████████████████████████████████

███████████████████████████████████

8.     ███████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████

Executed on this 27th day of May, 2020.


_____
Charles Pagliazzo

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 4, 2020, the foregoing document was served by File & Serve*Xpress* on the following attorneys of record:

> Steven L. Caponi
> Matthew B. Goeller
> K&L Gates
> 600 N. King St., Suite 901
> Wilmington, DE 19801

*/s/ A. Gage Whirley*
A. Gage Whirley (#6707)

3

*MANHATTAN TELECOMMUNICATIONS CORP. D/B/A METROPOLITAN TELECOMMUNICATIONS, A/K/A METTEL v. GRANITE TELECOMMUNICATIONS, LLC*
Court of Chancery of the State of Delaware
C.A. No. 2020-0380-JRS


A66
[PUBLIC VERSION] Reply Brief in Support of Plaintiff's Motion
for Temporary Restraining Order and Motion to Expedite


06/08/20

EFiled:  Jun 08 2020 05:32PM EDT
Transaction ID 65684065
Case No. 2020-0380-JRS

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

MANHATTAN TELECOMMUNICATIONS CORP., D/B/A METROPOLITAN TELECOMMUNICATIONS, A/K/A METTEL,

          Plaintiff,

    v.

GRANITE TELECOMMUNICATIONS, LLC,

        Defendant.

C.A. No. 2020-0380-JRS

██████████████████

**PUBLIC VERSION
FILED JUNE 8, 2020**

## REPLY BRIEF IN SUPPORT OF PLAINTIFF'S MOTION FOR <u>TEMPORARY RESTRAINING ORDER AND MOTION TO EXPEDITE</u>

*Of counsel:*

Anthony P. La Rocco, Esq.
Dana B. Parker, Esq.
Charles F. Rysavy, Esq.
K&L Gates LLP
One Newark Center, Tenth Floor
Newark, NJ 07102
anthony.larocco@klgates.com
dana.parker@klgates.com
charles.rysavy@klgates.com

Dated: June 1, 2020

**K&L GATES LLP**
Steven L. Caponi (No. 3484)
Matthew B. Goeller (No. 6283)
600 King Street, Suite 901
Wilmington, DE 19801
Phone: (302) 416-7000
steve.caponi@klgates.com
matthew.goeller@klgates.com

*Counsel for Plaintiff Manhattan Telecommunications Corp.*

# <u>TABLE OF CONTENTS</u>

**Page(s)**

I.    INTRODUCTION ................................................................................1

II.   ARGUMENT......................................................................................4

A.    The relief requested by MetTel is not an unconstitutional prior
restraint on speech. .................................................................4

B.    MetTel has sufficiently pled irreparable harm meriting
injunctive relief.....................................................................10

C.    The balancing of equities strongly favors granting MetTel's
requested relief. ....................................................................14

D.    The Complaint asserts colorable claims for relief against
Granite. ................................................................................17

1.    Granite's statements to MetTel's customers are neither
true nor reasonable statements based on known facts. ...........18

2.    MetTel's Complaint states a colorable claim for
defamation...................................................................23

3.    The Complaint states colorable claims for Tortious
Interference and Trade Libel....................................27

4.    MetTel has pled a colorable claim for violation of
Delaware's  Uniform Deceptive Trade Practices Act...............28

E.    These proceedings should be expedited. ...........................28

III.  CONCLUSION...............................................................................31

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Allen v. News Corp.*,
    2005 WL 415095 (Del. Ch. Feb. 3, 2005) ..........................................................18

*Arkema Inc. v. Dow Chem. Co.*,
    2010 WL 2334386 (Del. Ch. May 25, 2010)......................................................17

*Bancroft Life & Cas. ICC, Ltd. v. Intercontinental Mgmt. Ltd.*,
    456 F. App'x 184 (3d Cir. 2012) ........................................................................14

*CapStack Nashville 3 LLC v. MACC Venture Partners*,
    2018 WL 3949274 (Del. Ch. Aug. 16, 2018) ........................................5, 8, 9, 10

*CBS Corp. v. Nat'l Amusements, Inc.*,
    2018 WL 2263385 (Del. Ch. May 17, 2018).......................................................11

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*,
    447 U.S. 557 (1980).............................................................................................5

*Conduent Business Servs., LLC v. Sky View Capital, LLC*,
    C.A. No. 2020-0232- JTL (Del. Ch. Mar. 30, 2020)..........................................31

*Conley v. Conley*,
    2015 WL 7747431 (Del. Super. Ct. Nov. 19, 2015)...........................................24

*Cty. of York Employees Ret. Plan v. Merrill Lynch & Co.*,
    2008 WL 4824053 (Del. Ch. Oct. 28, 2008) ......................................................29

*Eisenberg v. Chicago Milwaukee Corp.*,
    537 A.2d 1051 (Del. Ch. 1987) ..........................................................................10

*Giammargo v. Snapple Beverage Corp.*,
    1994 WL 672698 (Del. Ch. Nov. 15, 1994) .......................................................29

*Guidance Endodontics, LLC v. Dentsply Int'l, Inc.*,
    663 F. Supp. 2d 1138 (D.N.M. 2009)..................................................................28

*Horizon Pers. Commc'ns, Inc. v. Sprint Corp.*,
    2006 WL 2337592 (Del. Ch. Aug. 4, 2006) .......................................................14

*J.C. Pitman & Sons, Inc. v. Pitman*,
47 A.2d 721 (Del. Ch. 1946) ...............................................................6, 7, 13, 23

*Kanaga v. Gannett Co.*,
687 A.2d 173 (Del. 1996) ......................................................................25,26

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Price*,
1989 WL 108412 (Del.Ch. Sept.13, 1989) ...........................................11

*Morton v. Am. Mktg. Indus. Holdings, Inc.*,
1995 WL 1791090 (Del. Ch. Oct. 5, 1995) ...........................................18

*Nakahara v. NS 1991 Am. Trust*,
739 A.2d 770 (Del. Ch.1998) ...............................................................16

*Ninespots, Inc. v. Jupai Holdings, Ltd.*,
2018 WL 3626325 (D. Del. July 30, 2018) ...........................................28

*Organovo Holdings, Inc. v. Dimitrov*,
162 A.3d 102 (Del. Ch. 2017) ...............................................7, 8, 14, 24

*Perlman v. ox Media, Inc.*,
2019 WL 2647520 (Del. Ch. June 27, 2019).........................................23

*Portnoy v. Cryo-Cell Intern., Inc.*,
940 A.2d 43 (Del. Ch. 2008) .................................................................16

*Preston Hollow Capital LLC v. Nuveen LLC*,
216 A.3d 1 (Del. Ch. 2019) .............................................................5, 7

*Ramunno v. Cawley*,
705 A.2d 1029 (Del. 1998) .................................................................26, 27

*Singh v. Envtl. Assocs., Inc.*,
2003 WL 21039115 (Del. Ch. May 21, 2003)......................................11

*Smith v. Delaware State Police*,
2014 WL 3360173 (Del. Super. Ct. July 8, 2014)..............................25

*Sunstar Ventures, LLC v. Tigani*,
2009 WL 1231246 (Del. Super. Apr. 30, 2009) ..................................26

*The We Co. v. Softbank Grp. Corp.*,
  C.A. No. 2020-0258-AGB (Del. Ch. Apr. 17, 2020) .........................................31

*Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer
  Council, Inc.*,
  425 U.S. 748 (1976) ...................................................................................5

**Statutes**

6 *Del. C.* § 2531 *et seq.* .......................................................................5, 7, 13, 14, 27

## I.      INTRODUCTION

Defendant Granite Telecommunications, LLC ("Granite") has removed all reasonable doubt that it is using the COVID-19 crisis as the backdrop for its coordinated campaign to malign the services and reputation of Plaintiff Manhattan Telecommunications Corp. ("MetTel"), by telling MetTel's customers that ████ ███████████████████████████████ The only questions for this Court to decide on these Motions, therefore, are whether Granite's actions are somehow excusable and, if not, whether emergent relief is appropriate to prevent MetTel from further irreparable harm.

What is most telling about Granite's answering papers is not what they say, but what they do not say.  The factual allegations in MetTel's Complaint could be easily refuted if they were not true.  For example, if Granite were *not* in the midst of a coordinated campaign to convince MetTel's customers that it was████████ ███████████████████████████ Granite's opposition undoubtedly would have included affidavits from Granite personnel attesting to that fact.  Similarly, if Granite had *not* made the same false and misleading statements to more customers than the handful MetTel has been able to identify, Granite would have offered evidence refuting the allegation.  Or if "what was going on" with MetTel that Granite "would like to bring to the attention" of customers was *not* the same false and misleading information, or if Granite was *not* attempting to take advantage of the

current climate of uncertainty and fear caused by the COVID-19 crisis to harm MetTel's business, surely Granite would have submitted affidavits to that effect.  But it did not.  And the absence of such evidence speaks much louder than anything Granite actually says in its Brief.

Unable to refute the factual allegations in the Complaint, Granite is confined to unsuccessful technical arguments: it is entitled to make the statements at issue to MetTel's customers if it chooses to do so; MetTel cannot prove the extent of Granite's campaign to malign MetTel; and the statements at issue are true and not actionable.  But Granite is wrong in all three respects.

First, Granite has no right, First Amendment or otherwise, to make demonstrably false statements about a competitor for the purpose of maligning its services and gaining a competitive advantage.

Nor does Granite have a right to make statements during the current crisis that *perhaps* might not be enjoined during normal times.  Much like yelling "Fire!" may be protected speech in an empty parking lot but not in a crowded theater, whether Granite is entitled to libel MetTel and avoid an injunction must be assessed in the context of the circumstances in which the statements are made.  It is not simply *what* Granite is saying, but *when* it is saying it and to *whom*.

Granite is spreading lie that ███████████████████████████████

████████████████████████████████████████████████████████████

2

████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████ This makes the unfounded claim much more believable than it might otherwise be.  And Granite is telling this to customers in the healthcare and elder care fields, among others, for whom ███████████████████████████████ ██████████████████████████████ Especially under these circumstances, customers cannot ██████████████████████████████ Like people in a crowded theater, they do not have the time or even the ability to investigate, weigh the evidence, and then make a rational decision on what to do after someone yells "Fire!"  Granite is falsely maligning MetTel's services under circumstances most likely to achieve its goals, specifically to cause customers to terminate their business relationship with MetTel and replace it with Granite services, and must be enjoined from doing so.

Second, Granite seeks to impose a burden on MetTel that the law does not require—to prove the scope of the harm Granite has inflicted *before* being entitled to injunctive relief.  Many customers and potential customers will assume Granite's misinformation is true under the current circumstances.  This in turn will cause some unknowable portion of them to leave MetTel, or choose not to renew their contracts with MetTel, or not even to consider MetTel for telecommunications services, without MetTel ever knowing why.  The appropriate remedy is not simply to allow the campaign to run its course and then attempt to quantify the harm; the appropriate remedy is to stop Granite *now* from spreading its misinformation any further.

3

Finally, Granite makes an unsuccessful attempt to explain away its statements as true, or as based on a reasonable factual foundation, or as mere opinion.  None of the evidence Granite has assembled supports these arguments.  ████████████████

████████████████████████████████████████████████████

In fact, some of it shows the exact opposite.  A sophisticated competitor like Granite could not misinterpret this evidence as ██████████████████████

████████████████   Granite's *post hoc* justifications are so thin as to be transparent.

Granite has taken its best shot at explaining why MetTel is not entitled to the expedited relief it seeks and so obviously needs, and Granite has failed.

## II.    ARGUMENT

### A.    The relief requested by MetTel is not an unconstitutional prior restraint on speech.

Focusing exclusively on MetTel's first request for relief, Granite repeatedly argues that "the requested TRO would act as a prior restraint on protected speech."  *See*, *e.g.*, Ans. Br. at 22, 23.  But Granite fails to address MetTel's second request[1] for relief, that Granite be "enjoined from making any false or misleading statements about MetTel or its business operations."  In its attempt to draw attention away from this request, Granite incorrectly argues that "MetTel revealingly does not seek a

---

[1]    MetTel's first request for relief was broader than the second, but requested only temporary relief to align with expedited discovery while MetTel assesses the extent of Granite's campaign, the nature of the statements, and the identity of the individuals spreading these false statements.

████████████████████████████

████████████████████████████████████

TRO limiting Granite from making certain specific statements about MetTel." Ans. Br. at 1. But the second request for relief does exactly that.

Granite similarly raises the specter of a TRO that "could enjoin speech 'that may ultimately prove to be protected.'" Ans. Br. at 15 (quoting *CapStack Nashville 3 LLC v. MACC Venture Partners*, 2018 WL 3949274, at *4 (Del. Ch. Aug. 16, 2018)). But "false or misleading statements about MetTel or its business operations," which MetTel seeks to enjoin in its second request for relief, are not protected speech, and will never "ultimately be proved to be protected." Simply put, there is no First Amendment protection for making demonstrably false statements that malign a competitor's services and reputation. *See Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*, 447 U.S. 557, 563 (1980) (there can be no constitutional objection to the suppression of deceptive commercial messages); *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 771 (1976) (the states, not the Constitution, determine whether commercial speech which is false, deceptive, or misleading is permissible); 6 *Del. C.* § 2532.

Granite also argues that the relief requested is an unconstitutional restraint on free speech because it violates the traditional maxim that "equity does not enjoin a libel." Ans. Br. at 16–20. To be sure, this Court has long recognized that "equity lacks jurisdiction over a request to enjoin common-law defamation." *Preston Hollow Capital LLC v. Nuveen LLC*, 216 A.3d 1, 5 (Del. Ch. 2019). But the analysis

5

does not end there, and Granite's mere recitation of the traditional maxim ignores the full extent of MetTel's claims and the irreparable harm caused by Granite.

This Court is not precluded from ordering injunctive relief where, as here, it is necessary to enjoin Granite from continuing to (1) commit trade libel by making false statements about MetTel's services to its customers, and (2) tortiously interfere with MetTel's customer relationships. The reasoning behind the so-called "trade-libel exception" to the traditional maxim is set forth in *J.C. Pitman & Sons, Inc. v. Pitman*, 47 A.2d 721 (Del. Ch. 1946). *Pitman* involved two competing companies, Pitman & Sons, Inc. and Pitman Manufacturing Co., both of which manufactured and sold the same type of product. Pitman & Sons claimed Pitman Manufacturing was expropriating its trade name, and sent a letter to the latter's customers accusing Pitman Manufacturing of "start[ing] a campaign to confuse and deceive the trade." *Id.* at 723. Pitman & Sons warned its customers "not to deal with this new corporation until its rights to manufacture and your right to buy or sell this questionable product is decided upon by the courts." *Id.* at 724. Pitman Manufacturing brought a counterclaim alleging that the statements were defamatory and sought a preliminary injunction prohibiting further publication of the letters.

As the Court explained in *Pitman*, although American courts have traditionally "refused to enjoin mere trade libels, . . . [where] a court of equity has jurisdiction on some other ground, the American courts will also usually enjoin the

6

continued publication of a trade libel incident thereto. That is true when the libel is accompanied by some act of unfair business competition, if irreparable damage is imminent ...." *Id.* at 726. Thus, the Court in *Pitman* held: "The necessary conclusion therefore is that a continued course of wrongful action may, ordinarily, be stopped by injunction, although it includes a trade libel." *Id.* at 726.

Despite the obvious parallels between the facts in *Pitman* and the current dispute, Granite argues that *Pitman* has no application or relevance to MetTel's claims. Ans. Br. at 18. Granite is wrong. As this Court has explained:

> [Where] a separate tort . . . is alleged where relief at law is insufficient, and where the equitable remedy sought is, incidentally, an injunction of a "trade libel"—that is, a libelous statement to consumers that falsely disparages a plaintiff's goods or services . . . the matter is within this Court's jurisdiction, because the underlying behavior being examined without a jury is not mere speech, but involves other tortious activity where tradition and constitutional considerations do not require the findings of a jury.

*Preston Hollow Capital LLC*, 216 A.3d at 5. Here, MetTel is not asserting only a claim for defamation, or attendant torts based only on defamatory speech. MetTel has asserted independent claims for trade libel, tortious interference, and violations of Delaware's Deceptive Trade Practices Act. "[I]njunctive relief is a common and non-controversial remedy for tortious interference with prospective economic advantage." *Organovo Holdings, Inc. v. Dimitrov*, 162 A.3d 102, 122 (Del. Ch. 2017). *See also* 6 *Del. C.* § 2533(a). Similarly, "a person likely to be damaged by a deceptive trade practice of another may be granted an injunction against it under

7

the principles of equity and on terms that the court considers reasonable." *Organovo*, 162 A.3d at 122.

Granite is actively orchestrating a campaign to disrupt MetTel's operations and interfere with its existing and potential customer relations. These malicious efforts are precisely the kinds of bad acts this Court is empowered to enjoin, even though they include speech. *CapStack Nashville 3 LLC*, 2018 WL 3949274, at *6 (courts "are receptive to the idea that such malicious business falsehoods were subject to injunctive restraint, particularly when the statements invoked another tort doctrine as well.").

Granite attempts to avoid this point by arguing incorrectly, in cursory fashion in a footnote, that MetTel is not asserting a "traditional" trade libel claim. Ans. Br. at 19 n. 6. A traditional "trade libel" claim involves the disparagement of a business's goods or services. *CapStack Nashville 3 LLC*, 2018 WL 3949274, at *6. Here, Granite's disparaging statements have damaged, and will continue to damage, MetTel's services. Granite is not merely making false statements about MetTel's business reputation generally. It is targeting its malicious falsehoods at MetTel's ███ MetTel provides customized, integrated and managed telecommunications solutions, including voice, data, wireless, and cloud solutions, for its customers. ███

███

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████

Finally, Granite incorrectly argues that *CapStack* is materially indistinguishable from this case. Ans. Br. at 19. In *CapStack*, the Court held that injunctive relief would be an unconstitutional restraint because plaintiffs had pled only a thin cause of action for "defamation and/or trade libel" insufficient to overcome the traditional maxim and invoke the court's equitable powers. *CapStack Nashville 3 LLC*, 2018 WL 3949274, at *5–6. The court concluded that plaintiffs' claim was more accurately characterized as a claim for defamation seeking both injunctive relief and monetary damages. *Id.* at *5.

To plead a traditional "trade libel" claim, the plaintiff in *CapStack* should have pled that the defendant has disparaged not only plaintiff's general business reputation, but plaintiff's *specific goods or services* as well:

> [T]he Plaintiffs' trade-libel claim is not of the traditional variety; it does not involve disparagement of goods. Instead, the Plaintiffs allege that the Defendants have falsely accused Blatt of lying in an offering memorandum, thereby harming the Plaintiffs' pecuniary interests. In my view, these allegations are insufficient to overcome the longstanding rule forbidding pretrial injunctions against speech.

████████████████████████

████████████████████████████████████

*Id.* at \*6.  Without a valid trade libel claim, the Court was left with a garden-variety defamation claim in which plaintiffs were seeking to enjoin speech.  *Id.* at \*4. Injunctive relief, therefore, was not appropriate.

Here, MetTel has adequately pled an independent claim for trade libel.  As explained above and in the Complaint, Granite has actively disparaged ████ ████████████████████████████████████████████████████████████ ██████It is doing so in a way that tortiously interferes with MetTel's existing and prospective business relationships.  MetTel's trade libel claim also does not seek monetary damages, as plaintiffs' claim sought in *CapStack*.

Injunctive relief is appropriate here.  The irreparable harm to MetTel's reputation and business will continue if Granite is not ordered to terminate its campaign immediately.

## B.    MetTel has sufficiently pled irreparable harm meriting injunctive relief.

Granite repeatedly argues that MetTel has failed to demonstrate that it has suffered damages or irreparable harm.  Ans. Br. at 20–22.  But MetTel is not required to prove that it has already suffered specific and actual irreparable harm to support its request for injunctive relief.  Rather, it must show only "a reasonable likelihood of irreparable harm if injunctive relief is not granted."  *Eisenberg v. Chicago Milwaukee Corp.*, 537 A.2d 1051, 1055–56 (Del. Ch. 1987).  *See also CapStack*

*Nashville 3 LLC,* 2018 WL 3949274, at *3 (plaintiff must demonstrate "that irreparable harm *will likely result* absent a TRO.") (emphasis added).  If a plaintiff pleads a non-frivolous claim of wrongful conduct and shows a threat of resulting imminent irreparable harm, a TRO may issue.  *CBS Corp. v. Nat'l Amusements, Inc.*, 2018 WL 2263385, at *3 (Del. Ch. May 17, 2018).

MetTel is also not required to prove actual damages in order to obtain injunctive relief.  *See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Price*, 1989 WL 108412, at *2–4 (Del.Ch. Sept.13, 1989) (irreparable harm shown even though damages resulting from solicitation of plaintiff's customers were incalculable, because one cannot know how customers would have behaved in the absence of defendant's solicitation); *Singh v. Envtl. Assocs., Inc*., 2003 WL 21039115, at *9 (Del. Ch. May 21, 2003) (monetary value of lost customers recruited by former employer was impossible to calculate and constituted irreparable harm in context of a request for injunctive relief).

MetTel has pled facts that demonstrate a probability of irreparable harm in the absence of a TRO.  As explained throughout the Complaint, MetTel has irrefutable evidence that Granite personnel have spread false and misleading rumors ███ ████████████████████████████████████████████████████████████ ██████████████████████ MetTel has further alleged how these statements damage current and potential customers' trust in MetTel's services and its business,

11

compromising existing and future relationships in a way that may never be overcome.

Granite incorrectly states that, "[a]ccording to MetTel, out of its entire nationwide customer base, Granite personnel contacted two customers." Ans. Br. at 4. It is true that MetTel only has *hard proof* of two clients targeted by Granite, because those two customers happened to reach out to MetTel with their questions and concerns; however, even this limited evidence suggests the existence of other MetTel customers that have been targeted. *See* (Exhibit B to Complaint). The critical question, and the impetus for expedited discovery, therefore, is how many customers were told these lies and *did not* reach out to MetTel for the truth—and how many of them have been or will be induced to terminate their relationship, or not even consider doing business with, MetTel.

The Complaint pleads specific facts showing it is likely that Granite's efforts will or have extended well beyond these two customers, perhaps to all of MetTel's current clients and its prospective clients: (i) the two clients from whom MetTel has received reports have no relationship to one another; (ii) one of the emails from Granite reveals that it has met with several other MetTel customers; (iii) the apparent involvement of Granite's CEO indicates that this was a high-level, company-wide, coordinated effort, not a one-off incident; and (iv) the messages to MetTel's clients involved different Granite personnel in different geographic regions. These facts go

12

well beyond proof of "mere apprehension of uncertain damage" and "speculative" fear of irreparable harm. Ans. Br. at 13 (citations omitted). They demonstrate that irreparable harm to MetTel's services, business, and reputation are probable and imminent.

Perhaps just as convincing as the facts pled by MetTel is that Granite's answering papers include no evidence refuting any of those facts. Nor has it submitted affidavits refuting MetTel's repeated assertion that Granite is in the midst of a coordinated campaign to convince MetTel's customers and potential customers

████████████████████████████████████████████ MetTel

believes that discovery will prove definitively that Granite has not refuted these allegations because it cannot—because they are true.

Granite is correct that, under some circumstances, monetary damages may be sufficient to compensate a plaintiff for reputational harm due to a defendant's defamatory statements. Ans. Br. at 22. That does not mean, however, that equitable relief is foreclosed whenever a plaintiff has suffered harm to its reputation. Equity may intervene in those cases, such as here, where restraint becomes essential to the preservation of a business or other property interests threatened by other tortious acts. *Pitman*, 47 A.2d at 724–25.

As shown in MetTel's moving brief and discussed further *infra*, this misconduct constitutes defamation, trade libel, tortious interference, and violations

13

of Delaware's Deceptive Trade Practices Act, harming MetTel's services, business, and reputation, which cannot be remedied by monetary damages alone. *See Organovo Holdings, Inc.*, 162 A.3d at 122 ("Courts have recognized that a request for equitable remedies for tortious interference with prospective economic advantage can provide the requisite basis for equitable jurisdiction that can justify a related injunction against future speech."); *see also Bancroft Life & Cas. ICC, Ltd. v. Intercontinental Mgmt. Ltd.*, 456 F. App'x 184, 190 (3d Cir. 2012) (injunction prohibiting tortious interference appropriate); *Horizon Pers. Commc'ns, Inc. v. Sprint Corp.*, 2006 WL 2337592, at *24 (Del. Ch. Aug. 4, 2006) ("The loss of control of reputation, loss of trade, and loss of goodwill constitute irreparable injury."); 6 *Del. C.* § 2533(a) ("A person likely to be damaged by a deceptive trade practice of another may be granted an injunction against it under the principles of equity and on terms that the court considers reasonable.").

Granite's trade libel, tortious interference, and violations of Delaware's Deceptive Trade Practices Act are causing, and will continue to cause, irreparable harm to MetTel's services, reputation, and business operations if a TRO is not issued.

### C.    The balancing of equities strongly favors granting MetTel's requested relief.

Granite's primary argument that the balancing of equities favors denying MetTel's application for a TRO is that injunctive relief would act as an

unconstitutional prior restraint on free speech.  As discussed above, that argument fails on several grounds.

Granite's argument that the requested relief is grossly overbroad also fails in the face of MetTel's second, more narrowly tailored request that Granite be "enjoined from making any false or misleading statements about MetTel or its business operations."

Granite also argues that "MetTel has tools at its disposal to mitigate and even cure any alleged harm without the need for a court order restraining Granite's speech and competition rights."  Ans. Br. at 24.  More easily said than done.  It is far from likely that MetTel would be able to convince every concerned and lost customer and prospect that ███████████████████████████████████████████████ ███████████████████████████████████████  More importantly, however, MetTel cannot use the "tools at its disposal" unless it knows the identity of the customers to which Granite made these misrepresentations.  Granite has thus provided a strong argument in favor of expedited discovery so MetTel can determine the scope of its campaign of misinformation.

But even knowing every existing and potential customer to whom Granite made these false and misleading statements, and even with all the "tools at its disposal," MetTel could never entirely undo the damage to its services and business reputation.  As stated in the Complaint, once that seed has been planted, the client

15

will undertake a critical look at a provider with which it had been perfectly happy. There is simply no way MetTel will ever know how far the wind carried Granite's vicious fabrication beyond its immediate recipients, or to assure it can adequately comfort recipients who are already distracted by the exigencies of the pandemic crisis that Granite is exploiting.  The only way to secure any level of control over the deceit is by prohibiting Granite from spreading it further.

Finally, Granite claims that MetTel comes to this Court with "unclean hands" because MetTel's Chief Operating Officer, Andoni Economou, "ordered" a MetTel Senior Vice President, Tim Hanley, to ███████████████████████ ██████████████████████████████  Ans. Br. at 7, 25–26.  This is untrue.

Unclean hands "is a doctrine designed to protect the integrity of a court of equity, not a weapon to be wielded by parties seeking to excuse their own inequitable behavior by pointing out a trifling instance of impropriety by their counterpart." *Portnoy v. Cryo-Cell Intern., Inc.*, 940 A.2d 43, 81 (Del. Ch. 2008).  The doctrine of unclean hands bars the claim of a plaintiff in equity when the plaintiff has engaged in "reprehensible conduct" that bears a direct, immediate and necessary relation to the matter in controversy before the court.  *Nakahara v. NS 1991 Am. Trust*, 739 A.2d 770, 791–92 (Del. Ch. 1998).

16

Here, there is no evidence of any wrongdoing by MetTel, let alone the kind of reprehensible conduct necessary to warrant a finding of unclean hands.  A review of the source of this accusation—a statement in an email exchange found at Exhibit C to the Complaint—shows that the "clear implication" Granite draws from the statement is anything but.  The exact quote is as follows: ██████████████

████████████████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████ This was not Mr. Economou "ordering" or "directing" Mr. Hanley to spread the rumor that ██████████████ ████████████████████ Mr. Economou was merely recounting something he had heard indicating that it is Granite, and not MetTel, that ████████████ Mr. Economou did not intend that statement as an order or directive to Mr. Hanley, and Mr. Hanley did not understand it that way.  *See* Declarations of A. Economou and T. Hanley.  Accordingly, Mr. Hanley did not pass the information along to this, or any other, customer.  *See* T. Hanley Decl.

The balance of equities clearly favors entry of a TRO enjoining Granite's tortious conduct.

**D.    The Complaint asserts colorable claims for relief against Granite.**

MetTel's Complaint and moving brief show that it easily clears the relatively low bar of asserting at least one colorable claim.  *Arkema Inc. v. Dow Chem. Co*.,

████████████████████████████████

██████████████████████████████████████████████████

2010 WL 2334386, at *3 (Del. Ch. May 25, 2010) (citation omitted); *Allen v. News Corp.*, 2005 WL 415095, at *1 (Del. Ch. Feb. 3, 2005) (plaintiffs seeking expedited proceedings need only show that their claims are "sufficiently colorable" and that "there is the possibility of a threatened irreparable injury."); *Morton v. Am. Mktg. Indus. Holdings, Inc.*, 1995 WL 1791090, at *2 (Del. Ch. Oct. 5, 1995) (court determining whether plaintiff merits expedited proceedings does not judge the merits of the case or "even the legal sufficiency of the pleadings.").

### 1. Granite's statements to MetTel's customers are neither true nor reasonable statements based on known facts.

Cutting across all of Granite's arguments that MetTel has not pled even one colorable claim is its assertion that the statements its personnel made about MetTel's ██████████████████████████████████████████ Ans. Br. at 3. *See also* Ans. Br. at 8–12, 32–33, 37. But they *are* untrue, and a review of Granite's exhibits shows that it did not have a single fact that provided a reasonable basis for the statements.

Granite points first to evidence that a handful of other telecom companies are ██████████████ Ans. Br. at 9. But the existence of other competitors known to be ████████████████████████████████████████████████ ████████████████████████████████████████████████

18

Granite next relies on its Exhibits 2 and 3 as evidence that Mr. Easton had a

reasonable basis for telling MetTel's customer that MetTel ███████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

The fact that MetTel had ████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████  ███████████████████████████████████████

██████████████████████████████████████  ███████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████  That information, therefore,

does not supply any facts upon which Granite could form a reasonable belief that

████████████████████████████████████████████

   ██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

████████████████████████████████████████████  ██████████████████

███████████████████████████████████████████████████████████████████

───────────────
2 ██████████████████████████████████████████████████████████████
██████████████████████████████████████████
██ █████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████
                                   19
                    █████████████████████████████████████████
      ███████████████████████████████████████████████████████████

████████████████████████████████████  A sophisticated business

entity like Granite understands this.

Not only do these documents not support Mr. Easton's statement that MetTel

is ████████████████████████████  there is no indication that he

was even aware of these documents or based his statement in any way on them.

Granite next claims that MetTel recently ████████████████████████

████████████████████████  Ans. Br. at 11.  But the Declaration

of Mr. Balestraci and the emails attached thereto as exhibits show nothing of the

kind.  They show that MetTel ████████████████████████████

████████████████████████████████████████To

quote the exact language used by MetTel in that email:

████████████████████████████
████████████████████████████
████████████████████████████
████████████████████████████
████████████████████████████
████████████████████████████
████████████████████████████
████████████████████████████
████████████████████████████
██████████████████████

────────────────────

████████████████████████████████
████████████████  █ ████████████████
████████████████████████████████
████████████████████████████████
████████████████████

████████████████████████
████████████████████████████████

Balestraci Cert. Ex. A (April 14, 2020 email from Salame (MetTel) to Balestraci (Granite)).  Nothing in this email supports Granite's assertion that ██████████

████████████████████████████████████████████████████████

And true to form, Granite indicated it had no interest in helping out its own customers who are hurting during the current crisis.  *See* Balestraci Ex. B, April 28, 2020, email from Sullivan (MetTel) to Ballestraci (Granite) ("Knowing Rand's unlikely desire to offer anything (i.e.; 'why would I want to help them?'), I cannot think of anything else that would provide immediate benefit that customers are looking for.").[4]

Granite also points to the Declaration of its Director of Carrier Relations, Geoff Cookman.  But that evidence likewise does not support Granite's assertion that the statements made about MetTel's ████████████████ were true.  Mr. Cookman recounts only that Mr. Sullivan of MetTel inquired whether Granite would be willing to ████████████████████████████████████████ ████████████████ Cookman Decl., ¶ 7. ████████████████████████

---

[4] Despite the fact that nothing in MetTel's inquiry indicated that it was looking for ████████████████████████████ Mr. Ballestraci offered this decidedly unhelpful yet perplexing response: ████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████ Balestraci Ex. B, April 28, 2020, email from Ballestraci to Sullivan.

████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████    *Id.* at ¶ 8 (emphasis added).  Unless Mr. Sullivan believed that

Granite was ████████████████████████████████████████

████████████████

      Moreover, these emails were generated *after* Granite began its campaign, as there is no indication that Mr. Easton based his statements on either the information recorded in the Ballestraci Declaration and exhibits, or in the Cookman Declaration. Nor is there any indication that information was even shared with him.  That evidence, therefore, does not show that Mr. Easton's statements about MetTel's ████████████████ were true, or even that they provided him with a reasonable basis to make those statements.

      Finally, Granite attaches the Declaration of its Vice President of Channel Sales, Charles Pagliazzo, who recounts that some unidentified MetTel sales agent in an undated conversation informed him that MetTel ████████████████████

████████████████████████████████████████████████████

████████████████████████    Irrespective of whether Mr. Pagliazzo was actually given this information by an unidentified sales agent, it is not true.  A. Economou Decl.

████████████████████████████████████████████

████████████████████████████████████████████████████

Granite has provided no evidence that it has a reasonable basis to believe that the misrepresentations it is spreading ██████████████████████████ As such, those misrepresentations form a valid basis for MetTel's claims in this lawsuit.

### 2.    MetTel's Complaint states a colorable claim for defamation.

Granite incorrectly argues that this Court does not have jurisdiction to adjudicate MetTel's defamation claim because whether a defendant made a false statement and whether it did so with actual malice is a jury issue in the first instance. Ans. Br. at 28–30 (citing *Perlman v. Vox Media, Inc.*, 2019 WL 2647520, at *1 (Del. Ch. June 27, 2019)).

Notwithstanding its findings in *Perlman*, this Court will issue injunctive relief for defamation claims if the defamation furthered another claim that independently warranted injunctive relief. *See, e.g.*, *Pitman*, 47 A.2d at 725 ("When, however, a court of equity has jurisdiction on some grounds, the American courts will also usually enjoin the continued publication of a trade libel incident thereto. That is true when the libel is accompanied by some act of unfair business competition, if irreparable damage is imminent."). As described above, in *Pitman*, the defendant sought a preliminary injunction prohibiting further publication of defamatory letters by the plaintiff. The court issued the requested injunction, concluding that "intimidating possible customers . . . should they deal with the complainant, comes within the necessary conclusion . . . that a continued course of wrongful action may

23

ordinarily be stopped by injunction, although it includes a trade libel."  *Id.* at 726 (internal quotation marks omitted).  Granite's efforts ███████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████  fall into the same category.

Similarly, in *Organovo Holdings*, the Court noted: "Courts have recognized that a request for equitable remedies for tortious interference with prospective economic advantage can provide the requisite basis for equitable jurisdiction that can justify a related injunction against future speech." *Organovo Holding*, 162 A.3d at 122.  MetTel brings such a claim against Granite, and correctly alleges that there is no adequate remedy at law. *See* Compl., Count II.

Granite next argues that the challenged statements were not defamatory.  Ans. Br. at 30–33.  But MetTel has already shown that Granite's statements were untrue, had no valid factual basis, and were motivated by a malicious intent to drive customers away from MetTel's services and toward Granite's services.

Granite likewise gets no traction from the argument that a customer's report that a Granite employee (presumably Mr. Easton) told them that MetTel was ████████ ████████████████s not actionable defamation because it is a paraphrase.  Ans. Br. at 32.  Delaware law only requires a plaintiff to allege "the substance of the defamatory statements," not the exact words used. *See, e.g., Conley v. Conley*, 2015 WL

███████████████████████

████████████████████████████████

7747431, at *1 (Del. Super. Ct. Nov. 19, 2015) ("At a minimum, the plaintiff, in a defamation suit must identify the substance of the defamatory statements and whether they were actually published."); *Smith v. Delaware State Police*, 2014 WL 3360173, at *7 (Del. Super. Ct. July 8, 2014) (same).  MetTel's allegation provides the substance of the defamatory statement, identifies when the conversation took place, and the two entities involved.

Mr. Easton declares that he has no memory of ever saying that MetTel ███ ██████████████████████████ Easton Decl., ¶ 7.  Significantly, he does not say that he never *made* the statement, only that he does not *recall* making the statement.  He also does not deny that he made the customer call recounted in the email, and he does not deny that he told the customer something that it could have reasonably understood to mean that MetTel ██████████████ Accordingly, even if ████████████████ is a paraphrase of what was communicated to the customer by Granite, it still forms the basis for a valid defamation claim.

Finally, the statements at issue are not pure opinions, as Granite suggests. Ans. Br. at 31–32.  While expressions of pure opinion are not actionable as defamatory, this "does not provide a 'wholesale defamation exemption for anything that might be labeled opinion.'"  *Kanaga v. Gannett Co.*, 687 A.2d 173, 177 (Del. 1996) (quoting *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 18 (1990)).  "A statement is not a protected opinion simply because it contains 'colorful language,

catchy phrases or hyperbole.'" *Ramunno v. Cawley*, 705 A.2d 1029, 1038 n.34 (Del. 1998) (citation omitted).

Moreover, when an opinion is accompanied by "'the facts upon which [the declarant] bases his opinion, and those facts are either *incorrect* or *incomplete,* or [the declarant's] assessment of them is erroneous, the statement may still imply a false assertion of fact.  Simply couching such statements in terms of opinion does not dispel these implications.'"  *Kanaga*, 687 A.2d at 177–78 (quoting *Milkovich*, 497 U.S. at 17) (emphasis added).  Thus, a "speaker may not insulate himself or herself from liability simply by phrasing defamatory statements as opinions where an imbedded defamatory fact may be inferred."  *Ramunno,* 705 A.2d at 1036. Whether a statement implies a false assertion of fact is examined from "the entire context of the published statements, considered from the viewpoint of the average reader."  *Sunstar Ventures, LLC v. Tigani*, 2009 WL 1231246, at *7 (Del. Super. Apr. 30, 2009) (quoting *Kanaga*, 687 A.2d at 179).

Here, at no point did Mr. Easton employ phrases like "I believe" or "in my opinion," which, although insufficient to prove opinion by themselves, may indicate to the hearer that the declarant is stating his personal opinion.  Rather, the email contains declarative statements relaying information ███████████████

███████████████████████████████████

26

███████████████████

███████████████████████████████

Compl. ¶ 20.  Based on the plain language alone, the average reader would not and could not conclude that any of these statements are Easton's "opinions."

Moreover, these statements also imply that Easton and Granite have access to ████████████████████████████████████████████ *See Ramunno*, 705 A.2d at 1036 (statement defamatory where factual basis for statement is not disclosed by declarant).  Indeed, the customer here was left to speculate as to the facts upon which the statements were made.  Granite knows that a customer receiving such information during the current crisis is even more likely to assume it is based on facts and believe it. ███████████████████████████████████

████████  That alone makes these statements defamatory.

### 3. The Complaint states colorable claims for Tortious Interference and Trade Libel.

As shown in MetTel's moving brief, the Complaint states colorable claims for Tortious Interference and Trade Libel.  Opening Br. 12–15.  Granite's arguments against this proposition—that there is evince of only two impacted customers, that allegations that the campaign extended far beyond these two customers are pure speculation, and that the statements at issue are non-actionable opinions (Ans. Br. at 7–8, 21, 28)—have been addressed and refuted above.

27

███████████████████████████
████████████████████████████████

### 4.   MetTel has pled a colorable claim for violation of Delaware's Uniform Deceptive Trade Practices Act.

Granite incorrectly asserts that: "[T]he [DTPA] is not available to litigants who cannot show any evidence of wrongful conduct or injury taking place in Delaware." Ans. Br. at 33 (quoting *Ninespots, Inc. v. Jupai Holdings, Ltd.*, 2018 WL 3626325, at *13 (D. Del. July 30, 2018) (citing *Guidance Endodontics, LLC v. Dentsply Int'l, Inc.*, 663 F. Supp. 2d 1138 (D.N.M. 2009))).  This is an inaccurate statement of Delaware law.  First, the *Ninespots* court cited to a District of New Mexico case precisely because "there is a lack of Delaware case law regarding this specific issue." *Ninespots*, 2018 WL 3626325, at *13.  Moreover, the court in *Ninespots* did not actually address the issue, nor confirm that the holding of *Guidance Endodontics* is consistent with existing Delaware law. *Id.* ("I do not need to decide whether the Act can apply if the actions and injury did not take place in Delaware, because Plaintiff is unable to meet one of the other requirements for standing under the Act.").

Granite's other arguments—that the DTPA does not apply because this case involves only three isolated statements, and because MetTel's common law claims are not colorable (Ans. Br. at 33–35)—have been addressed earlier and refuted.

### E.   These proceedings should be expedited.

Granite's primary arguments against expedition are that MetTel's claims are "weak" and that there is no evidence that imminent irreparable harm is likely without

emergent injunctive relief.  Ans. Br. at 36–37.  There is no need to address Granite's arguments here, as they have been thoroughly addressed above and in MetTel's moving brief.   Moreover, a plaintiff seeking expedited proceedings need demonstrate only "a *sufficient possibility* of threatened irreparable injury." *Giammargo v. Snapple Beverage Corp.*, 1994 WL 672698, at *2 (Del. Ch. Nov. 15, 1994) (emphasis added).  The court conducts only "an almost superficial factual assessment" of the bad acts.  *Cty. of York Employees Ret. Plan v. Merrill Lynch & Co.*, 2008 WL 4824053, at *6 (Del. Ch. Oct. 28, 2008).  MetTel has pled colorable claims and shown more than a sufficient possibility of threatened irreparable injury.

Granite's only other argument against expediting these proceedings is the "substantial burden it will impose on Granite and the Court."  Ans. Br. at 38.  Granite reasons that, "[e]ven in normal times," proceeding on an expedited basis would be difficult and expensive, given that party and third-party witnesses and documents are located "around the country—both the MetTel customers identified in the Complaint and other customers MetTel 'believes' were contacted by Granite—in order to determine who Granite spoke with, the circumstances of those communications, the precise content of Granite's statements, whether and how MetTel's customers reacted to those communications, and any communications those customers received from MetTel." *Id.*

Granite exaggerates the burden on the parties and the Court.  The number and identity of the MetTel customers and potential customers who received false and misleading information on ███████████ from Granite can be discovered in short order via focused interrogatories and document requests to Granite.  To the extent those communications were via email or text, they too can be easily gathered and produced.  Only once that information is produced can the parties determine the necessity of deposing the declarants and recipients of the offending communications and seeking the production of documents from third parties.  It may be that only a handful of depositions and third party productions are needed, or it may be that several are needed.  But this Court should not decline to expedite these proceedings based solely on Granite's unsubstantiated concerns that discovery will be onerous.

But if initial discovery reveals that, as MetTel believes, the scope of Granite's nefarious campaign is very broad, Granite cannot be heard to complain that the discovery burden on it will be too great.  It should have considered that before it began the campaign.

Remarkably, Granite suggests that the proceedings should not be expedited because "[t]hese are not normal times."[5]  Ans. Br. at 39.  *But it is precisely because*

---

[5] These may actually be particularly opportune times for discovery that ranges over a wide geographic area, inasmuch as depositions, document productions, and court conferences are generally taking place remotely at this time.  Parties, counsel, and the courts are equipped for this new reality, and gathering documents and taking

*these are not "normal times" that we are here in the first place.*  Granite chose to capitalize on these "not normal" times, using the current crisis as the backdrop for its campaign ████████████████████████████████████ ████████████████████████.  It would be the height of injustice to delay the proceedings until "normal" times resume (which may still be many months in the future), and thereby allow Granite to finish using the COVID-19 pandemic to its own contemptible advantage.[6]

## III.   CONCLUSION

For the foregoing reasons and those expressed in MetTel's moving brief, MetTel respectfully requests that the Court grant its Motion for a Temporary Restraining Order and Motion to Expedite.

---

depositions across the country is no more difficult or expensive right now than if all witnesses and documents were in the same state.

[6] Granite cites three recent cases in which the court declined to expedite proceedings because of the coronavirus pandemic.  Ans. Br. at 39 (citing *Snow Phipps Grp., LLC v. KCake Acquisition, Inc.*, C.A. No. 2020-0282-KSJM (Del. Ch. Apr. 17, 2020); *The We Co. v. Softbank Grp. Corp.*, C.A. No. 2020-0258-AGB (Del. Ch. Apr. 17, 2020); *Conduent Business Servs., LLC v. Sky View Capital, LLC*, C.A. No. 2020-0232- JTL (Del. Ch. Mar. 30, 2020).  But none of those cases involved a defendant that was actively *using the pandemic* to harm a competitor's business and asking the court to not to expedite *because of the pandemic*.  Nor is there any indication in those opinions that the court would have declined to expedite in these circumstances.

Dated: June 1, 2020                 **K&L GATES LLP**

*/s/ Steven L. Caponi*
Steven L. Caponi (No. 3484)
Matthew B. Goeller (No. 6283)
600 King Street, Suite 901
Wilmington, DE 19801
Phone: (302) 416-7000
steve.caponi@klgates.com
matthew.goeller@klgates.com

*Of counsel:*

Anthony P. La Rocco, Esq.
Dana B. Parker, Esq.
Charles F. Rysavy, Esq.
K&L Gates LLP
One Newark Center, Tenth Floor
Newark, NJ 07102
anthony.larocco@klgates.com
dana.parker@klgates.com
charles.rysavy@klgates.com

*Counsel for Plaintiff Manhattan*
*Telecommunications Corp.*

Words: 7,559

*MANHATTAN TELECOMMUNICATIONS CORP. D/B/A METROPOLITAN TELECOMMUNICATIONS, A/K/A METTEL v. GRANITE TELECOMMUNICATIONS, LLC*
Court of Chancery of the State of Delaware
C.A. No. 2020-0380-JRS

A67
Certificate of Service to [PUBLIC VERSION] Reply Brief in Support of
Plaintiff's Motion for Temporary Restraining Order and Motion to Expedite

06/08/20

EFiled:  Jun 08 2020 05:32PM EDT
Transaction ID 65684065
Case No. 2020-0380-JRS

**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

MANHATTAN TELECOMMUNICATIONS
CORP., D/B/A METROPOLITAN
TELECOMMUNICATIONS, A/K/A
METTEL,

       Plaintiff,

   v.

GRANITE TELECOMMUNICATIONS, LLC,

       Defendant.

C.A. No. 2020-0380-JRS

<u>**CERTIFICATE OF SERVICE**</u>

I, Steven L. Caponi, hereby certify that on this 8th day of June, 2020, I caused (1) *Public Version of Reply Brief in Support of Plaintiff's Motion for a Temporary Restraining Order and Motion to Expedite* and (2) this *Certificate of Service* to be filed and served by electronic filing on the following:

MORRIS, NICHOLS, ARSHT
& TUNNELL LLP
R. Judson Scaggs, Jr.
Barnaby Grzaslewicz
A. Gage Whirley
1201 North Market Street, 16th Floor
Wilmington, Delaware 19801

/s/ Steven L. Caponi
Steven L. Caponi (No. 3484)