# Exhibit 1

EFiled:  May 27 2020 04:47PM EDT
Transaction ID 65660504
Case No. 2020-0380-JRS

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| MANHATTAN TELECOMMUNICATIONS CORP., D/B/A METROPOLITAN TELECOMMUNICATIONS, A/K/A METTEL, | C.A. No. |
| Plaintiff, | ▮▮▮▮▮▮▮▮▮ |
| v. | **PUBLIC VERSION** **FILED MAY 27, 2020** |
| GRANITE TELECOMMUNICATIONS, LLC, | |
| Defendant. | |

### VERIFIED COMPLAINT

Plaintiff Manhattan Telecommunications Corp., d/b/a Metropolitan Telecommunications, a/k/a MetTel ("MetTel" or "Plaintiff"), by way of its Complaint against Defendant Granite Telecommunications, LLC ("Granite" or "Defendant"), alleges as follows:

### NATURE OF ACTION

1.     It is often said that a crisis will bring out the best and the worst in people.  Defendant Granite falls decidedly into the latter category.

2.     During these unprecedented times, when Americans are being exhorted to join together, to use their resources to help one another and defeat a common enemy, Granite has taken the lowest of roads.  It is taking advantage of the legitimate fear and uncertainty gripping the nation by using an ongoing campaign to spread

*even more—but completely false—fear and uncertainty* about a competitor, MetTel, so it can steal MetTel's current and potential clients and thereby increase its own profits.

3.      MetTel discovered that Granite has undertaken a coordinated effort, which appears to stretch from entry level sales personnel all the way to the CEO, to contact current and potential MetTel clients and tell them that ███████████████ ████████████████████████████████████ These statements are completely false without any basis in fact, and Granite either knows they are false or is recklessly indifferent to whether they are true or false.  Granite is making these false statements to sow doubt with MetTel's existing and potential clients about ███████ ██ ██ ████ ███ ██ ████ ██ ██ ██ ████ ███████ ████████████████████████████

4.      Granite's conduct is even more despicable because many of MetTel's clients are in healthcare, public service, public safety, and federal, state and local governments.  MetTel provides essential services for its clients—a service all the more essential under the current circumstances, when the majority of employees in the U.S. who are able to do so are working solely by telecommuting, and telecommunications is the only practical way to remain connected to patients, customers and the public.  Even more so during these times, clients need to know they are partnered with ████████████████████████████████████

████████████████████████████████████

████████████████████████ which they are with MetTel.  False word of

MetTel's ████████████████████ is the kind of rumor that will spread

throughout the market and poison MetTel's prospects, particularly among those for

whom an interruption in telecommunications services would be the most devastating

at this time: healthcare and government operations on the front lines of the pandemic.

5.      Without this Court's immediate intervention, there is a high probability

that Granite's malicious campaign will succeed, and MetTel's business and its

reputation will be irreparably damaged.

## PARTIES

6.      Plaintiff MetTel is a privately-held corporation organized under the

laws of Delaware, with its principal place of business in New York, New York.

MetTel's registered agent for service of process is: Corporation Service Company,

251 Little Falls Drive, Wilmington, DE 19808.

7.      Defendant Granite is a limited liability company organized under the

laws of Delaware, with its principal place of business in Quincy, Massachusetts.  Its

registered agent for service of process is Corporate Creations Network Inc., 3411

Silverside Road, Tatnall Building, Suite 104, Wilmington, DE, 19810.

## JURISDICTION

8. This Court has subject matter jurisdiction in accordance with 10 *Del. C.* § 341.

9. This Court has jurisdiction to award injunctive relief in accordance with Ct. Ch. R. 65.

## FACTS

10. MetTel provides customized, integrated and managed communications solutions for enterprise clients. By converging all communications over a proprietary network, MetTel enables clients to deploy and manage technology-driven voice, data, wireless, and cloud solutions globally. Its MetTel Portal® enables clients to manage their inventory, usage, spend, and repairs from one simple, user-friendly interface.

11. Granite describes itself as one of the premier telecommunications solutions providers for businesses across the United States and Canada, and the leading corporate phone service provider to multi-location companies.

12. MetTel has spent more than twenty years building a reputation for reliability among its clients and in the marketplace. Reliability is a critical characteristic for telecommunications companies. One key to reliability is ███ ███████████████████ That, in turn, makes ████████████████ critically important to its clients.

████████████████████████████████

The Pandemic

13.     The global crisis caused by the COVID-19 pandemic is without parallel since the Spanish Flu pandemic of a century ago.  To date, approximately 1.5 million people in the United States have contracted the virus and approximately 90,000 have died.  Of those numbers, approximately 153,000 nursing home residents and workers have been infected and approximately 28,100 have died.

14.     The COVID-19 pandemic has had a devastating economic impact as well.  The U.S. economy suffered its most severe contraction in more than a decade in the first quarter of the year.  To date, more than 36 million American workers have filed for unemployment benefits since the pandemic took hold and the national unemployment rate is nearly 15 percent.  The Dow Jones Industrial Average is down approximately 17% year to date.

15.     COVID-19 has also caused unprecedented disruptions in the daily lives of all Americans, resulting in major changes in behavioral patterns with the usual day-to-day functioning being put on hold for an indefinite period.  Not surprisingly, experts have reported a significant increase in depression, post-traumatic stress disorder, substance abuse, domestic violence, and child abuse.

16.     It is this grim reality that Granite saw as a shameful opportunity to enrich itself by capitalizing on the public's fears.  Not content to simply capitalize

on the public's existing, well-founded fears, Granite took an even lower step by generating *new* fears with misinformation about MetTel.

Granite's Ongoing Campaign of Lies

17.    Granite has begun telling MetTel's current and potential clients—falsely ███████████████████████████████████████████

██████████████████    The purpose of the campaign is to convince MetTel's clients and potential clients that MetTel is █████████████████████████████

███████████████████████████████████████

18.    Granite has executed this ongoing campaign via e-mails, voice mail messages, and telephone conversations with MetTel clients for the specific purpose of damaging MetTel's business and harming its reputation.

19.    In late April 2020, MetTel learned for the first time that Granite might be spreading false information about MetTel.  MetTel received an email from one of its clients that was concerned and confused about a voice mail it received on April 24, 2020, from a client relations professional at Granite.  The caller indicated he had some unsettling information about MetTel that he would share when the client returned the call.  ████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████Exhibit A.

20.   On May 12, 2020, MetTel learned that Granite had contacted another MetTel client, this one an operator of assisted living and memory care retirement communities.  The client forwarded to MetTel an email by the Senior Director of Healthcare at Granite, who was attempting to schedule a call between Granite's Chief Executive Officer and the Chairman of the Board and CEO of the client.  In a follow-up email of the same date explaining the purpose for the call, the Senior Director made it clear that Granite wanted to take the client's business away from MetTel.  As a rationale for why the client would be interested in leaving MetTel and taking its business to Granite, he said that ███████████████████████████████ ████████████████████████████████████████  Exhibit B.

21.   The client was understandably confused and concerned about this information and sought reassurances from MetTel.

22.   These statements were blatantly false.  MetTel is not ████████████ ████████████████████████████████████████████ ██████████████████████

23.   Moreover, there is no legitimate way that Granite had ██████████ ████ upon which to base these statements.  ████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████

████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

Granite was spreading harmful "facts" about MetTel with a gross indifference to whether those "facts" were true or false. Obviously, the truth or falsity of these statements did not matter to Granite because the statements benefitted Granite.

24.     The Chief Information Officer of the same client that was contacted on May 12, 2020, informed MetTel that around the same time as the Granite Senior Director's email, Granite personnel called the client's CEO's assistant with the message that MetTel was ████████████████. Exhibit C. The client's CIO reported that the CEO was *very* concerned by this information and that the news had spread very quickly within the client's organization. *Id.*

25.     Again, this information was false. █████████████████████. And Granite was not privy to any valid information that would have allowed it to reach that conclusion legitimately.

26.     Finally, in his May 11, 2020, email, the Granite Senior Director stated that Granite had made presentations to some of MetTel's other clients, all of whom were in the healthcare field. Upon information and belief, Granite made the same misrepresentations about █████████████████████.

27.     One of these clients has not returned MetTel's calls and has rejected efforts to set up a meeting with MetTel since being contacted by Granite. Met Tel

████████████████████████████████████████

has concluded that it most likely lost that client's future business due to Granite's campaign.

28.     Granite's campaign of misinformation against MetTel cannot be excused as the actions of one or two rogue employees.  The Granite Senior Director was attempting to set up a call between the client's CEO *and the CEO of Granite*. Thus, the campaign apparently is being orchestrated with the knowledge, approval, and participation of the highest level executives at Granite.

### The Harm to MetTel

29.     MetTel believes that Granite personnel have contacted many, if not all, of MetTel's other current clients, as well as its prospective clients, and disseminated the same or similar false, misleading, and defamatory statements about MetTel.  This belief is based on the fact that: (i) MetTel has received these reports from two different clients, who have no relationship to one another; (ii) one of the emails from Granite reveals that it has met with several MetTel customers; (iii) the apparent involvement of Granite's CEO indicates that this was not a one-off incident; and (iv) the messages to MetTel's clients involved different Granite personnel in different geographic regions.

30.     Given the critical nature of telecommunications services, once a doubt has been raised about ███████████████, a client would be duty-bound to investigate; it could not ignore an assertion of risk to its critical infrastructure.  Once

that seed has been planted, the client will undertake a critical look at a provider with which it had been perfectly happy.  The client may terminate the contract based on a pretext when the termination is actually caused by unresolved doubts about ██ ████████████████

31.    Given the importance of ██████████████████████████ of a telecommunications provider, there is a real risk that MetTel will be asked to bid on fewer and fewer contracts going forward as Granite's lies circulate throughout the marketplace.

32.    Thus, the irreparable harm to MetTel's reputation and business will continue, most likely increasing substantially, if Granite is not brought to task and ordered to terminate its campaign immediately.

33.    Moreover, MetTel's reputation and goodwill in the industry has already been harmed.  It appears likely that it has already lost clients or potential clients. Granite must be held liable to compensate MetTel for these losses.

## COUNT ONE
### Defamation

34.    All paragraphs set forth above are incorporated by reference as if fully set forth herein.

35.    Granite published and continues to publish to third persons false and defamatory statements about MetTel, as detailed above.

36.     These third parties have understood the nature of these statements, that they referred to MetTel, and that they were damaging to MetTel's reputation.

37.     These statements also constitute defamation *per se* in that they were and are made with actual malice, attempting to take advantage of the fear and uncertainty of a global catastrophe, and contain false and defamatory information about MetTel's business.

38.     As a direct and proximate result of Granite's defamation and defamation *per se*, MetTel has suffered damages, including general (presumed) damages, actual damages (e.g., loss of future or continued business from current clients and prospective clients) and irreparable to its business reputation and goodwill, and will continue to suffer such harm in the future.

<u>**COUNT TWO**</u>
**Tortious Interference with Prospective Economic Advantage**

39.     All paragraphs set forth above are incorporated by reference as if fully set forth herein.

40.     The false and misleading statements by Granite interfered with MetTel's prospective economic advantage.  Upon information and belief, one or more clients were prepared to enter into a business relationship with MetTel, but were persuaded not to do so by Granite's dissemination of false information.

41.     The false and misleading statements by Granite interfered with MetTel's prospective economic advantage by also inducing a currently unknown

number of prospective clients to not enter into business relationships with MetTel. The number and identities of these additional prospective clients are known only to Granite and will be revealed in discovery.

42. Granite's actions were intentional and without justification, leveraging a national emergency for personal gain.

43. As a direct and proximate result of Granite's actions, MetTel has suffered significant harm and will continue to suffer significant harm in the future, which may not be adequately compensable with monetary damages.

44. MetTel has no adequate remedy at law.

### COUNT THREE
### Tortious Interference with Contractual Relations

45. All paragraphs set forth above are incorporated by reference as if fully set forth herein.

46. Granite was, and is, aware of the business and contractual relationships between MetTel and its clients.

47. MetTel has a reasonable expectation that its business and contractual relationships with its clients will continue.

48. As described in detail herein, Granite's intentional interference with MetTel's rights has deprived, and continues to deprive, MetTel of the benefit of its bargains, and impaired the value of its contractual relationships with its clients.

49.     Granite's ongoing campaign to interfere with MetTel's business and contractual relationships with its clients is designed for an improper purpose, uses improper means, and is not legally justified.

50.     Granite's ongoing interference with MetTel's business and contractual relationships has directly and proximately caused, and will in the future directly and proximately cause, significant harm to MetTel, including monetary damages.

51.     As a direct and proximate result of Granite's actions, MetTel has suffered significant harm and will continue to suffer significant harm in the future, which may not be adequately compensable with monetary damages.

52.     MetTel has no adequate remedy at law.

## COUNT FOUR
### Trade Libel

53.     All paragraphs set forth above are incorporated by reference as if fully set forth herein.

54.     Granite has made, published, and transmitted statements directed to MetTel's *existing* clients that Granite knows are false or were made with reckless disregard for the truth or falsity of the statements, and that were intended to result in harm to MetTel, and Granite continues to do so.

55.     Upon information and belief, Granite has made, published, and transmitted statements directed to MetTel's *prospective* clients that Granite knows are false, that were made with reckless disregard for the truth or falsity of the

statements, and that were intended to result in harm to MetTel, and Granite continues to do so.

56.     Granite's conduct exploits a national crisis with the specific intent of prejudicing MetTel in the conduct of its business and causing it monetary and reputational harm.

57.     Granite does not enjoy any privilege to make false, misleading and/or disparaging statements about MetTel.

58.     As a direct and proximate result of Granite's actions, MetTel has suffered significant harm and will continue to suffer significant harm in the future, which may not be adequately compensable with monetary damages.

59.     Without judicial intervention, Granite will continue to falsely disparage MetTel.

60.     MetTel has no adequate remedy at law.

## COUNT FIVE
### Deceptive Trade Practices, 6 Del. C. § 2532

61.     All paragraphs set forth above are incorporated by reference as if fully set forth herein.

62.     Delaware Statute 6 *Del. C.* § 2532, which prohibits deceptive trade practices, provides in relevant part:

> (a)  A person engages in a deceptive trade practice when, in the course of a business, vocation, or occupation, that person:

\* \* \*

(8)   Disparages the goods, services, or business of another by false or misleading representation of fact;

\* \* \*

(12)  Engages in any other conduct which similarly creates a likelihood of confusion or of misunderstanding.

63.   Granite and MetTel are in commercial competition in the market for telecommunications solutions.

64.   As part of an ongoing campaign to influence clients to purchase Granite's services, Granite has disparaged MetTel through false and misleading statements in emails, voice mails, and in telephone calls to MetTel's *existing* clients regarding MetTel's ███████████████████████████████

██████████████████████████████████████████████

████████████

65.   Upon information and belief, as part of an ongoing campaign to influence clients to purchase Granite's services, Granite has disparaged MetTel through false and misleading statements in emails, voice mails, and in telephone calls to MetTel's *prospective* clients regarding MetTel's ████████████

██████████████████████████████████████████████

███████████████████████████

66.     Granite's false and misleading statements have violated 6 *Del. C.* §§ 2532(a)(8) and (a)(12) by misrepresenting and disparaging MetTel's business operations.

67.     Granite's false and misleading statements have deceived and/or have the tendency to deceive MetTel's clients and potential clients and the public in general regarding the characteristics and qualities of MetTel's services and commercial activities.

68.     Granite's false and misleading statements are material because they are likely to influence the decisions of clients and potential clients of MetTel's services, and/or have the tendency to deceive MetTel's clients and potential clients and the public in general regarding the critical issue of ███████████████████

███████████████████████

69.     Granite's actions have been intentionally and deliberately undertaken during a global pandemic for the purposes of causing confusion, mistake and deception and for the purpose of enabling Granite to profit unfairly and at the expense of MetTel.

70.     As a direct and proximate result of Granite's actions, MetTel has suffered significant harm to date, including monetary damages, and will continue to cause significant harm in the future.

## **REQUEST FOR RELIEF**

WHEREFORE, MetTel requests judgment against Granite as follows:

A.   Preliminarily enjoining Granite from making any statements about MetTel or its business operations to any current MetTel client;

B.   Preliminarily and permanently enjoining Granite from making any false or misleading statements about MetTel or its business operations;

C.   Finding that Granite defamed MetTel;

D.   Finding that Granite tortiously interfered with MetTel's contractual rights;

E.   Finding that Granite tortiously interfered with MetTel's prospective economic advantage;

F.   Finding that Granite committed trade libel;

G.   Finding that Granite violated Delaware Statute 6 *Del. C.* § 2532;

H.   Awarding damages to compensate MetTel for harm it has sustained in consequence of Granite's actions, including prejudgment and post-judgment interest;

I.   Awarding MetTel permissible statutory damages pursuant to Delaware Statute 6 *Del. C.* § 2532, including but not limited to treble damages and attorneys' fees;

J.      Referring this matter to the Delaware Attorney General upon finding of

        Granite's willful violation of Delaware Statute 6 *Del. C.* § 2532 for

        possible imposition of a civil fine pursuant to 6 *Del. C.* § 2533(e);

K.      Awarding MetTel its costs and attorneys' fees; and

L.      Granting other and further relief as this Court deems just and proper.


Dated: May 19, 2020                    **K&L GATES LLP**

                                       */s/ Steven L. Caponi*
                                       Steven L. Caponi (No. 3484)
                                       Matthew B. Goeller (No. 6283)
                                       600 King Street, Suite 901
                                       Wilmington, DE 19801
                                       Phone: (302) 416-7000
                                       steve.caponi@klgates.com
                                       matthew.goeller@klgates.com

                                       *Counsel for Plaintiff Manhattan*
                                       *Telecommunications Corp.*

**EFiled:  May 27 2020 04:52PM EDT**
**Transaction ID 65660589**
**Case No. 2020-0380-JRS**

# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| MANHATTAN TELECOMMUNICATIONS CORP., D/B/A METROPOLITAN TELECOMMUNICATIONS, A/K/A METTEL, | C.A. No. |
| Plaintiff, | ███████████████ |
| v. | **PUBLIC VERSION** **FILED MAY 27, 2020** |
| GRANITE TELECOMMUNICATIONS, LLC, | |
| Defendant. | |

## OPENING BRIEF IN SUPPORT OF PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER AND MOTION TO EXPEDITE

**K&L GATES LLP**
Steven L. Caponi (No. 3484)
Matthew B. Goeller (No. 6283)
600 King Street, Suite 901
Wilmington, DE 19801
Phone: (302) 416-7000
steve.caponi@klgates.com
matthew.goeller@klgates.com

*Counsel for Plaintiff Manhattan Telecommunications Corp.*

Dated: May 19, 2020

# TABLE OF CONTENTS

Page(s)

I.     INTRODUCTION .................................................................................... 1

II.     FACTUAL BACKGROUND................................................................... 2

     A.     MetTel and Granite ........................................................................ 2

     B.     The COVID-19 Pandemic .............................................................. 3

     C.     Granite's Ongoing Campaign of Lies ............................................ 4

     D.     The Harm to MetTel........................................................................ 8

III.     ARGUMENT.......................................................................................... 9

     A.     Legal Standards .............................................................................. 9

     B.     MetTel Has Asserted Colorable Claims.......................................... 11

         1.     Defamation............................................................................ 11

         2.     Tortious Interference with Prospective Economic
             Advantage ............................................................................ 12

         3.     Tortious Interference with Contractual Relations.................. 13

         4.     Trade Libel............................................................................ 14

         5.     Deceptive Trade Practices...................................................... 15

     C.     MetTel Is Suffering and Will Continue to Suffer Irreparable
         Harm................................................................................................ 17

     D.     The Balance of Equities Favors an Injunction ................................. 20

     E.     The Court Should Grant Expedition ................................................ 21

IV.     CONCLUSION........................................................................................ 22

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allen v. News Corp.*,
  2005 WL 415095 (Del. Ch. Feb. 3, 2005) ....................................................10, 21

*Arkema Inc. v. Dow Chem. Co.*,
  2010 WL 2334386 (Del. Ch. May 25, 2010)....................................................9

*Bancroft Life & Cas. ICC, Ltd. v. Intercontinental Mgmt. Ltd.*,
  456 F. App'x 184 (3d cir. 2012) ...........................................................19

*Box v. Box*,
  697 A.2d 395 (Del. 1997) ...............................................................10

*CapStack Nashville 3 LLC v. MACC Venture Partners*,
  2018 WL 3949274 (Del. Ch. Aug. 16, 2018) ....................................................20

*Dieleuterio v. Pennell*,
  1985 WL 4567 (Del. Ch. Dec. 13, 1985)...........................................................17

*Horizon Pers. Commc'ns, Inc. v. Sprint Corp.*,
  WL 2337592 (Del. Ch. Augu. 4, 2006) .............................................................18

*IMO Daniel Kloiber Dynasty Trust*,
  98 A.3d 924 (Del. Ch. 2014) .............................................................17

*J. C. Pitman & Sons v. Pitman*,
  47 A.2d 721 (1946) ....................................................................18

*Morton v. Am. Mktg. Indus. Holdings, Inc.*,
  1995 WL 1791090 (Del. Ch. Oct. 5, 1995) .........................................................10

*Organovo Holdings, Inc. v. Dimitrov*,
  162 A.3d 102 (Del. Ch. 2017) ..........................................................12, 14, 19, 20

*Police & Fire Ret. Sys. of City of Detroit v. Bernal*,
  2009 WL 1873144 (Del. Ch. June 26, 2009)........................................................11

*Preston Hollow Capital LLC v. Nuveen LLC*,
  216 A.3d 1 (Del. Ch. 2019) .........................................................11, 14

ii

*Renco Grp., Inc. v. MacAndrews AMG Holdings*,
    2013 WL 209124 (Del. Ch. Jan. 18, 2013)......................................................10

*T. Rowe Price Recovery Fund, L.P. v. Rubin*,
    770 A.2d 536 (Del. Ch. 2000) ............................................................................20

*Trilogy Portfolio Co., LLC v. Brookfield Real Estate Fin. Partners, LLC*,
    2012 WL 120201 (Del. Ch. Jan. 30, 2012)..........................................................9

*WaveDivision Holdings, LLC v. Highland Capital Mgmt., L.P.*,
    49 A.3d 1168 (Del. 2012) ..................................................................................13

**Statutes**

6 *Del. C.* § 2531 *et seq.* ........................................................................15, 16, 17, 18

## I.      INTRODUCTION

During these unprecedented times, when Americans are being exhorted to join together, to use their resources to help one another and defeat a common enemy, Defendant Granite Telecommunications, LLC ("Granite") has taken the lowest of roads.  It is taking advantage of the legitimate fear and uncertainty gripping the nation by using an ongoing campaign to spread *even more—but completely false— fear and uncertainty* about a competitor, Plaintiff Manhattan Telecommunications Corp., d/b/a Metropolitan Telecommunications, a/k/a MetTel ("MetTel").  Granite has orchestrated this campaign in order to steal MetTel's current and potential clients and thereby increase its own profits.

MetTel has discovered that Granite has undertaken a coordinated effort, which appears to stretch from entry level sales personnel all the way to the CEO, to contact current and potential MetTel clients and tell them that MetTel ███████████ ███████████████████████████ These statements are completely false without any basis in fact, and Granite either knows they are false or is recklessly indifferent to whether they are true or false.  Granite is making these false statements to sow doubt with MetTel's existing and potential clients about ██████ ██ ███ ███████ and generate fear of losing essential telecommunications services in the near future.

Granite's conduct is even more despicable because many of MetTel's clients ███████████████████████ ████████████████████████████.

are in healthcare, public service, public safety, and federal, state and local governments.  MetTel provides essential services for its clients—a service all the more essential under the current circumstances, when the majority of employees in the U.S. who are able to do so are working solely by telecommuting, and telecommunications is the only practical way to remain connected to patients, customers, and the public.  Even more so during these times, clients need to know that ████████████████████████████████████████████████

████████████████████████████████████ False word of ████████████████████████████████ is the kind of rumor that will spread throughout the market and poison MetTel's prospects, particularly among those for whom an interruption in telecommunications services would be the most devastating at this time: healthcare and government operations on the front lines of the pandemic.

Without this Court's immediate intervention, there is a high probability that Granite's malicious campaign will succeed, and MetTel's business and its reputation will be irreparably damaged.

## II.    FACTUAL BACKGROUND

### A.    MetTel and Granite

Plaintiff MetTel is a privately-held corporation organized under the laws of Delaware, with its principal place of business in New York, New York.  Defendant

████████████████████████████████
████████████████████████████████████████████.

Granite is a limited liability company organized under the laws of Delaware, with its principal place of business in Quincy, Massachusetts.

MetTel provides customized, integrated and managed communications solutions for enterprise clients. By converging all communications over a proprietary network, MetTel enables clients to deploy and manage technology-driven voice, data, wireless, and cloud solutions globally. Its MetTel Portal® enables clients to manage their inventory, usage, spend, and repairs from one simple, user-friendly interface. Granite describes itself as one of the premier telecommunications solutions providers for businesses across the United States and Canada, and the leading corporate phone service provider to multi-location companies.

MetTel has spent more than twenty years building a reputation for reliability among its clients and in the marketplace. Reliability is a critical characteristic for telecommunications companies. One key to reliability is the ████████████ ████████ That, in turn, makes the ████████████████ critically important to its clients.

## B. The COVID-19 Pandemic

The global crisis caused by the COVID-19 pandemic is without parallel since the Spanish Flu pandemic of a century ago. To date, approximately 1.5 million people in the United States have contracted the virus and approximately 90,000 have

died.  Of those numbers, approximately 153,000 nursing home residents and workers have been infected and approximately 28,100 have died.

The COVID-19 pandemic has had a devastating economic impact as well. The U.S. economy suffered its most severe contraction in more than a decade in the first quarter of the year.  To date, more than 36 million American workers have filed for unemployment benefits since the pandemic took hold and the national unemployment rate is nearly 15 percent.  The Dow Jones Industrial Average is down approximately 17% year to date.

COVID-19 has also caused unprecedented disruptions in the daily lives of all Americans, resulting in major changes in behavioral patterns with the usual day-to-day functioning being put on hold for an indefinite period.  Not surprisingly, experts have reported a significant increase in depression, post-traumatic stress disorder, substance abuse, domestic violence, and child abuse.

It is this grim reality that Granite saw as a shameful opportunity to enrich itself by capitalizing on the public's fears.  Not content to simply capitalize on the public's existing, well-founded fears, Granite took an even lower step by generating *new* fears with misinformation about MetTel.

### C.    Granite's Ongoing Campaign of Lies

Granite has begun telling MetTel's current and potential clients—falsely—

███████████████████████████████████████████████████████

4

██████████████████████████████████████████

███████████████████████████████████████████████████████.

███████   The purpose of the campaign is to convince MetTel's clients and potential clients that MetTel is a decidedly unreliable telecom provider that will likely leave them without essential services when they are needed most.

Granite has executed this ongoing campaign via e-mails, voice mail messages, and telephone conversations with MetTel clients for the specific purpose of damaging MetTel's business and harming its reputation.

In late April 2020, MetTel learned for the first time that Granite might be spreading false information about MetTel.  MetTel received an email from one of its clients that was concerned and confused about a voice mail it had received on April 24, 2020, from a client relations professional at Granite.  The caller indicated that he had some unsettling information about MetTel that he would share when the client returned the call. ████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████ *See* Compl. Ex. A.

On May 12, 2020, MetTel learned that Granite had contacted another MetTel client, this one an operator of assisted living and memory care retirement communities.  The client forwarded to MetTel an email by the Senior Director of Healthcare at Granite, who was attempting to schedule a call between Granite's Chief Executive Officer and the Chairman of the Board and CEO of the client.  In a follow-up email of the same date explaining the purpose for the call, the Senior

████████████████████████████████

████████████████████████████████████████.

Director made it clear that Granite wanted to take the client's business away from

MetTel.  As a rationale for why the client would be interested in leaving MetTel and

taking its business to Granite, he said that ████████████████████████████

████████████████████████████████████████████ *See* Compl.

Ex. B.   The client was understandably confused and concerned about this

information and sought reassurances from MetTel.

These statements were blatantly false.  MetTel is not ████████████████

████████████████████████████████████████████████████████

██████████████████████ ████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████ Granite was spreading harmful "facts" about MetTel with a gross

indifference to whether those "facts" were true or false.  Obviously, the truth or

falsity of these statements did not matter to Granite because the statements benefitted

Granite.

6

██████████████████████████████████████

████████████████████████████████████████████████

The Chief Information Officer of the same client that was contacted on May 11, 2020, informed MetTel that around the same time as the Granite Senior Director's email, Granite personnel called the client's CEO's assistant with the message that MetTel was ███████████████. *See* Compl. Ex. C. The client's CIO reported that the CEO was *very* concerned by this information and that the news had spread very quickly within the client's organization. *Id.*

Again, this information was false. ███████████████████████. And Granite was not privy to any valid information that would have allowed it to reach that conclusion legitimately.

Finally, in his May 11, 2020, email, the Granite Senior Director stated that Granite had made presentations to some of MetTel's other clients, all of whom were in the healthcare field. Upon information and belief, Granite made the same misrepresentations about MetTel's ███████████ to those clients.

One of these clients has not returned MetTel's calls and has rejected efforts to set up a meeting with MetTel since being contacted by Granite. MetTel has concluded that it most likely lost that client's future business due to Granite's campaign.

Granite's campaign of misinformation against MetTel cannot be excused as the actions of one or two rogue employees. The Granite Senior Director was attempting to set up a call between the client's CEO *and the CEO of Granite*. Thus,

the campaign apparently is being orchestrated with the knowledge, approval, and participation of the highest level executives at Granite.

### D.     The Harm to MetTel

MetTel believes that Granite personnel have contacted many, if not all, of MetTel's other current clients, as well as its prospective clients, and disseminated the same or similar false, misleading, and defamatory statements about MetTel. This belief is based on the fact that: (i) MetTel has received these reports from two different clients, who have no relationship to one another; (ii) one of the emails from Granite reveals that it has met with several MetTel customers; (iii) the apparent involvement of Granite's CEO indicates that this was not a one-off incident; and (iv) the messages to MetTel's clients involved different Granite personnel in different geographic regions.

Given the critical nature of telecommunications services, once a doubt has been raised about a provider's reliability, a client would be duty-bound to investigate; it could not ignore an assertion of risk to its critical infrastructure. Once that seed has been planted, the client will undertake a critical look at a provider with which it had been perfectly happy. The client may terminate the contract based on a pretext when the termination is actually caused by unresolved doubts about █

████████████

██████ ████████ ███ █████ ████ ██ ██ ████ ██████ ██ █

████████████████████████ means that there is a real risk that MetTel will be asked to bid on fewer and fewer contracts going forward as Granite's lies circulate throughout the marketplace. Thus, the irreparable harm to MetTel's reputation and business will continue, most likely increasing substantially, if Granite is not brought to task and ordered to terminate its campaign immediately. Moreover, MetTel's reputation and goodwill in the industry has already been harmed. It appears likely that it has already lost clients or potential clients. Granite must be held liable to compensate MetTel for these losses.

## III.   ARGUMENT

### A.   Legal Standards

"A TRO is a special remedy of short duration designed primarily to prevent imminent irreparable injury pending a preliminary injunction or final resolution of a matter." *Trilogy Portfolio Co., LLC v. Brookfield Real Estate Fin. Partners, LLC*, 2012 WL 120201, at *4 (Del. Ch. Jan. 30, 2012). To obtain a Temporary Restraining Order, the applicant need only demonstrate: (1) a colorable claim on the merits; (2) a threat of irreparable harm if relief is not granted; and (3) a balance of the hardships that favors the applicant. *Arkema Inc. v. Dow Chem. Co*., 2010 WL 2334386, at *3 (Del. Ch. May 25, 2010) (citation omitted).

In addition, this Court has broad power to expedite proceedings. Delaware courts are "always receptive to expediting any type of litigation in the interests of affording justice to the parties." *Box v. Box*, 697 A.2d 395, 399 (Del. 1997). The threshold for obtaining expedited proceedings is low—plaintiffs seeking expedited proceedings need only show that their claims are "sufficiently colorable" and that "there is the possibility of a threatened irreparable injury." *Allen v. News Corp*., 2005 WL 415095, at *1 (Del. Ch. Feb. 3, 2005). Whether that showing is met is assessed on the face of the pleadings—when considering whether to grant expedition, the Court does not judge the merits of the case or "even the legal sufficiency of the pleadings." *Morton v. Am. Mktg. Indus. Holdings, Inc*., 1995 WL 1791090, at *2 (Del. Ch. Oct. 5, 1995).

As this Court has instructed, "[t]he burden on a plaintiff in seeking an expedited proceeding is not high. 'A party's request to schedule an application for a preliminary injunction, and to expedite the discovery related thereto, is normally routinely granted. Exceptions to that norm are rare.'" *Renco Grp., Inc. v. MacAndrews AMG Holdings*, 2013 WL 209124, at *1 (Del. Ch. Jan. 18, 2013) (quoting *In re Ness Technologies, Inc.*, 2011 WL 3444573, at *2 (Del. Ch. Aug. 3, 2011)).

The Court should grant the Motion for a Temporary Restraining Order because MetTel has demonstrated "a sufficiently colorable claim and the possibility

10

of irreparable harm in the absence of relief." *See Police & Fire Ret. Sys. of City of Detroit v. Bernal*, 2009 WL 1873144, at *1 (Del. Ch. June 26, 2009).  The verified allegations set forth in the Complaint justify the relative expense and inconvenience of expedited proceedings in this action.

### B.    MetTel Has Asserted Colorable Claims

#### 1.    Defamation

MetTel has asserted a valid claim for defamation.  "Defamation is generally understood as 'a false publication calculated to bring one into disrepute.' Ordinarily, the elements of defamation are: (1) defamatory communication; (2) publication; (3) reference to the plaintiff; (4) third party's understanding of the communication's defamatory character; and (5) injury."  *Preston Hollow Capital LLC v. Nuveen LLC*, 216 A.3d 1, 9 (Del. Ch. 2019) (internal citations omitted).  As MetTel explains in its Complaint, Granite published and continues to publish to third persons false and defamatory statements about MetTel.  These third parties have understood the nature of these statements, that they referred to MetTel, and that they were damaging to MetTel's reputation.  These statements also constitute defamation *per se* in that they were and are made with actual malice and contain false and defamatory information about MetTel's business.

As a direct and proximate result of Granite's defamation and defamation *per se*, MetTel has suffered damages, including the loss of future business from current

████████████████████████████

████████████████████████████████.

clients and prospective clients, and irreparable harm to its business reputation and goodwill.  Without judicial intervention, MetTel will continue to suffer such harm in the future.

### 2. Tortious Interference with Prospective Economic Advantage

MetTel has asserted a valid claim for tortious interference with prospective economic advantage.  To state such a claim, MetTel must plead "(a) the reasonable probability of a business opportunity, (b) the intentional interference by the defendant with that opportunity, (c) proximate causation, and (d) damages." *Organovo Holdings, Inc. v. Dimitrov*, 162 A.3d 102, 122 (Del. Ch. 2017).

As explained in the Complaint, Granite's false and misleading statements have interfered with MetTel's prospective economic advantage.  Upon information and belief, one or more clients were prepared to enter into a business relationship with MetTel, but were persuaded not to do so by Granite's dissemination of false information.  The false and misleading statements by Granite interfered with MetTel's prospective economic advantage by also inducing a currently unknown number of prospective clients to not enter into business relationships with MetTel. The number and identities of these additional prospective clients are known only to Granite and will be revealed in discovery.  Granite's actions were intentional and without justification, leveraging a national emergency for personal gain.

### 3.    Tortious Interference with Contractual Relations

MetTel has asserted a valid claim for tortious interference with contractual relations.  To prevail on a claim for tortious interference with contractual relations, MetTel must show that: "(1) there was a contract, (2) about which the particular defendant knew, (3) an intentional act that was a significant factor in causing the breach of contract, (4) the act was without justification, and (5) it caused injury." *WaveDivision Holdings, LLC v. Highland Capital Mgmt., L.P.*, 49 A.3d 1168, 1174 (Del. 2012).

MetTel has various existing contractual relations with its customers and clients.  Granite was, and is, aware of these contractual relationships.  MetTel has a reasonable expectation that its business and contractual relationships with its clients will continue.  As described in the Complaint, Granite's intentional interference with MetTel's rights has deprived, and continues to deprive, MetTel of the benefit of its bargains, and impaired the value of its contractual relationships with its clients.  Granite's ongoing campaign to interfere with MetTel's business and contractual relationships with its clients is designed for an improper purpose, uses improper means, and is not legally justified.  Granite's ongoing interference with MetTel's business and contractual relationships has directly and proximately caused, and will in the future directly and proximately cause, significant harm to MetTel.

### 4.    Trade Libel

MetTel has asserted a valid claim for trade libel.  Trade libel is "a libelous statement to consumers that falsely disparages a plaintiff's goods or services." *Preston Hollow Capital LLC*, 216 A.3d at 13.  Plaintiffs are entitled to relief under the concept of trade libel for "any injury to economic advantage arising from false derogatory statements." *Organovo Holdings, Inc.*, 162 A.3d at 120.

As explained in the Complaint, Granite has made, published, and transmitted statements directed to MetTel's *existing* clients that Granite knows are false or were made with reckless disregard for the truth or falsity of the statements, and that were intended to result in harm to MetTel.  And Granite continues to do so.  Upon information and belief, Granite has also made, published, and transmitted statements directed to MetTel's *potential* clients that Granite knows are false, that were made with reckless disregard for the truth or falsity of the statements, and that were intended to result in harm to MetTel.  And Granite continues to do so.

Granite's conduct was undertaken with the specific intent of prejudicing MetTel in the conduct of its business, disparaging its goods and services, and causing it monetary and reputational harm.  Granite does not enjoy any privilege to make false, misleading and/or disparaging statements about MetTel.  As a direct and proximate result of Granite's actions, MetTel has suffered significant harm and will

14

continue to suffer significant harm in the future, which may not be adequately compensable with monetary damages.

### 5.   Deceptive Trade Practices

MetTel has asserted a valid claim that Granite has violated Delaware's Uniform Deceptive Trade Practices Act. 6 *Del. C.* § 2531 *et seq.*  Under this statute,

> (a) A person engages in a deceptive trade practice when, in the course of a business, vocation, or occupation, that person:
>
> *   *   *
>
> (8)   Disparages the goods, services, or business of another by false or misleading representation of fact;
>
> *   *   *
>
> (12) Engages in any other conduct which similarly creates a likelihood of confusion or of misunderstanding.

6 *Del. C.* § 2532(a).

As explained in the Complaint, Granite and MetTel are in commercial competition in the market for telecommunications solutions.  As part of an ongoing campaign to influence clients to purchase Granite's services, Granite has disparaged MetTel through false and misleading statements in emails, voice mails, and in telephone calls to MetTel's *existing* clients regarding ████████████

██████████████████████████████████████████

███████████████████████████

Upon information and belief, as part of an ongoing campaign to influence clients to purchase Granite's services, Granite has disparaged MetTel through false

and misleading statements in emails, voice mails, and in telephone calls to MetTel's *prospective* clients regarding ███████████████████████████

███████████████████████████████████████████████

███████████████████████ Granite's false and misleading statements have violated 6 *Del. C.* §§ 2532(a)(8) and (a)(12) by misrepresenting and disparaging MetTel's business operations.

Granite's false and misleading statements have deceived and/or have the tendency to deceive MetTel's clients and potential clients and the public in general regarding the characteristics and qualities of MetTel's services and commercial activities.  Granite's false and misleading statements are material because they are likely to influence the decisions of clients and potential clients of MetTel's services, and/or have the tendency to deceive MetTel's clients and potential clients and the public in general regarding the critical issue of ███████████████████ ██████████████████████████ Granite's actions have been intentionally and deliberately undertaken for the purposes of causing confusion, mistake and deception and for the purpose of enabling Granite to profit unfairly and at the expense of MetTel.  As a direct and proximate result of Granite's actions, MetTel has suffered significant harm to date, including monetary damages, and will continue to cause significant harm in the future.

16

These allegations present a valid claim for a violation of Delaware's Deceptive Trade Practices Act.  Under 6 *Del C.* § 2533(a), "[a] person likely to be damaged by a deceptive trade practice of another may be granted an injunction against it under the principles of equity and on terms that the court considers reasonable."  Granite's violation of the Deceptive Trade Practices Act may also result in referral to the Delaware Attorney General.  *See* 6 *Del. C.* § 2533(e) ("If a court of competent jurisdiction finds that any person has willfully violated this subchapter, upon petition to the court by the Attorney General in the original complaint or at any time following the court's finding of a willful violation, the person shall forfeit and pay to the State a civil penalty of not more than $10,000 for each violation.").

## C.     MetTel Is Suffering and Will Continue to Suffer Irreparable Harm

Of the three factors necessary for this Court to issue a temporary restraining order, irreparable harm is the most important: "it is the *sine qua non* for this form of relief." *IMO Daniel Kloiber Dynasty Trust*, 98 A.3d 924, 937 (Del. Ch. 2014).  "The purpose of a temporary restraining order is to preserve the *status quo* to enable the plaintiff to adequately . . . prepare his case and demonstrate his entitlement to ultimate relief." *Dieleuterio v. Pennell*, 1985 WL 4567, at *2 (Del. Ch. Dec. 13, 1985).  "[Courts] usually enjoin the continued publication of a trade libel incident thereto. That is true when the libel is accompanied by some act of unfair business

competition, if irreparable damage is imminent." *J. C. Pitman & Sons v. Pitman*, 47 A.2d 721, 725 (1946).  Injunctive relief is also appropriate and necessary to address Granite's tortious interference and violations of the Deceptive Trade Practices Act. *See Organovo Holdings, Inc.*, 162 A.3d at 122; 6 *Del. C.* § 2533(a) ("A person likely to be damaged by a deceptive trade practice of another may be granted an injunction against it under the principles of equity and on terms that the court considers reasonable.").

Here, Granite has caused, and, without judicial intervention, will continue to cause imminent and irreparable harm to MetTel's business reputation and its relationship with its customers.  "The loss of control of reputation, loss of trade, and loss of goodwill constitute irreparable injury." *Horizon Pers. Commc'ns, Inc. v. Sprint Corp.*, 2006 WL 2337592, at *24 (Del. Ch. Aug. 4, 2006).  Injunctive relief is necessary to enjoin Granite from continuing to disparage MetTel's services and cause harm to its business reputation and relations with clients.

As explained throughout the Complaint, MetTel has a reasonable basis to believe that Granite personnel have contacted many, if not all, of MetTel's current clients, as well as its prospective clients, and disseminated false, misleading, and defamatory statements about MetTel's services, impugning its reliability and misrepresenting that ███████████████████████.  MetTel has received reports from at least two different clients, and emails MetTel has obtained

18

reveal that Granite has met with several other MetTel customers.  This ongoing campaign appears to have been orchestrated by Granite's top management.

MetTel's reputation and goodwill in the industry have already been harmed. It appears likely that it has already lost clients and potential clients, and that it will continue to lose clients and potential clients in the future if Granite is not stopped. Given the importance of ███████ ████ █ ██ ████ ██████ ██ █ ████████████████ MetTel risks losing out on contracts going forward as Granite's lies about ███████████████ spread rapidly throughout the marketplace.  The irreparable harm to MetTel's reputation and business will continue if Granite is not brought to task and ordered to terminate its campaign immediately.

In addition, Granite's intentional interference with MetTel's contracts has deprived, and continues to deprive, MetTel of the benefit of its bargains, and impaired the value of its contractual relationships with its clients.  This misconduct cannot be remedied by monetary damages alone.  *See Organovo Holdings, Inc.*, 162 A.3d at 122 ("Courts have recognized that a request for equitable remedies for tortious interference with prospective economic advantage can provide the requisite basis for equitable jurisdiction that can justify a related injunction against future speech."); *see also Bancroft Life & Cas. ICC, Ltd. v. Intercontinental Mgmt. Ltd.*, 456 F. App'x 184, 190 (3d Cir. 2012) (ruling that injunction for tortious interference

19

was warranted).   Granite's ongoing interference with MetTel's business and contractual relationships has directly and proximately caused, and will in the future directly and proximately cause, irreparable harm to MetTel without judicial intervention.

### D.  The Balance of Equities Favors an Injunction

Where the absence of an injunction would cause "substantial, imminent, and irreparable harm" to the movant, and the nonmovant is "not threatened with any harm," the balance of the equities favors the issuance of injunctive relief. *T. Rowe Price Recovery Fund, L.P. v. Rubin*, 770 A.2d 536, 558-59 (Del. Ch. 2000). Delaware courts have noted that speech could be used as a bludgeon to destroy competition without effective redress at law and are "receptive to the idea that such malicious business falsehoods were subject to injunctive restraint, particularly when the statements invoked another tort doctrine as well." *CapStack Nashville 3 LLC v. MACC Venture Partners*, 2018 WL 3949274, at *6 (Del. Ch. Aug. 16, 2018) (citing *Organovo Holdings, Inc.*, 162 A.3d at 120).

The balance of the equities clearly favors MetTel.  Through its ongoing efforts to disparage MetTel, Granite continues to impugn MetTel's services and impair MetTel's contractual relationships with customers, clients, and business partners.  In that way, Granite's case is not like *CapStack Nashville 3 LLC*, which involved merely lying in an offering memorandum, thereby harming the plaintiffs' pecuniary

interests. 2018 WL 3949274, at *6 (Del. Ch. Aug. 16, 2018). Here, Granite is directly harming MetTel's services and disrupting MetTel's ongoing contractual relations with its clients. In contrast, Granite would suffer no harm if the requested injunctive relief is ordered. A temporary restraining order would not risk restraining free speech, as Granite would being enjoined only from continuing tortious conduct that also violates the Deceptive Trade Practices Act and may result in referral to the Delaware Attorney General.

### E. The Court Should Grant Expedition

Plaintiffs seeking expedited proceedings need only show that their claims are "sufficiently colorable" and that "there is the possibility of a threatened irreparable injury." *Allen*, 2005 WL 415095, at *1. For all of the same reasons that the Court should grant the requested injunctive relief, MetTel urges this Court to expedite these proceedings. Expedited proceedings are especially critical in order to determine the full extent of the harm caused by Granite so that MetTel can act quickly to correct and mitigate the damage before MetTel's customers leave MetTel based on Granite's false statements. In the absence of judicial intervention, MetTel will continue to suffer irreparable injury as a result of Granite's misconduct.

## IV.   CONCLUSION

For the foregoing reasons, MetTel respectfully requests that the Court grant the Motion for a Temporary Restraining Order and Motion to Expedite and enter an order in the proposed form filed with this Motion.

Dated: May 19, 2020                 **K&L GATES LLP**

*/s/ Steven L. Caponi*
Steven L. Caponi (No. 3484)
Matthew B. Goeller (No. 6283)
600 King Street, Suite 901
Wilmington, DE 19801
Phone: (302) 416-7000
steve.caponi@klgates.com
matthew.goeller@klgates.com

*Counsel for Plaintiff Manhattan
Telecommunications Corp.*

Words: 4,689

# Exhibit 2

**GRANTED**

EFiled: May 27 2020 03:09PM EDT
Transaction ID 65660186
Case No. 2020-0380-JRS

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

|  |  |  |
|---|---|---|
| MANHATTAN TELECOMMUNICATIONS CORP. D/B/A METROPOLITAN TELECOMMUNICATIONS, A/K/A METTEL | ) ) ) ) ) | |
| Plaintiff, | ) ) | C.A. No. 2020-0380-JRS |
| v. | ) ) | |
| GRANITE TELECOMMUNICATIONS, LLC | ) ) | |
| Defendant. | ) | |

### [PROPOSED] ORDER GRANTING DEFENDANTS' MOTION FOR CONFIDENTIAL TREATMENT

Defendant Granite Telecommunications, LLC ("Granite") having filed a Motion for Confidential Treatment (the "Motion"), and for good cause shown,

IT IS HEREBY ORDERED, this ___ day of May, 2020, that:

1.     The Motion is GRANTED; and

2.     Granite may file its opposition to Plaintiff's Opening Brief in Support of Plaintiff's Motion for a Temporary Restraining Order and Motion to Expedite, and any related papers, as Confidential Filings subject to the requirements of Court of Chancery Rule 5.1.

_____
Vice Chancellor

This document constitutes a ruling of the court and should be treated as such.

| | |
|---|---|
| **Court:** | DE Court of Chancery Civil Action |
| **Judge:** | Joseph Slights |
| **File & Serve Transaction ID:** | 65657331 |
| **Current Date:** | May 27, 2020 |
| **Case Number:** | 2020-0380-JRS |
| **Case Name:** | CONF COMPLAINT Manhattan Telecommunications Corp. v. Granite Telecommunications, LLC |
| **Court Authorizer:** | Slights, Joseph |

**/s/ Judge Slights, Joseph**

# Exhibit 3

EFiled: Jun 04 2020 04:46PM EDT
Transaction ID 65677741
Case No. 2020-0380-JRS

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| MANHATTAN TELECOMMUNICATIONS CORP. D/B/A METROPOLITAN TELECOMMUNICATIONS, A/K/A METTEL | ) ) ) ) | |
| | ) | |
| Plaintiff, | ) | C.A. No. 2020-0380-JRS |
| | ) | |
| v. | ) ) | **PUBLIC VERSION EFILED ON JUNE 4, 2020** |
| GRANITE TELECOMMUNICATIONS, LLC | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT'S BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER AND MOTION TO EXPEDITE

DONNELLY, CONROY & GELHAAR, LLP
T. Christopher Donnelly (admitted *pro hac vice*)
Joshua N. Ruby (admitted *pro hac vice* )
260 Franklin Street, Suite 1600
Boston, MA 02110
(617) 720-2880

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
R. Judson Scaggs, Jr. (#2676)
Barnaby Grzaslewicz (#6037)
A. Gage Whirley (#6707)
1201 N. Market Street
Wilmington, DE 19801
(302) 658-9200

*Counsel for Defendant Granite Telecommunications, LLC*

May 28, 2020

# **TABLE OF CONTENTS**

I.   PRELIMINARY STATEMENT.........................................................................1

II.  RELEVANT BACKGROUND ......................................................................4

   A. MetTel's Allegations Against Granite.......................................................4

       ■     ██████████████ .............................................................5

       ■     ██████████████.............................................................5

       3.   The Unspecified Customer........................................................7

       4.   Speculation About Other Customers.........................................8

   B. MetTel's ███████████ ........................................................8

      1. The Highly Competitive Telecommunications Market ................9

      2. MetTel's ███████ ...............................................................10

      3. MetTel's ████████████████ .......................................11

III.  LEGAL STANDARD ...............................................................................13

IV.  METTEL'S MOTION FOR A TRO SHOULD BE DENIED ........................14

   A. Preliminary Injunctive Relief Is Unconstitutional And Unavailable Here .....14

   B. MetTel Has Not Shown That It Will Suffer Irreparable Harm ......................20

   C. The Balance Of Equities Favors Granite .....................................22

   D. MetTel Has Not Pleaded Colorable Claims .................................25

      1. MetTel's Tortious Interference And Trade Libel Claims...........26

      2. MetTel's Defamation Claim .......................................29

      3. MetTel's Claim Under The Delaware Deceptive Trade Practices Act........33

V.   METTEL'S MOTION TO EXPEDITE SHOULD BE DENIED ...................36

VI.  CONCLUSION ......................................................................40

i

# TABLE OF AUTHORITIES

**Cases**                                                        **Page(s)**

*Agar v. Judy*,
　　151 A.3d 456 (Del. Ch. 2017) ..........................................................32

*Alexander v. United States*,
　　509 U.S. 544 (1993)..............................................................14, 20

*Alpha Builders, Inc. v. Sullivan*,
　　2004 WL 5383570 (Del. Ch. Nov. 5, 2004) ...............................13, 21

*Aquila, Inc. v. Quanta Servs., Inc.*,
　　805 A.2d 196 (Del. Ch. 2002) .............................................13, 21, 23

*Auburn Police Union v. Carpenter*,
　　8 F.3d 886 (1st Cir. 1993)......................................................14, 16

*State ex rel. Brady v. Pettinaro Enters.*,
　　870 A.2d 513 (Del. Ch. 2005) ...............................................34-35

*CapStack Nashville 3 LLC v. MACC Venture Partners*,
　　2018 WL 3949274 (Del. Ch. Aug. 16, 2018) (Glasscock, V.C.) ...............*passim*

*Conduent Business Servs., LLC v. Sky View Capital, LLC*,
　　C.A. No. 2020-0232-JTL (Del. Ch. Mar. 30, 2020)..........................................39

*DeBonaventura v. Nationwide Mut. Ins. Co.*,
　　419 A.2d 942 (Del. Ch. 1980) ..........................................................27

*Doe v. Delaware, Dep't of Servs. for Children, Youth & Their
Families, Div. of Family Servs.*,
　　2016 WL 5416679 (D. Del. Sept. 27, 2016)......................................................31

*EDIX Media Grp., Inc. v. Mahani*,
　　2006 WL 3742595 (Del. Ch. Dec. 12, 2006)........................................34

*Eureka Resources, LLC v. Range Resources-Appalachia, LLC*,
　　62 A.3d 1233 (Del. Super. Ct. 2012)................................................26

ii

*In re Frontier Communications Corporation*,
Case No. 20-22476, ECF No. 1 (Bankr. S.D.N.Y. Apr. 14, 2020) ....................9

*Gannett Co. v. State*,
571 A.2d 735 (Del. 1989) ..................................................................................14

*Golden Cycle, LLC v. Allan*,
1998 WL 892631 (Del. Ch. Dec. 10, 1998) ......................................................24

*Grand Ventures, Inc. v. Whaley*,
632 A.2d 63 (Del. 1993) ....................................................................................35

*Incyte Corp. v. Flexus Biosciences, Inc.*,
2017 WL 7803923 (Del. Super. Ct. Nov. 1, 2017)......................................27, 29

*Irgau v. Christiana Care Health Servs.*,
2008 WL 1724250 (Del. Super. Ct. Apr. 9, 2008) ............................................28

*Ivanhoe Partners v. Newmont Mining Corp.*,
533 A.2d 585 (Del. Ch. 1987) ..........................................................................24

*J.C. Pitman & Sons v. Pitman*,
47 A.2d 721 (Del. Ch. 1946) ....................................................................... 17-19

*Lipson v. Anesthesia Servs., P.A.*,
790 A.2d 1261 (Del. Super. Ct. 2001)...............................................................23

*Nakahara v. NS 1991 Am. Trust*,
718 A.2d 518 (Del. Ch. 1998) ..........................................................................25

*Ninespots, Inc. v. Jupai Holdings, Ltd.*,
2018 WL 3626325 (D. Del. July 30, 2018) ......................................................33

*Nyer v. Munoz-Mendoza*,
385 Mass. 184, 188, 430 N.E.2d 1214, 1217 (1982)........................................26

*Opportunity Partners L.P. v. Blackrock N.Y.*,
2011 WL 1379066 (Del. Ch. Mar. 28, 2011) ...................................................36

*Organovo Holdings, Inc. v. Dimitrov*,
162 A.3d 102 (Del. Ch. 2017) (Laster, V.C.) ......................................... 16, 21-22

*Overdrive, Inc. v. Baker & Taylor, Inc.*,
2011 WL 2448209 (Del. Ch. June 17, 2011)......................................................28

*Parsons v. Digital River, Inc.*,
2015 WL 139760 (Del. Ch. Jan. 12, 2015)........................................................36

*Perlman v. Vox Media, Inc.*,
2019 WL 2647520 (Del. Ch. June 27, 2019) (Slights, V.C.) ................ 21, 29-30

*Preston Hollow Capital LLC v. Nuveen LLC*,
216 A.3d 1 (Del. Ch. 2019) (Glasscock, V.C.)..................................... 18-19, 30

*Regal Home Distribs. v. Gordon*,
66 A.2d 754 (Del. Super. Ct. 1949)..................................................................23

*Riley v. Moyed*,
529 A.2d 248 (Del. 1987) ................................................................................30

*Rosenberg Diamond Dev. Corp. v. Appel*,
290 A.D.2d 239, 735 N.Y.S.2d 528 (1st Dep't 2002).......................................26

*Sherwood v. Ngon*,
2011 WL 6355209 (Del. Ch. Dec. 20, 2011)....................................................25

*Singer v. Magnavox Co.*,
380 A.2d 969 (Del. 1977), *overruled on other grounds*,
*Weinberger v. UOP, Inc.*, 457 A.2d 701 (Del. 1983)........................................33

*Snow Phipps Grp., LLC v. KCake Acquisition, Inc.*,
C.A. No. 2020-0282-KSJM (Del. Ch. Apr. 17, 2020)........................................39

*Sonet v. Plum Creek Timber Co.*,
1998 WL 749445 (Del. Ch. Sept. 23, 1998).................................................. 37-38

*Southeastern Promotions, Ltd. v. Conrad*,
420 U.S. 546 (1975)........................................................................... 15-16

*Stevens v. Independent Newspapers, Inc.*,
1988 WL 25377, at *4 (Del. Super. Ct. Mar. 10, 1988)....................................31

*In re TriQuint Semiconductor, Inc. Stockholders Litig.*,
2014 WL 2700964 (Del. Ch. June 13, 2014)....................................................36

iv

*UbiquiTel Inc. v. Sprint Corp.*,
2005 WL 3533697 (Del. Ch. Dec. 14, 2005)................................................26, 34

*The We Co. v. Softbank Grp. Corp.*,
C.A. No. 2020-0258-AGB (Del. Ch. Apr. 17, 2020) .........................................39

*In re Williams Cos., Inc. Stockholder Litig.*,
2016 WL 197177 (Del. Ch. Jan. 13, 2016).........................................................36

**Rules and Statutes**

6 *Del. C.* 2633(a).......................................................................................................13

**Other Authorities**

*In re Registration of Security Certificate of Metropolitan
Telecommunications Corp. d/b/a MetTel*,
Docket No. S-2017-2589999 (Pa. Pub. Utility Comm'n, Feb. 22,
2017) .................................................................................................................10

v

Defendant Granite Telecommunications, LLC ("Granite") submits this Opposition to the Motion for a Temporary Restraining Order and Motion to Expedite of Plaintiff Manhattan Telecommunications Corp., d/b/a Metropolitan Telecommunications, a/k/a MetTel ("MetTel").

## I.    PRELIMINARY STATEMENT

MetTel has rushed into this Court seeking a TRO that is *literally unprecedented*. MetTel has not cited a single case—from Delaware or anywhere else—where a court issued a TRO enjoining a competing business from making allegedly false statements to customers. Nor could any such authority exist, for such a TRO would impose a prior restraint in violation of the Constitutions of the United States and Delaware. Such a TRO would further violate the long-standing rule that equity will not enjoin a libel.

Moreover, MetTel revealingly does not seek a TRO limiting Granite from making certain specific statements about MetTel. Instead, MetTel has asked this Court to enjoin "Granite from making any statements about MetTel or its business operations to any current MetTel client." (Mot. for TRO at 1.) Such a wildly overbroad TRO would stop Granite from communicating at all with any MetTel customer about anything concerning MetTel. In effect, MetTel asks this Court to muzzle Granite from making even unquestionably true statements about MetTel

1

and end Granite's ability to compete with MetTel.  Such a sweeping injunction is plainly unconstitutional and unwarranted here.

Even leaving aside that MetTel has asked this Court for unconstitutional relief that this Court has no power to award, MetTel has not met the familiar elements for issuing a TRO.  First, and most importantly, MetTel has not shown that it has suffered or will suffer the irreparable harm—or any harm at all—necessary to issue a TRO.  MetTel has not alleged—and cannot allege—that it sustained any *actual* loss related to anything Granite purportedly did.  And even if such losses had been pleaded—and they have not—lost customers and business opportunities are harms which Delaware courts routinely address by awarding damages.

Nor has MetTel shown that the balance of equities tilts in its favor.  MetTel seeks a wildly overbroad TRO that would eliminate Granite's free speech rights and its right to compete with MetTel, which would ultimately result in less competition in the marketplace and concomitant harm to consumers.  ███████

█████████████████████████████████████

MetTel's unconstitutional attempt to stifle legitimate competition coupled with its unclean hands on these matters foreclose any argument that the balance of the equities favors MetTel.

2

Furthermore, MetTel has not come to this Court with even colorable claims. At best, it alleges isolated, imprecise statements of opinion by two line-level Granite salespeople to two MetTel customers resulting in no harm to MetTel. Such bare-bones allegations do not make a colorable claim under any legal theory.

Moreover, even assuming arguendo the challenged opinions concerning MetTel's ████████████ could be construed as factual statements—which they cannot—those words are not untrue.  MetTel shows unmistakable signs of a ████████████████████████ Even before the current economic crisis, ████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████ ████████████████████████ ████████████████████████████████████████████ And Granite understands that, also around the same time, MetTel may have ████████████████████████████████████████ ████████████████████████████ Given the highly competitive telecommunications market—████████████████████████ ████████████████████████████████████████—Granite had good reason to believe that MetTel ████████████████ Opining as much to MetTel's customers is therefore not actionable and provides no basis for issuing a

3

TRO to preclude Granite personnel from discussing that risk—or anything else about MetTel—with the businesses that would be most directly impacted.

MetTel has also failed to clear the threshold required to expedite these proceedings.  MetTel's claims are not colorable, and it has not alleged even a reasonable possibility of irreparable injury that would warrant imposing the extra costs of expedited proceedings on both Granite and this Court.

Accordingly, and as discussed in more detail below, MetTel's Motion for TRO and Motion to Expedite should be denied.

## II.    RELEVANT BACKGROUND

### A. MetTel's Allegations Against Granite

Although MetTel's Complaint is filled with rhetoric accusing Granite of "tak[ing] the lowest of roads" to exploit the pandemic and orchestrating an "[o]ngoing [c]ampaign of [l]ies" (Compl. at 6), the few specific, non-speculative factual allegations in the Complaint tell a decidedly different story.  According to MetTel, out of its entire nationwide customer base, Granite personnel contacted *two* customers—both current or former Granite customers—and made vague statements of opinion about ████████████████████ during the course of ordinary sales calls.  And, again according to MetTel, neither customer changed its relationship with MetTel in any way as a result of these vague statements of opinion.

4

1. █████████████████

First, MetTel alleges that one customer—██████████████ a former Granite customer—received one vague voicemail from a Granite salesperson in late April 2020. (*Id.*, ¶ 19 & Ex. A.)  According to an unverified transcription of the message, the Granite salesperson referred to ███████████████████ ██████████████████ and said that he "would like to bring that to your attention." (*Id.*, Ex. A.)

MetTel pointedly does not allege that anyone from ██████████████ ever returned this phone call or ever found out ██████████████████ (*See id.*, ¶ 19 & Ex. A.)  Instead, ████████████████ affirmatively stated that it would rely on MetTel—not Granite—for information about MetTel.  (*See id.*, Ex. A (email from ███████████████ to MetTel stating, "[if there's anything to know, I want your input, not his.").)  Nor does MetTel allege that its business with ██████████ ██████ has changed in any way since this contact.

2. ██████████████████

MetTel also alleges that Granite contacted another customer—██████████ ████████ which is also a current Granite customer, Easton Decl., ¶¶ 5-6— on May 11, once via email and once via phone.  In the email contact, Granite salesperson James Easton explained that he is attempting to set up a meeting between Granite's CEO and a senior ██████ executive to discuss "cost savings projects that [Granite

5

has] run" for other businesses similar to ██████ (Compl., Ex. B.)  Mr. Easton also expressed his opinion that an unnamed "current partner . . . ██████████████████

██████████████████████████████████████████████████

(*Id.*)

As for the phone call contact, MetTel claims that an unidentified person—not necessarily even a Granite employee—called an unspecified person at ██████ and said something, which a different ██████ employee summarized as ██████████████

██████████████████ (*Id.*, ¶ 24 & Ex. C.)  Mr. Easton has no memory of ever saying that MetTel ████████████████████ to anyone at ██████ Easton Decl., ¶ 7.

MetTel pointedly does not allege that either of these contacts have resulted in any change in its business relationship with ██████ To the contrary, Tim Hanley, a MetTel senior vice president, contacted ██████ chief information officer and reported to others at MetTel that the phone call had resolved any concerns ██████ might have.  (Compl., Ex. C ("[The chief information officer] is going to level set. He was very appreciative of the call.").)

Moreover, MetTel's senior management responded to word of the alleged phone call by directing Mr. Hanley to spread false information to ██████ about ██████████████████ Andoni Economou, MetTel's chief operating

6

officer, directed Mr. Hanley to "to call in and figure this out." (*Id.*)  Mr. Economou further directed:



Make sure you give them a firm assurance that ████████

(*Id.* (emphasis added).)  The implication is clear: Mr. Economou ordered Mr. Hanley to call the customer and reassure them as to ████████████ while simultaneously spreading the false and baseless rumor that ███████████ ██████████████████ (*See id.*); *see also* Hogle Decl., ¶ 5 ("At no time during my employment at Granite has Granite ever ████████████ ██████████).

### 3.  The Unspecified Customer

MetTel attempts to link the two customers that Granite salespeople did contact to a different, unnamed customer, who "has not returned MetTel's calls and has rejected efforts to set up a meeting with MetTel since being contacted by Granite." (Compl., ¶ 27.)  MetTel pointedly fails to plead this customer's name, so Granite has no way of even beginning to investigate this allegation.  Nor does MetTel plead any facts to suggest that this customer actually was recently contacted by Granite or, if so, what Granite personnel allegedly communicated to the customer.  Indeed, the only information present in MetTel's pleadings shows

7

that any Granite communication to this customer was about "cost savings projects that [Granite has] run" for them, not about MetTel.  (*See id.*, Ex. B.)  Moreover, even MetTel concedes that this customer is still a MetTel client, and MetTel provides no factual basis for its speculative, conclusory assertion that it is likely to lose the customer's business.  (*Id.*, ¶ 27 ("MetTel has concluded that it *most likely* lost that client's *future* business. . . .") (emphasis added).)

### 4.  Speculation About Other Customers

Finally, MetTel speculates that Granite salespeople made similarly vague statements of opinion about MetTel's ██████████ to customers mentioned in Mr. Easton's email.  (*Id.*, ¶ 26.)  MetTel admits it makes this accusation "upon information and belief" with no supporting evidence.  (*Id.*)  Again, the only available evidence is that any contact from Granite to any of these businesses was solely in connection with "cost savings projects that [Granite has] run" for them (*id.*, Ex. B), not about MetTel or ██████████

### B.  MetTel's ██████████

Not only has MetTel come to this Court alleging a few vague statements of opinion that have not caused MetTel to lose a single customer or suffer any other harm, but the statements of opinion are based on an entirely reasonable view of the facts.  MetTel and Granite participate in a competitive market where ██████████ ██████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████ Taken together, these facts signal that MetTel ██

████████████████████████

1. *The Highly Competitive Telecommunications Market*

MetTel and Granite are head-to-head competitors in the marketplace for

telecommunications solutions for businesses.  This market is saturated, and several

of Granite's and MetTel's other competitors ████████████████████████ in

recent years, ██████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████

9

2. *MetTel's* ▮▮▮▮▮▮▮

Even before ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮ In 2017, MetTel ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮

In 2019, MetTel ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[1] It is not clear from the publicly available documents whether the 2019 transaction

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

3. *MetTel's* 

Given the unstable nature of the telecommunications market dating back

several years, ███████████████████████████████████████████

███████████████████████████████ MetTel could be expected to ████████

███████████ In April 2020, MetTel came to Granite ████████████████

██████

████████████████████████████████████████████████████████████████

████████████ At some locations—mostly shopping malls—Granite controls the

telephone and data infrastructure, and MetTel purchases access services from

Granite to resell to MetTel's own customers. *See* Balestraci Decl., ¶¶ 4-5.  Facing

the prospect that one of its major retail customers ████████████████████████

██████████████████████████████████████████ MetTel affirmatively

approached Granite and pressed Granite to ████████████████████████████

████████████ *See id.*, ¶¶ 6-8.  The parties exchanged proposals but have not yet

come to terms.  *Id.*, ¶ 9.[2]

_____

[2] Emails exchanged between the parties about MetTel's ██████████████████████
show that even before the statements MetTel complains of here, Granite was
appropriately evaluating ████████████████████████████████████████████████
████████  *See* Balestraci Decl., ¶¶ 10-11; Balestraci Decl., Exs. A-B (showing that
Mr. Balestraci advised MetTel that ███████████████████████████████████████
██████████████████████████████████████████████████████████████████████
████████████

Second, MetTel asked for Granite's help in negotiating for ████████

████████████████████████████████████████████████████████

████████████████████████████████████████████ Sean

Sullivan, a senior MetTel executive in charge of relationships with carriers, asked

Geoff Cookman, a senior Granite executive with similar responsibilities, about

███████████████████████████████████████. *See* Cookman Decl., ¶¶

6-8. █████████████████████████████████████████

████████████████████████████████████████, Granite did

not pursue MetTel's proposal. *Id.*, ¶ 9.

Third, Granite recently received reports that MetTel ████████████

████████████████████████████████████████ Pagliazzo

Decl., ¶ 6. That MetTel would ██████████████████████████

████████████████████████████████████████████████

████ *Id.*, ¶ 7. █████████████████████████████████

████████████████████████████████████████████████

████████████████████████ *Id.*, ¶ 8.



---

[3] Agents are non-employee sales personnel frequently used by telecommunications
providers. Pagliazzo Decl., ¶ 4.

### III.   LEGAL STANDARD

A temporary restraining order may be issued only "when the movant demonstrates that: [1] it has a colorable claim, [2] faces a likelihood of imminent, irreparable harm if relief is not granted, and [3] will suffer greater hardships if the TRO is not granted than the defendants would if the relief were granted." *CapStack Nashville 3 LLC v. MACC Venture Partners*, 2018 WL 3949274, at *3 (Del. Ch. Aug. 16, 2018) (Glasscock, V.C.) (quotations omitted).  "Of the three factors, irreparable harm is the most important; it is the *sine qua non* for this form of relief."  *IMO Daniel Kloiber Dynasty Trust*, 98 A.3d 924, 937 (Del. Ch. 2014). "Mere apprehension of uncertain damage or insufficient remedy will not support a finding of irreparable harm."  *Alpha Builders, Inc. v. Sullivan*, 2004 WL 5383570, at *5 (Del. Ch. Nov. 5, 2004).  "To demonstrate irreparable harm, . . . [t]he alleged injury must be imminent and genuine, as opposed to speculative."  *Aquila, Inc. v. Quanta Servs., Inc.*, 805 A.2d 196, 208 (Del. Ch. 2002).

The standard for granting a TRO is the same regardless of whether the underlying claims for relief are common law claims or claims under the Delaware Deceptive Trade Practices Act ("DTPA").  *See* 6 *Del. C.* 2633(a) (authorizing injunctive relief "under the principles of equity and on terms that the court considers reasonable").

13

## IV.   METTEL'S MOTION FOR A TRO SHOULD BE DENIED

### A.  Preliminary Injunctive Relief Is Unconstitutional And Unavailable Here

MetTel seeks an Order enjoining Granite from "making any statements about MetTel or its business operations to any current MetTel client."  (Mot. for TRO at 1.)  In short, MetTel seeks a TRO forbidding Granite's speech activity. MetTel does not cite a single case holding that this Court may issue such a TRO. Nor could any such authority exist, because such a TRO would be both unconstitutional and violate the maxim that a court of equity will not enjoin a libel. This Court therefore cannot grant the sweeping, unconstitutional, and unprecedented TRO that MetTel seeks here.

First, the TRO MetTel is requesting constitutes a prior restraint in violation of both the First Amendment to the United States Constitution and Article I of the Delaware Constitution.[4]  "Temporary restraining orders and permanent injunctions—*i.e.*, court orders that actually forbid speech activities—are classic examples of prior restraints."  *Alexander v. United States*, 509 U.S. 544, 550 (1993); *see also Auburn Police Union v. Carpenter*, 8 F.3d 886, 903 (1st Cir. 1993)

---

[4] *See Gannett Co. v. State*, 571 A.2d 735, 740 n.9 (Del. 1989) ("We have previously noted that [Article I, Section 5] has the same scope as the federal first amendment."); *CapStack*, 2018 WL 3949274, at *4 ("the Delaware Constitution appears to explicitly prohibit prior restraints, providing that 'any citizen may print on any subject, being responsible for the abuse of that liberty.'").

("[A] judicial injunction that prohibits speech prior to a determination that the speech is unprotected . . . constitutes a prior restraint.") (citation omitted). "Any system of prior restraint . . . comes to this Court bearing a heavy burden against its constitutional validity." *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 558 (1975) (quotation and citation omitted).

Moreover, at the TRO stage, MetTel seeks a prior restraint on the barest of records, prior to any adjudication that the speech is seeks to enjoin is unprotected. As explained in *CapStack*,

> the Plaintiffs ask me to temporarily enjoin future speech based solely on a finding that the Complaint pleads a *colorable claim* for defamation or trade libel. Colorability, in the TRO context, requires only that the claim not be frivolous; if a plaintiff pleads a non-frivolous claim of wrongful conduct and shows a threat of resulting imminent irreparable harm, a TRO may issue. A finding that the plaintiff's claim is *likely* to prevail is not required. In my view, to enjoin speech upon such a showing would amount to an unconstitutional prior restraint.

2018 WL 3942974, at *4 (emphasis in original). Indeed, granting MetTel's requested TRO could enjoin speech "that may ultimately prove to be protected." *See id.* (quotation omitted). And because a TRO requires a far lower evidentiary showing than a final adjudication on the merits, "the danger that the court will get it wrong and mistakenly restrict protected speech is even greater." *Id.* (quotations

omitted).  It follows that a TRO imposing prior restraint on speech activities is constitutionally impermissible and may not issue at all.  *See id.*

Second, MetTel's request runs afoul of the "traditional maxim that equity will not enjoin a libel."  *CapStack*, 2018 WL 3949274, at *4 (quoting *Organovo Holdings, Inc. v. Dimitrov*, 162 A.3d 102, 115 (Del. Ch. 2017) (Laster, V.C.)).  "Traditionally, the reason for the special rule was jurisdictional," but the rule is now grounded on additional considerations, primarily "the importance afforded to the constitutional protections of speech."  *Organovo Holdings*, 162 A.3d at 115.  "Regardless of the rationale supporting the rule, '[t]he upshot is the same: a court of equity generally cannot issue an injunction in a defamation case.'"  *CapStack*, 2018 WL 3949274, at *4 (quoting *Organovo Holdings*, 162 A.3d at 119).

In certain circumstances, a *permanent* injunction enjoining speech is permissible, but only after a final adjudication that the speech to be enjoined is defamatory or otherwise unprotected.  *See, e.g.*, *Organovo Holdings*, 162 A.3d at 124-25; *see also Auburn Police Union*, 8 F.3d at 903.  But that is not what MetTel seeks here.  MetTel would have the Court restrain Granite's speech, including forbidding it from making *any* statements about MetTel to *any* of MetTel's customers, without first determining—or even hearing *evidence* regarding—what, exactly, Granite said, the truth of its statements, and whether the statements

16

constitute opinion or were otherwise privileged.  The relief sought is simply not available.

In its opening brief, MetTel entirely skips over the fact that its request for a TRO is constitutionally infirm and asks for relief outside the power of a court of equity.  MetTel does not cite a single case—from Delaware or anywhere else— holding that a TRO may issue solely to stop allegedly false and defamatory statements.  And MetTel offers no argument that the prior restraint doctrine or the limitations on equity's power to enjoin alleged libels do not apply here.

Rather than engage with the constitutional problems with its request for a TRO imposing unconstitutional prior restraint, MetTel cherry-picks quotations from certain factually inapposite cases discussing a non-binding doctrine that simply does not apply here.  In *J.C. Pitman & Sons v. Pitman*, 47 A.2d 721 (Del. Ch. 1946), the Court denied a demurrer to a counterclaim seeking to enjoin a course of conduct that included, as one component, alleged trade libel.  The Court concluded that, notwithstanding that a court of equity cannot enjoin a trade libel, "a continued course of wrongful action may, ordinarily, be stopped by injunction, although it includes a trade libel.  Intimidating possible customers by baseless threats to sue, should they deal with the complainant, comes within that rule."  *Id.* at 726 (citation omitted).  Stated differently, the mere presence of a trade libel claim does not necessarily deprive the court of the power to enjoin other, separate

17

acts of alleged unfair competition—such as baseless threats of litigation—that may be related to the alleged trade libel.  *See id.*; *see also Preston Hollow Capital LLC v. Nuveen LLC*, 216 A.3d 1, 5 (Del. Ch. 2019) (Glasscock, V.C.) (holding that, under *Pitman*, an injunction is only permissible where plaintiff alleges "other tortious activity where tradition and constitutional considerations do not require the findings of a jury").

Even were *Pitman* binding authority,[5] the doctrine it applied simply has nothing to do with MetTel's allegations here.  All of MetTel's claims are based on the allegations that Granite made false, misleading, and/or defamatory statements about MetTel to third parties.  (*See generally* Compl.)  In support of its claims for tortious interference and violations of the DTPA, MetTel alleges no *separate* acts other than the alleged false statements to customers.  (*See generally id.*)  MetTel makes no claim that Granite has engaged in unfair competition in any other way, such as by baselessly threatening litigation against MetTel customers, improperly using MetTel's confidential information or trade secrets, employing a former MetTel employee in violation of a restrictive covenant, or infringing on MetTel's

---

[5] *Pitman* was decided by a vice-chancellor nearly 75 years ago and has never been formally adopted by the Delaware Supreme Court.  Accordingly, this Court is free to disagree with the analysis in *Pitman*.

intellectual property rights.  The rule applied in *Pitman* therefore simply does not apply.[6]

Moreover, even if *Pitman* did apply—and it does not—simply pleading that alleged false statements *also* constitute a separate business tort does not transform *Pitman* into an all-purpose exception to the constitutional prohibition on prior restraints.  As Vice Chancellor Glasscock recognized in *CapStack*, such a reading of the law is impermissible:

> By characterizing a defamation claim as one for trade libel (and including in her complaint a separate tort, perhaps for intentional infliction of emotional distress), a plaintiff could circumvent the well-established prohibition on prior restraints. The exception would come nigh to swallowing the rule. Such an outcome could chill protected speech.

*CapStack*, 2018 WL 3949274, at *6.

*CapStack* is materially indistinguishable from this case.  There, the defendants accused the plaintiffs—their partners in a joint venture—of lying in a

---

[6] Even if *Pitman* applied here and could be read as broadly as MetTel implies—and, as discussed above, neither is true—*Pitman* still would not warrant granting MetTel's requested TRO.  First, *Pitman* was decided at the demurrer—*i.e.* the motion to dismiss—stage and awarded no injunctive relief to anyone.  47 A.2d at 726.  It does not stand for the proposition that preliminary or interim injunctive relief against allegedly false statements is constitutional, appropriate, or warranted.  *See CapStack*, 2018 WL 3949274, at *5.  Moreover, recent cases have limited *Pitman* to "traditional" claims of "trade libel," *i.e.*, disparagement of goods, as opposed to the types of statements alleged here.  *See, e.g.*, *Preston Hollow*, 216 A.3d at 4-5; *CapStack*, 2018 WL 3949274, at *6.

private placement memorandum and threatened to reveal the alleged lies unless the plaintiffs withdrew from the venture. *Id.* at *2. The plaintiffs moved for a TRO seeking to enjoin their partners' threatened disclosure of these accusations of lying. *Id.* at *3-4. Because the requested TRO sought to enjoin the defendants' speech—and *only* their speech—Vice Chancellor Glasscock held that a TRO would constitute unconstitutional prior restraint and could not issue. *See id.* at *3-6.

The result should be the same here. As in *CapStack*, MetTel asks that this Court enjoin Granite's speech—and *only* its speech—to MetTel's customers. A TRO that does so is unconstitutional prior restraint and cannot be issued. *See CapStack*, 2018 WL 3949274, at *6; *see also Alexander*, 509 U.S. at 550.

At bottom, MetTel has come to this Court seeking to stop Granite from saying anything about MetTel to any MetTel customers, speech which is constitutionally protected and which Granite is privileged to engage in. The Constitutions of Delaware and the United States do not permit such prior restraint, so MetTel's requested TRO must be denied.

### B.  MetTel Has Not Shown That It Will Suffer Irreparable Harm

Even if MetTel sought a constitutionally permissible TRO—and, as shown above, it does not—MetTel also cannot satisfy the second, and most important, requirement for obtaining a TRO: irreparable harm. The Motion for a TRO should also be denied on this separate basis.

20

MetTel only alleges that Granite has contacted two customers out of its entire nationwide customer base, neither of which have altered their relationships with MetTel in any way as a result of the alleged false statements MetTel complains of here.  (Compl., ¶¶ 19-20, 24.)  At most, MetTel speculates that one unspecified customer "most likely" will move "future" business away from MetTel as a result of Granite's alleged false statements, but MetTel alleges such merely "upon information and belief."  (*Id.*, ¶¶ 26-27.)  Such speculation about uncertain future harm is not enough to warrant a TRO.  *See, e.g.*, *Alpha Builders*, 2004 WL 5383570, at *5 ("Mere apprehension of uncertain damage or insufficient remedy will not support a finding of irreparable harm."); *Aquila*, 805 A.2d at 208 ("To demonstrate irreparable harm, . . . [t]he alleged injury must be imminent and genuine, as opposed to speculative.").

Nor can MetTel show that it has no adequate remedy at law.  "Generally, a party injured as a result of a tort has a complete and adequate remedy at law in the form of an action for damages."  *Organovo Holdings*, 162 A.3d at 114 (quotation omitted).  This case is no exception.  MetTel's musings on the unique nature of the telecommunications industry notwithstanding, MetTel's allegations of harm boil down to (1) lost business and (2) damage to its reputation and goodwill.  (*See* Compl., ¶¶ 30-31, 33.)  To the extent MetTel has lost current and future business, that harm can be redressed through an award of damages. *See Perlman v. Vox*

21

*Media, Inc.*, 2019 WL 2647520, at *6 (Del. Ch. June 27, 2019) (Slights, V.C.) ("Although Plaintiffs try to dress their allegations of 'lost business opportunities and lost investments' as irreparable harm, those losses, if proven, are readily and historically compensable by damages.").  And to the extent its reputation has been harmed, courts routinely quantify reputational harm into monetary damages awards.  *See Organovo Holdings*, 162 A.3d at 114 n.51 ("Imperfect though it is, an action for damages is the only hope for vindication or redress the law gives to a man whose reputation has been falsely dishonored.") (quoting *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 23 (1990)).  Calculating such damages is neither impractical nor impossible.  *See id.* at 114.

Accordingly, MetTel's bare-bones allegations simply do not make out the irreparable harm necessary to issue a TRO.  MetTel's Motion for a TRO should be denied on this independent basis as well.

### C. The Balance Of Equities Favors Granite

MetTel is also not entitled to a TRO here because the balance of equities tips in favor of Granite rather than MetTel.  A TRO is separately unwarranted for this reason too.

First, as shown above, the requested TRO would act as a prior restraint on protected speech, which is all the more troubling given the high likelihood that statements of two sales representatives were non-actionable statements of opinion.

22

*See* Section IV.D.2, *infra*.  The requested TRO will also have a chilling effect on

Granite's ability to compete with MetTel for customers, which it is privileged to

do.  *See Lipson v. Anesthesia Servs., P.A.*, 790 A.2d 1261, 1287 (Del. Super. Ct.

2001) ("[T]he Court must be mindful of the privilege enjoyed by competitors in the

same market to compete aggressively for market share"); *Regal Home Distribs. v.

Gordon*, 66 A.2d 754, 754-55 (Del. Super. Ct. 1949) ("One is privileged purposely

to cause a third person not to enter into or continue a business relation with a

competitor of the actor if (a) the relation concerns a matter involved in the

competition between the actor and the competitor, and (b) the actor does not

employ improper means, and (c) the actor does not intend thereby to create or

continue an illegal restraint of competition, and (d) the actor's purpose is at least in

part to advance his interest in his competition with the other.").

Second, the TRO MetTel seeks is wildly overbroad and would compound

the chilling effect and harm on Granite's speech and competition rights.  MetTel

would have the Court enjoin Granite from making "*any* statements about MetTel

or its business operations to *any* current MetTel client."  (Mot. for TRO at 1

(emphasis added).)  Granting MetTel's requested TRO would thus enjoin entirely

truthful speech and legitimate, everyday competitive activities.  It would even

constrain Granite if a dissatisfied MetTel customer contacted Granite.  Such an

overbroad TRO is impermissible.  *See*, *e.g.*, *Aquila,* 805 A.2d at 202-203 ("[A]

23

preliminary injunction is an extraordinary remedy, which will not issue unless it has been earned and will be denied where the remedy sought is excessive in relation to, or unnecessary to prevent, the injury threatened."); *Ivanhoe Partners v. Newmont Mining Corp.*, 533 A.2d 585, 609 (Del. Ch. 1987) ("[A]n injunctive remedy should not be disproportionate or excessive in relation to the specific harm that it is intended to prevent.").

Third, MetTel has tools at its disposal to mitigate and even cure any alleged harm without the need for a court order restraining Granite's speech and competition rights. MetTel explains in its own Brief that it is willing to share confidential information about ███████████████ with customers upon execution of a non-disclosure agreement. (MetTel Br. at 6.) If MetTel's ██████ ███████████████████████████████████████████ ███████████████████████ The existence of this remedy, and the relative ease with which MetTel could implement it, weighs heavily against granting an unwarranted and unconstitutional TRO. *See Golden Cycle, LLC v. Allan*, 1998 WL 892631, at *17 (Del. Ch. Dec. 10, 1998) (noting existence of non-legal remedies and holding "[t]he availability of this self-help strongly suggests that there is no need for injunctive relief here.").

Finally, MetTel comes to the Court with unclean hands. MetTel's own evidence shows that it engaged in the same conduct it accuses Granite of engaging

24

in here.  Mr. Economou, a senior MetTel executive, advised Mr. Hanley, the

MetTel salesperson with the high-level contacts at ███ to use his contacts to

reassure ███ that MetTel was ███████████████

███████████████████████

███████████ (Compl. Ex. C.)  MetTel's agenda is clear: while

reassuring ███ Mr. Hanley was being ordered to sow doubt about Granite's

███████ (*See id.*)  In these circumstances, "where the litigant's own acts

offend the very sense of equity to which he appeals," the court should refuse

equitable relief.  *Nakahara v. NS 1991 Am. Trust*, 718 A.2d 518, 522 (Del. Ch.

1998).

### D. MetTel Has Not Pleaded Colorable Claims

Even if injunctive relief were constitutionally permissible here—and it is

not—and even if MetTel had satisfied the irreparable harm and balance of the

equities elements for issuance of a TRO—and it has not—MetTel would still not

be entitled to a TRO.  A TRO will not issue unless the underlying claim is

"colorable."  *Sherwood v. Ngon*, 2011 WL 6355209, at *6 (Del. Ch. Dec. 20,

2011).  Because MetTel cannot make even a colorable showing on its claims, its

Motion for a TRO should be denied.

### 1.  MetTel's Tortious Interference And Trade Libel Claims

MetTel's Complaint purports to state common law claims for tortious

interference with prospective economic advantage (Count Two), tortious

interference with contractual relations (Count Three), and trade libel (Count Four).[7]

---

[7] Granite assumes, solely for purposes of opposing MetTel's Motion for a TRO, that Delaware law applies to MetTel's common law claims.  But it is far from clear that this is the case.  Delaware follows the Restatement (Second) to determine choice-of-law questions, with consideration given to "(1) the place where the injury occurred; (2) the place where the conduct causing the injury occurred; (3) the domicile, residence, nationality, place of incorporation and place of business of the parties; and (4) the place where the relationship, if any, between the parties is centered."  *Eureka Resources, LLC v. Range Resources-Appalachia, LLC*, 62 A.3d 1233, 1237 (Del. Super. Ct. 2012).  MetTel is headquartered in New York, and Granite is headquartered in Massachusetts.  None of the allegedly false statements were made either by or to any individuals located in Delaware.  The only conceivable connection to Delaware is that MetTel and Granite are both organized under Delaware law, a connection that typically does not suffice to apply Delaware law to business torts.  *See, e.g., UbiquiTel Inc. v. Sprint Corp.*, 2005 WL 3533697, at *4 (Del. Ch. Dec. 14, 2005) (applying Pennsylvania law to claim brought by Delaware corporation headquartered in Pennsylvania and noting, "the plaintiff's principal place of business is the single most important contact for determining the state of the applicable law as to most issues in situations involving . . . financial [or economic] injury. . . .") (quotations omitted, alteration in original).  Both New York and Massachusetts law proscribe prior restraints.  *See, e.g., Nyer v. Munoz-Mendoza*, 385 Mass. 184, 188, 430 N.E.2d 1214, 1217 (1982) ("[E]ven allegedly false and defamatory statements are protected from prior injunctive restraint by the First Amendment and art. 16 of the Massachusetts Declaration of Rights.");  *Rosenberg Diamond Dev. Corp. v. Appel*, 290 A.D.2d 239, 239, 735 N.Y.S.2d 528, 529 (1st Dep't 2002) ("Prior restraints on speech are strongly disfavored. . . .  Free speech is protected from censorship unless shown likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance or unrest.  Prior restraints are not permissible, as here, merely to enjoin the publication of libel.") (citations omitted).

Even accepting all of MetTel's well-pleaded allegations as true, these claims are not even colorable because MetTel does not adequately allege causation or damages, which are essential elements of each of these claims.[8]

In its Complaint, MetTel identifies only two MetTel customers to whom Granite allegedly made false, misleading, and/or defamatory statements about MetTel. (Compl. ¶¶ 19, 20, 24.) Based on these two isolated incidents, and without any evidence, MetTel speculates that it "*believes* that Granite personnel have contacted many, if not all, of MetTel's other current clients, as well as its prospective clients," and made similar statements. (*Id.* ¶ 29 (emphasis added).) Tellingly, MetTel does not identify even a single customer or prospective customer it claims to have lost as a result of any Granite statement. As a result, MetTel

---

[8] *DeBonaventura v. Nationwide Mut. Ins. Co.*, 419 A.2d 942, 947 (Del. Ch. 1980) ("interference with an existing contract requires (a) an intent to induce a breach (b) of an existing contract, (c) proximate causation, and (d) damages; a showing of deliberate interference with a prospective business opportunity requires (a) the reasonable probability of a business opportunity, (b) the intentional interference by defendant with that opportunity, (c) proximate causation, and (d) damages, all of which must be considered in light of a defendant's privilege to compete or protect his business interests in a fair and lawful manner"); *Incyte Corp. v. Flexus Biosciences, Inc.*, 2017 WL 7803923, at *7 (Del. Super. Ct. Nov. 1, 2017) (noting that no Delaware court has defined the elements of trade libel, but using the following definition: "Regardless of the label, the publication of a disparaging statement concerning the business of another is actionable where: (1) the statement is false; (2) the publisher either intends the publication to cause pecuniary loss or reasonably should recognize that publication will result in pecuniary loss; (3) pecuniary loss does in fact result; and (4) the publisher either knows that the statement is false or acts in reckless disregard of its truth or falsity.") (quotation omitted).

27

cannot point to any actual, concrete damages that have been caused by Granite's alleged conduct.

The closest MetTel comes is alleging that one of its *other* customers—not one of the two customers to whom Granite allegedly made false statements—"has not returned MetTel's calls and has rejected efforts to set up a meeting with MetTel since being contacted by Granite."  (*Id.* ¶ 27.)  Such speculation alleges nothing actionable.  This unnamed customer presumably remains a MetTel customer—and MetTel has not alleged otherwise—so MetTel cannot claim to have lost that one customer's business.  Nevertheless, MetTel apparently "conclude[s]" from the customer's silence that it has lost this customer's "future" business.  (*Id.*)  This alleged "injury" is purely speculative.

These allegations are insufficient to state colorable common law claims for tortious interference and trade libel.  As shown above, MetTel "has not identified a single customer or prospective business relationship or opportunity that [Granite] interfered with; nor has [MetTel] pled any facts supporting proximate causation or alleging specific damages."  *See Overdrive, Inc. v. Baker & Taylor, Inc.*, 2011 WL 2448209, at *9 (Del. Ch. June 17, 2011) (dismissing tortious interference claim); *see also See Irgau v. Christiana Care Health Servs.*, 2008 WL 1724250, at *6 (Del. Super. Ct. Apr. 9, 2008) (holding a tortious interference claim inadequately pleaded where "the injury is not actual, it is merely speculative.").  Similarly, as to

28

trade libel, MetTel has not alleged facts sufficient to show that "pecuniary loss does [or will] in fact result." *Incyte Corp.*, 2017 WL 7803923, at *7 (addressing elements of trade libel).

Finally, as discussed in more detail below with respect to MetTel's defamation claim, the various statements MetTel attributes to Granite were either statements of pure opinion—not fact—or made no representations of fact whatsoever. *See* Section IV.D.2, *infra*. Moreover, to the extent that any of these statements implied any assertions of fact, MetTel cannot show that any such assertions were "false." *See id.* The requisite elements of improper means and falsity are therefore also not colorably alleged with respect to MetTel's tortious interference and trade libel claims.

### 2. MetTel's Defamation Claim

As a threshold matter, this Court has no jurisdiction to entertain MetTel's defamation claim or award preliminary injunctive relief based on the defamation claim. As this Court held in *Perlman*:

> In connection with a claim for defamation, the Court of Chancery, in all instances, lacks subject matter jurisdiction to adjudicate the questions of whether a defendant made a false statement about the plaintiff and whether it did so with actual malice. A defendant alleged to have committed the tort of defamation is entitled, should she wish, to have a jury decide those threshold questions. If the jury declares that the defendant is liable for defamation, then the plaintiff may seek to enforce that

29

> declaration of defamation with mandatory injunctive
> relief in Chancery, but only in the event the declaration is
> not enough to prompt the defendant to remove the
> defamatory content from the offending site.

*Perlman*, 2019 WL 2647520, at *1; *accord Preston Hollow Capital LLC*, 216 A.3d at 16 ("[T]his Court is without jurisdiction to determine whether slander has occurred here.").

Even if this Court has jurisdiction over the defamation claim, it is still not colorably pleaded. "Ordinarily, the elements of defamation are: (1) defamatory communication; (2) publication; (3) reference to the plaintiff; (4) third party's understanding of the communication's defamatory character; and (5) injury." *Preston Hollow Capital*, 216 A.3d at 4. Leaving aside that MetTel has not colorably alleged injury or damages for the reasons discussed above, MetTel cannot make a colorable showing that any of the alleged statements on which its claims are based are defamatory in the first place.

First, MetTel alleges that ███████████ received a voice message from a Granite employee inquiring whether the customer was aware of ███ ████████████████████████ (Compl. ¶ 19 & Ex. A.) But this statement has no defamatory content—it does not even make a representation of fact. *See Riley v. Moyed*, 529 A.2d 248, 251 (Del. 1987) (to determine whether a

30

statement is actionable as defamation, the court must determine, among other things, "whether the statement can be objectively verified as true or false").

Second, MetTel alleges that ████ received an email from Granite stating that its "service provider … ████████████████████████████ ████████████████████████ This is a classic statement of opinion. (Compl. ¶ 20 & Ex. B.)  Nowhere on the face of the challenged statement is MetTel expressly mentioned and, as explained above, more than one carrier ███ ████████████████████ *See* Section II.B.1, *supra* (listing four carriers who ████████████████████████████ ████████████).  Even if the statement could be interpreted as referring to MetTel, asserting that it is also ████████████████ is a subjective and imprecise assessment.  *See, e.g.*, *Stevens v. Independent Newspapers, Inc.*, 1988 WL 25377, at *4 (Del. Super. Ct. Mar. 10, 1988) ("The word 'abuse' is not fact-laden, but rather reflects the subjective perceptions of the speaker.  Indeed, the term 'abuse' is so imprecise that the Delaware Supreme Court has held the phrase 'abuse of office' to be an expression of opinion and not a word of art.").  A statement that MetTel ████████████████████████████ clearly expresses the author's opinion.  *See, e.g.*, *Doe v. Delaware, Dep't of Servs. for Children, Youth & Their Families, Div. of Family Servs.*, 2016 WL 5416679, at *7 (D. Del. Sept. 27, 2016) ("The words 'appear coerced' indicate that Quinn was describing her belief about

31

the veracity of the children's statements").  And a statement that MetTel is

███████████████████████ is both a subjective assessment and non-actionable

hyperbole.  *See, e.g.*, *Agar v. Judy*, 151 A.3d 456, 486 (Del. Ch. 2017) ("None of

these statements are defamatory. The statement of being 'forced kicking and

screaming to settle' is indeed nonsensical, which is also why it would be

understood by a reader as hyperbole and not literal truth."); *Stevens*, 1988 WL

25377, at *4.

Third, MetTel alleges that Granite told an unnamed ███████ employee that

MetTel is ███████████████████ (Compl. ¶ 24 & Ex. C.)  But there is no

evidence of what Mr. Easton or any other Granite employee allegedly said on the

relevant telephone call.  Instead, the characterization ██████████████████████

██████████ is the summary that an ██████ employee—not the same ██████ employee

who spoke to the unidentified person on the telephone—provided to MetTel.  (*Id.*)

To the extent it is possible to make any assessment of the alleged statement—

which, as is clear from Exhibit C to the Complaint, is paraphrased and, at best for

MetTel, was conveyed secondhand—it is likewise a non-actionable statement of

opinion.

Moreover, as discussed at length above, MetTel is currently ███████████████

██████████████████████████ *See* Section II.B, *supra*.  Accordingly, to the

extent any of the alleged statements actually implicate any verifiable statements of

fact about MetTel's ███████████ Granite personnel had every reason to believe that those statements were factually accurate and could not have acted with the requisite reckless disregard for the truth.  *See*, *e.g.*, *CapStack*, 2018 WL 3949274, at *6 (listing elements of defamation).

Accordingly, MetTel's defamation claim is not colorable.

### 3.  *MetTel's Claim Under The Delaware Deceptive Trade Practices Act*

MetTel's claim under the DTPA fares no better, for the statute does not apply to conduct taking place entirely outside Delaware which causes no harm inside Delaware.  And even if the statute did apply, MetTel has not alleged the requisite pattern of conduct necessary to warrant an injunction under its terms.

First, MetTel has not shown that the DTPA even applies to any of the conduct alleged in its complaint.  "[T]he [DTPA] is not available to litigants who cannot show any evidence of wrongful conduct or injury taking place in Delaware."  *Ninespots, Inc. v. Jupai Holdings, Ltd.*, 2018 WL 3626325, at *13 (D. Del. July 30, 2018) (citing *Guidance Endodontics, LLC v. Dentsply Int'l, Inc.*, 663 F. Supp. 2d 1138 (D.N.M. 2009)).  This principle is consistent with the well-established presumption that "a law is not intended to apply outside the territorial jurisdiction of the State in which it is enacted."  *Singer v. Magnavox Co.*, 380 A.2d 969, 981 (Del. 1977), *overruled on other grounds*, *Weinberger v. UOP, Inc.*, 457 A.2d 701 (Del. 1983).

33

Here, none of the allegedly false or misleading statements occurred in Delaware because neither the speakers nor the recipients were located in Delaware. Nor could MetTel allege that it suffered any harm in Delaware. Instead, MetTel's principal place of business is in New York, and "the plaintiff's principal place of business is the single most important contact for determining the state of the applicable law as to most issues in situations involving . . . financial [or economic] injury. . . ." *UbiquiTel Inc. v. Sprint Corp.*, 2005 WL 3533697, at *4 (Del. Ch. Dec. 14, 2005) (quotation omitted). It follows that the DTPA simply does not apply here, and MetTel's allegations do not state colorable claims under the statute.

Second, even if the DTPA did apply, MetTel's allegations still do not make out colorable claims. "The DTPA was designed to prevent patterns of deceptive conduct, not isolated incidents." *EDIX Media Grp., Inc. v. Mahani*, 2006 WL 3742595, at *12 (Del. Ch. Dec. 12, 2006) (quotation omitted). As such, "the failure of a party to be able to state a claim for injunctive relief at the time the suit is brought is fatal to claims under the Deceptive Trade Practices Act." *State ex rel. Brady v. Pettinaro Enters.*, 870 A.2d 513, 537 (Del. Ch. 2005).

Again, here MetTel only alleges the three isolated statements discussed above. While MetTel contends that Granite made similar statements to other MetTel customers, this allegation is purely speculative and based on nothing more

34

than "information and belief." (*See* Compl. ¶¶ 26, 29.) Thus, any purported "pattern[] of deceptive conduct" is founded solely on surmise and conjecture, which is insufficient to state a claim under the DTPA. *See State ex rel. Brady*, 870 A.2d at 536 ("[A] claim for injunctive relief must be supported by the allegation of facts that create a reasonable apprehension of a future wrong.") (quotation omitted). Accordingly, MetTel cannot obtain a TRO based on its DTPA claim.

Third, because MetTel's common law tort claims are not colorable for the reasons discussed above, MetTel also cannot state colorable statutory claims. "[T]he [DTPA] was not intended to create a new cause of action distinct from the common law protections designed to secure businesses against the deceptive trade practices of others." *Grand Ventures, Inc. v. Whaley*, 632 A.2d 63, 68 (Del. 1993). Because MetTel has not alleged colorable common law claims, it has also not alleged colorable claims under the DTPA, for the DTPA cannot serve as a substitute where MetTel's other common law claims fail.

*          *          *

Simply put, MetTel has come to this Court seeking unconstitutional emergency relief based on flimsy, speculative allegations. This Court therefore could not issue MetTel's requested TRO even if all the standard elements for issuing a TRO were met, and MetTel has certainly not met those elements here. MetTel's Motion for TRO should therefore be denied.

35

## V.    METTEL'S MOTION TO EXPEDITE SHOULD BE DENIED

MetTel's claims are so weak, the claimed injury so speculative, and the requested remedy so drastic that it has not even met the comparatively lower standard required for expediting these proceedings.  MetTel's Motion to Expedite should therefore also be denied.

"[M]otions to expedite are not granted automatically," rather, plaintiffs must "earn expedition." *In re Williams Cos., Inc. Stockholder Litig.*, 2016 WL 197177, at *2 (Del. Ch. Jan. 13, 2016).  "Plaintiffs bear the burden of showing good cause for expedited proceedings." *In re TriQuint Semiconductor, Inc. Stockholders Litig.*, 2014 WL 2700964, at *2 (Del. Ch. June 13, 2014).  "To prevail on a motion to expedite, a plaintiff must demonstrate a sufficiently colorable claim and show a sufficient possibility of threatened irreparable injury, as would justify imposing on the defendants and the public the extra (and substantial) costs of an expedited preliminary injunction proceeding." *Parsons v. Digital River, Inc.*, 2015 WL 139760, at *1 (Del. Ch. Jan. 12, 2015) (quotation omitted).  MetTel has not made this showing.  As discussed above, MetTel's claims are not colorable, and MetTel has not shown that it will suffer irreparable harm.

"The colorable claim prong measures the substantive merits of the dispute and assures that the claim is worthy of the effort and expense of expedition." *Opportunity Partners L.P. v. Blackrock N.Y.*, 2011 WL 1379066, at *2 n.2 (Del.

36

Ch. Mar. 28, 2011). As shown above, MetTel's purported claims are not colorable.

As a threshold and gating item, MetTel seeks to expedited proceedings to pursue preliminary relief—prior restraint of allegedly false statements—that is unconstitutional and that this Court lacks subject matter jurisdiction to grant. *See* Sections IV.A and IV.D.2, *supra*. Moreover, MetTel fails to allege causation or damages, because it does not identify even a single customer or prospective customer it claims to have lost as a result of Granite's statements. *See* Section IV.D.1, *supra*. MetTel also fails to adequately plead the pattern of conduct necessary for a claim under the DTPA. *See* Section IV.D.3, *supra*. And MetTel's defamation and trade libel claims also fail because Granite's alleged statements were either statements of pure opinion or made no representations of fact whatsoever (and, to the extent they did involve implied statements of fact, Granite had ample reason to believe such statements were true). *See* Section IV.D.2, *supra*.

As for irreparable harm, MetTel must establish that, absent expedition, it will suffer "immediate, discernible harm for which there is no adequate remedy at law." *Sonet v. Plum Creek Timber Co.*, 1998 WL 749445, at *2 (Del. Ch. Sept. 23, 1998) (quotation omitted). Expedited proceedings should not be granted if "the injury is speculative or if the injury can be fully compensated after a full trial on the merits, either by an award of damages or by any other form of final equitable

37

relief." *Id.* at *2 (quotation omitted).  As shown above, any future or ongoing harm to MetTel is purely speculative.  *See* Section IV.B, *supra*.  And the injury MetTel alleges—lost profits and damage to its reputation and goodwill—can be fully compensated by an award of damages.  *See id.*

Expedition is also not warranted here because of the substantial burden it will impose on Granite and the Court.  Even in normal times, it would be difficult for this case to proceed on an expedited schedule.  In addition to ordinary discovery, adjudication of MetTel's claims—to the extent such claims have more substance than the Complaint conveys—will require extensive third-party discovery.  For example, such third-party discovery will include obtaining documents and live testimony from numerous third-party witnesses located around the country—both the MetTel customers identified in the Complaint and other customers MetTel "believes" were contacted by Granite—in order to determine who Granite spoke with, the circumstances of those communications, the precise content of Granite's statements, whether and how MetTel's customers reacted to those communications, and any communications those customers received from MetTel.  In addition, the parties will require significant discovery of MetTel's ████████ in order to determine the extent and cause of any lost profits, as well as whether Granite's alleged statements about MetTel's ████████████ were substantially true.

38

These are not normal times.  The myriad closures and restrictions aimed at addressing the COVID-19 pandemic, as well as the resulting delays and disruption for individuals and businesses of all types, are by now all too familiar to the Court. Given that the evidence and witnesses in this case are spread across the country— indeed, it is not clear that *any* of the witnesses are located in Delaware—the current office closures and travel restrictions will make proceeding on even a normal schedule challenging.  Proceeding on an expedited basis would be substantially more difficult.  Indeed, this Court has denied several recent requests for expedition, recognizing that the COVID-19 pandemic has made the cost of expedition even greater than usual.  *See, e.g.*, *Snow Phipps Grp., LLC v. KCake Acquisition, Inc.*, C.A. No. 2020-0282-KSJM (Del. Ch. Apr. 17, 2020); *The We Co. v. Softbank Grp. Corp.*, C.A. No. 2020-0258-AGB (Del. Ch. Apr. 17, 2020); *Conduent Business Servs., LLC v. Sky View Capital, LLC*, C.A. No. 2020-0232-JTL (Del. Ch. Mar. 30, 2020).

Given the Complaint's thin allegations, the speculative nature of the alleged injury, and the substantially higher costs of proceeding on an expedited basis in these times, MetTel's Motion to Expedite is unwarranted.  Granite respectfully submits that this Court should deny the motion and order this matter to proceed in the ordinary course.

39

## VI.   CONCLUSION

For all of these reasons, Granite respectfully requests that the Court deny

MetTel's Motion for a Temporary Restraining Order and Motion to Expedite.

MORRIS, NICHOLS, ARSHT
  & TUNNELL LLP

OF COUNSEL:
DONNELLY, CONROY &
GELHAAR, LLP
T. Christopher Donnelly (admitted
*pro hac vice* )
Joshua N. Ruby (admitted *pro hac
vice*)
260 Franklin Street, Suite 1600
Boston, MA 02110
(617) 720-2880

May 28, 2020

*/s/ R. Judson Scaggs, Jr.*
R. Judson Scaggs, Jr. (#2676)
Barnaby Grzaslewicz (#6037)
A. Gage Whirley (#6707)
MORRIS, NICHOLS, ARSHT &
TUNNELL LLP
1201 N. Market Street
Wilmington, DE  19899-1347
(302) 658-9200

Words: 9,287

40

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 4, 2020, the foregoing document was served by File & Serve*Xpress* on the following attorneys of record:

Steven L. Caponi
Matthew B. Goeller
K&L Gates
600 N. King St., Suite 901
Wilmington, DE 19801


*/s/ A. Gage Whirley*
A. Gage Whirley (#6707)

3

# Exhibit 4

EFiled:  Jun 08 2020 05:32PM EDT
Transaction ID 65684065
Case No. 2020-0380-JRS

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| MANHATTAN TELECOMMUNICATIONS CORP., D/B/A METROPOLITAN TELECOMMUNICATIONS, A/K/A METTEL, | C.A. No. 2020-0380-JRS |
| Plaintiff, | ███████████████ |
| v. | **PUBLIC VERSION** **FILED JUNE 8, 2020** |
| GRANITE TELECOMMUNICATIONS, LLC, | |
| Defendant. | |

## REPLY BRIEF IN SUPPORT OF PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND MOTION TO EXPEDITE

*Of counsel:*

Anthony P. La Rocco, Esq.
Dana B. Parker, Esq.
Charles F. Rysavy, Esq.
K&L Gates LLP
One Newark Center, Tenth Floor
Newark, NJ 07102
anthony.larocco@klgates.com
dana.parker@klgates.com
charles.rysavy@klgates.com

Dated: June 1, 2020

**K&L GATES LLP**
Steven L. Caponi (No. 3484)
Matthew B. Goeller (No. 6283)
600 King Street, Suite 901
Wilmington, DE 19801
Phone: (302) 416-7000
steve.caponi@klgates.com
matthew.goeller@klgates.com

*Counsel for Plaintiff Manhattan Telecommunications Corp.*

# <u>TABLE OF CONTENTS</u>

**Page(s)**

I.    INTRODUCTION ......................................................................................1

II.   ARGUMENT..........................................................................................4

    A.    The relief requested by MetTel is not an unconstitutional prior
        restraint on speech. ................................................................................4

    B.    MetTel has sufficiently pled irreparable harm meriting
        injunctive relief.....................................................................................10

    C.    The balancing of equities strongly favors granting MetTel's
        requested relief. ...................................................................................14

    D.    The Complaint asserts colorable claims for relief against
        Granite. .................................................................................................17

        1.    Granite's statements to MetTel's customers are neither
            true nor reasonable statements based on known facts. .............18

        2.    MetTel's Complaint states a colorable claim for
            defamation...............................................................................23

        3.    The Complaint states colorable claims for Tortious
            Interference and Trade Libel...................................................27

        4.    MetTel has pled a colorable claim for violation of
            Delaware's  Uniform Deceptive Trade Practices Act...............28

    E.    These proceedings should be expedited. ...........................................28

III.  CONCLUSION...........................................................................................31

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

## Cases

*Allen v. News Corp.*,
  2005 WL 415095 (Del. Ch. Feb. 3, 2005) ..........................................................18

*Arkema Inc. v. Dow Chem. Co.*,
  2010 WL 2334386 (Del. Ch. May 25, 2010).....................................................17

*Bancroft Life & Cas. ICC, Ltd. v. Intercontinental Mgmt. Ltd.*,
  456 F. App'x 184 (3d Cir. 2012) ..........................................................14

*CapStack Nashville 3 LLC v. MACC Venture Partners*,
  2018 WL 3949274 (Del. Ch. Aug. 16, 2018) .......................................5, 8, 9, 10

*CBS Corp. v. Nat'l Amusements, Inc.*,
  2018 WL 2263385 (Del. Ch. May 17, 2018).....................................................11

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*,
  447 U.S. 557 (1980)................................................................................5

*Conduent Business Servs., LLC v. Sky View Capital, LLC*,
  C.A. No. 2020-0232- JTL (Del. Ch. Mar. 30, 2020).........................................31

*Conley v. Conley*,
  2015 WL 7747431 (Del. Super. Ct. Nov. 19, 2015).........................................24

*Cty. of York Employees Ret. Plan v. Merrill Lynch & Co.*,
  2008 WL 4824053 (Del. Ch. Oct. 28, 2008) .....................................................29

*Eisenberg v. Chicago Milwaukee Corp.*,
  537 A.2d 1051 (Del. Ch. 1987) ..........................................................10

*Giammargo v. Snapple Beverage Corp.*,
  1994 WL 672698 (Del. Ch. Nov. 15, 1994) .....................................................29

*Guidance Endodontics, LLC v. Dentsply Int'l, Inc.*,
  663 F. Supp. 2d 1138 (D.N.M. 2009).................................................................28

*Horizon Pers. Commc'ns, Inc. v. Sprint Corp.*,
  2006 WL 2337592 (Del. Ch. Aug. 4, 2006) .....................................................14

ii

*J.C. Pitman & Sons, Inc. v. Pitman*,
    47 A.2d 721 (Del. Ch. 1946) ...............................................................6, 7, 13, 23

*Kanaga v. Gannett Co.*,
    687 A.2d 173 (Del. 1996) .............................................................................25,26

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Price*,
    1989 WL 108412 (Del.Ch. Sept.13, 1989) .........................................................11

*Morton v. Am. Mktg. Indus. Holdings, Inc.*,
    1995 WL 1791090 (Del. Ch. Oct. 5, 1995) ........................................................18

*Nakahara v. NS 1991 Am. Trust*,
    739 A.2d 770 (Del. Ch.1998) ..............................................................................16

*Ninespots, Inc. v. Jupai Holdings, Ltd.*,
    2018 WL 3626325 (D. Del. July 30, 2018) ........................................................28

*Organovo Holdings, Inc. v. Dimitrov*,
    162 A.3d 102 (Del. Ch. 2017) ...........................................................7, 8, 14, 24

*Perlman v. ox Media, Inc.*,
    2019 WL 2647520 (Del. Ch. June 27, 2019).....................................................  23

*Portnoy v. Cryo-Cell Intern., Inc.*,
    940 A.2d 43 (Del. Ch. 2008) ...............................................................................16

*Preston Hollow Capital LLC v. Nuveen LLC*,
    216 A.3d 1 (Del. Ch. 2019) ............................................................................5, 7

*Ramunno v. Cawley*,
    705 A.2d 1029 (Del. 1998) ...........................................................................26, 27

*Singh v. Envtl. Assocs., Inc.*,
    2003 WL 21039115 (Del. Ch. May 21, 2003)....................................................11

*Smith v. Delaware State Police*,
    2014 WL 3360173 (Del. Super. Ct. July 8, 2014).............................................25

*Sunstar Ventures, LLC v. Tigani*,
    2009 WL 1231246 (Del. Super. Apr. 30, 2009) ................................................26

*The We Co. v. Softbank Grp. Corp.*,
  C.A. No. 2020-0258-AGB (Del. Ch. Apr. 17, 2020) .........................................31

*Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer
  Council, Inc.*,
  425 U.S. 748 (1976)................................................................................................5

**Statutes**

*6 Del. C.* § 2531 *et seq.* .......................................................................5, 7, 13, 14, 27

## I.    INTRODUCTION

Defendant Granite Telecommunications, LLC ("Granite") has removed all reasonable doubt that it is using the COVID-19 crisis as the backdrop for its coordinated campaign to malign the services and reputation of Plaintiff Manhattan Telecommunications Corp. ("MetTel"), by telling MetTel's customers that ███ ████████████████████████████ The only questions for this Court to decide on these Motions, therefore, are whether Granite's actions are somehow excusable and, if not, whether emergent relief is appropriate to prevent MetTel from further irreparable harm.

What is most telling about Granite's answering papers is not what they say, but what they do not say.  The factual allegations in MetTel's Complaint could be easily refuted if they were not true.  For example, if Granite were *not* in the midst of a coordinated campaign to convince MetTel's customers that it was ████████ ████████████████████████████ Granite's opposition undoubtedly would have included affidavits from Granite personnel attesting to that fact.  Similarly, if Granite had *not* made the same false and misleading statements to more customers than the handful MetTel has been able to identify, Granite would have offered evidence refuting the allegation.  Or if "what was going on" with MetTel that Granite "would like to bring to the attention" of customers was *not* the same false and misleading information, or if Granite was *not* attempting to take advantage of the

current climate of uncertainty and fear caused by the COVID-19 crisis to harm MetTel's business, surely Granite would have submitted affidavits to that effect. But it did not. And the absence of such evidence speaks much louder than anything Granite actually says in its Brief.

Unable to refute the factual allegations in the Complaint, Granite is confined to unsuccessful technical arguments: it is entitled to make the statements at issue to MetTel's customers if it chooses to do so; MetTel cannot prove the extent of Granite's campaign to malign MetTel; and the statements at issue are true and not actionable. But Granite is wrong in all three respects.

First, Granite has no right, First Amendment or otherwise, to make demonstrably false statements about a competitor for the purpose of maligning its services and gaining a competitive advantage.

Nor does Granite have a right to make statements during the current crisis that *perhaps* might not be enjoined during normal times. Much like yelling "Fire!" may be protected speech in an empty parking lot but not in a crowded theater, whether Granite is entitled to libel MetTel and avoid an injunction must be assessed in the context of the circumstances in which the statements are made. It is not simply *what* Granite is saying, but *when* it is saying it and to *whom*.

Granite is spreading lie that ███████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████ This makes the unfounded claim much more believable than it might otherwise be.  And Granite is telling this to customers in the healthcare and elder care fields, among others, for whom ██████████████████████ ███████████████████████████ Especially under these circumstances, customers cannot █████████████████████████ Like people in a crowded theater, they do not have the time or even the ability to investigate, weigh the evidence, and then make a rational decision on what to do after someone yells "Fire!"  Granite is falsely maligning MetTel's services under circumstances most likely to achieve its goals, specifically to cause customers to terminate their business relationship with MetTel and replace it with Granite services, and must be enjoined from doing so.

Second, Granite seeks to impose a burden on MetTel that the law does not require—to prove the scope of the harm Granite has inflicted *before* being entitled to injunctive relief.  Many customers and potential customers will assume Granite's misinformation is true under the current circumstances.  This in turn will cause some unknowable portion of them to leave MetTel, or choose not to renew their contracts with MetTel, or not even to consider MetTel for telecommunications services, without MetTel ever knowing why.  The appropriate remedy is not simply to allow the campaign to run its course and then attempt to quantify the harm; the appropriate remedy is to stop Granite *now* from spreading its misinformation any further.

Finally, Granite makes an unsuccessful attempt to explain away its statements as true, or as based on a reasonable factual foundation, or as mere opinion.  None of the evidence Granite has assembled supports these arguments.  ████████████

████████████████████████████████████████████████

In fact, some of it shows the exact opposite.  A sophisticated competitor like Granite could not misinterpret this evidence as ████████████████████████

████████████████   Granite's *post hoc* justifications are so thin as to be transparent.

Granite has taken its best shot at explaining why MetTel is not entitled to the expedited relief it seeks and so obviously needs, and Granite has failed.

## II.   ARGUMENT

### A.   The relief requested by MetTel is not an unconstitutional prior restraint on speech.

Focusing exclusively on MetTel's first request for relief, Granite repeatedly argues that "the requested TRO would act as a prior restraint on protected speech."  *See*, *e.g.*, Ans. Br. at 22, 23.  But Granite fails to address MetTel's second request[1] for relief, that Granite be "enjoined from making any false or misleading statements about MetTel or its business operations."  In its attempt to draw attention away from this request, Granite incorrectly argues that "MetTel revealingly does not seek a

---

[1]   MetTel's first request for relief was broader than the second, but requested only temporary relief to align with expedited discovery while MetTel assesses the extent of Granite's campaign, the nature of the statements, and the identity of the individuals spreading these false statements.

████████████████████████

████████████████████████████████████

TRO limiting Granite from making certain specific statements about MetTel." Ans. Br. at 1.  But the second request for relief does exactly that.

Granite similarly raises the specter of a TRO that "could enjoin speech 'that may ultimately prove to be protected.'" Ans. Br. at 15 (quoting *CapStack Nashville 3 LLC v. MACC Venture Partners*, 2018 WL 3949274, at *4 (Del. Ch. Aug. 16, 2018)).   But "false or misleading statements about MetTel or its business operations," which MetTel seeks to enjoin in its second request for relief, are not protected speech, and will never "ultimately be proved to be protected."  Simply put, there is no First Amendment protection for making demonstrably false statements that malign a competitor's services and reputation.  *See Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*, 447 U.S. 557, 563 (1980) (there can be no constitutional objection to the suppression of deceptive commercial messages); *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 771 (1976) (the states, not the Constitution, determine whether commercial speech which is false, deceptive, or misleading is permissible); 6 *Del. C.* § 2532.

Granite also argues that the relief requested is an unconstitutional restraint on free speech because it violates the traditional maxim that "equity does not enjoin a libel." Ans. Br. at 16–20.  To be sure, this Court has long recognized that "equity lacks jurisdiction over a request to enjoin common-law defamation." *Preston Hollow Capital LLC v. Nuveen LLC*, 216 A.3d 1, 5 (Del. Ch. 2019).  But the analysis

does not end there, and Granite's mere recitation of the traditional maxim ignores the full extent of MetTel's claims and the irreparable harm caused by Granite.

This Court is not precluded from ordering injunctive relief where, as here, it is necessary to enjoin Granite from continuing to (1) commit trade libel by making false statements about MetTel's services to its customers, and (2) tortiously interfere with MetTel's customer relationships.  The reasoning behind the so-called "trade-libel exception" to the traditional maxim is set forth in *J.C. Pitman & Sons, Inc. v. Pitman*, 47 A.2d 721 (Del. Ch. 1946).  *Pitman* involved two competing companies, Pitman & Sons, Inc. and Pitman Manufacturing Co., both of which manufactured and sold the same type of product.  Pitman & Sons claimed Pitman Manufacturing was expropriating its trade name, and sent a letter to the latter's customers accusing Pitman Manufacturing of "start[ing] a campaign to confuse and deceive the trade." *Id.* at 723.  Pitman & Sons warned its customers "not to deal with this new corporation until its rights to manufacture and your right to buy or sell this questionable product is decided upon by the courts."  *Id.* at 724.  Pitman Manufacturing brought a counterclaim alleging that the statements were defamatory and sought a preliminary injunction prohibiting further publication of the letters.

As the Court explained in *Pitman*, although American courts have traditionally "refused to enjoin mere trade libels, . . . [where] a court of equity has jurisdiction on some other ground, the American courts will also usually enjoin the

continued publication of a trade libel incident thereto.  That is true when the libel is accompanied by some act of unfair business competition, if irreparable damage is imminent ....”  *Id.* at 726.  Thus, the Court in *Pitman* held: “The necessary conclusion therefore is that a continued course of wrongful action may, ordinarily, be stopped by injunction, although it includes a trade libel.”  *Id.* at 726.

Despite the obvious parallels between the facts in *Pitman* and the current dispute, Granite argues that *Pitman* has no application or relevance to MetTel’s claims.  Ans. Br. at 18.  Granite is wrong.  As this Court has explained:

> [Where] a separate tort . . . is alleged where relief at law is insufficient, and where the equitable remedy sought is, incidentally, an injunction of a “trade libel”—that is, a libelous statement to consumers that falsely disparages a plaintiff's goods or services . . . the matter is within this Court’s jurisdiction, because the underlying behavior being examined without a jury is not mere speech, but involves other tortious activity where tradition and constitutional considerations do not require the findings of a jury.

*Preston Hollow Capital LLC*, 216 A.3d at 5.  Here, MetTel is not asserting only a claim for defamation, or attendant torts based only on defamatory speech.  MetTel has asserted independent claims for trade libel, tortious interference, and violations of Delaware’s Deceptive Trade Practices Act.  “[I]njunctive relief is a common and non-controversial remedy for tortious interference with prospective economic advantage.”  *Organovo Holdings, Inc. v. Dimitrov*, 162 A.3d 102, 122 (Del. Ch. 2017).  *See also* 6 *Del. C.* § 2533(a).  Similarly, “a person likely to be damaged by a deceptive trade practice of another may be granted an injunction against it under

7

the principles of equity and on terms that the court considers reasonable." *Organovo*, 162 A.3d at 122.

Granite is actively orchestrating a campaign to disrupt MetTel's operations and interfere with its existing and potential customer relations. These malicious efforts are precisely the kinds of bad acts this Court is empowered to enjoin, even though they include speech. *CapStack Nashville 3 LLC*, 2018 WL 3949274, at *6 (courts "are receptive to the idea that such malicious business falsehoods were subject to injunctive restraint, particularly when the statements invoked another tort doctrine as well.").

Granite attempts to avoid this point by arguing incorrectly, in cursory fashion in a footnote, that MetTel is not asserting a "traditional" trade libel claim. Ans. Br. at 19 n. 6. A traditional "trade libel" claim involves the disparagement of a business's goods or services. *CapStack Nashville 3 LLC*, 2018 WL 3949274, at *6. Here, Granite's disparaging statements have damaged, and will continue to damage, MetTel's services. Granite is not merely making false statements about MetTel's business reputation generally. It is targeting its malicious falsehoods at MetTel's

███████████████████████████████████████████████ MetTel

provides customized, integrated and managed telecommunications solutions, including voice, data, wireless, and cloud solutions, for its customers. ███████

███████████████████████████████████████████████████

8

████████████████████████████

███████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████

Finally, Granite incorrectly argues that *CapStack* is materially indistinguishable from this case. Ans. Br. at 19. In *CapStack*, the Court held that injunctive relief would be an unconstitutional restraint because plaintiffs had pled only a thin cause of action for "defamation and/or trade libel" insufficient to overcome the traditional maxim and invoke the court's equitable powers. *CapStack Nashville 3 LLC*, 2018 WL 3949274, at *5–6. The court concluded that plaintiffs' claim was more accurately characterized as a claim for defamation seeking both injunctive relief and monetary damages. *Id.* at *5.

To plead a traditional "trade libel" claim, the plaintiff in *CapStack* should have pled that the defendant has disparaged not only plaintiff's general business reputation, but plaintiff's *specific goods or services* as well:

> [T]he Plaintiffs' trade-libel claim is not of the traditional variety; it does not involve disparagement of goods. Instead, the Plaintiffs allege that the Defendants have falsely accused Blatt of lying in an offering memorandum, thereby harming the Plaintiffs' pecuniary interests. In my view, these allegations are insufficient to overcome the longstanding rule forbidding pretrial injunctions against speech.

████████████████████████████████

████████████████████████████████████████████

*Id.* at *6.  Without a valid trade libel claim, the Court was left with a garden-variety defamation claim in which plaintiffs were seeking to enjoin speech.  *Id.* at *4. Injunctive relief, therefore, was not appropriate.

Here, MetTel has adequately pled an independent claim for trade libel.  As explained above and in the Complaint, Granite has actively disparaged ████ ████████████████████████████████████████████████████████████████ ██████It is doing so in a way that tortiously interferes with MetTel's existing and prospective business relationships.  MetTel's trade libel claim also does not seek monetary damages, as plaintiffs' claim sought in *CapStack*.

Injunctive relief is appropriate here.  The irreparable harm to MetTel's reputation and business will continue if Granite is not ordered to terminate its campaign immediately.

## B.  MetTel has sufficiently pled irreparable harm meriting injunctive relief.

Granite repeatedly argues that MetTel has failed to demonstrate that it has suffered damages or irreparable harm.  Ans. Br. at 20–22.  But MetTel is not required to prove that it has already suffered specific and actual irreparable harm to support its request for injunctive relief.  Rather, it must show only "a reasonable likelihood of irreparable harm if injunctive relief is not granted."  *Eisenberg v. Chicago Milwaukee Corp.*, 537 A.2d 1051, 1055–56 (Del. Ch. 1987).  *See also CapStack*

*Nashville 3 LLC,* 2018 WL 3949274, at *3 (plaintiff must demonstrate "that irreparable harm *will likely result* absent a TRO.") (emphasis added).  If a plaintiff pleads a non-frivolous claim of wrongful conduct and shows a threat of resulting imminent irreparable harm, a TRO may issue.  *CBS Corp. v. Nat'l Amusements, Inc.*, 2018 WL 2263385, at *3 (Del. Ch. May 17, 2018).

MetTel is also not required to prove actual damages in order to obtain injunctive relief.  *See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Price*, 1989 WL 108412, at *2–4 (Del.Ch. Sept.13, 1989) (irreparable harm shown even though damages resulting from solicitation of plaintiff's customers were incalculable, because one cannot know how customers would have behaved in the absence of defendant's solicitation); *Singh v. Envtl. Assocs., Inc*., 2003 WL 21039115, at *9 (Del. Ch. May 21, 2003) (monetary value of lost customers recruited by former employer was impossible to calculate and constituted irreparable harm in context of a request for injunctive relief).

MetTel has pled facts that demonstrate a probability of irreparable harm in the absence of a TRO.  As explained throughout the Complaint, MetTel has irrefutable evidence that Granite personnel have spread false and misleading rumors ███ ███████████████████████████████████████████ ████████████████████ MetTel has further alleged how these statements damage current and potential customers' trust in MetTel's services and its business,

compromising existing and future relationships in a way that may never be overcome.

Granite incorrectly states that, "[a]ccording to MetTel, out of its entire nationwide customer base, Granite personnel contacted two customers." Ans. Br. at 4. It is true that MetTel only has *hard proof* of two clients targeted by Granite, because those two customers happened to reach out to MetTel with their questions and concerns; however, even this limited evidence suggests the existence of other MetTel customers that have been targeted. *See* (Exhibit B to Complaint). The critical question, and the impetus for expedited discovery, therefore, is how many customers were told these lies and *did not* reach out to MetTel for the truth—and how many of them have been or will be induced to terminate their relationship, or not even consider doing business with, MetTel.

The Complaint pleads specific facts showing it is likely that Granite's efforts will or have extended well beyond these two customers, perhaps to all of MetTel's current clients and its prospective clients: (i) the two clients from whom MetTel has received reports have no relationship to one another; (ii) one of the emails from Granite reveals that it has met with several other MetTel customers; (iii) the apparent involvement of Granite's CEO indicates that this was a high-level, company-wide, coordinated effort, not a one-off incident; and (iv) the messages to MetTel's clients involved different Granite personnel in different geographic regions. These facts go

well beyond proof of "mere apprehension of uncertain damage" and "speculative" fear of irreparable harm.  Ans. Br. at 13 (citations omitted).  They demonstrate that irreparable harm to MetTel's services, business, and reputation are probable and imminent.

Perhaps just as convincing as the facts pled by MetTel is that Granite's answering papers include no evidence refuting any of those facts.  Nor has it submitted affidavits refuting MetTel's repeated assertion that Granite is in the midst of a coordinated campaign to convince MetTel's customers and potential customers ██████████████████████████████████████████ MetTel believes that discovery will prove definitively that Granite has not refuted these allegations because it cannot—because they are true.

Granite is correct that, under some circumstances, monetary damages may be sufficient to compensate a plaintiff for reputational harm due to a defendant's defamatory statements.  Ans. Br. at 22.  That does not mean, however, that equitable relief is foreclosed whenever a plaintiff has suffered harm to its reputation.  Equity may intervene in those cases, such as here, where restraint becomes essential to the preservation of a business or other property interests threatened by other tortious acts.  *Pitman*, 47 A.2d at 724–25.

As shown in MetTel's moving brief and discussed further *infra*, this misconduct constitutes defamation, trade libel, tortious interference, and violations

of Delaware's Deceptive Trade Practices Act, harming MetTel's services, business, and reputation, which cannot be remedied by monetary damages alone.  *See Organovo Holdings, Inc.*, 162 A.3d at 122 ("Courts have recognized that a request for equitable remedies for tortious interference with prospective economic advantage can provide the requisite basis for equitable jurisdiction that can justify a related injunction against future speech."); *see also Bancroft Life & Cas. ICC, Ltd. v. Intercontinental Mgmt. Ltd.*, 456 F. App'x 184, 190 (3d Cir. 2012) (injunction prohibiting tortious interference appropriate); *Horizon Pers. Commc'ns, Inc. v. Sprint Corp.*, 2006 WL 2337592, at *24 (Del. Ch. Aug. 4, 2006) ("The loss of control of reputation, loss of trade, and loss of goodwill constitute irreparable injury."); 6 *Del. C.* § 2533(a) ("A person likely to be damaged by a deceptive trade practice of another may be granted an injunction against it under the principles of equity and on terms that the court considers reasonable.").

Granite's trade libel, tortious interference, and violations of Delaware's Deceptive Trade Practices Act are causing, and will continue to cause, irreparable harm to MetTel's services, reputation, and business operations if a TRO is not issued.

### C.   The balancing of equities strongly favors granting MetTel's requested relief.

Granite's primary argument that the balancing of equities favors denying MetTel's application for a TRO is that injunctive relief would act as an

unconstitutional prior restraint on free speech.  As discussed above, that argument fails on several grounds.

Granite's argument that the requested relief is grossly overbroad also fails in the face of MetTel's second, more narrowly tailored request that Granite be "enjoined from making any false or misleading statements about MetTel or its business operations."

Granite also argues that "MetTel has tools at its disposal to mitigate and even cure any alleged harm without the need for a court order restraining Granite's speech and competition rights."  Ans. Br. at 24.  More easily said than done.  It is far from likely that MetTel would be able to convince every concerned and lost customer and prospect that ███████████████████████████████████████████████ ████████████████████████████████████  More importantly, however, MetTel cannot use the "tools at its disposal" unless it knows the identity of the customers to which Granite made these misrepresentations.  Granite has thus provided a strong argument in favor of expedited discovery so MetTel can determine the scope of its campaign of misinformation.

But even knowing every existing and potential customer to whom Granite made these false and misleading statements, and even with all the "tools at its disposal," MetTel could never entirely undo the damage to its services and business reputation.  As stated in the Complaint, once that seed has been planted, the client

15

will undertake a critical look at a provider with which it had been perfectly happy. There is simply no way MetTel will ever know how far the wind carried Granite's vicious fabrication beyond its immediate recipients, or to assure it can adequately comfort recipients who are already distracted by the exigencies of the pandemic crisis that Granite is exploiting.  The only way to secure any level of control over the deceit is by prohibiting Granite from spreading it further.

Finally, Granite claims that MetTel comes to this Court with "unclean hands" because MetTel's Chief Operating Officer, Andoni Economou, "ordered" a MetTel Senior Vice President, Tim Hanley, to ███████████████████████████████ ████████████████████████████████████  Ans. Br. at 7, 25–26.  This is untrue.

Unclean hands "is a doctrine designed to protect the integrity of a court of equity, not a weapon to be wielded by parties seeking to excuse their own inequitable behavior by pointing out a trifling instance of impropriety by their counterpart." *Portnoy v. Cryo-Cell Intern., Inc.*, 940 A.2d 43, 81 (Del. Ch. 2008).  The doctrine of unclean hands bars the claim of a plaintiff in equity when the plaintiff has engaged in "reprehensible conduct" that bears a direct, immediate and necessary relation to the matter in controversy before the court.  *Nakahara v. NS 1991 Am. Trust*, 739 A.2d 770, 791–92 (Del. Ch. 1998).

Here, there is no evidence of any wrongdoing by MetTel, let alone the kind of reprehensible conduct necessary to warrant a finding of unclean hands.  A review of the source of this accusation—a statement in an email exchange found at Exhibit C to the Complaint—shows that the "clear implication" Granite draws from the statement is anything but.  The exact quote is as follows: ███████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████ This was not Mr. Economou "ordering" or "directing" Mr. Hanley to spread the rumor that ███████████████

█████████████████████████ Mr. Economou was merely recounting something he had heard indicating that it is Granite, and not MetTel, that ███████████████ Mr. Economou did not intend that statement as an order or directive to Mr. Hanley, and Mr. Hanley did not understand it that way.  *See* Declarations of A. Economou and T. Hanley.  Accordingly, Mr. Hanley did not pass the information along to this, or any other, customer.  *See* T. Hanley Decl.

The balance of equities clearly favors entry of a TRO enjoining Granite's tortious conduct.

### D.  The Complaint asserts colorable claims for relief against Granite.

MetTel's Complaint and moving brief show that it easily clears the relatively low bar of asserting at least one colorable claim.  *Arkema Inc. v. Dow Chem. Co*.,

████████████████████████████████████████

██████████████████████████████████████████████████████████

2010 WL 2334386, at *3 (Del. Ch. May 25, 2010) (citation omitted); *Allen v. News Corp*., 2005 WL 415095, at *1 (Del. Ch. Feb. 3, 2005) (plaintiffs seeking expedited proceedings need only show that their claims are "sufficiently colorable" and that "there is the possibility of a threatened irreparable injury."); *Morton v. Am. Mktg. Indus. Holdings, Inc*., 1995 WL 1791090, at *2 (Del. Ch. Oct. 5, 1995) (court determining whether plaintiff merits expedited proceedings does not judge the merits of the case or "even the legal sufficiency of the pleadings.").

### 1. Granite's statements to MetTel's customers are neither true nor reasonable statements based on known facts.

Cutting across all of Granite's arguments that MetTel has not pled even one colorable claim is its assertion that the statements its personnel made about MetTel's ███████████████████████████████████████████ Ans. Br. at 3.  *See also* Ans. Br. at 8–12, 32–33, 37.  But they *are* untrue, and a review of Granite's exhibits shows that it did not have a single fact that provided a reasonable basis for the statements.

Granite points first to evidence that a handful of other telecom companies are ███████████████ Ans. Br. at 9.  But the existence of other competitors known to be██████████████████████████████████████████████ ████████████████████████████████████████████

18

Granite next relies on its Exhibits 2 and 3 as evidence that Mr. Easton had a

reasonable basis for telling MetTel's customer that MetTel ████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

The fact that MetTel had ████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████  ██████████████████████████████████████

████████████████████████████████████  ██████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████  That information, therefore,

does not supply any facts upon which Granite could form a reasonable belief that

████████████████████████████████████████

      ████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████████████  ████████████████████

████████████████████████████████████████████████████████████████

---

2 ██████████████████████████████████████████████████
████████████████████████████████████████
█ ██████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
19
      ████████████████████████████████████████████████
████████████████████████████████████████████████████████████████

████████████████████████████████████████████████ A sophisticated business

entity like Granite understands this.

Not only do these documents not support Mr. Easton's statement that MetTel

is ████████████████████████████████████ there is no indication that he

was even aware of these documents or based his statement in any way on them.

Granite next claims that MetTel recently ████████████████████████████

████████████████████████████████ Ans. Br. at 11.  But the Declaration

of Mr. Balestraci and the emails attached thereto as exhibits show nothing of the

kind.  They show that MetTel ████████████████████████████████████████

████████████████████████████████████████████████████████████To

quote the exact language used by MetTel in that email:

████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
██████████████████████████████████

─────────────────────

████████████████████████████████████████████
██████████████████████ █ ██████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
█████████████████████████████████

20

████████████████████████████████
██████████████████████████████████████████████

Balestraci Cert. Ex. A (April 14, 2020 email from Salame (MetTel) to Balestraci (Granite)).  Nothing in this email supports Granite's assertion that ███████████

████████████████████████████████████████████████████████████████████████

And true to form, Granite indicated it had no interest in helping out its own customers who are hurting during the current crisis.  *See* Balestraci Ex. B, April 28, 2020, email from Sullivan (MetTel) to Ballestraci (Granite) ("Knowing Rand's unlikely desire to offer anything (i.e.; 'why would I want to help them?'), I cannot think of anything else that would provide immediate benefit that customers are looking for.").[4]

Granite also points to the Declaration of its Director of Carrier Relations, Geoff Cookman.  But that evidence likewise does not support Granite's assertion that the statements made about MetTel's ████████████████were true.  Mr. Cookman recounts only that Mr. Sullivan of MetTel inquired whether Granite would be willing to ███████████████████████████████████████████████████████

██████████████████ Cookman Decl., ¶ 7. ████████████████████████████

---

[4] Despite the fact that nothing in MetTel's inquiry indicated that it was looking for ███████████████████████████████████ Mr. Ballestraci offered this decidedly unhelpful yet perplexing response:█████████████████████████████ ████████████████████████████████████████████████████████████████████ ███████████████████████████ Balestraci Ex. B, April 28, 2020, email from Ballestraci to Sullivan.

████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████

████████████  *Id.* at ¶ 8 (emphasis added).   Unless Mr. Sullivan believed that

Granite  was ████████████████████████████████

████████████

Moreover, these emails were generated *after* Granite began its campaign, as

there is no indication that Mr. Easton based his statements on either the information

recorded in the Ballestraci Declaration and exhibits, or in the Cookman Declaration.

Nor is there any indication that information was even shared with him.   That

evidence, therefore, does not show that Mr. Easton's statements about MetTel's

████████████  were true, or even that they provided him with a reasonable basis to

make those statements.

Finally, Granite attaches the Declaration of its Vice President of Channel

Sales, Charles Pagliazzo, who recounts that some unidentified MetTel sales agent in

an undated conversation informed him that MetTel ████████████████

████████████████████████████████████████

████████████████  Irrespective of whether Mr. Pagliazzo was actually

given this information by an unidentified sales agent, it is not true.  A. Economou

Decl.

22

████████████████████████████

████████████████████████████████████████

Granite has provided no evidence that it has a reasonable basis to believe that the misrepresentations it is spreading ███████████████████████████ As such, those misrepresentations form a valid basis for MetTel's claims in this lawsuit.

### 2.    MetTel's Complaint states a colorable claim for defamation.

Granite incorrectly argues that this Court does not have jurisdiction to adjudicate MetTel's defamation claim because whether a defendant made a false statement and whether it did so with actual malice is a jury issue in the first instance. Ans. Br. at 28–30 (citing *Perlman v. Vox Media, Inc.*, 2019 WL 2647520, at *1 (Del. Ch. June 27, 2019)).

Notwithstanding its findings in *Perlman*, this Court will issue injunctive relief for defamation claims if the defamation furthered another claim that independently warranted injunctive relief. *See, e.g.*, *Pitman*, 47 A.2d at 725 ("When, however, a court of equity has jurisdiction on some grounds, the American courts will also usually enjoin the continued publication of a trade libel incident thereto. That is true when the libel is accompanied by some act of unfair business competition, if irreparable damage is imminent."). As described above, in *Pitman*, the defendant sought a preliminary injunction prohibiting further publication of defamatory letters by the plaintiff. The court issued the requested injunction, concluding that "intimidating possible customers . . . should they deal with the complainant, comes within the necessary conclusion . . . that a continued course of wrongful action may

23

███████████████████████████

████████████████████████████████████

ordinarily be stopped by injunction, although it includes a trade libel." *Id.* at 726 (internal quotation marks omitted).  Granite's efforts ███████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████  fall into the same category.

Similarly, in *Organovo Holdings*, the Court noted: "Courts have recognized that a request for equitable remedies for tortious interference with prospective economic advantage can provide the requisite basis for equitable jurisdiction that can justify a related injunction against future speech." *Organovo Holding*, 162 A.3d at 122.  MetTel brings such a claim against Granite, and correctly alleges that there is no adequate remedy at law. *See* Compl., Count II.

Granite next argues that the challenged statements were not defamatory.  Ans. Br. at 30–33.  But MetTel has already shown that Granite's statements were untrue, had no valid factual basis, and were motivated by a malicious intent to drive customers away from MetTel's services and toward Granite's services.

Granite likewise gets no traction from the argument that a customer's report that a Granite employee (presumably Mr. Easton) told them that MetTel was ███████

███████████████s not actionable defamation because it is a paraphrase.  Ans. Br. at 32.  Delaware law only requires a plaintiff to allege "the substance of the defamatory statements," not the exact words used. *See, e.g.*, *Conley v. Conley*, 2015 WL

7747431, at *1 (Del. Super. Ct. Nov. 19, 2015) ("At a minimum, the plaintiff, in a defamation suit must identify the substance of the defamatory statements and whether they were actually published."); *Smith v. Delaware State Police*, 2014 WL 3360173, at *7 (Del. Super. Ct. July 8, 2014) (same). MetTel's allegation provides the substance of the defamatory statement, identifies when the conversation took place, and the two entities involved.

Mr. Easton declares that he has no memory of ever saying that MetTel ███ ████████████████████████████ Easton Decl., ¶ 7. Significantly, he does not say that he never *made* the statement, only that he does not *recall* making the statement. He also does not deny that he made the customer call recounted in the email, and he does not deny that he told the customer something that it could have reasonably understood to mean that MetTel ████████████████ Accordingly, even if ████████████████ is a paraphrase of what was communicated to the customer by Granite, it still forms the basis for a valid defamation claim.

Finally, the statements at issue are not pure opinions, as Granite suggests. Ans. Br. at 31–32. While expressions of pure opinion are not actionable as defamatory, this "does not provide a 'wholesale defamation exemption for anything that might be labeled opinion.'" *Kanaga v. Gannett Co.*, 687 A.2d 173, 177 (Del. 1996) (quoting *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 18 (1990)). "A statement is not a protected opinion simply because it contains 'colorful language,

catchy phrases or hyperbole.'" *Ramunno v. Cawley*, 705 A.2d 1029, 1038 n.34 (Del. 1998) (citation omitted).

Moreover, when an opinion is accompanied by "'the facts upon which [the declarant] bases his opinion, and those facts are either *incorrect* or *incomplete,* or [the declarant's] assessment of them is erroneous, the statement may still imply a false assertion of fact. Simply couching such statements in terms of opinion does not dispel these implications.'" *Kanaga*, 687 A.2d at 177–78 (quoting *Milkovich*, 497 U.S. at 17) (emphasis added). Thus, a "speaker may not insulate himself or herself from liability simply by phrasing defamatory statements as opinions where an imbedded defamatory fact may be inferred." *Ramunno,* 705 A.2d at 1036. Whether a statement implies a false assertion of fact is examined from "the entire context of the published statements, considered from the viewpoint of the average reader." *Sunstar Ventures, LLC v. Tigani*, 2009 WL 1231246, at *7 (Del. Super. Apr. 30, 2009) (quoting *Kanaga*, 687 A.2d at 179).

Here, at no point did Mr. Easton employ phrases like "I believe" or "in my opinion," which, although insufficient to prove opinion by themselves, may indicate to the hearer that the declarant is stating his personal opinion. Rather, the email contains declarative statements relaying information █████████████

████████████████████████████████████████

Compl. ¶ 20.  Based on the plain language alone, the average reader would not and could not conclude that any of these statements are Easton's "opinions."

Moreover, these statements also imply that Easton and Granite have access to ██████████████████████████████████████████████████████ *See Ramunno*, 705 A.2d at 1036 (statement defamatory where factual basis for statement is not disclosed by declarant).  Indeed, the customer here was left to speculate as to the facts upon which the statements were made.  Granite knows that a customer receiving such information during the current crisis is even more likely to assume it is based on facts and believe it. ████████████████████████████████████████

████████ That alone makes these statements defamatory.

### 3. The Complaint states colorable claims for Tortious Interference and Trade Libel.

As shown in MetTel's moving brief, the Complaint states colorable claims for Tortious Interference and Trade Libel.  Opening Br. 12–15.  Granite's arguments against this proposition—that there is evince of only two impacted customers, that allegations that the campaign extended far beyond these two customers are pure speculation, and that the statements at issue are non-actionable opinions (Ans. Br. at 7–8, 21, 28)—have been addressed and refuted above.

### 4. MetTel has pled a colorable claim for violation of Delaware's Uniform Deceptive Trade Practices Act.

Granite incorrectly asserts that: "[T]he [DTPA] is not available to litigants who cannot show any evidence of wrongful conduct or injury taking place in Delaware."  Ans. Br. at 33 (quoting *Ninespots, Inc. v. Jupai Holdings, Ltd.*, 2018 WL 3626325, at *13 (D. Del. July 30, 2018) (citing *Guidance Endodontics, LLC v. Dentsply Int'l, Inc.*, 663 F. Supp. 2d 1138 (D.N.M. 2009))).  This is an inaccurate statement of Delaware law.  First, the *Ninespots* court cited to a District of New Mexico case precisely because "there is a lack of Delaware case law regarding this specific issue."  *Ninespots*, 2018 WL 3626325, at *13.  Moreover, the court in *Ninespots* did not actually address the issue, nor confirm that the holding of *Guidance Endodontics* is consistent with existing Delaware law.  *Id.* ("I do not need to decide whether the Act can apply if the actions and injury did not take place in Delaware, because Plaintiff is unable to meet one of the other requirements for standing under the Act.").

Granite's other arguments—that the DTPA does not apply because this case involves only three isolated statements, and because MetTel's common law claims are not colorable (Ans. Br. at 33–35)—have been addressed earlier and refuted.

### E. These proceedings should be expedited.

Granite's primary arguments against expedition are that MetTel's claims are "weak" and that there is no evidence that imminent irreparable harm is likely without

emergent injunctive relief.  Ans. Br. at 36–37.  There is no need to address Granite's arguments here, as they have been thoroughly addressed above and in MetTel's moving brief.   Moreover, a plaintiff seeking expedited proceedings need demonstrate only "a *sufficient possibility* of threatened irreparable injury." *Giammargo v. Snapple Beverage Corp.*, 1994 WL 672698, at *2 (Del. Ch. Nov. 15, 1994) (emphasis added).  The court conducts only "an almost superficial factual assessment" of the bad acts.  *Cty. of York Employees Ret. Plan v. Merrill Lynch & Co.*, 2008 WL 4824053, at *6 (Del. Ch. Oct. 28, 2008).  MetTel has pled colorable claims and shown more than a sufficient possibility of threatened irreparable injury.

Granite's only other argument against expediting these proceedings is the "substantial burden it will impose on Granite and the Court."  Ans. Br. at 38.  Granite reasons that, "[e]ven in normal times," proceeding on an expedited basis would be difficult and expensive, given that party and third-party witnesses and documents are located "around the country—both the MetTel customers identified in the Complaint and other customers MetTel 'believes' were contacted by Granite—in order to determine who Granite spoke with, the circumstances of those communications, the precise content of Granite's statements, whether and how MetTel's customers reacted to those communications, and any communications those customers received from MetTel."  *Id.*

Granite exaggerates the burden on the parties and the Court.  The number and identity of the MetTel customers and potential customers who received false and misleading information on ████████████ from Granite can be discovered in short order via focused interrogatories and document requests to Granite.  To the extent those communications were via email or text, they too can be easily gathered and produced.  Only once that information is produced can the parties determine the necessity of deposing the declarants and recipients of the offending communications and seeking the production of documents from third parties.  It may be that only a handful of depositions and third party productions are needed, or it may be that several are needed.  But this Court should not decline to expedite these proceedings based solely on Granite's unsubstantiated concerns that discovery will be onerous.

But if initial discovery reveals that, as MetTel believes, the scope of Granite's nefarious campaign is very broad, Granite cannot be heard to complain that the discovery burden on it will be too great.  It should have considered that before it began the campaign.

Remarkably, Granite suggests that the proceedings should not be expedited because "[t]hese are not normal times."[5]  Ans. Br. at 39.  *But it is precisely because*

---

[5] These may actually be particularly opportune times for discovery that ranges over a wide geographic area, inasmuch as depositions, document productions, and court conferences are generally taking place remotely at this time.  Parties, counsel, and the courts are equipped for this new reality, and gathering documents and taking

30

*these are not "normal times" that we are here in the first place*.  Granite chose to capitalize on these "not normal" times, using the current crisis as the backdrop for its campaign ███████████████████████████████████

████████████████████████.  It would be the height of injustice to delay the proceedings until "normal" times resume (which may still be many months in the future), and thereby allow Granite to finish using the COVID-19 pandemic to its own contemptible advantage.[6]

## III.   CONCLUSION

For the foregoing reasons and those expressed in MetTel's moving brief, MetTel respectfully requests that the Court grant its Motion for a Temporary Restraining Order and Motion to Expedite.

---

depositions across the country is no more difficult or expensive right now than if all witnesses and documents were in the same state.

[6] Granite cites three recent cases in which the court declined to expedite proceedings because of the coronavirus pandemic.  Ans. Br. at 39 (citing *Snow Phipps Grp., LLC v. KCake Acquisition, Inc.*, C.A. No. 2020-0282-KSJM (Del. Ch. Apr. 17, 2020); *The We Co. v. Softbank Grp. Corp.*, C.A. No. 2020-0258-AGB (Del. Ch. Apr. 17, 2020); *Conduent Business Servs., LLC v. Sky View Capital, LLC*, C.A. No. 2020-0232- JTL (Del. Ch. Mar. 30, 2020).  But none of those cases involved a defendant that was actively *using the pandemic* to harm a competitor's business and asking the court to not to expedite *because of the pandemic*.  Nor is there any indication in those opinions that the court would have declined to expedite in these circumstances.

Dated: June 1, 2020

**K&L GATES LLP**

*/s/ Steven L. Caponi*
Steven L. Caponi (No. 3484)
Matthew B. Goeller (No. 6283)
600 King Street, Suite 901
Wilmington, DE 19801
Phone: (302) 416-7000
steve.caponi@klgates.com
matthew.goeller@klgates.com

*Of counsel:*

Anthony P. La Rocco, Esq.
Dana B. Parker, Esq.
Charles F. Rysavy, Esq.
K&L Gates LLP
One Newark Center, Tenth Floor
Newark, NJ 07102
anthony.larocco@klgates.com
dana.parker@klgates.com
charles.rysavy@klgates.com

*Counsel for Plaintiff Manhattan
Telecommunications Corp.*

Words: 7,559